# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 2:14-cv-05706

DANIELLE M. TRAMANTANO and DANIEL GILMARTIN and ANTHONY PASCALE, Plaintiffs,

vs.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Defendant.

DEPOSITION OF: MICHAEL R. COAN

---------------------------

T R A N S C R I P T of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before KAREN L. OLIVEIRA, a Certified Court Reporter and Notary Public of the State of New Jersey, held remotely, on Tuesday, August 11, 2020, commencing at 11:00 a.m.

REPORTING SERVICES ARRANGED THROUGH:

SENTRY COURT REPORTING
&
LITIGATION SERVICES, LLC
100 Hanover Avenue - Suite 202
Cedar Knolls, New Jersey 07927
Phone: (973) 359-8444

A P P E A R A N C E S:

COFFEY KAYE MYERS & OLLEY
BY: LAWRENCE A. KATZ, ESQ.
Two Bala Plaza, Suite 718
Bala Cynwyd, Pennsylvania 19004-1514
Attorneys for Plaintiffs

RUPRECHT HART RICCIARDULLI AND SHERMAN, LLP
BY: ALEXANDER B. STOCKDALE, ESQ.
53 Cardinal Drive
Suite 1
Westfield, New Jersey 07090
Attorneys for Defendants



I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL COAN | | | | |
| BY: MR. STOCKDALE | 4 | | 97/108 | |
| BY: MR. KATZ | | 83 | | 105/115 |


E X H I B I T S


| EXHIBIT | DESCRIPTION |
|---|---|
| A | Mr. Coan's 11/16/17 Report |
| C | Google Map of New Jersey Transit system |
| D | Excerpt of Chris Zapille's deposition transcript, page 18 |
| F | Excerpt of Anthony Pascale's deposition transcript, page 30 |
| H | CAD Blotter |
| I | Excerpt of Lieutenant Mooney's deposition transcript |


(Exhibits attached to transcript)



M I C H A E L R. C O A N, residing at 368 Southwest Squire Johns Lane, Palm City, Florida 34990, sworn.

DIRECT EXAMINATION BY MR. STOCKDALE:

Q. Good morning, Mr. Coan. I introduced myself earlier, my name is Alex Stockdale. I represent defendant New Jersey Transit in this lawsuit filed on behalf of Danielle Tramantano and Daniel Gilmartin and my understanding is that you have been named as an expert in this case and you have issued a report. Is that correct?
A. That's correct.
Q. And is your report dated November 16, 2017, the only report that you have issued in this case?
A. Yes.
Q. Okay. As we sit here today, do you have any plans or is it in the works to serve any supplemental report?
A. Not at this time.
Q. Okay. And does your report dated November 16, 2017, contain all of the opinions that you hold in this case?



A. Based on the information I had at the time, correct.
Q. And if the -- strike that.
If the information that you based your opinions on at the time you wrote your report were to change, is it fair to say that your opinions might change as well?
A. That would be fair.
Q. Okay. Have you ever been deposed before?
A. Yes.
Q. When was the last time?
A. Oh, about one year ago.
Q. Okay. Could you estimate for me how many times you have been deposed?
A. Between my private consultations and my police department career, I would say about 15 times.
Q. Okay. During your career did you ever testify in court?
A. Yes, I did.
Q. And can you estimate for me how many times you have testified in court?
A. I would say about five times. Those were criminal court.
Q. Right, I understand. Have you ever

testified in any court as an expert?
A. Other than a deposition, no.
Q. Okay. So you have never been qualified by a judge as an expert in any particular discipline and then testified before a jury. Is that correct?
A. Correct.
Q. Okay. So I'm going to dispense with the normal deposition instructions if that is okay with you. I think it is just important, because we are doing this via Zoom videoconference, maybe it makes sense for you to take an extra half second pause in between my questions and your responses which is going to help me, you and also Karen, the court reporter, out. Do you understand that?
A. I agree. Understood.
Q. Great. Do you have your report in front you?
A. I do.
Q. Okay. Are you able -- let me ask you this first, how long have you been doing expert work like securities or police expert work?
A. So I retired from the MTA police in January of 2017 and shortly thereafter I was engaged as an expert witness by the current firm that I'm testifying for.



Q. Okay. And, approximately, how many times have you been retained by Mr. Katz' firm to act as an expert?
A. I believe it is three times.
Q. And do you know the names of those other matters?
A. Not off the top of my head, no.
Q. Okay. Did you give depositions in all three of those cases?
A. I did not.
Q. Okay. Can you estimate for me how many expert matters that you have been retained to opine on in total?
A. Approximately, six.
Q. Okay. And do you have an understanding of where those cases are venued, meaning the locations of the courts?
A. I believe the other cases I'm involved with is -- well, they are actually with the Port Authority of New York and New Jersey, so I'm not certain if it is New Jersey courts or New York courts.
Q. Okay. Do you have an understanding whether it's a federal or state court?
A. I believe one was state and one was



federal.
Q. Okay. Understood. Now, I don't want to hear about any conversations that you have had with Mr. Katz or Mr. Myers, but what physical documents did you review in anticipation for today's deposition?
A. The documents that are listed on the reports are the only ones that I have reviewed.
Q. Okay. And you have your report in front of you, correct?
A. I do.
MR. STOCKDALE: Just for the record, Larry, I have some exhibits that I might show him. I don't need to put his report on the screen right now, but I marked it as Exhibit A.
MR. KATZ: Okay, thanks.
Q. Now, Mr. Coan, I'm looking at Page 3 of Exhibit A, which is your only report in this case. It lists various documents there. Is that correct?
A. Correct.
Q. Are those all of the documents that you reviewed in anticipation -- excuse me, in forming the opinions in forming your report?
A. Those would be the only documents. The only other information which I believe I did not list



was just Google search for some items.
Q. Okay. And what information, if anything, did you get from your Google search?
A. Information about the event that took place on January 21st at the Colombian festival.
Q. Okay. On Page 4 of Exhibit A, item L says "other items produced in discovery." Is there a reason that that category is placed there? Does it represent any particular documents?
A. No. When I received the documents, I just wanted to make sure that I covered everything so if I missed something, I put that in.
Q. Okay. And did you review all of the depositions in this case?
A. The depositions that are listed, correct.
Q. Okay. Well, I'm looking on Page 4, item K, it just says "deposition transcripts of testimony." So am I to assume that you read all of the depositions or some of them?
A. I read all of the depositions that I was provided. I did not list them separately at the time. I was provided the depositions of the plaintiffs and by the law enforcement individuals that were deposed.

Q. Okay. Mr. Coan, on Page 3 of your report, I'm looking under the heading that is titled "Operating assumptions." Let me know when you have that page in front of you, please.
A. I have it.
Q. Okay. I believe it's the third sentence that says, "It is based upon my review of listed items supplied to me by Coffey Kaye Myers and Olley as well as my own documents pertaining to police practices and procedures." Do you see that sentence?
A. I do.
Q. Did I read that correctly?
A. Yes, you did.
Q. Okay. My question is, it says your own documents pertaining to police practices and procedures. What documents are those?
A. I've read numerous manuals on police operations and supervision throughout my 35-year career, including policies and procedures to do with police departments such as the NYPD and the Metropolitan Transportation Authority Police Department. Those are the types of items that I was referring to.
Q. Are there any citations to any specific manuals, policies or periodicals that you have read



cited in your report?
A. No.
Q. Okay. I know that you mentioned you have been retained on a few other expert matters. Have you ever been retained on a case like this one? What I mean by that, a case where there is allegations of improper police response time and police, I guess, staffing levels.
A. Yes, I have.
Q. Okay. And what case is that?
A. Again, off the top of my head, I don't recall names of the plaintiffs, but it was similar cases, a similar case where employees were the victim of criminal actions where there was no safety or security or police presence.
Q. And is that case involving New Jersey Transit employees or some other Metro authority?
A. New Jersey Transit.
Q. Okay. Is that case still ongoing?
A. Correct.
Q. Okay.
A. To my knowledge.
Q. Have you already issued a report in that case?
A. In one case I have issued, I believe it



was, a preliminary report. In another case a report is pending.
Q. Understood. So first off, what facts and evidence or what documents have you reviewed that show -- strike that.
Let me ask you this, can we agree that the assailants, the perpetrators, the individuals who assaulted the train crew were not New Jersey Transit employees?
A. Based on the information I have, to the best of my knowledge, I would agree.
Q. Okay. So the plaintiffs in this case were assaulted by some third parties that are not connected or related to New Jersey Transit. Is that right?
A. To my knowledge, correct.
Q. And would you agree that they bear primary responsibility for assaulting the crew?
A. For the actual assault?
Q. Right.
A. Correct.
Q. What information in the records that you reviewed shows or indicates that the assailants who assaulted the crew in this case actually attended the Colombian Day Parade?



A. I do not have any information on that.
Q. Okay. Then what forms the basis of your opinion that with better planning and security related to the Colombian Day Parade that the assaults could have been prevented?
A. Based on the crowd conditions that a festival, such as the Colombian festival, would cause at the Elizabeth Street Station, based on prior history of the festival it's noted as one of, if not the, largest in the east coast. In prior years train service would have indicated a larger ridership, that and the prior train that went through the station called in that there was a large crowd on the platform. So there was that information from the prior train crew and then it was almost ten years of a history of this festival taking place at that location.
Q. Can we agree that the plaintiff's train stopped in other stations after Elizabeth, but before it got to Perth Amboy?
A. I don't recall exact stops.
Q. Okay. Do you understand that Perth Amboy was the eventual station where the police responded to in the train stop?
A. It's correct that the Perth Amboy police

responded and made a number of arrests, correct.
Q. Okay. Let me show you, hold on a second here. I apologize, I have three screens working here.
Mr. Coan I would like to show you what I've marked as Exhibit C, which is a map of the New Jersey Transit system.
A. I can see it.
Q. I know it's a little small, but can you see the bottom center area it says Elizabeth Station?
A. Right, I see Elizabeth and then the one before it is Linden. Am I looking at the right one?
Q. Yes, but I believe this train was going in the opposite direction, it would have been Elizabeth, Linden, Rahway. I don't know if it stopped at Avenel.
MR. KATZ: Alex, excuse me, just to help us when we read the record, can you refer to the color of the line on the map and that will help us for the record.
MR. STOCKDALE: That makes a lot of sense, Larry, thanks.
Q. So Mr. Coan, looking at the blue line, the darker blue line towards the middle of the page that starts at Newark Penn then travels down towards



the bottom of the picture, do you see that line?
A. I do.
Q. And do you see that Elizabeth Station is one of the stops on that line?
A. I do.
Q. And then do you see that there are a couple stops in between Elizabeth Station and Perth Amboy?
A. I do.
Q. Okay. Now, if the assailants in this case, the perpetrators who assaulted the plaintiffs, got on at any of those other stops after Elizabeth, but before Perth Amboy, could we agree that increased security as of Elizabeth Station would have had no effect on the incident?
A. Can you just repeat that.
Q. Sure. I apologize, it is a long-winded question. Could we -- we have established that there is stops in between Elizabeth and Perth Amboy, correct?
A. Correct.
Q. Okay. Now, if the assailants in this case got on, let's say, at Linden, could we agree that increased crowd control measures at Elizabeth would have had no effect on them?



MR. KATZ: I'm going to object to the question. You can answer them.
A. So the question is, if the assailants didn't board at Elizabeth, but boarded at a different station, in this case Linden?
Q. Correct, Linden, Rahway or any of the stations in between Elizabeth and Perth Amboy.
A. In answer to that particular question, if Elizabeth was the only station that had additional police resources and/or security, then that would be correct.
Q. Okay. And we're talking about Elizabeth Station in this case because adjacent to the station was where the Colombian Day Parade was on this day, correct?
A. To my knowledge, correct.
Q. And you are not aware of any other large events or anything going on between Elizabeth Station and Perth Amboy that would have required additional police security at those stations. Is that correct?
A. Well, it wasn't part of my review, so I'm not aware.
Q. Okay. And just to clarify, in summation, do you have any evidence to show or any facts that you are aware of that actually say that



the assailant in this case attended the Colombian Day Parade and boarded the train at Elizabeth Station?
A. I do not have that.
Q. Okay. In your review, do you recall reading the deposition of a trainman by the name of Chris Zapille?
A. I would have to review. Off the top of my head. . .
Q. Let me go to your report then. I'll take Exhibit C off the screen. If we could go to Page 4 on your report, which is Exhibit A.
A. Okay.
Q. The middle of that first paragraph there under "Case Summary" talks about Chris Z-a-p-i-l-l-e, Zapille. Do you see that?
A. Correct, yes.
Q. So what is your understanding of the report by Chris Zapille in this case?
A. So my understanding, to the best of my recollection, is he was on the prior train that passed Elizabeth Station and as stated in the report radioed into communications, in this case Amtrak communications, because he witnessed an overcrowding at Elizabeth Station and that they were, in fact, unruly. That was an indicator that there was a

potential situation arising or at least a crowd control situation at Elizabeth Station.
Q. Do you have a specific recollection of where the information came from that the crowd was unruly?
A. I do not, other than -- no, I do not.
Q. Okay. I'm going to show you --
MR. STOCKDALE: Larry, this is an excerpt from Mr. Zapille's deposition.
MR. KATZ: Okay.
MR. STOCKDALE: This is Page 18.
MR. KATZ: Thank you.
Q. Mr. Coan, if you could just read the information from Mr. Zapille's deposition on this page and just let me know when you have had a chance to review it.
A. I'm starting at line 6?
Q. Yes.
A. I have line one now to 17, I could start reading that?
Q. Yup, and let me know when you are done and I'll pull the screen down. Take your time.
A. Yeah, it starts with an answer. I'm not sure what the question is.
MR. KATZ: Alex, do you want the witness



to start at line 1 with the answer or do you want to have the question on the bottom of Page 17?
MR. STOCKDALE: Really it's the middle of that that I'm getting at. I wanted to let him read the whole page for completeness.
A. I'm down to 17, I read that. I read up to line 25.
Q. If we take a look at Exhibit D, Page 18, lines looks like seven through 11, Mr. Zapille responds to a question and he says, "A lot of people on the platform, on the yellow line. And that was it."
Now Mr. Zapille is speaking about his observations that he made when his train went through Elizabeth Station. Is that correct?
A. Correct.
Q. Anywhere in that statement does Mr. Zapille -- strike that.
Does Mr. Zapille say anywhere in that statement that the crowd was unruly?
A. In that particular line or in the statement?
Q. On that page in particular for now.
A. Well, line 12 he's questioned, "What did you do about that?" Then line 13, "I called Amtrak



CETC-9 and let him know that there were a lot of people there and that the amount of people were getting out of hand and they needed to get somebody there. My concern was somebody getting hurt, somebody getting hit."
Q. First of all, let me ask you this, does Mr. Zapille use the word "unruly" there?
A. No, he used the word or phrase "getting out of hand."
Q. Okay. And to your -- based on your review of all of the records in this case, does anybody say that the crowd at Elizabeth Station was getting unruly prior to the plaintiffs stopping at the station on that day?
A. Not to my recollection.
Q. Okay. So then the word "unruly," that would be your word, correct?
A. Correct.
Q. Okay. And when Mr. Zapille is saying on line 15 and 16 that the amount of people were getting out of hand, he says that his concern was that somebody would get hit, something would get hit.
A. Somebody getting hurt, someone getting hit.
Q. Is it fair to say he's talking about



safety issues related to the amount of people on the platform? Is that right?
A. We can assume that.
MR. KATZ: Objection to the question. I think the words speak for themselves. You can answer the question. The objection is on the record.
MR. STOCKDALE: I didn't know if you needed to take that call.
A. Can we repeat the question.
Q. I'll ask it fresh. Mr. Coan, based on the testimony of Mr. Zapille that we just reviewed that's been marked as Exhibit D, does he say anywhere that the crowd was getting unruly?
A. No, getting out of hand, correct.
Q. Is it a fair summation of his statements that he was concerned about overcrowding on the platform and that's what he reported?
A. Well, it's fair that one of his concerns was overcrowding, correct.
Q. Can we agree that the safety concerns from overcrowding are different from the safety concerns of unruly, boisterous or violent passengers? Can we agree those concerns are different?
A. They can be viewed as different, but one could cause another. Overcrowding can cause unruly

behavior.
Q. Is there any way to predict which crowd will erupt into violence and which crowd won't?
A. There is not.
Q. Okay. Do you hold any opinions in this case contained in your report having to do with New Jersey Transit Police's response to Mr. Zapille, you know, I guess dispatch reporting?
A. I believe what I mentioned in the report was based on that initial call, there was no response.
Q. Okay. That's based on your review of all of the materials. Is that correct?
A. Correct.
Q. And what would the standard of care in Transit policing require the police agency to do in response to a call like that?
A. An overcrowding condition?
Q. Right.
A. Based on my experience, you know, you are worried about a number of things; overcrowding, people fall into the train tracks, people rush the train because of the fear that the train is going to fill up and I'm not getting on the train that I wanted. So a police response to go and, at least,



assess the situation and contact rail traffic control to see if they are going to be able to accommodate this amount of passengers, if not, if New Jersey Transit has a plan of action of how to accommodate an excess amount of passengers and, again, respond, assess the situation, take the necessary precautions.
Q. Okay. I heard some stuff about administrative duties, but I'm going to focus on the policing aspect because that's where your expertise lies. Correct?
A. Correct.
Q. In terms of the police response, what police response was absolutely required, at minimum, to respond to a call like that?
A. If they are notified of a crowded condition on one of the platforms and they are the police department of record, at a minimum, a police officer or somebody should respond just to assess the situation, you know, it would be as simple as I'll check and advice and let that officer make the opinion as to what steps needed to be taken going forward.
Q. If New Jersey Transit dispatched an officer to Elizabeth Station in response to Mr. Zapille's call, that would meet the standard of care,



correct?
A. Just for an initial call, correct.
Q. Okay. Can you see what's on my screen now that I have marked as Exhibit I?
A. Correct. Starts at line 11?
Q. Yes. This is an excerpt from the deposition of Lieutenant Mooney. Do you recall reading his deposition?
A. I do.
Q. Okay. This is marked as Exhibit. I?
MR. STOCKDALE: Larry, it starts on page 69.
MR. KATZ: Thanks.
Q. Okay. Can you read Officer Mooney's question and response on lines 14 to 19, please. Let me know when you have had a chance to review it.
A. I read it.
Q. Okay. And can we agree that based on Lieutenant Mooney's sworn deposition testimony under oath that he said Officer Giovanonne, which is the officer that responded to this event, was dispatched to Elizabeth and then re-routed when they got a report of the assault on the train? Is that fair to say?
A. That's fair.



Q. Okay. And based on what you told me earlier, I can assume that New Jersey Transit met the standard of care in policing by dispatching a unit to Elizabeth Station in response to that call. Is that correct?
A. Well, they met part of it, the dispatch. He never arrived.
Q. Okay. Was it -- let me break that down then. I believe your report says that nobody was dispatched to Elizabeth Station. We can agree that's not correct, right?
A. Well, I think, I believe, that I mentioned that it was dispatched, but there was no record that he ever arrived.
Q. Okay. Then in this situation when an officer is dispatched to an overcrowded train platform and en route to that assignment he gets word that there is actually an assault on a moving train, is it reasonable for that officer to divert his attention from the overcrowded platform and respond to the assault on the train?
A. If that officer is the only officer available, that would be the course of action.
Q. Okay. So then based on Lieutenant Mooney's testimony, New Jersey Transit acted

Page 26

reasonably when it first dispatched Officer Giovanonne to Elizabeth and then diverted his action to follow the plaintiff's train. Is that correct?

MR. KATZ: Objection.

A. Again, if he was the only officer available, that would be reasonable.

Q. Okay. I would appreciate just a yes or no answer to this question. Do you give any opinions in your report that there was an issue with the actual staffing level of officers on that date?

A. Yes.

Q. And could you direct me to where in your report that is. Feel free to take your time.

A. Yes, okay. I mean just real quickly looking at the report, the one I have printed out is two-sided I have to it on Page 6. Evaluation and Basis of Opinion, the second paragraph. "There is no record of a general order describing the event or requesting additional personnel, electronic surveillance. There is no record of mutual aid discussions or agreements. There is no record of an assessment by the intelligence unit or any counter terrorism measures."

Q. I appreciate that and thank you for your response. My question was a little different. Are

Page 27

there any opinions contained in your report that say New Jersey Transit had X amount of officers and they were required to have Y amount of officers?

A. I noted -- I would have to look at it. I think it was in Lieutenant Mooney's testimony he described minimum manning requirements for staffing and that the minimum manning was met and I think there were eight officers assigned and four of them were at one station and Officer Giovanonne had a very large area in which to cover and I know I made mention, again, no prior planning, you know, of a large scale event, therefore, the resources were inadequate.

Q. Is the answer to my question no, that nowhere in your report does it say that New Jersey Transit was required to increase the number of officers they had on duty that day?

MR. KATZ: Objection. Let me make an objection first, Mr. Coan. I'm going to object to the question, it's misleading. Mr. Coan already discussed with you the portions of his report that he wrote to express that thought. While he may not have used that exact language, he has already shown you the parts of the report that expressed the same opinion that you are asking for.

Page 28

Q. I'll back up for a second. Mr. Coan, a moment ago we were speaking about this issue of staffing levels and you directed my attention to Page 6 of your report where it says, "There is no record of a general order describing the event or requesting additional personnel, electronic surveillance." Did I read that correctly?

A. Yes.

Q. Does that sentence say that New Jersey Transit in this case was required to increase the number of police officers?

A. It does not say "required".

Q. Okay. Can we agree if this case goes to trial and you testify, that you will not be speaking about the precise number of officers that New Jersey Transit was required to have in order to meet the standard of care?

A. I mean that specific question "required," correct, I would not.

Q. Okay. Mr. Coan, would you be able to sort of summarize for me your opinions with respect to what was required, your issues with the event planning or lack of event planning in this case?

A. What was required? I mean based on my experience when you have knowledge of a large scale

Page 29

event, such as the Colombian festival, at a minimum you would do an assessment of the location, the points of transportation, particularly with New Jersey Transit and New Jersey Transit Police Department; you would look at prior year's riderships of the event, not only at the one station, but the surrounding stations; you would look at any prior reports; you would certainly have a discussion with the local police department to get a better assessment and when you have, again, a large crowd like that, if you have the ability to, and they do have an intelligence unit, the New Jersey Transit, New Jersey Transit P.D., to do a threat assessment for any potential acts of terrorism. Based on that, you would decide what you believe, if any, adequate additional resources should be put forth.

I mean the one -- I think it is Captain Noble, he described other large scale events where they did deploy and they do deploy additional resources. So they had the ability to do it, they had a past history of doing it and where the police department, if they failed to recognize it, New Jersey Transit Rail Operations, they should have realized from previous year's increasing ridership on large scale events, such as the Colombian festival,

Page 30

then they should have requested the police department to perform or provide adequate security.
Q. And please stop me if I'm wrong at any point, but in order to summarize all of things that you said, in order to plan for an event like this, it would be important for New Jersey Transit to consider the volume of the riderships and also incidents that happened in past years with the same event. Is that fair?
A. Definitely those are two of the elements, correct.
Q. I didn't mean that as an exhaustive list, but those are two important things they would consider, correct?
A. Correct.
Q. Are you aware of any prior incidents relating to New Jersey Transit from Colombian Day parades prior to 2012?
A. Personally, I am not.
Q. If there were no prior incidents with the Colombian Day parades prior to 2013, would it be reasonable that no specific event planning was done, if there were no prior incidents?
A. I missed the beginning of the question.
Q. It was a poor question. Hypothetically,

Page 31

why would you plan to have increased security at an event where in years past there were no incidents?
A. Well, hypothetically, obviously depending on the event, but if you have a large scale event, there could be incidents, other than criminal acts; you could have people getting lost, people can get disorderly, there are other incidents and just as recognized by the train operator who called in Elizabeth Station, overcrowding issues. So I mean potential criminal incidents is just, again, one aspect. But if you have a large scale event, I think it is reasonable to assume that New Jersey Transit, New Jersey Transit Police should have realized that the normal minimum manning requirements may not be adequate to police such an event.
Q. Can we agree that New Jersey Transit was not required in 2013 to plan for every single event that may have happened either at or near a station?
A. Well, let me just get your question right. You said New Jersey Transit --
Q. Let me rephrase it. It was a poor question. Can we agree that New Jersey Transit in 2013 was not required to plan for every single event on the train line, whether it was big or small?
A. Every single event?

Page 32

MR. KATZ: What do you mean by "every single event"?
A. I mean every single event is a lot different than a pre-planned event that's been going on for ten years. I mean you can't plan for everything.
Q. We can agree that if a couple of kids have a lemonade stand next to Elizabeth Station, that's not something that New Jersey Transit would have to pre-plan for, even if it was the tenth year anniversary of their lemonade stand and they increased production of lemonade ten-fold over ten years.
A. If the lemonade stand had 200,000 attendees, I would say they needed to plan for that.
Q. Earlier you spoke about the planning was really needed because this was a large scale event. Is that right?
A. One of the reasons, yes, correct.
Q. How large was it?
A. From what I was able to ascertain from prior years, again, this goes back to the Google search I mentioned, excess of 200,000 people attended.
Q. Okay. And that's based on your research

Page 33

from prior years, correct?
A. Correct.
Q. Do you have any facts or any knowledge about exactly how big the parade was in 2013 when this incident occurred?
A. I do not.
Q. Okay. Could it have been smaller than 200,000?
A. Possibly.
Q. Okay. But you don't know how big it was, correct?
A. I do not.
Q. Okay. How big does an event have to be, at minimum, before the type of planning that you described is required?
A. How big? It all depends on -- it's a very hypothetical and very open-ended question. It all depends on the type of event.
Q. Is there any type of rule, textbook, manual, treatise, anywhere I could go to look up police practices relating to event planning in terms of the size of a crowd?
A. Other than an actual book or manual, I mean most police departments, at least the ones I've been involved with, have what we call like an

Page 34

operations or planning unit. They would make an initial determination on the size, at least the police departments I was involved with. It wasn't necessarily an outside manual. It was based on experience and different personnel and prior year's events, again, an operations unit would have a planning unit contained within it.

In this case, New Jersey Transit New, Jersey Transit Police, you know, there is an intelligence unit and normally they could be used to make an assessment.

Q. Earlier you mentioned the testimony from Captain Noble about planning for larger events. Do you recall that?

A. I do, yes.

Q. One of the things he mentioned were the Parades, Papal Visit, Super Bowl, and Wrestle Mania. I'm looking at Page 7 of your report marked as Exhibit A.

A. Correct.

Q. All right. Do you have any knowledge or way to assess whether the Colombian Day Parade was bigger or smaller than any of those events I mentioned?

A. Bigger or smaller than Papal Visit,

Page 35

Super Bowl, Wrestle Mania? No, I do not.

Q. Now, maybe you already covered this, I apologize, could you describe for me what communication was required between New Jersey Transit and the Elizabeth P.D. according -- in the pre-planning efforts?

A. The transportation police departments and New Jersey Transit, New Jersey Transit Police are going to cover a wide area so that they need to have relationships with numerous police departments.

When I was the chief of the MTA police, I mean we covered two states, numerous towns and villages and counties and we had mutual aid agreements with different departments. If we had an event that was going to encompass, you know, an area where we were uncertain we would have immediate resources to respond or if we couldn't put somebody there, we would at least touch base directly or via E-mail, via phone call on the day of the event with the local P.D.

In an event like this, from the chief -- every executive member, every member that was deposed in this case said they had no knowledge that this event was even taking place. Just, you know, a phone call, a Google search, a conversation

Page 36

with local departments, they would have had, you know, some knowledge that this is a big event and at a minimum, that they could have; one, at least directed the roll call that day that something was taking place. So conversations, you know, such as that, communications, sharing information, it wasn't always done in police departments, they tended to kind of work in silos, if you would, but obviously after 9/11, the police departments became more experienced and we learned that the sharing of information, intelligence is vital to smooth operations, safety and security. So they had the apparatus in place to do so. The fact that they had a unit to gather intelligence and to make assessments, they just neglected to do it. New Jersey Transit failed to ask them to do it and New Jersey Transit P.D. failed to do it.

Q. Mr. Coan, doesn't it cut both ways though, the fact that people in policing intelligence weren't even aware that this event was taking place, didn't that speak to the fact that it was never brought to their attention because it was never a concern?

MR. KATZ: Objection, hypothetical. How can he possibly know that? I object on the basis of

Page 37

the fact that you are asking Mr. Coan to answer a question that inquires into the reason that the New Jersey Transit Police hierarchy did not know about this event. We can't know subjectively why they didn't know about this event. It's only Mr. Coan's position that they should have known about the event and that not knowing about the event is an aspect of liability on their part. You can't ask him why they didn't know about the event, he would have to read their minds to do that.

MR. STOCKDALE: I didn't ask him why they didn't know about the event. I'll re-ask the question in this way.

Q. Mr. Coan, if the Colombian Day Parade in years prior to 2013 was never brought to police intelligence's attention because there were never any incidents with it, would that support the conclusion that no planning was necessary because there were no additional safety concerns with the parade?

A. In my opinion, no.

Q. Why not?

A. Because one of the main reasons intelligence units were started post 9/11 was to have a basis of gathering information in case there was some sort of an attack. One of the criteria that

terrorists look for is large gatherings of individuals who are basically innocent individuals who can't protect themselves, that's one of the tenants that terrorists -- that we learned post 9/11, they use that and they like large crowds. Another one is something to cause economic hardships and then another one would be to make a political statement. Those are just three areas and if you are going to have an intelligence unit, some minimum standards should be met and I think a gathering of 200,000 people to celebrate a Colombian festival, which is the independence of Colombia, I do think it is reasonable to assume that an intelligence unit should at least have had knowledge about it.

Again, I go back to not only crime crowd control, but, again, acts of terrorism. Intelligence units should have been able to find out quite quickly about a Colombian festival of 200,000 people. It's a country that's been at war for 50 years with a terrorist group. It's never come to the United States, thank goodness. I'm not saying that they should have thought it was coming to the United States, but I do think that there should have at least been an awareness, a notification to the patrol resources, to New Jersey Transit then to the local



police department, of this event.

Q. In your responses you used the phrase "minimum standard." Where does this minimum standard come from?

A. Well, again, I'm reflecting back on my own history and my career. I was part of a -- the beginning of the post 9/11 when the NYPD started an intelligence unit, counter-terrorism bureau, intelligence was a main part of it. We received a lot of training and so I have to say I would -- most intelligence units in other police departments would have received some basic training and some would know the tenants of what would go into an assessment of what could possibly be a target, which is what I was referring to.

So a minimum standard of a target for terrorism would be a large gathering because you have, unfortunately, for lack of a better phrase, you have easy targets, innocent victims. That's what I was referring to.

Q. Mr. Coan, do you understand that in order to establish, I guess this might be a little bit of a legalese, but in order to establish negligence, we need some sort of yardstick or standard to measure conduct by? I mean that's what



we are talking about in this case, right, what the minimum standard was for New Jersey Transit and whether or not they met that standard? I mean that's what we are talking about.

A. Okay. That's a question or a statement?

Q. I don't know. Let me ask you this, do you agree with that?

A. Do I agree that we are asking that they at least meet the minimum standard?

Q. Right.

A. Minimum requirement?

Q. Right.

A. I mean it's a difficult question. Again, I reflect on my own experience. When Lieutenant Mooney talks about minimum manning, is that what you are referring to?

Q. No. Let me back up for a second. I understand in your prior response you talked about your own personal experiences. What I'm here to talk about and figure out is what was the standard, what was required by the standard of care in Transit policing with respect to planning for a large event and where does that standard come from.

A. Well, the No. 1 reason police departments exist is to protect life and property.



So if you have a large gathering such as this, that certainly would come into play.

Q. Right, but it's your opinion in this case that New Jersey Transit did not meet the standard of care because they failed to appreciate the significance of the Colombian Day Parade and plan for it, correct?

A. Correct.

Q. Okay. What I'm asking you, where can I go to find this standard that says, "Transit Police Departments need to communicate with local law enforcement for an event such as this parade." Where can I go to find that standard if it is not your personal standard?

A. I don't know if there is a written document in New Jersey Transit Rail Operations or New Jersey Transit Police Department that states that. I can just say that going back to what police department's most vital function is is to protect life and property. That's certainly something that is standard. I would have to say if it is not written, it's implied.

Q. Based on your testimony, any time property or people are damaged or injured, then a Transit Police Department fails to meet the minimum

standard of care. Is that right?
A. Not at any time. You can't avoid everything. Again, it goes back to a pre-planned event in its tenth year, which tens of thousands, if not hundreds of thousands, of people participate in. I think that if it is not written there, the minimum standard would be to adequately provide for the safety and security for that event, for your passengers and for your crew.
Q. And I think you just touched on it and it's also in your report on Page 5, but basically it says that even increased police presence cannot ensure that no incidents take place. Is that fair?
A. That's fair.
Q. So it is possible that New Jersey Transit could have employed every single officer they had to the Elizabeth Station on this date and these assailants still would have been able to board the train and subsequently assault the train crew and the passengers, correct?
A. Hypothetically?
Q. Right.
A. Right.
Q. It's possible, I'm not saying it is likely, I'm just saying it's possible.



A. Right.
Q. Okay. Is it also possible that, let's say hypothetically, prior to the Colombian Day Parade somebody from New Jersey Transit gets on the phone, calls up the Elizabeth Police Department and they say, "Hey, we got this big parade coming up, what are you guys doing about it? What are we going to do?" And Elizabeth PD says, "Don't worry, we have it handled." Is that possible?
MR. KATZ: I'll object to the question. Anything is within the realm of possibility. There are no facts that you can point to to suggest that that event actually occurred. I think if we're going to give a proper examination --
MR. STOCKDALE: We can ask that hypothetical, if anything is possible. That's all I'm asking.
A. Hypothetically?
MR. KATZ: It is possible that an astroid can fall from the sky and land on the earth and eliminate the whole parade.
A. I mean it is possible, based on their own testimony, that they don't say that that happened, in fact, they all said they had no idea the event was taking place.



Q. Do you have any records from the Elizabeth Police Department related to their staffing efforts as it pertains to the Colombian Day Parade in 2013?
A. I do not.
Q. You don't know how many officers they had, correct?
A. I do not, correct.
Q. Can you turn to your report on Page 7, please.
A. I got it, Page 7.
Q. I'm looking at Page 7 of Exhibit A. The last sentence in the fifth paragraph starts with "The deployment." Do you see that? It's right in the middle.
A. "The deployment," yes.
Q. Okay. It says, "The deployment would include officers on the platforms, uniform and plain-clothes, portable cameras and sky watch." That's referring to the testimony of Captain Noble. Is that correct?
A. Correct.
Q. What's sky watch?
A. So the best way to describe it is a mobile unit which can -- from time to time trying



to -- it's almost like construction equipment where you could put it somewhere and you could extend this little command box that a police officer can go in and it goes up real high and you could use it as an observation point.
Q. Okay.
A. That's how to best describe it. Imagine it's almost like a crane only it has a little booth on top of it and you would place it somewhere as a fixture and you put a police officer with a communication device in the top of it and normally at least one other officer at the bottom of it for safety reasons and then that officer can make observations and call out if additional resources are needed or if they are needed to deploy in a certain area.
Q. If the police department would have deployed one of these sky watch officers right next to the train station in Elizabeth, would that have comported with the standard of care in policing?
A. In and of itself, it would have helped. I don't know if it would have met the standard of which you are talking about.
Q. Well, could we agree if there was a sky watch tower right next to the train station that

overlooked the station, that they would be able to monitor a crowded situation and that they would be able to direct other units to respond if they saw something get out of hand or something that needed to respond to?
A. Depending on where it was deployed, that potentially could work.
Q. Okay. And that deployment of the sky watch next to a station would help mitigate against the effects of overcrowding and potential for crowds to get out of hand, correct?
A. Well, what it would do is it would give you an awareness of it so you could call in adequate resources. It couldn't stop the crowd, just a man, a police officer, in a booth, but...
Q. If they were able to make observations of the train station, they could also report to other officers who were not in the booth that could respond, correct?
A. If those officers were available, correct.
Q. Okay. You are not aware, so we're clear, where Elizabeth P.D. had their officers stationed on the day of the parade in 2013, correct?
A. Correct.



Q. You are not aware if they had officers standing right next to the station or if they were ten miles away. Is that fair?
A. Right, that information was not provided, correct.
Q. Okay. Mr. Coan, I'm going to show you a YouTube video or a clip of a YouTube video. I'm going to ask you to ignore the scantily clad woman in the foreground. Okay?
MR. KATZ: Have we been provided with a copy of that video?
MR. STOCKDALE: I think it was used at a prior deposition. I don't know. It is something that I found on YouTube.
MR. KATZ: I'm going to object, for the record, to the use of the video, but go ahead.
Q. Okay. I'm going to play a couple seconds.
(Video played.)
Q. Mr. Coan, were you able to watch the two or three seconds of the video there?
A. Yes.
Q. Okay. Have you ever been to Elizabeth Station, the train station?
A. I believe I've passed through it.



Q. Okay. Now I'll represent to you this is a YouTube video showing the Elizabeth Colombian Day festival in 2013. Do you see a white tower in the back of this video --
A. I do.
Q. -- film.
A. I do.
Q. And does that look like one of the police sky watch towers that you referred to a moment ago in your testimony?
A. That's what I was trying to describe, yes.
Q. Okay. So if this video is correct and this is the Colombian Day festival in 2013, then you would agree it looks like the police have deployed a tower there?
A. It doesn't have police markings on it, but I would agree that there is a tower there. I do agree there is a tower there. Based on the video, I could not testify as to who deployed it there or whether it is -- whether or not it has personnel in it or not.
MR. KATZ: Alex, can you represent to us who that tower was placed there by?
MR. STOCKDALE: I can only represent



what the video shows.
MR. KATZ: Okay.
Q. Mr. Coan, can we agree that that tower is next to Elizabeth Train Station or are you not able to tell from this?
A. I cannot tell. Just my knowledge of the area, I could not tell.
Q. Okay. Then let's do this, do you see in the left third behind the DJ there is a man and another man in a red and blue shirt and they look like they are talking?
A. Yes.
Q. Do you see past them there is a little archway that looks like a storefront? Do you see that?
A. Yes.
Q. Okay. Give me one second. So this is a live Google Map showing the area where the parade was. I'll represent to you I think the stage we looked at is somewhere where my cursor is, where the gray sedan is. Do you see that archway in the middle?
A. I do.
Q. Okay. Can we agree --
MR. KATZ: Alex, would you please put

Page 50

your cursor where the archway is so I can make sure we are talking about the same thing here.

MR. STOCKDALE: Can you see it?

A. It looks green.

MR. KATZ: Thank you.

Q. Can we agree that's the same archway I pointed out a minute ago in the video?

A. I can agree to that, yes.

Q. Okay. And then I'm going to spin the image around and I'm going to show you that this is the Elizabeth Train Station. Can we agree on that?

A. Yes.

Q. Okay. So, hypothetically, if the tower that we saw in the video of the parade was a police tower, could we agree that there was police presence with a view of the train station and that could direct a response if need be?

A. Well, I think theoretically, but I think we are taking a leap at two things; one, it is properly covered by a police officer and two, they have communication not only with their own police department, but with New Jersey Transit and New Jersey Transit P.D. That's why I spoke about the planning aspect, that and having a conversation with the local police department.

Page 51

So in answer to that question, if those things took place, if the conversation took place, if it was pre-planned and you knew A, about the event and B, you are going to use sky watch and you had either a New Jersey Transit police officer or a local P.D. in there with communication to New Jersey Transit Police or New Jersey Transit, for that matter, then yes.

Q. Is it reasonable to assume that if that was an Elizabeth P.D. tower, that they would put somebody up in there that would have a communication device? Is that reasonable to assume?

A. A communication device? I would hope, that would be for safety, but who he communicates with, I couldn't speak to that.

Q. The whole point of the tower is that you have a better vantage point and you could direct resources if need be, right?

A. Correct.

Q. You wouldn't be able to do that unless you had a communication device?

A. Correct.

Q. Okay. And can we agree that, I think we already stated this, but that it is possible that Elizabeth P.D. had the situation covered and that no

Page 52

additional Transit police were needed at the location or at the Elizabeth Station?

MR. KATZ: I'm going to object to the question, again, because you are not creating any basis for the question that you are asking. You are asking about a general possibility and anything is possible. It's possible that I was there.

Q. Mr. Coan, we already established that you don't have any facts that say one way or another how many police officers Elizabeth P.D. dispatched to the parade, correct?

A. Correct.

Q. Okay. Hypothetically, if they did dispatch enough officers to adequately cover that area and the parade, is it possible that no additional Transit Police were necessary?

A. I think we are taking a leap; A, assuming that they hypothetically had adequate resources and B, that they would actually cover and go inside the station.

Q. Well, let me ask you this, would it be a sound police practice, if you are a local police officer, to see something going on at a train station and just ignore it because there are Transit Police that could respond?

Page 53

A. It would not be a sound -- that would not be sound police work, no.

Q. If the Elizabeth Police Department was told, "Hey, there is a large crowd on the train platform getting out of hand" or whatever, it would be below the standard of care in policing to just ignore that and assume some other agency was going to handle it, correct?

A. I would agree with that.

Q. Okay. Do you have an understanding of -- let me ask you this first.

When did the assault first start? The assault on the plaintiff's train, when did that start?

A. The exact time I would have to refer to my report. I know it was after the initial call went in and then they stopped.

Q. Okay. Can we do this, I'm going to take a quick two-minute restroom break and then you can look at your report for the time and we can talk about it.

(Whereupon a brief recess was held.)

Q. Mr. Coan, we just took a short break a moment ago. While we were on the break, what did you and Mr. Katz discuss?

A. We just discussed the deposition, the case.

MR. STOCKDALE: Larry, I was sitting at my desk on Zoom and I was privy to part of the conversation between you, Mr. Katz, and Mr. Coan.

MR. KATZ: We spoke about possibility versus --

MR. STOCKDALE: You got to let me finish.

MR. KATZ: Go ahead.

MR. STOCKDALE: Mr. Katz was discussing with Mr. Coan my questioning of him about the deposition, about the deposition strategy. Instructing a witness and speaking to a witness during the pendency of a deposition is absolutely improper and I believe that all of my questioning going forward would be now tainted because the witness has been instructed by counsel how to defeat the deposition tactics and also communicated to him what would be highlighted on cross-examination or re-direct.

So at this point I'm going to have to cancel the deposition. I'm going to resume the right to re-depose Mr. Coan, if necessary.

Larry, I'm going to put in a request to



Judge Hammer to get him on the phone to discuss this. If you rather have Mr. Coan wait and see what the judge says, then if he wants us to continue or if you want to continue on another day, that's fine.

MR. KATZ: Let's see if we can get him on the phone now. That's fine. We'll let Mr. Coan wait for a couple of minutes.

(Whereupon a brief recess was held.)

MR. STOCKDALE: Judge Hammer, Your Honor, this is Alex Stockdale from Ruprecht Hart Ricciardulli and Sherman and I represent defendant New Jersey Transit.

We were in the middle of a deposition, I'm deposing the plaintiff's police security expert, in this case. I had asked the expert to review some parts of his report, then I had a line of questioning. So we took a brief break to do that and while I was on the break, I could hear, through the Zoom call, that plaintiff's counsel called the expert and was spoon-feeding the expert testimony. They were discussing my deposition tactics, discussing how to defeat them; they were discussing what subjects would be raised on redirect by plaintiff's counsel and I just find that to be outrageous.

I don't think it is in accordance with



the Rules and essentially it is tainted, this deposition, and potentially a lot of other things in this litigation.

So I was just looking for some guidance from Your Honor on whether to terminate the deposition and move for a dismissal or what Your Honor thinks is appropriate.

JUDGE HAMMER: Look, putting aside what may or may not have happened, it's certainly not for me to tell you how to proceed with that. You should proceed in the way you believe is appropriate. I can't tell you what to do with that development or how best to handle it.

I would like to hear from the other side, though exactly what the heck happened here.

MR. KATZ: Your Honor, first of all, let me apologize. I honestly didn't think I was doing anything improper, otherwise, I would have turned the mic off. We were talking about some of the questions that were occurring, the fact that I made numerous objections to these questions, Mr. Stockdale was just asking about remote possibilities and the fact that, you know, the possibility is not an issue in the case based on the evidence, he's talking about things that weren't in evidence.



We were talking about basically well, how to address that issue because no matter how often I objected, these ridiculous questions were still asked and, sure enough, I did remind him about something I was going to bring up during cross-examination, nothing different than I had spoken to him about beforehand where I would give him subjects we were discussing.

I do apologize if that was inappropriate. If it was, I certainly would have taken myself off the Zoom thing. I apologize to the Court.

I'm happy to work in any way I can with Mr. Stockdale at this point. To let the deposition go forward, I don't think there is any significant prejudice to him and if it would help Mr. Stockdale, perhaps the resolution of the issue or the couple questions that I was going to go into with possibility, I simply won't ask those in cross-examination, perhaps that would cure any prejudice that he thinks he may have undergone.

JUDGE HAMMER: Well, look, without a full transcript, I'm in no position at this point to make any conclusions as to whether there was something untoward that happened or whether the

witness's responses were tainted in some way.
If it turns out that the witness's responses were tainted in some way because of conversations that counsel inappropriately had with the witness while the witness was still under oath and giving a deposition, that's one thing. If, on the other hand, it was that the discussion was so obvious or inconsequential, then it may be the case that while it is certainly not an appropriate discussion to be had, it's nonetheless innocuous and not prejudicial.
I don't know how I could possibly make any assessment along those lines at this point. It strikes me that perhaps the best way to proceed is to complete the deposition and then make an informed assessment as to whether there is or is not actually an issue here.
MR. KATZ: As I said, I'll make certain, in an attempt to eliminate any of Mr. Stockdale's fears, that some of the areas that I was going to go into in cross-examination, those couple of specific areas, I'll just not explore those areas, which will eliminate any concern for Mr. Stockdale about what the answers ultimately will be. I'm happy to do that.



I apologize that what I thought were pretty obvious things, to Mr. Stockdale looked more devious. It really wasn't intended that way. I'm going to do whatever I can do to cure that so we can go forward with this case.
JUDGE HAMMER: What do you want to do, Mr. Stockdale?
MR. STOCKDALE: I'm going to take two seconds to gather my thoughts and I will probably put an objection on the record and then proceed with the deposition and potentially make an application at a later date.
I appreciate Your Honor's input on this.
JUDGE HAMMER: All right. I think that makes perfect sense.
MR. STOCKDALE: Okay.
JUDGE HAMMER: Thank you for calling, I appreciate it. I hope you folks have a safe and uneventful afternoon.
MR. STOCKDALE: Thank you, you, too.
MR. KATZ: You, too, Your Honor. Thanks.
(Phone call ended.)
MR. KATZ: Do you want to wait a few minutes and once you have everything together, we'll



get him back on the line?
MR. STOCKDALE: You can call him back and once he's back, we'll be, I guess, ready to go.
MR. KATZ: Thanks a lot.
(Whereupon a brief recess was held.)
Q. Mr. Coan, first I'm going to put an objection on the record.
MR. STOCKDALE: There has been some discussions between plaintiff's counsel and Mr. Coan during the pendency of the deposition about the deposition strategy and so forth. We had a discussion with Judge Hammer about the issue. I'm going to reserve the right to bar any testimony of Mr. Coan, either previous or going forward. I'm also going to reserve the right to make any appropriate application for sanctions or ethical violations or the like related to the communication between counsel and the witness during the pendency of the deposition.
Q. Mr. Coan, before we took a break, did you get an opportunity to review, I guess, the timeline of events, for lack of a better phrase?
A. I reviewed my report and the timelines, yes.
Q. Okay. Is there a specific portion of



your report that sort of discusses the timeline of the various calls and police responses?
A. I reviewed the case summary portion, Page 4.
Q. Okay.
A. It goes into Page 5.
Q. Okay. Are you able to tell from your report or your own memory when was the first call about the overcrowding condition from Mr. Zapille?
A. Yeah, as mentioned earlier Chris Zapille, approximately 8:30 p.m., prior to the subject train, he transmitted to New Jersey Rail Operations through AMTRAK of the crowd, overcrowded condition at the station.
Q. Okay. And we already spoke earlier that in response Officer Giovanonne was dispatched to Elizabeth Station. Is that correct?
A. Correct.
Q. Okay. While he was en route to Elizabeth Station, he got the call about a fight on the train. Is that right?
A. Correct.
Q. Now, were there any calls about the fight on the train?
A. No, I don't have that.

Q. Okay. Do you recall that there was the initial call about the fight involving passengers, then there was a second call involving employees? Do you recall that?
A. I don't recall specifics about how many calls. I do know that there was a call regarding the assault --
Q. Okay.
A. -- of passengers and then I believe another conductor called in a second call.
Q. Okay. I'm going to show you what's been marked as Exhibit H, which is the CAD Blotter. Do you see the first line there at about, approximately, 9:09 there is a request for requesting officers NJCL requesting officer. Do you see that? Is that too small? I'm sorry.
MR. KATZ: You said 9:09?
A. I got it.
MR. KATZ: Is that the first line you are looking at?
A. Yeah, first line.
Q. Then the second line says that Perth Amboy will assist and send unit, correct?
A. Correct.
Q. Okay. And then the next line at 9:12



says "2B70 responding." Is that right?
A. Correct.
Q. Do you recall that was Officer Giovanonne?
A. I don't recall specifically, but I believe he was the only officer assigned.
Q. Okay. Do you see that three minutes after he was already responding that there is another entry at approximately 9:15 that is saying officer requested because there is a fight on the train. Is that correct?
A. I'm not sure who is requesting, that's NJCL communications, okay.
Q. Then there is another entry at 9:26 that reports that a conductor may have been assaulted. Is that right?
A. Correct.
Q. Okay. So it looks like about nine minutes between when Transit was notified that there was an assault on the train and then later they were notified that a conductor may have been notified?
A. 9:09 -- ten minutes, yeah.
Q. Is it your opinion in this case that increased security and increased police response could have prevented the assaults to the plaintiffs?



A. Based on this timeline or based on everything that I have?
Q. Everything that you know about the case and that you have reviewed, is it your opinion that with increased police presence and security, the assaults could have been prevented?
A. I think I even mentioned this previously, there is never a guaranty. Certainly with a known event, pre-planning may have prevented it, yes.
Q. What I'm asking is, what specific things could New Jersey Transit Police Department have done to prevent these particular assaults on this day?
A. You know, as I mentioned, no one in their staff claimed any awareness of this event and the video you showed yourself, it was a large scale event. Obviously, all of those people there knew about it prior in order to know to get there. There had to have been some awareness in the community, so had they had more than a minimum number of officers assigned, had New Jersey Transit and New Jersey Transit Police Department just coordinated their efforts with the locals, they would have known what local P.D. was there, so they could have had additional officers at the train station and



additional officers on the train.
At times there are -- Transit Police Department, you could have stationary officers and then if need be, they can get on a crowded train and ride that train to ensure the safety and security for the commuters as well as the workers on the train.
Q. With all -- are you finished?
A. Yeah.
Q. With all due respect, Mr. Coan, I'm not interested in what New Jersey Transit could have done, I'm interested in what they had to have done in order to meet the minimum standard of care in Transit policing. So let me ask you this, is it a requirement in Transit policing to have a Transit officer ride every single train?
A. No.
Q. Okay.
A. I mean no, there is no set standard of requirements of that nature.
Q. Okay.
A. That I'm aware of.
Q. Is there a set standard that requires New Jersey Transit or any other Transit Authority Police Department to have an officer on every platform at every station?

Page 66

A. Not that I'm aware.
Q. Where was the train when the assault began?
A. Exactly, I would have to refer. I know the passengers -- a number of passengers entered on Elizabeth Station and then it stopped at the Perth Amboy Station. So between Elizabeth and Perth Amboy my recollection is where the assault was occurring as the train was ongoing.
Q. And we already agreed that there were additional stops in between those first two stations that you mentioned, correct?
A. Correct.
Q. Okay. Give me a moment.
A. I'm not certain if they bypassed the stops or not or exactly what the train, you know -- physically what the train did.
Q. I'm going to show you an excerpt from Mr. Pascale's deposition, he was a plaintiff in this case. This is marked as Exhibit F.
Now, Mr. Coan, I've highlighted a portion on the left side of the screen on Page 30. If you could review that testimony and just let me know when you have had a chance to review it.
A. Okay.

Page 67

MR. KATZ: Did you say this is Pascale's testimony?
MR. STOCKDALE: It is.
A. Okay, I've read it.
Q. Okay. Now, based on Mr. Pascale's testimony on Page 30 of his deposition that's been marked as Exhibit F, can we agree that the fight actually started after the train left Woodbridge Station?
A. Based on his observations, yes.
Q. Okay. Are you aware of any other observations that the incident or the assault happened at some other point?
A. Not that I have, no.
Q. Let's go back to Exhibit C. Do you see Exhibit C on the screen?
A. I do, yeah, the train route, yes.
Q. If you look at the very bottom on the dark blue line, it says there is Woodbridge then the next stop is Perth Amboy. Is that fair?
A. Fair, yes.
Q. Okay. So if the fight did not start until after the train left Woodbridge Station, how would New Jersey Transit have stopped it or responded any sooner than they did at Perth Amboy when Perth

Page 68

Amboy is the next stop?
A. Had they had pre-planning, they may have had officers riding the train.
Q. Right. I understand they may have, but we already agreed that they were not required to have an officer on the train, correct?
A. Not to my knowledge, correct, right. Not to my knowledge.
Q. Let's take that out for a second. If you were responding to a crowded situation on a train platform, is it required for police to then put an officer on every single train that goes through that station?
A. There is not a requirement to my knowledge, no.
Q. Okay. Then what, if anything, did New Jersey Transit not do that could have prevented the assaults that occurred after the train left Woodbridge Station?
A. It all goes back to having not pre-planned for an event that they should have been aware about.
Q. Okay. And what evidence do we have that the pre-planning that you say was mandatory would have prevented the assaults?

Page 69

A. Again, as I also mentioned, you can never guaranty it, but you certainly want to take every precaution when you have prior knowledge of a large scale event.
Q. Well, what would the pre-planning have resulted in, meaning in terms of resources or what was it required to do?
A. Well, you know, you keep saying "requirement." Again, they are supposed to protect life and property. As a police department, they should have had an awareness of this event and made an assessment and then there is a number of safety precautions and law enforcement precautions that you could have taken; I've mentioned some of those, police officers on the platform, police officers riding the train or additional officers being prepared to respond, and as mentioned in the testimony, they had a minimum number of officers. They had one officer on this particular line. I believe he was covering more than just one line.
Q. But, Mr. Coan, would you agree that if the standard is they must protect lives and property, every time a life or property is not protected, the Transit Authority or the police department fails to meet the standard of care? Does that make sense?

Page 70

A. Well, every time? I couldn't opine on that.
Q. Okay. You mentioned that they were required -- they had at minimum number of officers. That's what you said. Is that right?
A. Based on Lieutenant Mooney's testimony, yes.
Q. Okay. Where could I go to find any type of standard or requirement or source that says New Jersey Transit under these circumstances was required to have more officers than they did?
A. I would not be aware of where.
Q. Okay. You mentioned that part of the pre-planning would have additional officers that are prepared to respond. Is that right?
A. Potentially, that could be part of the pre-planning, yes.
Q. If there were additional officers available to respond and they got notified that an assault occurred on a train after it left Woodbridge Station, would they have been able to respond any sooner than the next available station, which is Perth Amboy?
A. It's a hypothetical question, so it is really difficult to answer.

Page 71

Q. Well, right, but let me make it more concrete for you. In this case we have testimony that the assault occurred after the train left Woodbridge Station, so short of a S.W.A.T. team with a helicopter landing on top of the train, what was going to get -- how were they going to get officers there any sooner than Perth Amboy, which is the next stop?
A. Again, hypothetically, if you would have had more officers assigned as opposed to just one officer, we don't know what would have happened. We can't guess what would have happened, but certainly the only adequate response that happened was Perth Amboy Police who responded and made the arrests after the assault took place. We -- it is speculation as to what would have happened had adequate resources been in place beforehand.
Q. Had additional officers been on the platform in Elizabeth, would they have stopped all of the passengers from getting on the trains?
A. I can't hypothetically say what they would have done, but you certainly -- certainly somebody would have been there to deal with crowd control issues and had they noticed if it was disorderly actions taking place, they could have

Page 72

stopped some people from getting on or they could have checked with rail control to see if they could send another train so that the trains wouldn't be so crowded or they could find out -- not so much send another train -- find out when is the next train. Somebody would have been there to deal with the crowd, but nobody was there so we don't know what would have happened.
Q. Wouldn't the police have needed probable cause to detain someone on the platform?
A. Probable cause you would need to make an arrest. If there is a safety issue and the train is overcrowded, you have the right to refuse somebody entry on to the train for safety reasons. Overcrowded platform is a safety issue. Overcrowded train is a safety issue.
Q. How many passengers need to be on a platform before it is overcrowded?
A. It all depends on the platform. It would be, again, part of an assessment.
Q. How many people were on the platform that day at Elizabeth Station?
A. I don't have the exact number.
Q. My question is really how would police, even if there were additional police there, how would

Page 73

they have prevented the people from boarding the train who eventually assaulted the plaintiffs a few stops later?
A. So you are asking me hypothetically how?
Q. No. Let me back up. It's not a hypothetical. I'm asking a causation question. How would the increased security in and around Elizabeth Station by the New Jersey Transit Police Department, how could that have prevented the assaults that happened a few stops later?
A. If the police -- potentially, if the assailants saw a police presence, the uniform could have served as a deterrent. There was no attempt to deter because there was no uniform presence. Traditionally, policing patrol when you are not on an assignment, you serve as a deterrent.
Q. Right, but if there were additional police on the platform, they would have let the passengers get on the train, correct?
A. Well, possibly, yes, but again, it goes back to if the platform is overcrowded, additional police can stop people from entry to the platform, this way it doesn't get overcrowded. If the train pulls in and there is not adequate space for the number of passengers, they can ask the train to

bypass the station, they could find out when the next train is coming or restrict access to the train. There is a number of steps that could have been taken.

Q. Are you aware of any evidence that would tend to prove or tend to show that additional New Jersey Transit Police Officers at the Elizabeth Station would have stopped the assailants from getting on that train that the plaintiffs were on?

A. In addition to the one police officer that was assigned to that line, I do not, no.

Q. Mr. Coan, looking at some of the opinions on Page 6 of your report, this is marked as Exhibit A.

A. Okay.

Q. I'm looking on Page 6, it looks like the fourth bullet point to me. Are you able to just sort of summarize what is within that bullet point and how it is important to this case?

A. I'm just re-reading it.

Q. Take your time.

A. What's your question again?

Q. That opinion on Page 6, that's the fourth bullet point, it is talking about the failure of the NJT or NJT Police Department to provide any



information to the train crews about the crowd. Is that a fair summation?

A. Yes.

Q. And it is your opinion that a Transit Authority and a Transit Police Department are required to notify train crews about events such as the Colombian Day Parade. Is that right?

A. If you are aware that something is going to impact ridership, particularly a large scale event like this festival/parade, it is more like a festival, you should notify the train, New Jersey Transit, the Transit Authority in which you work for, that they could have additional crew members, maybe an additional train available as well, as I mentioned earlier numerous times, you would pre-plan for the event and have additional police officers working. You could tell them what you would be doing.

Q. But is that the responsibility of train operations or is that a police function?

A. Well, ultimately New Jersey Transit operates the railroad, New Jersey Transit Rail Operations. If they were not aware of it, they should have been aware of it based on the history. The dates are pretty much -- it's on the same weekend each year for ten years.



Secondly, they should have asked New Jersey Transit Police Department to make them aware of events such as this, just like Captain Noble mentioned, somebody made them aware of the Super Bowl, somebody made them aware of Wrestle Mania, Papal visit. They should have used the same communication for this event as they used for those events. Some of those events were more inside locations, some of those were ticketed inside events like Wrestle Mania where you can pretty much determine the amount of people to show up where it is little easier to police. This is an undetermined amount. What you have is past history. No information was provided by New Jersey Transit or New Jersey Transit Police and the rail crews were basically left on their own.

Q. Mr. Coan, have you ever worked as a trainmaster?

A. I have not.

Q. Have you ever worked for a Transit Authority in any type of operational job or capacity?

A. Well, transit operation, I mean I was the Police Chief of the Metropolitan Transportation Authority Police Department. The Metropolitan Transportation Authority, which includes the two



largest commuter trains in the country, the Long Island Railroad and the Metro North Railroad, we worked extensively with our partners, including rail control at both agencies, Metro North and Long Island Railroad. Daily activity and any large scale events, we would meet with them and plan. I would want to know what their resources are and they wanted to know what our resources were.

Q. But a moment ago you were talking about what New Jersey Transit Rail Operations was required to do. I guess my question is, I don't mean to minimize your credentials at all, what makes you qualified to opine as to what New Jersey Transit Rail Operations was required to do?

A. Other than from the safety and security end and the law enforcement end, you are right, I cannot -- I'm not in a position to say what their rail operations would do.

Q. The next one on Page 6, your bulleted point opinion talks about New Jersey Transit failed to adhere to the NJ Transit Rail safety policy as set forth in the NJ Transit Manual. Do you see that?

A. I do.

Q. Okay. What specific parts of the NJ Transit Manual did the company violate?

A. I don't have that in front of me. I believe I was provided with copies of the conductor's manual. I want to see if I have it listed here. I don't have that in front of me.

Q. Anywhere in your report does it say where New Jersey Transit violated any specific sections of that manual?

A. It does not.

Q. Okay. Next one talks about how there should have been self-defense training. Do you see that?

A. I do.

Q. Okay. When you were at the MTA, what type of self-defense were the train conductors trained in, was it Karate, Taekwondo, Jujitsu?

A. Physical self-defense was not requested upon us. We did do orientation for all new train crews as well as ongoing orientation as to how to respond, what to do, when to call us, what to make us aware of.

Q. Is there a requirement that you are aware of in any type of manual, regulation, statute that requires a Transit Authority to train their conductors in self-defense?

A. Not that I'm aware.



Q. Could we agree that based on your experience, you wouldn't want people employing self-defense tactics unless they are really trained and capable of using them?

A. Well, absent any other safety precautions, absent any police presence, I would put that line in there because if the New Jersey Transit was not going to provide adequate safety and security, New Jersey Transit Police Department was not going to be responding in an adequate manner, then they are left to their own vices, therefore, that's why I put that in there.

Q. Okay. In terms of how it would make any difference in this case, how would -- let me back up. So there is no specific requirement that they have to be trained in self-defense. Is that fair?

A. That's fair.

Q. Okay. If they were trained in self-defense, how could that have prevented the assaults to the train crew on this day in question?

A. It is speculation. It's unknown.

Q. Okay. Next bullet point item says, "In light of NJT and/or NJT PD'S failures, NJT also acted unreasonably in failing to protect its train employees with self-defense devices such as pepper



spray or electric-shock weapons." Did I read that correctly?

A. Correct.

Q. What type of pepper spray did the MTA employees carry when you were head of the Transit Authority Police?

A. None to my knowledge.

Q. Okay. Are you aware of any requirement or rule that says trainmen or specifically conductors are required to carry any self-defense devices, such as pepper spray or electric-shock weapons?

A. I am not.

Q. Hypothetically, what would happen if Danielle Tramantano unloaded a can of pepper spray on the train car when the assaults were taking place?

A. Hypothetically, it would be difficult to answer that.

Q. Okay. Well, have you ever been trained to use pepper spray?

A. Yes.

Q. Okay. Were your officers, under your supervision and employ, were they trained to use pepper spray, at least some of them?

A. Yes.

Q. Would it be advisable to empty a can of



pepper spray in a confined space like a train car when there are innocent bystanders there?

A. Every situation is different. It would be difficult to answer.

Q. Okay. But would it be advisable or would you be happy if one of your officers unloaded a can of pepper spray in a confined space and essentially pepper sprayed 40, 50, 60 people, some of which were completely innocent?

A. If it was the minimum amount of force that was able to be used to bring the situation under control, then I would be accepting of it.

Q. So then is it your position and opinion in this case that had Danielle Tramantano unloaded a can of pepper spray in the confined car where the assaults took place, that that would have prevented the train crew from being injured?

A. Again, that's speculation.

Q. Okay. Give me like two minutes to review my notes. I'm probably almost done.

A. Okay.

(Whereupon a brief recess was held.)

Q. Mr. Coan, is it fair to say that police departments, such as the New Jersey Transit Police Department, have a finite number of resources at

their disposal to deploy to stop crime?
A. That would be fair.
Q. And they need to make judgment calls on how to deploy those resources safely and effectively. Is that fair?
A. That's fair.
Q. Okay. If there were other events going on on the day of the Colombian Day Parade in 2013, could that put a strain on the amount of resources that New Jersey Transit Police had to deploy that day?
A. That could, yes.
Q. Okay. Are you aware that there was a Zac Brown Band concert also going on that day?
A. I recall reading that somewhere.
Q. Okay.
A. Yes.
Q. And would it be reasonable to deploy officers to something like a concert?
A. Depending on the location. At a local train station, again, if it is an inside location, prepaid event, you have an idea from past history how many people are going to enter or exit, so, yes.
Q. Okay. I have no further questions for you. Thank you.



CROSS-EXAMINATION BY MR. KATZ:
Q. I have a number of questions. Mr. Stockdale used the term several times throughout the deposition "required." It is my recollection that in each situation you indicated that there were no specific rules requiring a number of the things that you spoke about. Is that correct?
A. That's correct.
Q. Whether or not there was a specific rule concerning the word "required," you have an opinion on whether or not the recommendations you made would constitute good police practice?
A. Correct.
Q. That was actually a yes or no question.
A. Yes.
Q. Okay. And what is your opinion?
A. So, again, you are bringing up the point; there are no specific requirements because you could never write a prescription for every potential occurrence or event, but on the day in question, when these crews were assaulted, this was a known event, it had been happening for ten years and there was no pre-planning, no conversations with the local police, no conversations between New Jersey Rail Operations, New Jersey P.D. and any local police officers, no



increase in resources on the day in question.
There was no, as I mentioned in the report, there was no -- Elizabeth Station wasn't even put down as a directed patrol, which a number -- I mentioned in the report, a number of stations were listed for directed patrol on that day. Based on the testimony of the officers and the command staff, they all said that they had no knowledge, were not even aware that this event was taking place, including the individual in charge of the intelligence unit.
Again, there is no requirement because you can never define exactly what is going to be needed for a specific event, but as the people in charge of the safety and security, the New Jersey Transit Rail Operations and New Jersey Transit Police Department, they certainly should have been aware of it and taken the adequate steps to ensure the safety of the commuters and their passengers.
Captain Noble mentioned prior events that they would pre-plan and put out resources for. It was just mentioned, the Zac Brown concert, resources were deployed. They became aware of that event. I just believe that that is just contrary to planning, proper police policies and practice to not have adequately provided for the safety and security



at such a large event as the Colombian festival on that day. Had they, there is never a guarantee that you would have prevented something, but you certainly would be in a better position to respond, whereas after a number of calls about the assaults, the local police responded, took police action and ended the assaults and made arrests.
Q. The next question actually addresses something you just finished up with, it's a word that Mr. Stockdale used a lot during his questioning -- it is a response that you had during Mr. Stockdale's questioning, excuse me. When he asked whether specific actions would have occurred in response to specific measures taken by the police department, you indicated that the answer would be speculative, I believe that's the word you used.
A. Yes.
Q. Can you render an opinion within a reasonable during of law enforcement certainty whether the various things that you have recommended in your report would have deterred criminal activity in a large group setting?
A. You came in a little bit broken, but I believe you asked can I render within a reasonable degree of police certainty if proper planning had

Page 86

taken place and proper personnel allocation on the day in question, coordination with the rail traffic control, New Jersey Transit and New Jersey Transit Police and the local police, could this have been prevented, I think it would have went a very long way in providing for the safety and security of the passengers and the train crew on the day in question.

Q. And I think I probably broke up because I didn't actually go too far in saying "prevented," I said would all of those measures have deterred criminal activity from occurring?

A. I mean historically a police presence serves as a deterrent, that's why they wear a uniform, that's why they are identifiable and that's the police presence that is normally on display. Particularly at a large scale event, you put as many uniform officers as you can, you deploy them in the right place, they have the adequate supervision and information and communication and it goes a very very long way to preventing not just criminal activity, but the safety issues that are a concern as well.

Q. Mr. Coan, you were asked questions concerning a number of people that were on the platform and I believe there may have been some questions concerning the number of people within the

Page 87

train car itself. Let's talk about the platform first. Can you render an opinion without knowing the precise number of people on the platform, but from the general descriptions that were given to you of the platform being extremely crowded and even overcrowded, based on that description of the number of people on the platform, does that create a potential, under general law enforcement principles, of potential assaults or other dangers when you have too many people packed into a small space?

MR. STOCKDALE: Objection to form.

Q. You can answer if you understood the question.

A. I understood. Any crowd condition when you have an area with a fixed amount of space, such as a train platform, and then a fixed amount of space on a train, if it gets overcrowded, that can cause safety -- numerous safety concerns and sometimes the pushing and the shoving and the crowding concern, somebody could take it the wrong way and people could become disorderly.

Again, prior to that, just the fact that it is a -- just the fact that it was the area and it was known from prior events that hundreds of thousands of people, tens of thousands of people

Page 88

attended this event, the video that was shown shows it would be -- that train platform could easily become overwhelmed with individuals waiting for a train. Somebody could slip, trip and fall on to the rail tracks. That's one of the main concerns in a situation like that. Certainly crowding conditions as it pertains to transportation are always of a major concern.

Q. Okay. There was a question about pepper spray. I've never used pepper spray before, but obviously the question implied that the pepper spray was going to be sprayed over the number of people. Can you fine-tune the use of a pepper spray so that you are only spraying the assailant and the immediate people around them as opposed to the whole train car?

A. I mean depending on the canister that is provided, although I'll admit it would be difficult, but again, if that is the least amount of force necessary to prevent the assault from continuing or occurring, then I would be in favor of that.

Q. Okay. Early in the deposition Mr. Stockdale asked you a question that concerned the fact that there were no reports of problems at the stations before Elizabeth, but only at Elizabeth itself. Elizabeth is the station where the Colombian

Page 89

Day Parade was occurring, correct?

MR. STOCKDALE: Objection to form. You can answer.

A. Correct.

Q. Okay. Would the crowds or events occurring at the stations before the Elizabeth Station have any relationship to the Colombian Day Parade?

A. Not directly, but indirectly, people traveling to and from.

Q. Okay. From your experience as a police officer and as the chief of various transit police authorities, is it your experience that large crowds in small spaces increase the likelihood of unruly or dangerous conduct?

MR. STOCKDALE: I'm going to object to the question to the extent that I don't think any of this is in his report, therefore, not admissible.

Q. You can answer that anyway.

A. Based on my experience, large crowds in a contained space always has a potential for safety issues and the potential for violence.

Q. Is that something that you have learned through your hands-on experience in law enforcement?

A. It's something I learned and was

reinforced when I became the chief of the MTA Police. We had plans at certain train stations, particularly Penn Station, during train delays where we would restrict access to the station itself and the platforms in order to keep the crowd at a manageable size.

Q. Is that experience part of the pool of knowledge that you used in rendering your opinions?

A. Yes, it is.

Q. You were asked a question whether or not your recommendations -- strike that. I won't go into that one.

Is it your opinion that it is the obligation of law enforcement to understand when and where large crowds of people are going to be to properly allocate their resources?

A. I feel quite strongly if there is information that can be attained through open sources known to the public, that you should, as a police department, be aware of large gatherings or crowds or events that are going to attract crowds, yes.

Q. And Mr. Stockdale pointed out that various police departments had limited resources to assign. Based on your experience in the law enforcement field, when one department has limited



resources, do they often work in cooperation with other police departments?

A. That is a standard operating procedure, particularly with a smaller department, particularly with the smaller departments than with a transportation police department or transportation authority. Mutual aid agreements with local municipalities is a standard in order to adequately provide for the safety and security, it is absolutely necessary.

Q. When you reviewed the depositions of the various management level personnel within the New Jersey Transit Police Department, did you see any testimony that prior to the event, New Jersey Transit and New Jersey Transit Police worked with local municipalities to make a plan for the effective use of their collective resources in protecting people at this event?

A. Based on their testimony and their depositions, as far as it relates to the Colombian Festival, there was no indication that there were any conversations or pre-planning and, in fact, when they were specifically asked, they all stated they had no knowledge of that year's event or any previous year's events, although they were aware of other large scale



events within their jurisdiction.

Q. Based on all of the depositions that you have read in this case, do you see any evidence that New Jersey Transit or New Jersey Transit Police took any efforts to protect the crowds or the employees before such a time that the assault was actually reported?

MR. STOCKDALE: Objection.

A. I saw no evidence and I based it on the fact, again, there was no pre-planning, no resources deployed and, in fact, they had a minimum number of officers assigned on that day and it was never even mentioned at a roll call that this event was taking place.

Q. You testified in one of the last several answers you gave to Mr. Stockdale, I believe, about Long Island Railroad or maybe MTA when there were large crowds, you limited the number of people on the platform at a time. Did I understand that correctly?

MR. STOCKDALE: Objection.

A. That's correct. If we had, obviously, knowledge of a pre-planned event, we would strategically station officers at the outer stations. The larger stations within the city we would have officers there normally 24 hours/seven and we would



restrict access to platforms and at times restrict access to people boarding trains.

Q. And what is the law enforcement rationale for doing that?

A. It is purely a safety concern; safety of the passengers, your passengers who are getting on your train, and safety of the police and safety of the train crew members.

Q. Based on your review of the evidence in this case, do you have any reason to believe that New Jersey Transit or New Jersey Transit Police were unable to do the same thing during the time of this incident?

MR. STOCKDALE: Objection.

A. Had they utilized their resources and adequately planned and deployed officers, I do believe they could have done a much better job -- a much better job could have been done and this assault possibly could have been prevented and the safety of the other passengers and the crew members would have been much more secure than it was.

Q. Did you read testimony about the NICE vision system that NJT has?

A. I did.

Q. And what do you understand that system

to be?
A. It is a, not getting into any real technical aspects of it, it is a camera system that's deployed in certain areas of New Jersey Transit. It is administered from a location and the majority of those cameras are -- can record and some can be viewed as well. It's sort of a part of the umbrella of the safety and security of a large scale system, such as New Jersey Transit.
Q. Okay. Was there a NICE vision camera available at the Elizabeth Station?
A. At the time of the incident, there was not, based on the information I have.
Q. Had a camera been available there, would it have enabled somebody in a control center or command center to watch real-time what is going on on the platform?
A. Potentially, yes.
Q. Based on your law enforcement experience, if there was a camera there that was being monitored and the person or the officer monitoring it observed that the platform was getting extremely crowded, could there be a response to that overcrowding by the police department?
MR. STOCKDALE: Objection.



A. Based on that question, had there been a camera and had it been monitored and that information was given over to the patrol force and the individual or individuals in charge on that day, resources can and would have and should have been deployed. At a minimum, you would have seen the platform getting overcrowded, you could have told rail control as well as the police.
Q. Mr. Coan, as you know, we spoke for a couple of minutes during one of the earlier bathroom breaks, I think is what happened, did any part of our discussion cause you to change or modify any of the opinions that you have given today?
MR. STOCKDALE: I'm going to object to this whole line of questioning and this revisionist history and it is not proper to feed the witness answers like this in order to rehab your unethical conduct in this deposition. I'm going to object. I'm going to instruct the witness not to answer.
MR. KATZ: Alex, you already put on the record your perception of what occurred. I think it is only fair when a judge reads this at some pint in time he hears what Mr. Coan has to say.
MR. STOCKDALE: I don't think it is fair at all to lead the witness, to massage the egregious,



unethical, improper, prejudicial conduct that's gone on at this deposition. I don't think that's proper at all.
MR. KATZ: Well, I hear all of the adjectives you are using, that's fine. When Judge Hammer reads the record, don't you believe Judge Hammer will be interested in knowing Mr. Coan's opinion as to whether he changes his testimony at all or whether it made any differences?
(Off the record discussion.)
MR. STOCKDALE: With that objection, he can answer the question, but it doesn't change the facts of the case no matter what you do.
MR. KATZ: I think it is important for the judge to know.
Q. I'll ask you again. Mr. Coan, the conversation that we had during one of the rest room breaks, did you change any of your opinions because of that?
A. Absolutely not.
Q. Did I plant any ideas in your mind because of it?
MR. STOCKDALE: Objection.
A. Absolutely not.
Q. Most importantly, I guess, have you



testified today any differently than the facts and opinions and underlying information that was contained in your original report?
A. I'm sorry, I missed it beginning of it. The audio was off.
Q. I'm sorry. Have you testified today any differently than the facts and the opinions and some of your underlying basis for those opinions that was contained in the report that we have been referring to throughout this deposition?
MR. STOCKDALE: Objection.
A. My opinion, as written in the report, is based on the material that was given to me back in 2017 and on any law enforcement experience. That's what my opinion has been based upon.
MR. KATZ: Alex, I have no other questions.
MR. STOCKDALE: Thanks.
REDIRECT EXAMINATION BY MR. STOCKDALE:
Q. Mr. Coan, do you understand that in this case what we are talking about is the standard of care that New Jersey Transit Police Department was required to follow in this case? Do you understand that?
A. Based on what you have informed me of,

yes.
Q. Okay. And the standard of care in Police Transit Authority is what a reasonably prudent Transit Police Authority would do in similar circumstances. Do you have any reason to dispute that?
A. No.
Q. Okay. And if it was the standard of care in policing, wouldn't you expect at most or at least a majority of Transit Authorities would act similarly and employ similar mechanisms for policing?
A. In this particular circumstance with a pre-planned event with excess of tens of thousands of people? I would not agree to that, no.
Q. Okay. Let me ask it this way, what percentage of Transit Police Departments have their conductors carry pepper spray?
A. Unknown.
Q. Are you aware of a single one?
A. Unknown.
Q. So you are not aware of a single police department that requires a conductor of a train to carry a pepper spray?
A. The police department requiring them? That would be more on the rail agency. No, I'm



not -- I do not.
Q. It's in your report, right? Now you are telling me it's not a police thing, it's a Transit operations thing?
A. The way you asked that question, the way I wrote it was that New Jersey Transit or New Jersey Transit Police, but the way you asked the question specifically the police department, that would be a joint agreement between the two. I'm digging into the weeds only because there is unions, et cetera, that's why I specifically said that. I was reflecting on my experience.
Q. Okay, but --
A. If we tried to initiate something with a rail crew, we would have to bring in the agency. That was mainly more for collective bargaining agreements.
Q. We can agree, you are not aware of any train crews that carry pepper spray?
A. Correct.
Q. Okay. Are you aware of any train crews that are trained in self-defense, whether it be Karate, Taekwondo or anything else?
A. I am not.
Q. Is there any reason that I should



believe that the opinions contained in your report and specifically on Page 6, Page 5 and Page 6, are not your personal opinions as opposed to standards in the industry of Transit police?
A. I'm not sure I understand the question. The opinion is based on my experience and the standards as I understand them in policing commuter rails.
Q. Okay. My question is, where do those standards come from?
A. Well, there are some rules and procedures and every agency is different, every police department is different. There are law -- there is the penal law and then common practice.
Q. What rules or procedures are cited in your report?
A. I don't have anything specific in the report.
Q. Right, that's what I'm getting at. Is there any evidence or is there any basis to support that the opinions you give in this case reflect the standard of policing as opposed to your personal views or personal standards?
A. I mean it is based upon my 35 years of



experience that the standards of -- that police departments have a requirement to protect life and property and that certain standards have to be met and adequately policing events, particularly crowd control pre-planned events, is part of that standard, although there is nothing specifically written for every occurrence.
Q. In what part or portion of your 35 years experience did you -- were you apprised that a Transit Police Department is required to have the conductors carry pepper spray?
A. I do not have that.
Q. Okay. In what part of your 35 years of police experience were you apprised that there is a standard that train crewmen are required to be trained in self-defense?
A. I don't have that.
Q. Okay. We already went over you say that NJT violated the manual, but you are not aware of any specific portions of the manual, correct?
A. Correct.
Q. Okay. You mentioned NICE vision, the surveillance system. Is that right?
A. Correct.
Q. Does it say anywhere in your report that

in 2013 Transit Authority was required to have a camera at every station?
A. No.
Q. Okay. Do you believe there is such a requirement?
A. No.
Q. Okay.
A. Common practice, but not a requirement.
Q. New Jersey Transit was not required to have NICE vision cameras at Elizabeth Station. Is that right?
A. Not to my knowledge.
Q. Hypothetically, even if there was a NICE vision camera at Elizabeth Station, how would it have prevented the assaults after the train left Woodbridge?
A. Had there been an awareness of the camera there and an awareness of the event, which was well-known, somebody could have been observing the camera and possibly deployed resources when they saw it getting crowded. Again, there is never a guaranty that this all would have been prevented.
Q. Right, but what information do you have that would lend -- make it more probable than not that a camera observing the crowds at Elizabeth



Station would have stopped the assaults that occurred on the train after it left Woodbridge?
A. I mean just the camera itself, it would not have been adequate. A camera being observed, re-deployment of resources, the potential, not a guaranty, to at least adequately respond and uniform officers could have served as a deterrent to what happened, as opposed to no response and no pre-planning and no camera.
Q. When we took the break a little bit ago, did Mr. Katz instruct you to turn off your camera and microphone before he called you?
A. I don't recall exactly, but I believe so.
Q. Okay. And --
A. When we took the break, I mean I did it on my own.
Q. And when you spoke with Mr. Katz, were you discussing the strategy of some of my deposition questions?
A. I'm sorry, could you just repeat that.
Q. When you spoke to Mr. Katz about my deposition questioning, did you discuss the strategy of how the questions were being asked?
A. I don't recall discussing the strategy,



no.
Q. Okay. Did you recall him telling you about my questioning of the possibility of certain other things occurring in the litigation?
A. No.
Q. Okay. What, if anything, else do you recall about your conversation with Mr. Katz?
A. Nothing that was not in my report or in prior conversations that wasn't previously discussed.
Q. Do you recall him telling you what he was going to ask you on cross-examination?
A. Specifically, no.
Q. Well, non-specifically, do you recall that?
A. No, other than him saying that there would be a cross-examination.
Q. Okay. And he was discussing some of the things that he would bring up on cross-examination, correct?
A. I don't remember anything specific, but yes.
Q. Okay.
A. I didn't take any notes during the conversation.
Q. I should have asked this in the



beginning, is there anything, whether medication, medical condition or otherwise, that's affects your memory here today that would impede your testimony?
A. No.
Q. Okay. Is there anything preventing you from remembering the details of your conversation with Mr. Katz an hour ago?
A. No.
Q. Okay. I have nothing further.
RECROSS-EXAMINATION BY MR. KATZ:
Q. I think I may have one or two questions. Mr. Coan, during your career in law enforcement, did you attend various conferences concerning law enforcement?
A. Yes, I did. Not only internally with NYPD and MTA, but externally with international associations with Chiefs of Police and New York State Chiefs of Police, those types of events.
Q. During those type of events, did you have an opportunity to hear presenters on various aspects of law enforcement and policing?
A. Yes, I did.
Q. Did you also have an opportunity to speak one-on-one with other senior officials of police departments around the country?

Page 106

A. Yes. We had, you know, sometimes we would have specific meetings with just chiefs of commuter rails.
Q. You have testified in response to Mr. Stockdale's questions that many of the opinions you have written today are not set in stone in writing, in written standards. Is that correct?
A. That's correct.
Q. Are the principles that you have presented in your report and that you have testified to today principles that -- are they the same principles that the vast majority of people in law enforcement hold based on your experience in discussing these things with them and attending conferences and hearing presentations at conferences?
MR. STOCKDALE: Objection, this is not contained in his report. Objection, leading.
Q. You can answer.
A. Based on my experience, yes.
Q. And when you say based on your experience, let me know in a little more detail what that experience is. What are you basing your opinion that this is a common approach, rather than just your own personal approach?
A. As I mentioned earlier, I alluded to it

Page 107

in my report, so 35 years experience with law enforcement, over eight of those years was as Chief of the Department of the MTA Police, which polices the largest and second largest transportation on commuter rails in the country and based on, you know, my years of experience, knowledge of upcoming events is essential; knowledge of day-to-day activity, which is affecting your rails and your stations, is an absolute necessity, not only for the MTA, but for all commuter rails; this way you can adequately address potential situations. Again, you are not going to address everything, you are not going to prevent all occurrences that affect crime and safety, but you certainly have a duty and responsibility to have the awareness, adequately plan and deploy your officers and work with your law enforcement partners.
Q. Now, is that an opinion that you hold alone or do you happen to know that's an opinion held by the Chiefs of Police and other senior management people that you have interacted with over your career?
A. That's an opinion that I hold and it's held by many people who not only were in the same position I was in, but that were within that position. We actually had meetings with, you know,

Page 108

commuter rail chiefs throughout the country. We had conference calls monthly and numerous events and deployment procedures and operations would be discussed. It is standard police practice.
Q. No other questions.
REDIRECT EXAMINATION BY MR. STOCKDALE:
Q. Mr. Coan, just briefly, I won't keep you much longer, but in your experience is it ever advisable for a train crewman to punch a passenger?
A. In self-defense, again, it's speculation.
Q. Well then --
A. Every situation is different.
Q. Well, let's talk about this situation. Did you read the deposition testimony of Danielle Tramantano?
A. I do recall reading it, yes.
Q. Are you aware that she ran after one of the assailants with a hand iron?
A. I mean I don't recall specifics of it. I don't believe I mentioned her specific actions in my report, so I don't remember it specifically.
Q. I wouldn't have expected you to, but you are aware that after the assault, they jumped down on to the track and chased one of the assailants. Is

Page 109

that correct?
A. I believe somebody jumped on to the tracks and her and another crew member went on to the tracks because that's a major major safety concern if somebody is on the tracks.
Q. What do you mean -- strike that.
Are you aware that she struck that individual with a closed fist?
A. I don't recall from her testimony, from the -- I don't recall that specifically.
Q. Is that something that would be proper to do, for a train crewmen to track down somebody off of the train and punch them?
A. Depending on the circumstances, it could possibly be if she wanted -- in self-defense.
Q. What part of chasing somebody down and then punching them is self-defense?
A. Well, if they are on the train tracks trespassing, putting their life in danger, along with other passengers and crew in danger, I'm not going to say specifically what exactly was going through -- what her mindset was, but if you are trespassing on the tracks, which this individual was, as you just stated, and she is trying to prevent somebody from getting hurt, up to and including herself on the

Page 110

tracks, then I can't say specifically what she would do or not do.

Q. I'm talking specifically about the facts of this case, which is the whole point of what this deposition is. Are you allowed to strike somebody because they are trespassing?

A. Again, somebody who jumped off the train on to the tracks, her specific actions I can't say whether or not -- I'm not really in a position. That's not what I looked at when I reviewed this case, her specific actions that you are talking to.

What I reviewed is what the police department did and did not do and what New Jersey Transit Rail Operations did and did not do.

Q. Are you aware of what a citizen's arrest is?

A. I am more aware of what a citizen's arrest is in New York State than New Jersey.

Q. What is it in New York State?

A. A crime that's in fact committed and a felony in fact committed in your presence when a citizen makes an arrest.

Q. The person has to observe the felony occurring, correct?

A. Correct.

Page 111

Q. Then the felony has to be actively ongoing, correct?

A. I believe so, yes. In fact committed, yes.

Q. Then they can make a citizen's arrest?

A. In New York State, yes.

Q. Okay. Are the citizens allowed to use force, are they allowed to punch somebody in order to make a citizen's arrest for trespassing?

A. In New York State for trespassing, not that I recall.

Q. Are you aware about --

A. Again, if it was -- again, we are kind of digging into the weeds here. Depending on where they are trespassing, I would say in New York State whether or not you could use force if it is in your house or on your property.

Q. If you were faced with a situation at the MTA when you were the police chief, you were training the conductors let's say --

A. Right.

Q. -- and you have a situation where an assault on a train takes place and one of the perpetrators absconds from the train, they leave the train and run away --

Page 112

A. But they run away on to the railroad tracks?

Q. Yes, on to the railroad tracks.

A. Okay.

Q. Would you advise that train crew to track that person down, punch them, put themselves in harm's way and then drag that person off the tracks?

A. Based on what you just said, I would speculate, again, it's a speculative question, probably not.

In this case we're dealing with somebody who was previously assaulted and we don't exactly know all of the circumstances in her mindset. Again, that's not exactly what I looked at. I looked at the rail agency and the police response.

Q. Would it be proper for a train crewman to seek revenge on an assailant who just punched them?

MR. KATZ: Objection to the question. There is no evidence of revenge being sought.

A. It is a hard question to answer because there is self-defense, revenge, spontaneous moments after you were already assaulted, I don't know if that would be considered revenge. I think we are getting into a very speculative area.

Page 113

Q. In order to use self-defense, your person has to be in jeopardy, right? You have to fear for your safety, correct?

A. Correct.

Q. What part of Danielle Tramantano chasing down one of the assailants and putting her life in jeopardy or her person in jeopardy, would she have been able to use self-defense legally?

A. I think we need to ask her that, correct? She was there. Again, I didn't look at her specific actions. You would need to ask her that.

Q. Hypothetically, do you think that chasing someone down and striking them sounds like an action that was done in self-defense?

A. Hypothetically, again, we're dealing with -- it's hypothetical, but we also know there was an incident where this individual was assaulted and it's -- it sounds to me like it was part of the ongoing assault and then somebody gets on to the tracks that needs to be removed from the tracks because you can't allow people to trespass on tracks and there is no police presence there at this time, so I really don't want to get into whether or not it was self-defense or not. I think that's beyond my scope of this report.

Q. In New York State or New Jersey or any jurisdiction you are aware of, is it ever legal to shoot somebody in the back in self-defense?
MR. KATZ: Objection. There is no weapons used in this case.
MR. STOCKDALE: It's a hypothetical question.
A. Hypothetically, you can use force to the amount that you need to to defend your life or somebody else's. Where -- if that is -- if that becomes deadly physical force -- if deadly physical force is being used against you or you believe it is about to be used against you and/or a third party and you use deadly physical force back, if you are being threatened with deadly physical force and you believe your life is in danger or a third party's life is in danger, hypothetically or speculatively, you can't even begin to say if somebody discharged a weapon where you can shoot that person. There is nothing like that. It's based on whether or not you feel your life is or a third party's life is in danger as to what physical force you are going to use to prevent and terminate that action.
Q. I have no further questions.



RECROSS-EXAMINATION BY MR. KATZ:
Q. Mr. Coan, I just have a couple more since Mr. Stockdale led us down this yellow brick road, let me continue the journey a little bit. Are you a member of the --
MR. STOCKDALE: Lollipop Guild, Larry?
MR. KATZ: No, I'm actually sometimes referred to as the wicked witch.
Q. You would agree it's unsafe for a civilian to be walking on a train track, correct?
A. Correct.
Q. If a member of the crew knows that somebody who had been on the train jumped on the train tracks, it would be part of the crew's responsibility to try to protect that person from the harm of being on a train track, do you think?
A. I would agree with that. If somebody is trespassing on the tracks, they are putting themselves and others in danger.
Q. And rather than taking the position of seeking revenge, would it be reasonable for a member of the train crew to sucker punch the individual because he's continuing to refuse to get off the track and to, thus, disable him so he can be brought to safety? Would that be a reasonable action?



A. I think that as opposed to revenge, I think you are correct, it would be more to prevent and terminate danger.
Q. No other questions.
MR. STOCKDALE: All right, I guess we are done.
(The proceedings are adjourned 1:30 p.m.)



C E R T I F I C A T E

I, KAREN L. OLIVEIRA, a Notary Public and Certified Court Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony of the aforementioned first duly sworn by me.

I do further certify that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Notary Public of the State of New Jersey
Certificate Number XI01575

**A**

**a.m (1)** 1:17
**ability (2)** 29:11,20
**able (17)** 6:19 23:2 28:20 32:21 38:17 42:18 46:1,3,16 47:20 49:5 51:20 61:7 70:21 74:17 81:11 113:8
**above-entitled (1)** 1:13
**absconds (1)** 111:24
**absent (2)** 79:5,6
**absolute (1)** 107:9
**absolutely (5)** 23:13 54:15 91:9 96:20 96:24
**accepting (1)** 81:12
**access (4)** 74:2 90:4 93:1,2
**accommodate (2)** 23:2,4
**accurate (1)** 117:6
**act (2)** 7:2 98:10
**acted (2)** 25:25 79:23
**action (10)** 1:2 23:4 25:23 26:2 85:6 113:14 114:23 115:25 117:11,14
**actions (7)** 11:14 71:25 85:13 108:21 110:8,11 113:11
**actively (1)** 111:1
**activity (5)** 77:5 85:21 86:11,20 107:7
**acts (3)** 29:14 31:6 38:16
**actual (3)** 12:19 26:10 33:23
**addition (1)** 74:10
**additional (24)** 16:9 16:19 26:19 28:6 29:16,19 37:19 45:14 52:1,16 64:25 65:1 66:11 69:16 70:14,18 71:18 72:25 73:17 73:21 74:6 75:13 75:14,16
**address (3)** 57:2 107:10,12
**addresses (1)** 85:8
**adequate (13)** 29:15 30:2 31:15 46:13 52:18 71:13,16 73:24 79:8,10 84:17 86:18 103:4
**adequately (9)** 42:7 52:14 84:25 91:8 93:16 101:4 103:6 107:10,15
**adhere (1)** 77:21
**adjacent (1)** 16:13
**adjectives (1)** 96:5
**adjourned (1)** 116:7
**administered (1)** 94:5
**administrative (1)** 23:8
**admissible (1)** 89:18
**admit (1)** 88:17
**advice (1)** 23:20
**advisable (3)** 80:25 81:5 108:9
**advise (1)** 112:5
**affect (1)** 107:13
**aforementioned (1)** 117:7
**afternoon (1)** 59:19
**agencies (1)** 77:4
**agency (6)** 22:16 53:7 98:25 99:15 100:12 112:15
**ago (8)** 5:13 28:2 48:10 50:7 53:24 77:9 103:10 105:7
**agree (36)** 6:15 12:6 12:11,17 13:18 15:13,23 21:20,23 24:18 25:10 28:13 31:16,22 32:7 40:7,8 45:24 48:15,18,19 49:3 49:24 50:6,8,11 50:15 51:23 53:9 67:7 69:21 79:1 98:14 99:18 115:9 115:17
**agreed (2)** 66:10 68:5
**agreement (1)** 99:9
**agreements (4)** 26:21 35:14 91:7 99:17
**ahead (2)** 47:16 54:10
**aid (3)** 26:20 35:13 91:7
**Alex (8)** 4:8 14:17 18:25 48:23 49:25 55:10 95:20 97:16
**ALEXANDER (1)** 2:8
**allegations (1)** 11:7
**allocate (1)** 90:16
**allocation (1)** 86:1
**allow (1)** 113:21
**allowed (3)** 110:5 111:7,8
**alluded (1)** 106:25
**Amboy (17)** 13:20 13:23,25 15:8,13 15:19 16:7,19 62:23 66:7,7 67:20,25 68:1 70:23 71:7,14
**amount (15)** 20:2 20:20 21:1 23:3,5 27:2,3 76:11,13 81:10 82:9 87:15 87:16 88:18 114:9
**Amtrak (3)** 17:22 19:25 61:13
**and/or (3)** 16:10 79:23 114:13
**anniversary (1)** 32:11
**answer (20)** 16:2,8 18:23 19:1 21:5 26:8 27:14 37:1 51:1 70:25 80:17 81:4 85:15 87:12 89:3,19 95:19 96:12 106:18 112:21
**answers (3)** 58:24 92:16 95:17
**Anthony (2)** 1:4 3:12
**anticipation (2)** 8:5 8:22
**anybody (1)** 20:12
**anyway (1)** 89:19
**apologize (7)** 14:3 15:17 35:3 56:17 57:9,11 59:1
**apparatus (1)** 36:13
**application (2)** 59:11 60:16
**appreciate (5)** 26:7 26:24 41:5 59:13 59:18
**apprised (2)** 101:9 101:14
**approach (2)** 106:23,24
**appropriate (4)** 56:7,11 58:9 60:15
**approximately (5)** 7:1,14 61:11 62:13 63:9
**archway (4)** 49:14 49:21 50:1,6
**area (11)** 14:10 27:10 35:9,15 45:16 49:7,18 52:15 87:15,23 112:25
**areas (5)** 38:8 58:20 58:22,22 94:4
**arising (1)** 18:1
**ARRANGED (1)** 1:21
**arrest (6)** 72:12 110:15,18,22 111:5,9
**arrests (3)** 14:1 71:14 85:7
**arrived (2)** 25:7,14
**ascertain (1)** 32:21
**aside (1)** 56:8
**asked (13)** 55:15 57:4 76:1 85:12 85:24 86:22 88:22 90:10 91:23 99:5 99:7 103:24 104:25
**asking (11)** 27:25 37:1 40:8 41:9 43:17 52:5,6 56:22 64:11 73:4 73:6
**aspect (4)** 23:9 31:11 37:7 50:24
**aspects (2)** 94:3 105:21
**assailant (3)** 17:1 88:14 112:17
**assailants (11)** 12:7 12:23 15:10,22 16:3 42:18 73:12 74:8 108:19,25 113:6
**assault (21)** 12:19 24:23 25:18,21 42:19 53:12,13 62:7 63:20 66:2,8 67:12 70:20 71:3 71:15 88:19 92:6 93:18 108:24 111:23 113:19
**assaulted (10)** 12:8 12:13,24 15:11 63:15 73:2 83:21 112:12,23 113:17
**assaulting (1)** 12:18
**assaults (15)** 13:4 63:25 64:6,13 68:18,25 73:9 79:20 80:15 81:16 85:5,7 87:9 102:15 103:1
**assess (4)** 23:1,6,18 34:22
**assessment (10)** 26:22 29:2,10,13 34:11 39:13 58:13 58:16 69:12 72:20
**assessments (1)** 36:15
**assign (1)** 90:24
**assigned (6)** 27:8 63:6 64:21 71:10 74:11 92:12
**assignment (2)** 25:17 73:16
**assist (1)** 62:23
**associations (1)** 105:17
**assume (8)** 9:19 21:3 25:2 31:12 38:13 51:9,12 53:7
**assuming (1)** 52:18
**assumptions (1)** 10:3
**astroid (1)** 43:20
**attached (1)** 3:16
**attack (1)** 37:25
**attained (1)** 90:18
**attempt (2)** 58:19 73:13
**attend (1)** 105:13
**attended (4)** 12:24 17:1 32:24 88:1
**attendees (1)** 32:15
**attending (1)** 106:14
**attention (4)** 25:20 28:3 36:22 37:16
**attorney (2)** 117:10 117:12
**Attorneys (2)** 2:5 2:10
**attract (1)** 90:21
**audio (1)** 97:5
**August (1)** 1:16
**authorities (2)** 89:13 98:10
**authority (16)** 7:20 10:21 11:17 65:23 69:24 75:5,12 76:21,24,25 78:23 80:6 91:7 98:3,4 102:1
**available (8)** 25:23 26:6 46:20 70:19 70:22 75:14 94:11 94:14
**Avenel (1)** 14:16
**Avenue (1)** 1:24
**avoid (1)** 42:2
**aware (41)** 16:17,22 16:25 30:16 36:20 46:22 47:1 65:21 66:1 67:11 68:21 70:12 74:5 75:8 75:22,23 76:2,4,5 78:20,22,25 80:8 82:13 84:9,16,22

90:20 91:25 98:19 98:21 99:18,21 101:19 108:18,24 109:7 110:15,17 111:12 114:2
**awareness (8)** 38:24 46:13 64:15,19 69:11 102:17,18 107:15

**B**

**B (4)** 2:8 3:8 51:4 52:19
**back (19)** 28:1 32:22 38:15 39:5 40:17 41:18 42:3 48:4 60:1,2,3 67:15 68:20 73:5 73:21 79:14 97:13 114:3,14
**Bala (2)** 2:4,4
**Band (1)** 82:14
**bar (1)** 60:13
**bargaining (1)** 99:16
**base (1)** 35:18
**based (51)** 5:1,4 10:7 12:10 13:6,8 20:10 21:10 22:10 22:12,20 24:18 25:1,24 28:24 29:14 32:25 34:4 41:23 43:22 48:19 56:24 64:1,1 67:5 67:10 70:6 75:23 79:1 84:6 87:6 89:20 90:24 91:19 92:2,9 93:9 94:13 94:19 95:1 97:13 97:15,25 100:6,25 106:13,19,20 107:5 112:8 114:20
**basic (1)** 39:12
**basically (4)** 38:2 42:11 57:1 76:16
**basing (1)** 106:22
**basis (7)** 13:2 26:17 36:25 37:24 52:5 97:8 100:21
**bathroom (1)** 95:10
**bear (1)** 12:17
**began (1)** 66:3
**beginning (4)** 30:24 39:7 97:4 105:1
**behalf (1)** 4:10
**behavior (1)** 22:1
**believe (34)** 7:4,18 7:25 8:25 10:6 11:25 14:13 22:9 25:9,12 29:15
47:25 54:16 56:11 62:9 63:6 69:20 78:2 84:23 85:16 85:24 86:24 92:16 93:10,17 96:6 100:1 102:4 103:13 108:21 109:2 111:3 114:12,15
**best (6)** 12:11 17:19 44:24 45:7 56:13 58:14
**better (8)** 13:3 29:9 39:18 51:17 60:22 85:4 93:17,18
**beyond (1)** 113:24
**big (7)** 31:24 33:4 33:10,13,16 36:2 43:6
**bigger (2)** 34:23,25
**bit (4)** 39:23 85:23 103:10 115:4
**Blotter (2)** 3:13 62:12
**blue (4)** 14:23,24 49:10 67:19
**board (2)** 16:4 42:18
**boarded (2)** 16:4 17:2
**boarding (2)** 73:1 93:2
**boisterous (1)** 21:22
**book (1)** 33:23
**booth (3)** 45:8 46:15,18
**bottom (5)** 14:10 15:1 19:2 45:12 67:18
**Bowl (3)** 34:17 35:1 76:5
**box (1)** 45:3
**break (9)** 25:8 53:19,23,24 55:17 55:18 60:20 103:10,16
**breaks (2)** 95:11 96:18
**brick (1)** 115:3
**brief (5)** 53:22 55:8 55:17 60:5 81:22
**briefly (1)** 108:7
**bring (4)** 57:5 81:11 99:15 104:18
**bringing (1)** 83:17
**broke (1)** 86:8
**broken (1)** 85:23
**brought (3)** 36:22 37:15 115:24
**Brown (2)** 82:14 84:21
**bullet (4)** 74:17,18 74:24 79:22
**bulleted (1)** 77:19
**bureau (1)** 39:8
**bypass (1)** 74:1
**bypassed (1)** 66:15
**bystanders (1)** 81:2

**C**

**C (11)** 1:12 2:1 3:11 4:1,1 14:6 17:10 67:15,16 117:1,1
**CAD (2)** 3:13 62:12
**call (25)** 21:8 22:10 22:17 23:14,25 24:2 25:4 33:25 35:19,25 36:4 45:14 46:13 53:16 55:19 59:23 60:2 61:8,20 62:2,3,6 62:10 78:19 92:13
**called (6)** 13:13 19:25 31:8 55:19 62:10 103:12
**calling (1)** 59:17
**calls (7)** 43:5 61:2 61:23 62:6 82:3 85:5 108:2
**camera (14)** 94:3,10 94:14,20 95:2 102:2,14,18,20,25 103:3,4,9,11
**cameras (3)** 44:19 94:6 102:10
**cancel (1)** 54:23
**canister (1)** 88:16
**capable (1)** 79:4
**capacity (1)** 76:21
**Captain (5)** 29:17 34:13 44:20 76:3 84:19
**car (5)** 80:15 81:1 81:15 87:1 88:15
**Cardinal (1)** 2:9
**care (14)** 22:15 23:25 25:3 28:17 40:21 41:5 42:1 45:20 53:6 65:12 69:25 97:22 98:2 98:9
**career (6)** 5:17,18 10:19 39:6 105:12 107:21
**carry (6)** 80:5,10 98:17,23 99:19 101:11
**case (57)** 4:12,17,25 8:18 9:14 11:5,6 11:10,13,16,19,24 11:25 12:1,12,24 15:11,23 16:5,13
17:1,14,18,22 20:11 22:6 28:10 28:13,23 34:8 35:23 37:24 40:1 41:4 54:2 55:15 56:23 58:8 59:5 61:3 63:23 64:3 66:20 71:2 74:19 79:14 81:14 92:3 93:10 96:13 97:21 97:23 100:22 110:4,11 112:11 114:5
**cases (4)** 7:9,16,18 11:13
**category (1)** 9:8
**causation (1)** 73:6
**cause (8)** 13:7 21:25 21:25 38:6 72:10 72:11 87:17 95:12
**Cedar (1)** 1:24
**celebrate (1)** 38:11
**center (3)** 14:10 94:15,16
**certain (8)** 7:21 45:15 58:18 66:15 90:2 94:4 101:3 104:3
**certainly (15)** 29:8 41:2,20 56:9 57:10 58:9 64:8 69:2 71:12,22,22 84:16 85:3 88:6 107:14
**certainty (2)** 85:19 85:25
**Certificate (1)** 117:20
**Certified (2)** 1:14 117:4
**certify (2)** 117:5,9
**CETC-9 (1)** 20:1
**cetera (1)** 99:10
**chance (3)** 18:15 24:16 66:24
**change (5)** 5:6,7 95:12 96:12,18
**changes (1)** 96:8
**charge (3)** 84:10,14 95:4
**chased (1)** 108:25
**chasing (3)** 109:16 113:5,13
**check (1)** 23:20
**checked (1)** 72:2
**chief (7)** 35:11,22 76:23 89:12 90:1 107:2 111:19
**chiefs (5)** 105:17,18 106:2 107:19 108:1
**Chris (5)** 3:11 17:6 17:14,18 61:10
**circumstance (1)** 98:12
**circumstances (4)** 70:10 98:5 109:14 112:13
**citations (1)** 10:24
**cited (2)** 11:1 100:16
**citizen (1)** 110:22
**citizen's (4)** 110:15 110:17 111:5,9
**citizens (1)** 111:7
**city (2)** 4:2 92:24
**CIVIL (1)** 1:2
**civilian (1)** 115:10
**clad (1)** 47:8
**claimed (1)** 64:15
**clarify (1)** 16:23
**clear (1)** 46:23
**clip (1)** 47:7
**closed (1)** 109:8
**clothes (1)** 44:19
**Coan (45)** 1:5 3:3 4:7 8:17 10:1 14:5 14:23 18:13 21:10 27:19,20 28:1,20 36:18 37:1,14 39:21 47:6,20 49:3 52:8 53:23 54:5,12,24 55:2,6 60:6,9,14,20 65:9 66:21 69:21 74:12 76:17 81:23 86:22 95:9,23 96:16 97:20 105:12 108:7 115:2
**Coan's (3)** 3:10 37:5 96:7
**coast (1)** 13:10
**Coffey (2)** 2:3 10:8
**collective (2)** 91:17 99:16
**Colombia (1)** 38:12
**Colombian (25)** 9:5 12:25 13:4,7 16:14 17:1 29:1 29:25 30:17,21 34:22 37:14 38:11 38:18 41:6 43:3 44:3 48:2,14 75:7 82:8 85:1 88:25 89:7 91:20
**color (1)** 14:19
**come (5)** 38:20 39:4 40:23 41:2 100:10
**coming (3)** 38:22 43:6 74:2
**command (3)** 45:3 84:7 94:16

**commencing (1)** 1:17
**committed (3)** 110:20,21 111:3
**common (3)** 100:14 102:8 106:23
**communicate (1)** 41:11
**communicated (1)** 54:19
**communicates (1)** 51:14
**communication (...** 35:4 45:11 50:21 51:6,11,13,21 60:17 76:7 86:19
**communications (...** 17:22,23 36:6 63:13
**community (1)** 64:19
**commuter (6)** 77:1 100:7 106:3 107:5 107:10 108:1
**commuters (2)** 65:6 84:18
**company (1)** 77:25
**complete (1)** 58:15
**completely (1)** 81:9
**completeness (1)** 19:5
**comported (1)** 45:20
**concern (9)** 20:4,21 36:23 58:23 86:21 87:19 88:8 93:5 109:4
**concerned (2)** 21:16 88:22
**concerning (4)** 83:10 86:23,25 105:13
**concerns (7)** 21:18 21:20,22,23 37:19 87:18 88:5
**concert (3)** 82:14,19 84:21
**conclusion (1)** 37:17
**conclusions (1)** 57:24
**concrete (1)** 71:2
**condition (6)** 22:18 23:16 61:9,14 87:14 105:2
**conditions (2)** 13:6 88:6
**conduct (4)** 39:25 89:15 95:18 96:1
**conductor (4)** 62:10 63:15,21 98:22
**conductor's (1)** 78:2
**conductors (6)** 78:14,24 80:9 98:17 101:11 111:20
**conference (1)** 108:2
**conferences (3)** 105:13 106:15,15
**confined (3)** 81:1,7 81:15
**connected (1)** 12:14
**consider (2)** 30:6,14
**considered (1)** 112:24
**constitute (1)** 83:12
**construction (1)** 45:1
**consultations (1)** 5:16
**contact (1)** 23:1
**contain (1)** 4:24
**contained (8)** 22:6 27:1 34:7 89:21 97:3,9 100:1 106:17
**continue (3)** 55:3,4 115:4
**continuing (2)** 88:19 115:23
**contrary (1)** 84:23
**control (12)** 15:24 18:2 23:1 38:16 71:24 72:2 77:4 81:12 86:3 94:15 95:7 101:5
**conversation (8)** 35:25 50:24 51:2 54:5 96:17 104:7 104:24 105:6
**conversations (7)** 8:3 36:5 58:4 83:23,24 91:22 104:9
**cooperation (1)** 91:1
**coordinated (1)** 64:22
**coordination (1)** 86:2
**copies (1)** 78:2
**copy (1)** 47:11
**correct (103)** 4:13 4:14 5:2 6:5,6 8:10,19,20 9:16 11:20 12:16,21 13:25 14:1 15:20 15:21 16:6,11,15 16:16,20 17:16 19:15,16 20:17,18 21:14,19 22:13,14 23:10,11 24:1,2,5 25:5,11 26:3 28:19 30:11,14,15 32:19 33:1,2,11 34:20 41:7,8 42:20 44:7,8,21 44:22 46:11,19,21 46:24,25 47:5 48:13 51:19,22 52:11,12 53:8 61:17,18,22 62:23 62:24 63:2,11,17 66:12,13 68:6,7 73:19 80:3 83:7,8 83:13 89:1,4 92:21 99:20 101:20,21,24 104:19 106:7,8 109:1 110:24,25 111:2 113:3,4,10 115:10,11 116:2
**correctly (4)** 10:12 28:7 80:2 92:19
**counsel (8)** 54:18 55:19,23 58:4 60:9,17 117:10,12
**counter (1)** 26:22
**counter-terroris...** 39:8
**counties (1)** 35:13
**country (5)** 38:19 77:1 105:25 107:5 108:1
**couple (8)** 15:7 32:7 47:17 55:7 57:17 58:21 95:10 115:2
**course (1)** 25:23
**court (11)** 1:1,15,22 5:19,22,24 6:1,13 7:24 57:12 117:4
**courts (3)** 7:17,21 7:22
**cover (4)** 27:10 35:9 52:14,19
**covered (5)** 9:11 35:2,12 50:20 51:25
**covering (1)** 69:20
**crane (1)** 45:8
**create (1)** 87:7
**creating (1)** 52:4
**credentials (1)** 77:12
**crew (18)** 12:8,18 12:24 13:15 42:9 42:19 75:13 79:20 81:17 86:7 93:8 93:20 99:15 109:3 109:20 112:5 115:12,22
**crew's (1)** 115:14
**crewman (2)** 108:9 112:16
**crewmen (2)** 101:15 109:12
**crews (7)** 75:1,6 76:15 78:18 83:21 99:19,21
**crime (4)** 38:15 82:1 107:13 110:20
**criminal (7)** 5:24 11:14 31:5,10 85:21 86:11,20
**criteria (1)** 37:25
**CROSS (1)** 3:3
**cross-examinatio...** 54:20 57:6,20 58:21 83:1 104:11 104:16,18
**crowd (22)** 13:6,13 15:24 18:1,4 19:20 20:12 21:13 22:2,3 29:10 33:22 38:15 46:14 53:4 61:13 71:23 72:7 75:1 87:14 90:5 101:4
**crowded (8)** 23:15 46:2 65:4 68:10 72:4 87:5 94:23 102:21
**crowding (2)** 87:19 88:6
**crowds (11)** 38:5 46:10 89:5,13,20 90:15,20,21 92:5 92:18 102:25
**cure (2)** 57:20 59:4
**current (1)** 6:24
**cursor (2)** 49:20 50:1
**cut (1)** 36:18
**Cynwyd (1)** 2:4

**D**

**D (4)** 3:2,11 19:8 21:12
**Daily (1)** 77:5
**damaged (1)** 41:24
**danger (7)** 109:19 109:20 114:16,17 114:21 115:19 116:3
**dangerous (1)** 89:15
**dangers (1)** 87:9
**Daniel (2)** 1:4 4:11
**Danielle (6)** 1:3 4:10 80:14 81:14 108:15 113:5
**dark (1)** 67:19
**darker (1)** 14:24
**date (3)** 26:10 42:17 59:12
**dated (2)** 4:15,23
**dates (1)** 75:24
**day (38)** 12:25 13:4 16:14,14 17:1 20:14 27:17 30:17 30:21 34:22 35:19 36:4 37:14 41:6 43:3 44:3 46:24 48:2,14 55:4 64:13 72:22 75:7 79:20 82:8,8,11 82:14 83:20 84:1 84:6 85:2 86:2,7 89:1,7 92:12 95:4
**day-to-day (1)** 107:7
**deadly (4)** 114:11 114:11,14,15
**deal (2)** 71:23 72:6
**dealing (2)** 112:11 113:15
**decide (1)** 29:15
**defeat (2)** 54:18 55:22
**defend (1)** 114:9
**defendant (3)** 1:9 4:9 55:11
**Defendants (1)** 2:10
**define (1)** 84:12
**Definitely (1)** 30:10
**degree (1)** 85:25
**delays (1)** 90:3
**department (45)** 5:17 10:22 23:17 29:5,9,22 30:1 39:1 41:17,25 43:5 44:2 45:17 50:22,25 53:3 64:12,22 65:3,24 69:10,24 73:8 74:25 75:5 76:2 76:24 79:9 81:25 84:16 85:14 90:20 90:25 91:4,6,13 94:24 97:22 98:22 98:24 99:8 100:13 101:10 107:3 110:13
**department's (1)** 41:19
**departments (19)** 10:20 33:24 34:3 35:7,10,14 36:1,7 36:9 39:11 40:25 41:11 81:24 90:23 91:2,5 98:16 101:2 105:25
**depending (6)** 31:4

46:6 82:20 88:16 109:14 111:14
**depends (3)** 33:16 33:18 72:19
**deploy (9)** 29:19,19 45:15 82:1,4,10 82:18 86:17 107:15
**deployed (10)** 45:18 46:6 48:15,20 84:22 92:11 93:16 94:4 95:5 102:20
**deployment (6)** 44:14,16,17 46:8 103:5 108:3
**deposed (4)** 5:9,15 9:25 35:23
**deposing (1)** 55:14
**deposition (43)** 1:4 3:11,12,14 6:2,8 8:6 9:18 17:5 18:9 18:14 24:7,8,19 47:13 54:1,13,13 54:15,19,23 55:13 55:21 56:2,6 57:14 58:6,15 59:11 60:10,11,19 66:19 67:6 83:4 88:21 95:18 96:2 97:10 103:19,23 108:15 110:5
**depositions (9)** 7:8 9:14,15,20,21,23 91:11,20 92:2
**describe (4)** 35:3 44:24 45:7 48:11
**described (3)** 27:6 29:18 33:15
**describing (2)** 26:18 28:5
**description (2)** 3:10 87:6
**descriptions (1)** 87:4
**desk (1)** 54:4
**detail (1)** 106:21
**details (1)** 105:6
**detain (1)** 72:10
**deter (1)** 73:14
**determination (1)** 34:2
**determine (1)** 76:11
**deterred (2)** 85:21 86:10
**deterrent (4)** 73:13 73:16 86:13 103:7
**development (1)** 56:12
**device (4)** 45:11 51:12,13,21
**devices (2)** 79:25
80:10
**devious (1)** 59:3
**difference (1)** 79:14
**differences (1)** 96:9
**different (13)** 16:4 21:21,23,24 26:25 32:4 34:5 35:14 57:6 81:3 100:12 100:13 108:13
**differently (2)** 97:1 97:7
**difficult (5)** 40:13 70:25 80:16 81:4 88:17
**digging (2)** 99:9 111:14
**direct (7)** 3:3 4:5 26:12 46:3 50:17 51:17 54:21
**directed (4)** 28:3 36:4 84:4,6
**direction (1)** 14:14
**directly (2)** 35:18 89:9
**disable (1)** 115:24
**discharged (1)** 114:18
**discipline (1)** 6:4
**discovery (1)** 9:7
**discuss (3)** 53:25 55:1 103:23
**discussed (4)** 27:21 54:1 104:9 108:4
**discusses (1)** 61:1
**discussing (9)** 54:11 55:21,21,22 57:8 103:19,25 104:17 106:14
**discussion (6)** 29:8 58:7,10 60:12 95:12 96:10
**discussions (2)** 26:21 60:9
**dismissal (1)** 56:6
**disorderly (3)** 31:7 71:25 87:21
**dispatch (3)** 22:8 25:6 52:14
**dispatched (8)** 23:23 24:21 25:10 25:13,16 26:1 52:10 61:16
**dispatching (1)** 25:3
**dispense (1)** 6:7
**display (1)** 86:15
**disposal (1)** 82:1
**dispute (1)** 98:5
**DISTRICT (2)** 1:1 1:1
**divert (1)** 25:19
**diverted (1)** 26:2
**DJ (1)** 49:9
**document (1)** 41:16
**documents (11)** 8:4 8:7,19,21,24 9:9 9:10 10:9,15,16 12:4
**doing (7)** 6:10,20 29:21 43:7 56:17 75:17 93:4
**drag (1)** 112:7
**Drive (1)** 2:9
**due (1)** 65:9
**duly (1)** 117:7
**duties (1)** 23:8
**duty (2)** 27:17 107:14

**E**

**E (7)** 2:1,1 3:2,8 4:1 117:1,1
**E-mail (1)** 35:19
**earlier (9)** 4:8 25:2 32:16 34:12 61:10 61:15 75:15 95:10 106:25
**Early (1)** 88:21
**earth (1)** 43:20
**easier (1)** 76:12
**easily (1)** 88:2
**east (1)** 13:10
**easy (1)** 39:19
**economic (1)** 38:6
**effect (2)** 15:15,25
**effective (1)** 91:16
**effectively (1)** 82:4
**effects (1)** 46:10
**efforts (4)** 35:6 44:3 64:23 92:5
**egregious (1)** 95:25
**eight (2)** 27:8 107:2
**either (3)** 31:18 51:5 60:14
**electric-shock (2)** 80:1,11
**electronic (2)** 26:19 28:6
**elements (1)** 30:11
**eliminate (3)** 43:21 58:19,23
**Elizabeth (62)** 13:8 13:19 14:10,11,15 15:3,7,12,14,19 15:24 16:4,7,9,12 16:18 17:2,21,24 18:2 19:15 20:12 23:24 24:22 25:4 25:10 26:2 31:9 32:8 35:5 42:17 43:5,8 44:2 45:19 46:23 47:23 48:2 49:4 50:11 51:10
51:25 52:2,10 53:3 61:17,20 66:6,7 71:19 72:22 73:7 74:7 84:3 88:24,24,25 89:6 94:11 102:10 102:14,25
**else's (1)** 114:10
**employ (2)** 80:22 98:11
**employed (1)** 42:16
**employee (2)** 117:10,12
**employees (7)** 11:13 11:17 12:9 62:3 79:25 80:5 92:5
**employing (1)** 79:2
**empty (1)** 80:25
**en (2)** 25:17 61:19
**enabled (1)** 94:15
**encompass (1)** 35:15
**ended (2)** 59:23 85:6
**enforcement (18)** 9:24 41:12 69:13 77:16 85:19 87:8 89:24 90:14,25 93:3 94:19 97:14 105:12,14,21 106:13 107:2,16
**engaged (1)** 6:23
**ensure (3)** 42:13 65:5 84:17
**enter (1)** 82:23
**entered (1)** 66:5
**entry (4)** 63:9,14 72:14 73:22
**equipment (1)** 45:1
**erupt (1)** 22:3
**ESQ (2)** 2:3,8
**essential (1)** 107:7
**essentially (2)** 56:1 81:8
**establish (2)** 39:22 39:23
**established (2)** 15:18 52:8
**estimate (3)** 5:14,21 7:11
**et (1)** 99:10
**ethical (1)** 60:16
**Evaluation (1)** 26:16
**event (72)** 9:4 24:21 26:18 27:12 28:5 28:22,23 29:1,6 30:5,8,22 31:2,4,5 31:11,15,17,23,25 32:2,3,4,17 33:13 33:18,21 35:15,19
35:21,24 36:2,20 37:4,5,6,7,9,12 39:1 40:22 41:12 42:4,8 43:13,25 51:3 64:9,15,17 68:21 69:4,11 75:9,16 76:7 82:22 83:20,21 84:9,13,23 85:1 86:16 88:1 91:14 91:18,24 92:13,22 98:13 102:18
**events (26)** 16:18 29:18,25 34:6,13 34:23 60:22 75:6 76:3,8,8,9 77:5 82:7 84:19 87:24 89:5 90:21 91:25 92:1 101:4,5 105:18,19 107:6 108:2
**eventual (1)** 13:23
**eventually (1)** 73:2
**evidence (11)** 12:4 16:24 56:24,25 68:23 74:5 92:3,9 93:9 100:21 112:20
**exact (4)** 13:21 27:23 53:15 72:23
**exactly (9)** 33:4 56:15 66:4,16 84:12 103:13 109:21 112:12,14
**examination (4)** 4:5 43:14 97:19 108:6
**excerpt (6)** 3:11,12 3:14 18:9 24:6 66:18
**excess (3)** 23:5 32:23 98:13
**excuse (3)** 8:22 14:17 85:12
**executive (1)** 35:22
**exhaustive (1)** 30:12
**Exhibit (19)** 3:10 8:15,18 9:6 14:6 17:10,11 19:8 21:12 24:4,10 34:19 44:12 62:12 66:20 67:7,15,16 74:14
**exhibits (2)** 3:16 8:13
**exist (1)** 40:25
**exit (1)** 82:23
**expect (1)** 98:9
**expected (1)** 108:23
**experience (25)** 22:20 28:25 34:5

40:14 79:2 89:11 89:13,20,24 90:7 90:24 94:20 97:14 99:12 100:6 101:1 101:9,14 106:13 106:19,21,22 107:1,6 108:8
**experienced (1)** 36:10
**experiences (1)** 40:19
**expert (13)** 4:12 6:1 6:4,20,21,24 7:3 7:12 11:4 55:14 55:15,19,20
**expertise (1)** 23:9
**explore (1)** 58:22
**express (1)** 27:22
**expressed (1)** 27:24
**extend (1)** 45:2
**extensively (1)** 77:3
**extent (1)** 89:17
**externally (1)** 105:16
**extra (1)** 6:11
**extremely (2)** 87:5 94:23

**F**

**F (4)** 3:12 66:20 67:7 117:1
**faced (1)** 111:18
**fact (17)** 17:24 36:13,19,21 37:1 43:24 56:20,22 87:22,23 88:23 91:22 92:10,11 110:20,21 111:3
**facts (9)** 12:3 16:25 33:3 43:12 52:9 96:13 97:1,7 110:3
**failed (5)** 29:22 36:16,17 41:5 77:20
**failing (1)** 79:24
**fails (2)** 41:25 69:24
**failure (1)** 74:24
**failures (1)** 79:23
**fair (22)** 5:6,8 20:25 21:15,18 24:23,25 30:9 42:13,14 47:3 67:20,21 75:2 79:16,17 81:23 82:2,5,6 95:22,24
**fall (3)** 22:22 43:20 88:4
**far (2)** 86:9 91:20
**favor (1)** 88:20
**fear (2)** 22:23 113:3
**fears (1)** 58:20
**federal (2)** 7:24 8:1
**feed (1)** 95:16
**feel (3)** 26:13 90:17 114:20
**felony (3)** 110:21,23 111:1
**festival (14)** 9:5 13:7,7,9,16 29:1 29:25 38:11,18 48:3,14 75:11 85:1 91:21
**festival/parade (1)** 75:10
**field (1)** 90:25
**fifth (1)** 44:13
**fight (6)** 61:20,24 62:2 63:10 67:7 67:22
**figure (1)** 40:20
**filed (1)** 4:10
**fill (1)** 22:24
**film (1)** 48:6
**financially (1)** 117:13
**find (8)** 38:17 41:10 41:13 55:24 70:8 72:4,5 74:1
**fine (3)** 55:4,6 96:5
**fine-tune (1)** 88:13
**finish (1)** 54:9
**finished (2)** 65:7 85:9
**finite (1)** 81:25
**firm (2)** 6:24 7:2
**first (17)** 6:20 12:3 17:13 20:6 26:1 27:19 53:11,12 56:16 60:6 61:8 62:13,19,21 66:11 87:2 117:7
**fist (1)** 109:8
**five (1)** 5:23
**fixed (2)** 87:15,16
**fixture (1)** 45:10
**Florida (1)** 4:2
**focus (1)** 23:8
**folks (1)** 59:18
**follow (2)** 26:3 97:23
**force (11)** 81:10 88:18 95:3 111:8 111:16 114:8,11 114:12,14,15,22
**foregoing (1)** 117:5
**foreground (1)** 47:9
**form (2)** 87:11 89:2
**forming (2)** 8:22,23
**forms (1)** 13:2
**forth (3)** 29:16 60:11 77:22
**forward (5)** 23:22 54:17 57:15 59:5 60:14
**found (1)** 47:14
**four (1)** 27:8
**fourth (2)** 74:17,24
**free (1)** 26:13
**fresh (1)** 21:10
**front (5)** 6:16 8:9 10:4 78:1,4
**full (1)** 57:23
**function (2)** 41:19 75:19
**further (4)** 82:24 105:9 114:24 117:9

**G**

**gather (2)** 36:14 59:9
**gathering (4)** 37:24 38:10 39:17 41:1
**gatherings (2)** 38:1 90:20
**general (5)** 26:18 28:5 52:6 87:4,8
**getting (25)** 19:4 20:3,4,5,8,13,20 20:23,23 21:13,14 22:24 31:6 53:5 71:20 72:1 74:9 93:6 94:2,22 95:6 100:20 102:21 109:25 112:25
**Gilmartin (2)** 1:4 4:11
**Giovanonne (5)** 24:20 26:2 27:9 61:16 63:4
**give (9)** 7:8 26:8 43:14 46:12 49:17 57:7 66:14 81:19 100:22
**given (4)** 87:4 95:3 95:13 97:13
**giving (1)** 58:6
**go (21)** 17:9,10 22:25 33:20 38:15 39:13 41:10,13 45:3 47:16 52:20 54:10 57:15,18 58:20 59:5 60:3 67:15 70:8 86:9 90:11
**goes (9)** 28:13 32:22 42:3 45:4 61:6 68:12,20 73:20 86:19
**going (67)** 6:7,13 14:13 16:1,18 18:7 22:23 23:2,8 23:21 27:19 32:4 35:9,15 38:8 41:18 43:7,13 47:6,8,15,17 50:9 50:10 51:4 52:3 52:23 53:7,18 54:17,22,23,25 57:5,18 58:20 59:4,8 60:6,13,14 60:15 62:11 66:18 71:6,6 75:8 79:8 79:10 82:7,14,23 84:12 88:12 89:16 90:15,21 94:16 95:14,18,19 104:11 107:11,12 109:20,21 114:22
**good (2)** 4:7 83:12
**goodness (1)** 38:21
**Google (6)** 3:11 9:1 9:3 32:22 35:25 49:18
**gray (1)** 49:21
**Great (1)** 6:16
**green (1)** 50:4
**group (2)** 38:20 85:22
**guarantee (1)** 85:2
**guaranty (4)** 64:8 69:2 102:21 103:6
**guess (9)** 11:8 22:8 39:22 60:3,21 71:12 77:11 96:25 116:5
**guidance (1)** 56:4
**Guild (1)** 115:6
**guys (1)** 43:7

**H**

**H (4)** 3:8,13 4:1 62:12
**half (1)** 6:11
**Hammer (10)** 55:1 55:9 56:8 57:22 59:6,14,17 60:12 96:6,7
**hand (9)** 20:3,9,21 21:14 46:4,11 53:5 58:7 108:19
**handle (2)** 53:8 56:13
**handled (1)** 43:9
**hands-on (1)** 89:24
**Hanover (1)** 1:24
**happen (2)** 80:13 107:18
**happened (15)** 30:8 31:18 43:24 56:9 56:15 57:25 67:13 71:11,12,13,16 72:8 73:10 95:11 103:8
**happening (1)** 83:22
**happy (3)** 57:13 58:24 81:6
**hard (1)** 112:21
**hardships (1)** 38:6
**harm (1)** 115:16
**harm's (1)** 112:7
**Hart (2)** 2:8 55:10
**head (4)** 7:7 11:11 17:8 80:5
**heading (1)** 10:2
**hear (5)** 8:3 55:18 56:14 96:4 105:20
**heard (1)** 23:7
**hearing (1)** 106:15
**hears (1)** 95:23
**heck (1)** 56:15
**held (7)** 1:16 53:22 55:8 60:5 81:22 107:18,23
**helicopter (1)** 71:5
**help (5)** 6:13 14:17 14:19 46:9 57:16
**helped (1)** 45:21
**Hey (2)** 43:6 53:4
**hierarchy (1)** 37:3
**high (1)** 45:4
**highlighted (2)** 54:20 66:21
**historically (1)** 86:12
**history (8)** 13:9,16 29:21 39:6 75:23 76:13 82:22 95:16
**hit (4)** 20:5,22,22,24
**hold (6)** 4:25 14:2 22:5 106:13 107:17,22
**honestly (1)** 56:17
**Honor (5)** 55:10 56:5,7,16 59:21
**Honor's (1)** 59:13
**hope (2)** 51:13 59:18
**hour (1)** 105:7
**hours/seven (1)** 92:25
**house (1)** 111:17
**hundreds (2)** 42:5 87:24
**hurt (3)** 20:4,23 109:25
**hypothetical (7)** 33:17 36:24 43:16 70:24 73:6 113:16 114:6
**hypothetically (18)** 30:25 31:3 42:21 43:3,18 50:13

52:13,18 71:9,21 73:4 80:13,16 102:13 113:12,15 114:8,17

**I**

**idea (2)** 43:24 82:22
**ideas (1)** 96:21
**identifiable (1)** 86:14
**ignore (3)** 47:8 52:24 53:7
**image (1)** 50:10
**Imagine (1)** 45:7
**immediate (2)** 35:16 88:14
**impact (1)** 75:9
**impede (1)** 105:3
**implied (2)** 41:22 88:11
**important (5)** 6:9 30:6,13 74:19 96:14
**importantly (1)** 96:25
**improper (4)** 11:7 54:16 56:18 96:1
**inadequate (1)** 27:13
**inappropriate (1)** 57:10
**inappropriately (1)** 58:4
**incident (6)** 15:15 33:5 67:12 93:13 94:12 113:17
**incidents (10)** 30:7 30:16,20,23 31:2 31:5,7,10 37:17 42:13
**include (1)** 44:18
**includes (1)** 76:25
**including (4)** 10:19 77:3 84:9 109:25
**inconsequential (1)** 58:8
**increase (4)** 27:16 28:10 84:1 89:14
**increased (9)** 15:13 15:24 31:1 32:12 42:12 63:24,24 64:5 73:7
**increasing (1)** 29:24
**independence (1)** 38:12
**indicated (3)** 13:11 83:5 85:15
**indicates (1)** 12:23
**indication (1)** 91:21
**indicator (1)** 17:25
**indirectly (1)** 89:9
**individual (6)** 84:10 95:3 109:8,23 113:17 115:22
**individuals (6)** 9:24 12:7 38:2,2 88:3 95:4
**industry (1)** 100:4
**information (23)** 5:1,4 8:25 9:2,4 12:10,22 13:1,14 18:4,14 36:6,11 37:24 47:4 75:1 76:14 86:19 90:18 94:13 95:2 97:2 102:23
**informed (2)** 58:15 97:25
**initial (5)** 22:10 24:2 34:2 53:16 62:2
**initiate (1)** 99:14
**injured (2)** 41:24 81:17
**innocent (4)** 38:2 39:19 81:2,9
**innocuous (1)** 58:10
**input (1)** 59:13
**inquires (1)** 37:2
**inside (4)** 52:20 76:8,9 82:21
**instruct (2)** 95:19 103:11
**instructed (1)** 54:18
**Instructing (1)** 54:14
**instructions (1)** 6:8
**intelligence (14)** 26:22 29:12 34:10 36:11,14,19 37:23 38:9,13,16 39:8,9 39:11 84:10
**intelligence's (1)** 37:16
**intended (1)** 59:3
**interacted (1)** 107:20
**interested (4)** 65:10 65:11 96:7 117:13
**internally (1)** 105:15
**international (1)** 105:16
**introduced (1)** 4:7
**involved (3)** 7:18 33:25 34:3
**involving (3)** 11:16 62:2,3
**iron (1)** 108:19
**Island (3)** 77:2,4 92:17
**issue (10)** 26:9 28:2 56:23 57:2,17 58:17 60:12 72:12 72:15,16
**issued (4)** 4:13,16 11:23,25
**issues (6)** 21:1 28:22 31:9 71:24 86:21 89:22
**item (3)** 9:6,17 79:22
**items (4)** 9:1,7 10:8 10:22

**J**

**January (2)** 6:23 9:5
**jeopardy (3)** 113:2 113:7,7
**Jersey (106)** 1:1,7 1:16,24 2:10 3:11 4:9 7:20,21 11:16 11:18 12:8,14 14:7 22:7 23:3,23 25:2,25 27:2,15 28:9,15 29:4,4,12 29:13,23 30:6,17 31:12,13,16,20,22 32:9 34:8,9 35:4,8 35:8 36:16,17 37:3 38:25 40:2 41:4,16,17 42:15 43:4 50:22,23 51:5,6,7 55:12 61:12 64:12,21,21 65:10,23 67:24 68:17 70:10 73:8 74:7 75:11,20,21 76:2,14,15 77:10 77:13,20 78:6 79:7,9 81:24 82:10 83:24,25 84:14,15 86:3,3 91:13,14,15 92:4 92:4 93:11,11 94:4,9 97:22 99:6 99:6 102:9 110:13 110:18 114:1 117:5,19
**job (3)** 76:21 93:17 93:18
**Johns (1)** 4:2
**joint (1)** 99:9
**journey (1)** 115:4
**judge (14)** 6:4 55:1 55:3,9 56:8 57:22 59:6,14,17 60:12 95:22 96:5,6,15
**judgment (1)** 82:3
**Jujitsu (1)** 78:15
**jumped (4)** 108:24 109:2 110:7
115:13
**jurisdiction (2)** 92:1 114:2
**jury (1)** 6:5

**K**

**K (1)** 9:18
**Karate (2)** 78:15 99:23
**Karen (3)** 1:14 6:13 117:3
**Katz (53)** 2:3 3:4 8:4,16 14:17 16:1 18:10,12,25 21:4 24:13 26:4 27:18 32:1 36:24 43:10 43:19 47:10,15 48:23 49:2,25 50:5 52:3 53:25 54:5,6,10,11 55:5 56:16 58:18 59:21 59:24 60:4 62:17 62:19 67:1 83:1 95:20 96:4,14 97:16 103:11,18 103:22 104:7 105:7,10 112:19 114:4 115:1,7
**Katz' (1)** 7:2
**Kaye (2)** 2:3 10:8
**keep (3)** 69:8 90:5 108:7
**kids (1)** 32:7
**kind (2)** 36:8 111:13
**knew (2)** 51:3 64:17
**Knolls (1)** 1:24
**know (58)** 7:5 10:3 11:3 14:9,15 18:15,21 20:1 21:7 22:8,20 23:19 24:16 27:10 27:11 33:10 34:9 35:15,25 36:2,5 36:25 37:3,4,5,9 37:12 39:12 40:6 41:15 44:6 45:22 47:13 53:16 56:23 58:12 62:6 64:3 64:14,18 66:4,16 66:24 69:8 71:11 72:7 77:7,7 95:9 96:15 106:1,21 107:5,18,25 112:13,23 113:16
**knowing (3)** 37:7 87:2 96:7
**knowledge (23)** 11:22 12:11,16 16:16 28:25 33:3 34:21 35:23 36:2
38:14 49:6 68:7,8 68:15 69:3 80:7 84:8 90:8 91:24 92:22 102:12 107:6,7
**known (6)** 37:6 64:9 64:23 83:21 87:24 90:19
**knows (1)** 115:12

**L**

**L (4)** 1:14 4:1 9:6 117:3
**lack (3)** 28:23 39:18 60:22
**land (1)** 43:20
**landing (1)** 71:5
**Lane (1)** 4:2
**language (1)** 27:23
**large (32)** 13:13 16:17 27:10,12 28:25 29:10,18,25 31:4,11 32:17,20 38:1,5 39:17 40:22 41:1 53:4 64:16 69:4 75:9 77:5 85:1,22 86:16 89:13,20 90:15,20 91:25 92:18 94:8
**larger (3)** 13:11 34:13 92:24
**largest (4)** 13:10 77:1 107:4,4
**Larry (7)** 8:13 14:22 18:8 24:11 54:3,25 115:6
**law (20)** 9:24 41:11 69:13 77:16 85:19 87:8 89:24 90:14 90:24 93:3 94:19 97:14 100:14,14 105:12,13,21 106:12 107:1,16
**LAWRENCE (1)** 2:3
**lawsuit (1)** 4:10
**lead (1)** 95:25
**leading (1)** 106:17
**leap (2)** 50:19 52:17
**learned (4)** 36:10 38:4 89:23,25
**leave (1)** 111:24
**led (1)** 115:3
**left (11)** 49:9 66:22 67:8,23 68:18 70:20 71:3 76:16 79:11 102:15 103:2
**legal (1)** 114:2
**legalese (1)** 39:23

**legally (1)** 113:8
**lemonade (4)** 32:8 32:11,12,14
**lend (1)** 102:24
**let's (9)** 15:23 43:2 49:8 55:5 67:15 68:9 87:1 108:14 111:20
**level (2)** 26:10 91:12
**levels (2)** 11:8 28:3
**liability (1)** 37:8
**lies (1)** 23:10
**Lieutenant (7)** 3:14 24:7,19 25:24 27:5 40:15 70:6
**life (12)** 40:25 41:20 69:10,23 101:2 109:19 113:6 114:9,16,16,21,21
**light (1)** 79:23
**likelihood (1)** 89:14
**limited (3)** 90:23,25 92:18
**Linden (5)** 14:12,15 15:23 16:5,6
**line (29)** 14:19,23 14:24 15:1,4 18:17,19 19:1,7 19:11,21,24,25 20:20 24:5 31:24 55:16 60:1 62:13 62:19,21,22,25 67:19 69:19,20 74:11 79:7 95:15
**lines (3)** 19:9 24:15 58:13
**list (3)** 8:25 9:22 30:13
**listed (5)** 8:7 9:15 10:7 78:3 84:6
**lists (1)** 8:19
**litigation (3)** 1:23 56:3 104:4
**little (11)** 14:9 26:25 39:22 45:3 45:8 49:13 76:12 85:23 103:10 106:21 115:4
**live (1)** 49:18
**lives (1)** 69:22
**LLC (1)** 1:23
**LLP (1)** 2:8
**local (16)** 29:9 35:20 36:1 38:25 41:11 50:25 51:5 52:22 64:24 82:20 83:23,25 85:5 86:4 91:7,15
**locals (1)** 64:23
**location (6)** 13:17 29:2 52:1 82:20 82:21 94:5
**locations (2)** 7:17 76:9
**Lollipop (1)** 115:6
**long (6)** 6:20 77:1,4 86:5,20 92:17
**long-winded (1)** 15:17
**longer (1)** 108:8
**look (13)** 19:8 27:4 29:5,7 33:20 38:1 48:8 49:10 53:20 56:8 57:22 67:18 113:10
**looked (5)** 49:20 59:2 110:10 112:14,14
**looking (12)** 8:17 9:17 10:2 14:12 14:23 26:15 34:18 44:12 56:4 62:20 74:12,16
**looks (6)** 19:9 48:15 49:14 50:4 63:18 74:16
**lost (1)** 31:6
**lot (8)** 14:21 19:10 20:1 32:3 39:10 56:2 60:4 85:10

**M**

**M (2)** 1:3 4:1
**main (3)** 37:22 39:9 88:5
**major (3)** 88:8 109:4,4
**majority (3)** 94:5 98:10 106:12
**man (3)** 46:14 49:9 49:10
**manageable (1)** 90:5
**management (2)** 91:12 107:19
**mandatory (1)** 68:24
**Mania (4)** 34:17 35:1 76:5,10
**manner (1)** 79:10
**manning (4)** 27:6,7 31:14 40:15
**manual (10)** 33:20 33:23 34:4 77:22 77:25 78:3,7,22 101:19,20
**manuals (2)** 10:17 10:25
**map (4)** 3:11 14:6 14:19 49:18
**marked (10)** 8:15 14:6 21:12 24:4 24:10 34:18 62:12 66:20 67:7 74:13
**markings (1)** 48:17
**massage (1)** 95:25
**material (1)** 97:13
**materials (1)** 22:13
**matter (4)** 1:13 51:8 57:2 96:13
**matters (3)** 7:6,12 11:4
**mean (26)** 11:6 26:14 28:18,24 29:17 30:12 31:9 32:1,3,5 33:24 35:12 39:25 40:3 40:13 43:22 65:18 76:22 77:11 86:12 88:16 100:25 103:3,16 108:20 109:6
**meaning (2)** 7:16 69:6
**measure (1)** 39:25
**measures (4)** 15:24 26:23 85:14 86:10
**mechanisms (1)** 98:11
**medical (1)** 105:2
**medication (1)** 105:1
**meet (8)** 23:25 28:16 40:9 41:4 41:25 65:12 69:25 77:6
**meetings (2)** 106:2 107:25
**member (6)** 35:22 35:22 109:3 115:5 115:12,21
**members (3)** 75:13 93:8,20
**memory (2)** 61:8 105:3
**mention (1)** 27:11
**mentioned (26)** 11:3 22:9 25:13 32:23 34:12,16,24 61:10 64:7,14 66:12 69:1,14,17 70:3,13 75:14 76:4 84:2,5,19,21 92:13 101:22 106:25 108:21
**met (7)** 25:2,6 27:7 38:10 40:3 45:22 101:3
**Metro (3)** 11:17 77:2,4
**Metropolitan (3)** 10:21 76:23,24
**mic (1)** 56:19
**MICHAEL (2)** 1:5 3:3
**microphone (1)** 103:12
**middle (6)** 14:24 17:13 19:3 44:15 49:22 55:13
**miles (1)** 47:3
**mind (1)** 96:21
**minds (1)** 37:10
**mindset (2)** 109:22 112:13
**minimize (1)** 77:12
**minimum (25)** 23:13,17 27:6,7 29:1 31:14 33:14 36:3 38:9 39:3,3 39:16 40:2,9,11 40:15 41:25 42:6 64:20 65:12 69:18 70:4 81:10 92:11 95:6
**minute (1)** 50:7
**minutes (7)** 55:7 59:25 63:7,19,22 81:19 95:10
**misleading (1)** 27:20
**missed (3)** 9:12 30:24 97:4
**mitigate (1)** 46:9
**mobile (1)** 44:25
**modify (1)** 95:12
**moment (5)** 28:2 48:9 53:24 66:14 77:9
**moments (1)** 112:22
**monitor (1)** 46:2
**monitored (2)** 94:21 95:2
**monitoring (1)** 94:22
**monthly (1)** 108:2
**Mooney (2)** 24:7 40:15
**Mooney's (6)** 3:14 24:14,19 25:25 27:5 70:6
**morning (1)** 4:7
**move (1)** 56:6
**moving (1)** 25:18
**MTA (10)** 6:22 35:11 78:13 80:4 90:1 92:17 105:16 107:3,9 111:19
**municipalities (2)** 91:8,16
**mutual (3)** 26:20 35:13 91:7
**Myers (3)** 2:3 8:4 10:8

**N**

**N (4)** 1:12 2:1 3:2 4:1
**name (2)** 4:8 17:5
**named (1)** 4:12
**names (2)** 7:5 11:12
**nature (1)** 65:19
**near (1)** 31:18
**necessarily (1)** 34:4
**necessary (6)** 23:6 37:18 52:16 54:24 88:19 91:10
**necessity (1)** 107:9
**need (13)** 8:14 35:9 39:24 41:11 50:17 51:18 65:4 72:11 72:17 82:3 113:9 113:11 114:9
**needed (11)** 20:3 21:8 23:21 32:15 32:17 45:15,15 46:4 52:1 72:9 84:13
**needs (1)** 113:20
**neglected (1)** 36:15
**negligence (1)** 39:24
**neither (2)** 117:9,11
**never (15)** 6:3 25:7 36:21,22 37:15,16 38:20 64:8 69:2 83:19 84:12 85:2 88:10 92:12 102:21
**new (116)** 1:1,7,15 1:24 2:10 3:11 4:9 7:20,20,21,21 11:16,18 12:8,14 14:6 22:6 23:3,23 25:2,25 27:2,15 28:9,15 29:3,4,12 29:13,22 30:6,17 31:12,13,16,20,22 32:9 34:8,8 35:4,8 35:8 36:15,16 37:2 38:25 40:2 41:4,16,16 42:15 43:4 50:22,22 51:5,6,7 55:12 61:12 64:12,21,21 65:10,23 67:24 68:16 70:9 73:8 74:6 75:11,20,21 76:1,14,14 77:10 77:13,20 78:6,17 79:7,9 81:24 82:10 83:24,25 84:14,15 86:3,3 91:12,14,15 92:4 92:4 93:10,11

94:4,9 97:22 99:6 99:6 102:9 105:17 110:13,18,18,19 111:6,10,15 114:1 114:1 117:4,19
**Newark (1)** 14:25
**NICE (5)** 93:22 94:10 101:22 102:10,13
**nine (1)** 63:18
**NJ (3)** 77:21,22,24
**NJCL (2)** 62:14 63:13
**NJT (7)** 74:25,25 79:23,23,23 93:23 101:19
**Noble (5)** 29:18 34:13 44:20 76:3 84:19
**non-specifically (1)** 104:13
**normal (2)** 6:8 31:14
**normally (4)** 34:10 45:11 86:15 92:25
**North (2)** 77:2,4
**Notary (3)** 1:15 117:3,19
**noted (2)** 13:9 27:4
**notes (3)** 1:12 81:20 104:23
**noticed (1)** 71:24
**notification (1)** 38:24
**notified (5)** 23:15 63:19,21,21 70:19
**notify (2)** 75:6,11
**November (2)** 4:15 4:24
**number (27)** 14:1 22:21 27:16 28:11 28:15 64:20 66:5 69:12,18 70:4 72:23 73:25 74:3 81:25 83:2,6 84:4 84:5 85:5 86:23 86:25 87:3,6 88:12 92:11,18 117:20
**numerous (7)** 10:17 35:10,12 56:20 75:15 87:18 108:2
**NYPD (3)** 10:20 39:7 105:16

**O**

**O (1)** 4:1
**oath (2)** 24:20 58:5
**object (9)** 16:1 27:19 36:25 43:10 47:15 52:3 89:16 95:14,18
**objected (1)** 57:3
**objection (21)** 21:4 21:6 26:4 27:18 27:19 36:24 59:10 60:7 87:11 89:2 92:8,20 93:14 94:25 96:11,23 97:11 106:16,17 112:19 114:4
**objections (1)** 56:21
**obligation (1)** 90:14
**observation (1)** 45:5
**observations (5)** 19:14 45:14 46:16 67:10,12
**observe (1)** 110:23
**observed (2)** 94:22 103:4
**observing (2)** 102:19,25
**obvious (2)** 58:8 59:2
**obviously (5)** 31:3 36:8 64:17 88:11 92:21
**occurred (8)** 33:5 43:13 68:18 70:20 71:3 85:13 95:21 103:1
**occurrence (2)** 83:20 101:7
**occurrences (1)** 107:13
**occurring (8)** 56:20 66:8 86:11 88:20 89:1,6 104:4 110:24
**officer (36)** 23:18 23:20,24 24:14,20 24:21 25:16,19,22 25:22 26:1,5 27:9 42:16 45:3,10,12 45:13 46:15 50:20 51:5 52:23 61:16 62:15 63:3,6,9 65:15,24 68:6,12 69:19 71:11 74:10 89:12 94:21
**officers (47)** 26:10 27:2,3,8,17 28:11 28:15 44:6,18 45:18 46:18,20,23 47:1 52:10,14 62:14 64:20,25 65:1,3 68:3 69:15 69:15,16,18 70:4 70:11,14,18 71:6 71:10,18 74:7 75:16 80:21 81:6 82:19 83:25 84:7 86:17 92:12,23,25 93:16 103:7 107:15
**officials (1)** 105:24
**Oh (1)** 5:13
**okay (154)** 4:19,23 5:9,14,18 6:3,7,8 6:19 7:1,8,11,15 7:23 8:2,9,16 9:2 9:6,13,17 10:1,6 10:14 11:3,10,19 11:21 12:12 13:2 13:22 14:2 15:10 15:22 16:12,23 17:4,12 18:7,10 20:10,16,19 22:5 22:12 23:7 24:3 24:10,14,18 25:1 25:8,15,24 26:7 26:14 28:13,20 32:25 33:7,10,13 40:5 41:9 43:2 44:17 45:6 46:8 46:22 47:6,9,17 47:23 48:1,13 49:2,8,17,24 50:9 50:13 51:23 52:13 53:10,18 59:16 60:25 61:5,7,15 61:19 62:1,8,11 62:25 63:7,13,18 65:17,20 66:14,25 67:4,5,11,22 68:16,23 70:3,8 70:13 74:15 77:24 78:9,13 79:13,18 79:22 80:8,18,21 81:5,19,21 82:7 82:13,16,24 83:16 88:9,21 89:5,11 94:10 98:2,8,15 99:13,21 100:9 101:13,18,22 102:4,7 103:15 104:2,6,17,22 105:5,9 111:7 112:4
**OLIVEIRA (2)** 1:14 117:3
**Olley (2)** 2:3 10:8
**once (2)** 59:25 60:3
**one-on-one (1)** 105:24
**ones (2)** 8:8 33:24
**ongoing (5)** 11:19 66:9 78:18 111:2 113:19
**open (1)** 90:18
**open-ended (1)** 33:17
**operates (1)** 75:21
**operating (2)** 10:3 91:3
**operation (1)** 76:22
**operational (1)** 76:21
**operations (18)** 1:8 10:18 29:23 34:1 34:6 36:12 41:16 61:13 75:19,22 77:10,14,18 83:24 84:15 99:4 108:3 110:14
**operator (1)** 31:8
**opine (3)** 7:12 70:1 77:13
**opinion (25)** 13:3 23:21 26:17 27:25 37:20 41:3 63:23 64:4 74:23 75:4 77:20 81:13 83:10 83:16 85:18 87:2 90:13 96:8 97:12 97:15 100:6 106:22 107:17,18 107:22
**opinions (19)** 4:24 5:5,6 8:23 22:5 26:8 27:1 28:21 74:13 90:8 95:13 96:18 97:2,7,8 100:1,3,22 106:5
**opportunity (3)** 60:21 105:20,23
**opposed (6)** 71:10 88:15 100:3,23 103:8 116:1
**opposite (1)** 14:14
**order (14)** 26:18 28:5,16 30:4,5 39:22,23 64:18 65:12 90:5 91:8 95:17 111:8 113:1
**orientation (2)** 78:17,18
**original (1)** 97:3
**outer (1)** 92:23
**outrageous (1)** 55:24
**outside (1)** 34:4
**overcrowded (12)** 25:16,20 61:13 72:13,15,15,18 73:21,23 87:6,17 95:7
**overcrowding (11)** 17:23 21:16,19,21 21:25 22:18,21 31:9 46:10 61:9 94:24
**overlooked (1)** 46:1
**overwhelmed (1)** 88:3

**P**

**P (3)** 1:12 2:1,1
**P.D (12)** 29:13 35:5 35:20 36:17 46:23 50:23 51:6,10,25 52:10 64:24 83:25
**p.m (2)** 61:11 116:8
**packed (1)** 87:10
**page (34)** 3:12,13 8:17 9:6,17 10:1,4 14:24 17:11 18:11 18:15 19:2,5,8,23 24:11 26:16 28:3 34:18 42:11 44:9 44:11,12 61:4,6 66:22 67:6 74:13 74:16,23 77:19 100:2,2,2
**Palm (1)** 4:2
**Papal (3)** 34:17,25 76:6
**parade (23)** 12:25 13:4 16:14 17:2 33:4 34:22 37:14 37:19 41:6,12 43:3,6,21 44:3 46:24 49:18 50:14 52:11,15 75:7 82:8 89:1,8
**parades (3)** 30:18 30:21 34:17
**paragraph (3)** 17:13 26:17 44:13
**part (19)** 16:21 25:6 37:8 39:6,9 54:4 70:13,16 72:20 90:7 94:7 95:11 101:5,8,13 109:16 113:5,18 115:14
**participate (1)** 42:5
**particular (8)** 6:4 9:9 16:8 19:21,23 64:13 69:19 98:12
**particularly (7)** 29:3 75:9 86:16 90:2 91:4,4 101:4
**parties (2)** 12:13 117:11
**partners (2)** 77:3 107:16
**parts (3)** 27:24 55:16 77:24
**party (1)** 114:13
**party's (2)** 114:16 114:21
**PASCALE (1)** 1:4
**Pascale's (4)** 3:12 66:19 67:1,5

**passed (2)** 17:21 47:25
**passenger (1)** 108:9
**passengers (19)** 21:22 23:3,5 42:9 42:20 62:2,9 66:5 66:5 71:20 72:17 73:19,25 84:18 86:7 93:6,6,20 109:20
**patrol (5)** 38:24 73:15 84:4,6 95:3
**pause (1)** 6:11
**PD (1)** 43:8
**PD'S (1)** 79:23
**penal (1)** 100:14
**pendency (3)** 54:15 60:10,18
**pending (1)** 12:2
**Penn (2)** 14:25 90:3
**Pennsylvania (1)** 2:4
**people (45)** 19:10 20:2,2,20 21:1 22:22,22 31:6,6 32:23 36:19 38:11 38:18 41:24 42:5 64:17 72:1,21 73:1,22 76:11 79:2 81:8 82:23 84:13 86:23,25 87:3,7,10,20,25 87:25 88:12,15 89:9 90:15 91:17 92:18 93:2 98:14 106:12 107:20,23 113:21
**pepper (18)** 79:25 80:4,11,14,19,23 81:1,7,8,15 88:9 88:10,11,13 98:17 98:23 99:19 101:11
**percentage (1)** 98:16
**perception (1)** 95:21
**perfect (1)** 59:15
**perform (1)** 30:2
**periodicals (1)** 10:25
**perpetrators (3)** 12:7 15:11 111:24
**person (8)** 94:21 110:23 112:6,7 113:2,7 114:19 115:15
**personal (6)** 40:19 41:14 100:3,23,24 106:24
**Personally (1)** 30:19
**personnel (6)** 26:19 28:6 34:5 48:21 86:1 91:12
**pertaining (2)** 10:9 10:15
**pertains (2)** 44:3 88:7
**Perth (17)** 13:20,22 13:25 15:7,13,19 16:7,19 62:22 66:6,7 67:20,25 67:25 70:23 71:7 71:13
**phone (7)** 1:25 35:19,25 43:4 55:1,6 59:23
**phrase (4)** 20:8 39:2 39:18 60:22
**physical (7)** 8:4 78:16 114:11,11 114:14,15,22
**physically (1)** 66:17
**picture (1)** 15:1
**pint (1)** 95:22
**place (21)** 9:5 13:16 35:24 36:5,13,20 42:13 43:25 45:9 51:2,2 71:15,17 71:25 80:15 81:16 84:9 86:1,18 92:14 111:23
**placed (2)** 9:8 48:24
**plain- (1)** 44:18
**plaintiff (1)** 66:19
**plaintiff's (7)** 13:18 26:3 53:13 55:14 55:19,23 60:9
**plaintiffs (10)** 1:5 2:5 9:24 11:12 12:12 15:11 20:13 63:25 73:2 74:9
**plan (11)** 23:4 30:5 31:1,17,23 32:5 32:15 41:6 77:6 91:16 107:15
**planned (2)** 68:21 93:16
**planning (18)** 13:3 27:11 28:23,23 30:22 32:16 33:14 33:21 34:1,7,13 35:6 37:18 40:22 50:24 84:24 85:25 103:9
**plans (2)** 4:20 90:2
**plant (1)** 96:21
**platform (30)** 13:14 19:11 21:2,17 25:17,20 53:5 65:25 68:11 69:15 71:19 72:10,15,18 72:19,21 73:18,21 73:22 86:24 87:1 87:3,5,7,16 88:2 92:19 94:17,22 95:6
**platforms (4)** 23:16 44:18 90:5 93:1
**play (2)** 41:2 47:17
**played (1)** 47:19
**Plaza (1)** 2:4
**please (5)** 10:4 24:15 30:3 44:10 49:25
**point (17)** 30:4 43:12 45:5 51:16 51:17 54:22 57:14 57:23 58:13 67:13 74:17,18,24 77:20 79:22 83:18 110:4
**pointed (2)** 50:7 90:22
**points (1)** 29:3
**police (162)** 5:17 6:21,22 10:9,15 10:17,20,21 11:7 11:8,15 13:23,25 16:10,20 22:16,25 23:12,13,17,17 28:11 29:4,9,21 30:1 31:13,15 33:21,24 34:3,9 35:7,8,10,11 36:7 36:9 37:3,15 39:1 39:11 40:24 41:10 41:17,18,25 42:12 43:5 44:2 45:3,10 45:17 46:15 48:9 48:15,17 50:14,15 50:20,21,25 51:5 51:7 52:1,10,16 52:22,22,24 53:2 53:3 55:14 61:2 63:24 64:5,12,22 65:2,24 68:11 69:10,15,15,24 71:14 72:9,24,25 73:8,11,12,18,22 74:7,10,25 75:5 75:16,19 76:2,12 76:15,23,24 79:6 79:9 80:6 81:23 81:24 82:10 83:12 83:23,25 84:15,24 85:6,6,14,25 86:4 86:4,12,15 89:11 89:12 90:1,19,23 91:2,6,13,15 92:4 93:7,11 94:24 95:8 97:22 98:3,4 98:16,21,24 99:3 99:7,8 100:4,13 101:1,10,14 105:17,18,25 107:3,19 108:4 110:12 111:19 112:15 113:22
**Police's (1)** 22:7
**polices (1)** 107:3
**policies (3)** 10:19,25 84:24
**policing (16)** 22:16 23:9 25:3 36:19 40:22 45:20 53:6 65:13,14 73:15 98:9,11 100:7,23 101:4 105:21
**policy (1)** 77:21
**political (1)** 38:7
**pool (1)** 90:7
**poor (2)** 30:25 31:21
**Port (1)** 7:19
**portable (1)** 44:19
**portion (4)** 60:25 61:3 66:22 101:8
**portions (2)** 27:21 101:20
**position (9)** 37:6 57:23 77:17 81:13 85:4 107:24,25 110:9 115:20
**possibilities (1)** 56:22
**possibility (6)** 43:11 52:6 54:6 56:23 57:19 104:3
**possible (12)** 42:15 42:24,25 43:2,9 43:16,19,22 51:24 52:7,7,15
**possibly (8)** 33:9 36:25 39:14 58:12 73:20 93:19 102:20 109:15
**post (3)** 37:23 38:4 39:7
**potential (11)** 18:1 29:14 31:10 46:10 83:19 87:8,9 89:21,22 103:5 107:11
**potentially (6)** 46:7 56:2 59:11 70:16 73:11 94:18
**practice (6)** 52:22 83:12 84:24 100:15 102:8 108:4
**practices (3)** 10:10 10:15 33:21
**pre- (3)** 35:5 68:20 103:8
**pre-plan (3)** 32:10 75:15 84:20
**pre-planned (6)** 32:4 42:3 51:3 92:22 98:13 101:5
**pre-planning (9)** 64:9 68:2,24 69:5 70:14,17 83:23 91:22 92:10
**precaution (1)** 69:3
**precautions (4)** 23:6 69:13,13 79:6
**precise (2)** 28:15 87:3
**predict (1)** 22:2
**prejudice (2)** 57:16 57:21
**prejudicial (2)** 58:11 96:1
**preliminary (1)** 12:1
**prepaid (1)** 82:22
**prepared (2)** 69:17 70:15
**prescription (1)** 83:19
**presence (11)** 11:15 42:12 50:15 64:5 73:12,14 79:6 86:12,15 110:21 113:22
**presentations (1)** 106:15
**presented (1)** 106:10
**presenters (1)** 105:20
**pretty (3)** 59:2 75:24 76:10
**prevent (6)** 64:13 88:19 107:12 109:24 114:23 116:2
**prevented (16)** 13:5 63:25 64:6,9 68:17,25 73:1,9 79:19 81:16 85:3 86:5,9 93:19 102:15,22
**preventing (2)** 86:20 105:5
**previous (3)** 29:24 60:14 91:24
**previously (3)** 64:8 104:9 112:12
**primary (1)** 12:18
**principles (4)** 87:8 106:9,11,12
**printed (1)** 26:15

**prior (29)** 13:8,10 13:12,15 17:20 20:13 27:11 29:5 29:7 30:16,18,20 30:21,23 32:22 33:1 34:5 37:15 40:18 43:3 47:13 61:11 64:18 69:3 84:19 87:22,24 91:14 104:9
**private (1)** 5:16
**privy (1)** 54:4
**probable (3)** 72:9 72:11 102:24
**probably (4)** 59:9 81:20 86:8 112:10
**problems (1)** 88:23
**procedure (1)** 91:3
**procedures (6)** 10:10,16,19 100:12,16 108:3
**proceed (4)** 56:10 56:11 58:14 59:10
**proceedings (2)** 1:13 116:7
**produced (1)** 9:7
**production (1)** 32:12
**proper (8)** 43:14 84:24 85:25 86:1 95:16 96:2 109:11 112:16
**properly (2)** 50:20 90:16
**property (8)** 40:25 41:20,24 69:10,22 69:23 101:3 111:17
**protect (9)** 38:3 40:25 41:19 69:9 69:22 79:24 92:5 101:2 115:15
**protected (1)** 69:23
**protecting (1)** 91:17
**prove (1)** 74:6
**provide (5)** 30:2 42:7 74:25 79:8 91:9
**provided (8)** 9:22 9:23 47:5,10 76:14 78:2 84:25 88:17
**providing (1)** 86:6
**prudent (1)** 98:3
**public (4)** 1:15 90:19 117:3,19
**pull (1)** 18:22
**pulls (1)** 73:24
**punch (5)** 108:9 109:13 111:8 112:6 115:22
**punched (1)** 112:17
**punching (1)** 109:17
**purely (1)** 93:5
**pushing (1)** 87:19
**put (20)** 8:14 9:12 29:16 35:17 45:2 45:10 49:25 51:10 54:25 59:9 60:6 68:11 79:6,12 82:9 84:4,20 86:16 95:20 112:6
**putting (4)** 56:8 109:19 113:6 115:18

**Q**

**qualified (2)** 6:3 77:13
**question (58)** 10:14 15:18 16:2,3,8 18:24 19:2,10 21:4,6,9 24:15 26:8,25 27:14,20 28:18 30:24,25 31:19,22 33:17 37:2,13 40:5,13 43:10 51:1 52:4,5 70:24 72:24 73:6 74:22 77:11 79:20 83:14,20 84:1 85:8 86:2,7 87:13 88:9,11,22 89:17 90:10 95:1 96:12 99:5,7 100:5,9 112:9,19,21 114:7
**questioned (1)** 19:24
**questioning (8)** 54:12,16 55:17 85:10,12 95:15 103:23 104:3
**questions (17)** 6:12 56:19,21 57:3,18 82:24 83:2 86:22 86:25 97:17 103:20,24 105:11 106:5 108:5 114:24 116:4
**quick (1)** 53:19
**quickly (2)** 26:14 38:17
**quite (2)** 38:17 90:17

**R**

**R (6)** 1:5,12,12 2:1 4:1 117:1
**radioed (1)** 17:22
**Rahway (2)** 14:15 16:6
**rail (23)** 1:7 23:1 29:23 41:16 61:12 72:2 75:21 76:15 77:3,10,13,18,21 83:24 84:15 86:2 88:5 95:7 98:25 99:15 108:1 110:14 112:15
**railroad (7)** 75:21 77:2,2,5 92:17 112:1,3
**rails (5)** 100:8 106:3 107:5,8,10
**raised (1)** 55:23
**ran (1)** 108:18
**rationale (1)** 93:4
**re- (2)** 54:20 103:4
**re-ask (1)** 37:12
**re-depose (1)** 54:24
**re-reading (1)** 74:20
**re-routed (1)** 24:22
**read (19)** 9:19,21 10:12,17,25 14:18 18:13 19:5,6,6 24:14,17 28:7 37:9 67:4 80:1 92:3 93:22 108:15
**reading (5)** 17:5 18:20 24:8 82:15 108:17
**reads (2)** 95:22 96:6
**ready (1)** 60:3
**real (3)** 26:14 45:4 94:2
**real-time (1)** 94:16
**realized (2)** 29:24 31:13
**really (8)** 19:3 32:17 59:3 70:25 72:24 79:3 110:9 113:23
**realm (1)** 43:11
**reason (6)** 9:8 37:2 40:24 93:10 98:5 99:25
**reasonable (12)** 25:19 26:6 30:22 31:12 38:13 51:9 51:12 82:18 85:19 85:24 115:21,25
**reasonably (2)** 26:1 98:3
**reasons (4)** 32:19 37:22 45:13 72:14
**recall (22)** 11:12 13:21 17:4 24:7 34:14 62:1,4,5 63:3,5 82:15 103:13,25 104:2,7 104:10,13 108:17 108:20 109:9,10 111:11
**received (3)** 9:10 39:9,12
**recess (4)** 53:22 55:8 60:5 81:22
**recognize (1)** 29:22
**recognized (1)** 31:8
**recollection (5)** 17:20 18:3 20:15 66:8 83:4
**recommendations...** 83:11 90:11
**recommended (1)** 85:20
**record (17)** 8:12 14:18,20 21:6 23:17 25:14 26:18 26:20,21 28:4 47:16 59:10 60:7 94:6 95:21 96:6 96:10
**records (3)** 12:22 20:11 44:1
**RECROSS (1)** 3:3
**RECROSS-EXA...** 105:10 115:1
**red (1)** 49:10
**redirect (4)** 3:3 55:23 97:19 108:6
**refer (3)** 14:18 53:15 66:4
**referred (2)** 48:9 115:8
**referring (6)** 10:23 39:15,20 40:16 44:20 97:9
**reflect (2)** 40:14 100:22
**reflecting (2)** 39:5 99:12
**refuse (2)** 72:13 115:23
**regarding (1)** 62:6
**regulation (1)** 78:22
**rehab (1)** 95:17
**reinforced (1)** 90:1
**related (5)** 12:14 13:4 21:1 44:2 60:17
**relates (1)** 91:20
**relating (2)** 30:17 33:21
**relationship (1)** 89:7
**relationships (1)** 35:10
**relative (2)** 117:10 117:12
**remember (2)** 104:20 108:22
**remembering (1)** 105:6
**remind (1)** 57:4
**remote (1)** 56:22
**remotely (1)** 1:16
**removed (1)** 113:20
**render (3)** 85:18,24 87:2
**rendering (1)** 90:8
**repeat (3)** 15:16 21:9 103:21
**rephrase (1)** 31:21
**report (63)** 3:10 4:13,15,16,21,23 5:5 6:16 8:9,14,18 8:23 10:2 11:1,23 12:1,1 17:9,11,18 17:21 22:6,9 24:23 25:9 26:9 26:13,15 27:1,15 27:21,24 28:4 34:18 42:11 44:9 46:17 53:16,20 55:16 60:23 61:1 61:8 74:13 78:5 84:3,5 85:21 89:18 97:3,9,12 99:2 100:1,17,19 101:25 104:8 106:10,17 107:1 108:22 113:25
**reported (2)** 21:17 92:7
**reporter (3)** 1:15 6:14 117:4
**reporting (3)** 1:21 1:22 22:8
**reports (4)** 8:8 29:8 63:15 88:23
**represent (7)** 4:9 9:9 48:1,23,25 49:19 55:11
**request (2)** 54:25 62:14
**requested (3)** 30:1 63:10 78:16
**requesting (5)** 26:19 28:5 62:14 62:15 63:12
**require (1)** 22:16
**required (31)** 16:19 23:13 27:3,16 28:10,12,16,19,22 28:24 31:17,23 33:15 35:4 40:21 68:5,11 69:7 70:4 70:10 75:6 77:10 77:14 80:10 83:4 83:10 97:23 101:10,15 102:1,9
**requirement (12)**

40:11 65:14 68:14 69:9 70:9 78:21 79:15 80:8 84:11 101:2 102:5,8
**requirements (4)** 27:6 31:14 65:19 83:18
**requires (3)** 65:22 78:23 98:22
**requiring (2)** 83:6 98:24
**research (1)** 32:25
**reserve (2)** 60:13,15
**residing (1)** 4:1
**resolution (1)** 57:17
**resources (29)** 16:10 27:12 29:16 29:20 35:17 38:25 45:14 46:14 51:18 52:19 69:6 71:16 77:7,8 81:25 82:4 82:9 84:1,20,22 90:16,23 91:1,17 92:10 93:15 95:4 102:20 103:5
**respect (3)** 28:21 40:22 65:9
**respond (16)** 23:5 23:14,18 25:20 35:17 46:3,5,19 52:25 69:17 70:15 70:19,21 78:19 85:4 103:6
**responded (6)** 13:24 14:1 24:21 67:24 71:14 85:6
**responding (4)** 63:1 63:8 68:10 79:10
**responds (1)** 19:10
**response (22)** 11:7 22:7,11,17,25 23:12,13,24 24:15 25:4 26:25 40:18 50:17 61:16 63:24 71:13 85:11,13 94:23 103:8 106:4 112:15
**responses (5)** 6:12 39:2 58:1,3 61:2
**responsibility (4)** 12:18 75:18 107:14 115:15
**rest (1)** 96:17
**restrict (4)** 74:2 90:4 93:1,1
**restroom (1)** 53:19
**resulted (1)** 69:6
**resume (1)** 54:23
**retained (4)** 7:2,12 11:4,5
**retired (1)** 6:22
**revenge (6)** 112:17 112:20,22,24 115:21 116:1
**review (16)** 8:5 9:13 10:7 16:21 17:4,7 18:16 20:11 22:12 24:16 55:15 60:21 66:23,24 81:20 93:9
**reviewed (11)** 8:8 8:22 12:4,23 21:11 60:23 61:3 64:4 91:11 110:10 110:12
**revisionist (1)** 95:15
**Ricciardulli (2)** 2:8 55:11
**ride (2)** 65:5,15
**ridership (3)** 13:11 29:24 75:9
**riderships (2)** 29:5 30:7
**ridiculous (1)** 57:3
**riding (2)** 68:3 69:16
**right (51)** 5:25 8:14 12:15,20 14:11,12 21:2 22:19 25:11 31:20 32:18 34:21 40:1,10,12 41:3 42:1,22,23 43:1 44:14 45:18,25 47:2,4 51:18 54:23 59:14 60:13 60:15 61:21 63:1 63:16 68:4,7 70:5 70:15 71:1 72:13 73:17 75:7 77:16 86:18 99:2 100:20 101:23 102:11,23 111:21 113:2 116:5
**road (1)** 115:4
**roll (2)** 36:4 92:13
**room (1)** 96:17
**route (3)** 25:17 61:19 67:17
**rule (3)** 33:19 80:9 83:9
**rules (4)** 56:1 83:6 100:11,16
**run (2)** 111:25 112:1
**Ruprecht (2)** 2:8 55:10
**rush (1)** 22:22

**S**

**S (3)** 1:12 2:1 3:8
**S.W.A.T (1)** 71:4
**safe (1)** 59:18
**safely (1)** 82:4
**safety (38)** 11:14 21:1,20,21 36:12 37:19 42:8 45:13 51:14 65:5 69:12 72:12,14,15,16 77:15,21 79:5,8 84:14,17,25 86:6 86:21 87:18,18 89:21 91:9 93:5,5 93:7,7,19 94:8 107:13 109:4 113:3 115:25
**sanctions (1)** 60:16
**saw (5)** 46:3 50:14 73:12 92:9 102:20
**saying (8)** 20:19 38:21 42:24,25 63:9 69:8 86:9 104:15
**says (20)** 9:7,18 10:7,14 14:10 19:10 20:21 25:9 28:4 41:10 42:12 43:8 44:17 55:3 62:22 63:1 67:19 70:9 79:22 80:9
**scale (14)** 27:12 28:25 29:18,25 31:4,11 32:17 64:16 69:4 75:9 77:5 86:16 91:25 94:8
**scantily (1)** 47:8
**scope (1)** 113:25
**screen (6)** 8:14 17:10 18:22 24:3 66:22 67:16
**screens (1)** 14:3
**search (4)** 9:1,3 32:23 35:25
**second (11)** 6:11 14:2 26:17 28:1 40:17 49:17 62:3 62:10,22 68:9 107:4
**Secondly (1)** 76:1
**seconds (3)** 47:18 47:21 59:9
**sections (1)** 78:7
**secure (1)** 93:21
**securities (1)** 6:21
**security (21)** 11:15 13:3 15:14 16:10 16:20 30:2 31:1 36:12 42:8 55:14 63:24 64:5 65:5 73:7 77:15 79:9 84:14,25 86:6 91:9 94:8
**sedan (1)** 49:21
**see (30)** 10:10 14:8 14:10,11 15:1,3,6 17:15 23:2 24:3 44:14 48:3 49:8 49:13,14,21 50:3 52:23 55:2,5 62:13,15 63:7 67:15 72:2 77:22 78:3,10 91:13 92:3
**seek (1)** 112:17
**seeking (1)** 115:21
**seen (1)** 95:6
**self-defense (20)** 78:10,14,16,24 79:3,16,19,25 80:10 99:22 101:16 108:10 109:15,17 112:22 113:1,8,14,24 114:3
**send (3)** 62:23 72:3 72:4
**senior (2)** 105:24 107:19
**sense (4)** 6:11 14:22 59:15 69:25
**sentence (4)** 10:6,10 28:9 44:13
**SENTRY (1)** 1:22
**separately (1)** 9:22
**serve (2)** 4:20 73:16
**served (2)** 73:13 103:7
**serves (1)** 86:13
**service (1)** 13:11
**SERVICES (2)** 1:21,23
**set (4)** 65:18,22 77:21 106:6
**setting (1)** 85:22
**seven (1)** 19:9
**sharing (2)** 36:6,10
**Sherman (2)** 2:8 55:11
**shirt (1)** 49:10
**shoot (2)** 114:3,19
**short (2)** 53:23 71:4
**shortly (1)** 6:23
**shoving (1)** 87:19
**show (12)** 8:13 12:5 14:2,5 16:24 18:7 47:6 50:10 62:11 66:18 74:6 76:11
**showed (1)** 64:16
**showing (2)** 48:2 49:18
**shown (2)** 27:23 88:1
**shows (3)** 12:23 49:1 88:1
**side (2)** 56:15 66:22
**significance (1)** 41:6
**significant (1)** 57:15
**silos (1)** 36:8
**similar (4)** 11:12,13 98:4,11
**similarly (1)** 98:11
**simple (1)** 23:19
**simply (1)** 57:19
**single (10)** 31:17,23 31:25 32:2,3 42:16 65:15 68:12 98:19,21
**sit (1)** 4:19
**sitting (1)** 54:3
**situation (17)** 18:1 18:2 23:1,6,19 25:15 46:2 51:25 68:10 81:3,11 83:5 88:6 108:13 108:14 111:18,22
**situations (1)** 107:11
**six (1)** 7:14
**size (3)** 33:22 34:2 90:6
**sky (8)** 43:20 44:19 44:23 45:18,24 46:8 48:9 51:4
**slip (1)** 88:4
**small (5)** 14:9 31:24 62:16 87:10 89:14
**smaller (5)** 33:7 34:23,25 91:4,5
**smooth (1)** 36:11
**somebody (33)** 20:3 20:4,5,22,23 23:18 35:17 43:4 51:11 71:23 72:6 72:13 76:4,5 87:20 88:4 94:15 102:19 109:2,5,12 109:16,24 110:5,7 111:8 112:11 113:19 114:3,10 114:18 115:13,17
**sooner (3)** 67:25 70:22 71:7
**sorry (4)** 62:16 97:4 97:6 103:21
**sort (6)** 28:21 37:25 39:24 61:1 74:17 94:7
**sought (1)** 112:20
**sound (3)** 52:22 53:1,2
**sounds (2)** 113:13 113:18
**source (1)** 70:9
**sources (1)** 90:18

**space (7)** 73:24 81:1 81:7 87:10,15,16 89:21
**spaces (1)** 89:14
**speak (4)** 21:5 36:21 51:15 105:24
**speaking (4)** 19:13 28:2,14 54:14
**specific (24)** 10:24 18:3 28:18 30:22 58:21 60:25 64:11 77:24 78:6 79:15 83:6,9,18 84:13 85:13,14 100:18 101:20 104:20 106:2 108:21 110:8,11 113:11
**specifically (13)** 63:5 80:9 91:23 99:8,11 100:2 101:6 104:12 108:22 109:10,21 110:1,3
**specifics (2)** 62:5 108:20
**speculate (1)** 112:9
**speculation (4)** 71:15 79:21 81:18 108:11
**speculative (3)** 85:15 112:9,25
**speculatively (1)** 114:17
**spin (1)** 50:9
**spoke (8)** 32:16 50:23 54:6 61:15 83:7 95:9 103:18 103:22
**spoken (1)** 57:7
**spontaneous (1)** 112:22
**spoon-feeding (1)** 55:20
**spray (17)** 80:1,4,11 80:14,19,23 81:1 81:7,15 88:10,10 88:11,13 98:17,23 99:19 101:11
**sprayed (2)** 81:8 88:12
**spraying (1)** 88:14
**Squire (1)** 4:2
**staff (2)** 64:15 84:7
**staffing (5)** 11:8 26:10 27:6 28:3 44:2
**stage (1)** 49:19
**stand (3)** 32:8,11,14
**standard (39)** 22:15 23:25 25:3 28:17 39:3,3,16,25 40:2 40:3,9,20,21,23 41:5,10,13,14,21 42:1,7 45:20,22 53:6 65:12,18,22 69:22,25 70:9 91:3,8 97:21 98:2 98:8 100:23 101:5 101:15 108:4
**standards (8)** 38:9 100:3,7,10,24 101:1,3 106:7
**standing (1)** 47:2
**start (5)** 18:19 19:1 53:12,14 67:22
**started (3)** 37:23 39:7 67:8
**starting (1)** 18:17
**starts (5)** 14:25 18:23 24:5,11 44:13
**state (12)** 1:15 7:24 7:25 105:17 110:18,19 111:6 111:10,15 114:1 117:4,19
**stated (4)** 17:21 51:24 91:23 109:24
**statement (5)** 19:17 19:20,22 38:7 40:5
**statements (1)** 21:15
**states (5)** 1:1 35:12 38:21,23 41:17
**station (72)** 13:8,12 13:23 14:10 15:3 15:7,14 16:5,9,13 16:13,18 17:2,21 17:24 18:2 19:15 20:12,14 23:24 25:4,10 27:9 29:6 31:9,18 32:8 42:17 45:19,25 46:1,9,17 47:2,24 47:24 49:4 50:11 50:16 52:2,20,23 61:14,17,20 64:25 65:25 66:6,7 67:9 67:23 68:13,19 70:21,22 71:4 72:22 73:8 74:1,8 82:21 84:3 88:25 89:7 90:3,4 92:23 94:11 102:2,10,14 103:1
**stationary (1)** 65:3
**stationed (1)** 46:24
**stations (12)** 13:19 16:7,20 29:7 66:11 84:5 88:24 89:6 90:2 92:23 92:24 107:8
**statute (1)** 78:22
**stenographic (1)** 1:12
**steps (3)** 23:21 74:3 84:17
**Stockdale (58)** 2:8 3:4 4:5,8 8:12 14:21 18:8,11 19:3 21:7 24:11 37:11 43:15 47:12 48:25 50:3 54:3,8 54:11 55:9,10 56:21 57:14,16 58:23 59:2,7,8,16 59:20 60:2,8 67:3 83:3 85:10 87:11 88:22 89:2,16 90:22 92:8,16,20 93:14 94:25 95:14 95:24 96:11,23 97:11,18,19 106:16 108:6 114:6 115:3,6 116:5
**Stockdale's (3)** 58:19 85:11 106:5
**stone (1)** 106:6
**stop (8)** 13:24 30:3 46:14 67:20 68:1 71:8 73:22 82:1
**stopped (9)** 13:19 14:16 53:17 66:6 67:24 71:19 72:1 74:8 103:1
**stopping (1)** 20:13
**stops (9)** 13:21 15:4 15:7,12,19 66:11 66:16 73:3,10
**storefront (1)** 49:14
**strain (1)** 82:9
**strategically (1)** 92:23
**strategy (5)** 54:13 60:11 103:19,23 103:25
**Street (1)** 13:8
**strike (6)** 5:3 12:5 19:18 90:11 109:6 110:5
**strikes (1)** 58:14
**striking (1)** 113:13
**strongly (1)** 90:17
**struck (1)** 109:7
**stuff (1)** 23:7
**subject (1)** 61:12
**subjectively (1)** 37:4
**subjects (2)** 55:22 57:8
**subsequently (1)** 42:19
**sucker (1)** 115:22
**suggest (1)** 43:12
**Suite (3)** 1:24 2:4,9
**summarize (3)** 28:21 30:4 74:18
**summary (2)** 17:14 61:3
**summation (3)** 16:24 21:15 75:2
**Super (3)** 34:17 35:1 76:4
**supervision (3)** 10:18 80:22 86:18
**supplemental (1)** 4:21
**supplied (1)** 10:8
**support (2)** 37:17 100:21
**supposed (1)** 69:9
**sure (7)** 9:11 15:17 18:24 50:1 57:4 63:12 100:5
**surrounding (1)** 29:7
**surveillance (3)** 26:20 28:6 101:23
**sworn (3)** 4:3 24:19 117:7
**system (7)** 3:11 14:7 93:23,25 94:3,8 101:23

**T**

**T (5)** 1:12,12 3:8 117:1,1
**tactics (3)** 54:19 55:21 79:3
**Taekwondo (2)** 78:15 99:23
**tainted (4)** 54:17 56:1 58:1,3
**take (15)** 6:11 17:10 18:22 19:8 21:8 23:6 26:13 42:13 53:18 59:8 68:9 69:2 74:21 87:20 104:23
**taken (8)** 1:14 23:21 57:11 69:14 74:4 84:17 85:14 86:1
**takes (1)** 111:23
**talk (4)** 40:19 53:20 87:1 108:14
**talked (1)** 40:18
**talking (15)** 16:12 20:25 40:1,4 45:23 49:11 50:2 56:19,24 57:1 74:24 77:9 97:21 110:3,11
**talks (4)** 17:14 40:15 77:20 78:9
**target (2)** 39:14,16
**targets (1)** 39:19
**team (1)** 71:4
**technical (1)** 94:3
**tell (7)** 49:5,6,7 56:10,12 61:7 75:17
**telling (3)** 99:3 104:2,10
**ten (7)** 13:15 32:5 32:12 47:3 63:22 75:25 83:22
**ten-fold (1)** 32:12
**tenants (2)** 38:4 39:13
**tend (2)** 74:6,6
**tended (1)** 36:7
**tens (3)** 42:4 87:25 98:13
**tenth (2)** 32:10 42:4
**term (1)** 83:3
**terminate (3)** 56:5 114:23 116:3
**terms (4)** 23:12 33:21 69:6 79:13
**terrorism (4)** 26:23 29:14 38:16 39:17
**terrorist (1)** 38:20
**terrorists (2)** 38:1,4
**testified (8)** 5:22 6:1 6:5 92:15 97:1,6 106:4,10
**testify (3)** 5:19 28:14 48:20
**testifying (1)** 6:25
**testimony (27)** 9:19 21:11 24:19 25:25 27:5 34:12 41:23 43:23 44:20 48:10 55:20 60:13 66:23 67:2,6 69:18 70:6 71:2 84:7 91:14 91:19 93:22 96:8 105:3 108:15 109:9 117:6
**textbook (1)** 33:19
**thank (7)** 18:12 26:24 38:21 50:5 59:17,20 82:25
**thanks (6)** 8:16 14:22 24:13 59:22 60:4 97:18
**theoretically (1)** 50:18
**thing (6)** 50:2 57:11 58:6 93:12 99:3,4
**things (15)** 22:21

30:4,13 34:16 50:19 51:2 56:2 56:24 59:2 64:11 83:6 85:20 104:4 104:18 106:14
**think (40)** 6:9 21:5 25:12 27:5,7 29:17 31:11 38:10 38:12,23 42:6,10 43:13 47:12 49:19 50:18,18 51:23 52:17 55:25 56:17 57:15 59:14 64:7 86:5,8 89:17 95:11,21,24 96:2 96:14 105:11 112:24 113:9,12 113:24 115:16 116:1,2
**thinks (2)** 56:7 57:21
**third (6)** 10:6 12:13 49:9 114:13,16,21
**thought (3)** 27:22 38:22 59:1
**thoughts (1)** 59:9
**thousands (5)** 42:4 42:5 87:25,25 98:13
**threat (1)** 29:13
**threatened (1)** 114:15
**three (6)** 7:4,9 14:3 38:8 47:21 63:7
**ticketed (1)** 76:9
**time (23)** 4:22 5:2,5 5:12 9:23 11:7 18:22 26:13 41:23 42:2 44:25,25 53:15,20 69:23 70:1 74:21 92:6 92:19 93:12 94:12 95:23 113:22
**timeline (3)** 60:22 61:1 64:1
**timelines (1)** 60:23
**times (10)** 5:15,17 5:22,23 7:2,4 65:2 75:15 83:3 93:1
**titled (1)** 10:2
**today (7)** 4:19 95:13 97:1,6 105:3 106:6,11
**today's (1)** 8:5
**told (3)** 25:1 53:4 95:7
**top (6)** 7:7 11:11 17:7 45:9,11 71:5
**total (1)** 7:13
**touch (1)** 35:18
**touched (1)** 42:10
**tower (11)** 45:25 48:3,16,18,19,24 49:3 50:13,15 51:10,16
**towers (1)** 48:9
**towns (1)** 35:12
**track (6)** 108:25 109:12 112:6 115:10,16,24
**tracks (17)** 22:22 88:5 109:3,4,5,18 109:23 110:1,8 112:2,3,7 113:20 113:20,21 115:14 115:18
**Traditionally (1)** 73:15
**traffic (2)** 23:1 86:2
**train (119)** 12:8 13:10,12,15,18,24 14:13 17:2,20 19:14 22:22,23,23 22:24 24:23 25:16 25:18,21 26:3 31:8,24 42:19,19 45:19,25 46:17 47:24 49:4 50:11 50:16 52:23 53:4 53:13 61:12,21,24 63:10,20 64:25 65:1,4,5,6,15 66:2 66:9,16,17 67:8 67:17,23 68:3,6 68:10,12,18 69:16 70:20 71:3,5 72:3 72:5,5,12,14,16 73:2,19,23,25 74:2,2,9 75:1,6,11 75:14,18 78:14,17 78:23 79:20,24 80:15 81:1,17 82:21 86:7 87:1 87:16,17 88:2,4 88:15 90:2,3 93:7 93:8 98:22 99:19 99:21 101:15 102:15 103:2 108:9 109:12,13 109:18 110:7 111:23,24,25 112:5,16 115:10 115:13,14,16,22
**trained (8)** 78:15 79:3,16,18 80:18 80:22 99:22 101:16
**training (4)** 39:10 39:12 78:10 111:20
**trainman (1)** 17:5
**trainmaster (1)** 76:18
**trainmen (1)** 80:9
**trains (4)** 71:20 72:3 77:1 93:2
**Tramantano (6)** 1:3 4:10 80:14 81:14 108:16 113:5
**transcript (6)** 3:12 3:13,14,16 57:23 117:6
**transcripts (1)** 9:18
**transit (126)** 1:7 3:11 4:9 11:17,18 12:8,14 14:7 22:7 22:16 23:4,23 25:2,25 27:2,16 28:10,16 29:4,4 29:12,13,23 30:6 30:17 31:12,13,16 31:20,22 32:9 34:8,9 35:4,8,8 36:16,17 37:3 38:25 40:2,21 41:4,10,16,17,25 42:16 43:4 50:22 50:23 51:5,7,7 52:1,16,24 55:12 63:19 64:12,21,22 65:2,10,12,14,14 65:23,23 67:24 68:17 69:24 70:10 73:8 74:7 75:4,5 75:12,12,20,21 76:2,14,15,20,22 77:10,13,20,21,22 77:25 78:6,23 79:7,9 80:5 81:24 82:10 84:15,15 86:3,3 89:12 91:13,14,15 92:4 92:4 93:11,11 94:4,9 97:22 98:3 98:4,10,16 99:3,6 99:7 100:4 101:10 102:1,9 110:14
**transmitted (1)** 61:12
**transportation (9)** 10:21 29:3 35:7 76:23,25 88:7 91:6,6 107:4
**traveling (1)** 89:10
**travels (1)** 14:25
**treatise (1)** 33:20
**trespass (1)** 113:21
**trespassing (7)** 109:19,22 110:6 111:9,10,15 115:18
**trial (1)** 28:14
**tried (1)** 99:14
**trip (1)** 88:4
**true (1)** 117:6
**try (1)** 115:15
**trying (3)** 44:25 48:11 109:24
**Tuesday (1)** 1:16
**turn (2)** 44:9 103:11
**turned (1)** 56:18
**turns (1)** 58:2
**two (13)** 2:4 30:10 30:13 35:12 47:20 50:19,20 59:8 66:11 76:25 81:19 99:9 105:11
**two-minute (1)** 53:19
**two-sided (1)** 26:16
**type (9)** 33:14,18,19 70:8 76:21 78:14 78:22 80:4 105:19
**types (2)** 10:22 105:18

U

**ultimately (2)** 58:24 75:20
**umbrella (1)** 94:7
**unable (1)** 93:12
**uncertain (1)** 35:16
**undergone (1)** 57:21
**underlying (2)** 97:2 97:8
**understand (13)** 5:25 6:14 13:22 39:21 40:18 68:4 90:14 92:19 93:25 97:20,23 100:5,7
**understanding (6)** 4:11 7:15,23 17:17,19 53:10
**understood (5)** 6:15 8:2 12:3 87:12,14
**undetermined (1)** 76:12
**unethical (2)** 95:17 96:1
**uneventful (1)** 59:19
**unfortunately (1)** 39:18
**uniform (6)** 44:18 73:12,14 86:14,17 103:6
**unions (1)** 99:10
**unit (14)** 25:3 26:22 29:12 34:1,6,7,10 36:14 38:9,13 39:8 44:25 62:23 84:10
**United (3)** 1:1 38:20 38:22
**units (4)** 37:23 38:17 39:11 46:3
**unknown (3)** 79:21 98:18,20
**unloaded (3)** 80:14 81:6,14
**unreasonably (1)** 79:24
**unruly (10)** 17:25 18:5 19:20 20:7 20:13,16 21:13,22 21:25 89:14
**unsafe (1)** 115:9
**untoward (1)** 57:25
**upcoming (1)** 107:6
**use (16)** 20:7 38:5 45:4 47:16 51:4 80:19,22 88:13 91:16 111:7,16 113:1,8 114:8,14 114:22
**utilized (1)** 93:15

V

**vantage (1)** 51:17
**various (8)** 8:19 61:2 85:20 89:12 90:23 91:12 105:13,20
**vast (1)** 106:12
**venued (1)** 7:16
**versus (1)** 54:7
**vices (1)** 79:11
**victim (1)** 11:13
**victims (1)** 39:19
**video (15)** 47:7,7,11 47:16,19,21 48:2 48:4,13,19 49:1 50:7,14 64:16 88:1
**videoconference (1)** 6:10
**view (1)** 50:16
**viewed (2)** 21:24 94:7
**views (1)** 100:24
**villages (1)** 35:13
**violate (1)** 77:25
**violated (2)** 78:6 101:19
**violations (1)** 60:16
**violence (2)** 22:3 89:22
**violent (1)** 21:22
**vision (5)** 93:23 94:10 101:22 102:10,14
**visit (3)** 34:17,25 76:6
**vital (2)** 36:11 41:19

**volume (1)** 30:7
**vs (1)** 1:6

**W**

**wait (3)** 55:2,7 59:24
**waiting (1)** 88:3
**walking (1)** 115:10
**want (11)** 8:2 18:25 19:1 55:4 59:6,24 69:2 77:6 78:3 79:2 113:23
**wanted (5)** 9:11 19:4 22:25 77:7 109:15
**wants (1)** 55:3
**war (1)** 38:19
**wasn't (6)** 16:21 34:3 36:6 59:3 84:3 104:9
**watch (9)** 44:19,23 45:18,25 46:9 47:20 48:9 51:4 94:16
**way (21)** 22:2 34:22 37:13 44:24 52:9 56:11 57:13 58:1 58:3,14 59:3 73:23 86:5,20 87:20 98:15 99:5 99:5,7 107:10 112:7
**ways (1)** 36:18
**we'll (3)** 55:6 59:25 60:3
**we're (5)** 16:12 43:13 46:22 112:11 113:15
**weapon (1)** 114:18
**weapons (3)** 80:1,11 114:5
**wear (1)** 86:13
**weeds (2)** 99:10 111:14
**weekend (1)** 75:24
**well-known (1)** 102:19
**went (6)** 13:12 19:14 53:16 86:5 101:18 109:3
**weren't (2)** 36:20 56:25
**Westfield (1)** 2:10
**white (1)** 48:3
**wicked (1)** 115:8
**wide (1)** 35:9
**witch (1)** 115:8
**witness (12)** 3:3 6:24 18:25 54:14 54:14,18 58:5,5 60:18 95:16,19,25
**witness's (2)** 58:1,2
**witnessed (1)** 17:23
**woman (1)** 47:8
**Woodbridge (8)** 67:8,19,23 68:19 70:20 71:4 102:16 103:2
**word (8)** 20:7,8,16 20:17 25:17 83:10 85:9,16
**words (1)** 21:5
**work (9)** 6:20,21 36:8 46:7 53:2 57:13 75:12 91:1 107:16
**worked (4)** 76:17 76:20 77:3 91:15
**workers (1)** 65:6
**working (2)** 14:3 75:16
**works (1)** 4:20
**worried (1)** 22:21
**worry (1)** 43:8
**wouldn't (6)** 51:20 72:3,9 79:2 98:9 108:23
**Wrestle (4)** 34:17 35:1 76:5,10
**write (1)** 83:19
**writing (1)** 106:6
**written (7)** 41:15,22 42:6 97:12 101:6 106:6,7
**wrong (2)** 30:3 87:20
**wrote (3)** 5:5 27:22 99:6

**X**

**X (3)** 3:2,8 27:2
**XI01575 (1)** 117:20

**Y**

**Y (1)** 27:3
**yardstick (1)** 39:24
**yeah (6)** 18:23 61:10 62:21 63:22 65:8 67:17
**year (4)** 5:13 32:10 42:4 75:25
**year's (5)** 29:5,24 34:5 91:24,24
**years (18)** 13:10,15 30:8 31:2 32:5,13 32:22 33:1 37:15 38:19 75:25 83:22 100:25 101:8,13 107:1,2,6
**yellow (2)** 19:11 115:3
**York (9)** 7:20,21 105:17 110:18,19 111:6,10,15 114:1
**YouTube (4)** 47:7,7 47:14 48:2
**Yup (1)** 18:21

**Z**

**Z-a-p-i-l-l-e (1)** 17:14
**Zac (2)** 82:14 84:21
**Zapille (13)** 17:6,15 17:18 19:9,13,18 19:19 20:7,19 21:11 22:7 61:9 61:11
**Zapille's (4)** 3:11 18:9,14 23:25
**Zoom (4)** 6:10 54:4 55:19 57:11

**0**

**07090 (1)** 2:10
**07927 (1)** 1:24

**1**

**1 (3)** 2:9 19:1 40:24
**1:30 (1)** 116:7
**100 (1)** 1:24
**105/115 (1)** 3:4
**11 (3)** 1:16 19:9 24:5
**11/16/17 (1)** 3:10
**11:00 (1)** 1:17
**12 (1)** 19:24
**13 (1)** 19:25
**14 (1)** 24:15
**15 (2)** 5:17 20:20
**16 (3)** 4:15,24 20:20
**17 (3)** 18:19 19:2,6
**18 (3)** 3:12 18:11 19:8
**19 (1)** 24:15
**19004-1514 (1)** 2:4

**2**

**2:14-cv-05706 (1)** 1:2
**200,000 (5)** 32:14 32:23 33:8 38:10 38:18
**2012 (1)** 30:18
**2013 (11)** 30:21 31:17,23 33:4 37:15 44:4 46:24 48:3,14 82:8 102:1
**2017 (4)** 4:16,24 6:23 97:14
**202 (1)** 1:24
**2020 (1)** 1:16
**21st (1)** 9:5
**24 (1)** 92:25
**25 (1)** 19:7
**2B70 (1)** 63:1

**3**

**3 (2)** 8:17 10:1
**30 (3)** 3:13 66:22 67:6
**34990 (1)** 4:3
**35 (4)** 100:25 101:8 101:13 107:1
**35-year (1)** 10:18
**359-8444 (1)** 1:25
**368 (1)** 4:1

**4**

**4 (5)** 3:4 9:6,17 17:11 61:4
**40 (1)** 81:8

**5**

**5 (3)** 42:11 61:6 100:2
**50 (2)** 38:19 81:8
**53 (1)** 2:9

**6**

**6 (9)** 18:17 26:16 28:4 74:13,16,23 77:19 100:2,2
**60 (1)** 81:8
**69 (1)** 24:12

**7**

**7 (4)** 34:18 44:9,11 44:12
**718 (1)** 2:4

**8**

**8:30 (1)** 61:11
**83 (1)** 3:4

**9**

**9/11 (4)** 36:9 37:23 38:4 39:7
**9:09 (3)** 62:14,17 63:22
**9:12 (1)** 62:25
**9:15 (1)** 63:9
**9:26 (1)** 63:14
**97/108 (1)** 3:4
**973 (1)** 1:25