# EXHIBIT O

Copyright © 2017 by Dr. Carl Berkowitz

# Safety Report

## Tramontano, Gilmarten, and Pascale v. New Jersey Transit Rail Operations, Inc. (NJ Transit)




Prepared by: Carl M. Berkowitz, Ph.D., PE, AICP

November 30, 2017

Copyright © 2017 by Dr. Carl Berkowitz

# Table of Contents

I. ABOUT THE PERSONAL INJURY (JULY 21, 2013) .... 4
II. SUMMARY OF SPECIFIC OPINIONS .... 5
III. SAFETY AND SECURITY INCIDENTS - GENERALLY .... 7
IV. BACKGROUND .... 10
V. PROFESSIONAL QUALIFICATIONS: TRANSPORTATION SAFETY AND SECURITY .... 12
VI. GENERAL FINDINGS AND OPINIONS .... 16
A. Tramontano, Gilmarten, and Pascale Physical Assault .... 16
B. Accident Location .... 16
C. Specific Opinions .... 16
VII. ACCIDENT INFORMATION REVIEWED .... 21
A. Elements of the Injury .... 21
B. Injury Causation .... 22
C. The Exposure to Hazards .... 22
D. Workplace Safety .... 22
E. Training .... 23
F. Warning .... 24
G. Anatomy of this Injury .... 24
H. Analysis .... 24
VIII. DOCUMENTS REVIEWED AND SUMMARY OF TESTIMONY RELATED TO THE ACCIDENT .... 26
A. Documents Reviewed .... 26
B. Plaintiff's Complaint .... 27
C. NJ Transit Department Investigation Report .... 28
D. NJ Transit Voluntary Statement of James Muzikowski .... 29
E. NJ Transit Voluntary Statement of Daniel Gilmartin .... 29
F. NJ Transit form of Danielle Tramantano .... 29
G. NJ Transit form of Daniel Gilmartin .... 29
H. NJ Transit form of Anthony Pascale .... 30
I. NJ Transit form of James Muzikowski .... 30
J. NJ Transit form of Patrick Hayes .... 30
K. NJ Transit Report of Employee Injury .... 30
L. NJ Transit Department CAD Blotter .... 31
M. Testimony Reviewed .... 31
IX. DISCUSSION AND EVALUATION .... 54
A. Preventing Injuries .... 54
B. Federal Occupational Safety and Health Act (OSHA) Administration .... 55
C. Factors Affecting Assessment of Hazards and Other Risks .... 56
D. Diligence .... 57
E. APTA, Standards and Practices Washington, DC, 2004. American Public Transit Association .... 57
X. REFERENCES .... 57
APPENDIX A. PASSENGER AND WORKPLACE SECURITY .... 59
APPENDIX B. INJURY POTENTIAL MODEL .... 68

Copyright © 2017 by Dr. Carl Berkowitz

APPENDIX C. OCCUPATIONAL SAFETY AND HEALTH ACT ..... 69

APPENDIX D. APTA MANUAL FOR THE DEVELOPMENT OF SYSTEM SAFETY PROGRAM PLANS, MAY 15, 2006. (APPLICABLE TO ANY MODE OF TRANSPORTATION) ..... 70

APPENDIX E. MEMORANDUM FROM OSHA ON TRAINING FROM DAVID MICHAELS, ASSISTANT SECRETARY, APRIL 28, 2010 ..... 78

APPENDIX F. OSHA EMPLOYER RESPONSIBILITIES ..... 80

APPENDIX G. THE GENERAL DUTY CLAUSE OF THE UNITED STATES OCCUPATIONAL SAFETY AND HEALTH ACT ... 82

APPENDIX H. NJ TRANSIT RAIL EMPLOYEE SAFETY RULES AND ON-TRACK SAFETY MANUAL ..... 84

Copyright © 2017 by Dr. Carl Berkowitz

## I. About the Personal Injury (July 21, 2013)

On July 21, 2013, at approximately 9:00 PM, NJ Transit train employees Danielle Tramontano, Daniel Gilmartin, and Anthony Pascale were assaulted and seriously injured while discharging their duty's onboard NJ Transit train number 7273. The assault and injuries would have been prevented, if not for the NJ Transit police force's failure to provide effective safety and security for the crew of train 7273.

### *A. Prior to Elizabeth Station*

Train 7273 was traveling from New York City Penn Station to Long Branch. Prior to arriving at Elizabeth, another NJ Transit engineer had alerted NJT at least 11 minutes before the other train was scheduled to arrive, that there was a large, loud, unruly and dangerous crowd on the platform at Elizabeth Station. This crowd, it was determined, included many people who had attended the Colombian Festival Day activities. NJ Transit operations and Police Department (NJTPD) were informed that many in the crowd were under the influence of alcohol and other substances and were engaging in boisterous, unruly, and sometimes violent conduct. Even though NJ Transit had a police department, on July 21, 2013, there was no visible NJ Transit law enforcement present at Elizabeth Station or on the train.

### *B. At Elizabeth Station*

Upon the arrival of 7273 at Elizabeth Station, approximately 80 persons that boarded the first car of the train were boisterous, unruly, and out of control. As the train departed from Elizabeth, there was no security (i.e. police presence) on the platform nor onboard the train.

### *C. Departing Elizabeth Station*

After Elizabeth, train 7273 is scheduled to make station stops at Linden, Rahway, Woodbridge, Perth Amboy and other cities up to Long Branch. While the train was en-route to Woodbridge Station, the behavior of the crowd became worse. Many passengers became unrulier, more boisterous, and the intensity of their behavior became more threatening. At or near Woodbridge Station, the crew once again contacted train operations to report worsening conditions onboard and to request police protection. Despite a request for assistance, no police met the train at Woodbridge and the crew was required to proceed to the next station.

### *D. Departing Woodbridge Station*

Shortly after departing Woodbridge, the passengers became even more unmanageable and violent with each other and a female passenger and her two young children were in the middle of this dangerous situation. When Ms. Tramontano and Mr. Gilmartin attempted to rescue the passenger and her two young children and get them to safety, they too were physically assaulted by members of the disorderly crowd. Thereafter, Mr. Pascale attempted to assist his co-workers and he as well was physically assaulted by the same individuals.

Copyright © 2017 by Dr. Carl Berkowitz

### *E. At Perth Amboy Station*

Despite additional communications with NJ Transit train operations and NJTPD requesting assistance, none arrived until Perth Amboy Station with that City's police officers providing initial contact with the perpetrators. As it will be shown later in this report, the unruly crowd at Elizabeth Stations was first reported at 8:30 PM, and train 7273 did not receive assistance at Perth Amboy until almost 9:30 PM. Nearly one hour elapsed as these events unfolded.

## II. Summary of Specific Opinions

The injuries sustained by Tramontano, Gilmarten, and Pascale were directly caused by the acts and the acts, omissions and violations of the Federal Employers' Liability Act, the Occupational Safety and Health Act of 1970[1], APTA Standards and Practices[2] and various statutes, standards and regulations by NJ Transit and its Police Department. The defendant failed to properly provide for the security and safety of its passengers and crews on July 21, 2013. Based on the information presented throughout this report and within a reasonable degree of transportation engineering certainty, it is my professional opinion that the NJ Transit at the time of the accident are responsible for:

- Negligence by requiring the crew of train 7273 to allow onboard boisterous, unruly, intoxicated, and likely dangerous passengers;
- Failing to provide adequate and consistent security and safety enforcement at the platform in Elizabeth Station;
- Failing to provide adequate and consistent security and safety enforcement onboard train 7273;
- Failing to provide the crew of 7273 with tools and equipment that could be used for self-defense;
- Failing to respond in a timely and effective fashion to calls for help on the platform at Elizabeth Station and onboard 7273;
- Failing to properly plan for the security and safety needs of the Colombian Day festivities and the operational needs at Elizabeth Station; and
- Failed in their duty of care for the safety of its employees. It is mandated by federal statute under the Federal Employers' Liability Act that NJ Transit provide its employees a safe place to work;
- Failed in their duty of care for the safety of its passengers.

NJ Transit had a continuing and non-delegable duty to monitor their system on a regular basis to anticipate and identify areas of serious safety and security concern and to take all the means within their control to render the train safe for train crew and passengers.

Clearly, the injuries sustained were directly due to the Railroad's continuance of hazardous conditions that presented a significant danger to their train crews. Based on the information presented in this report and with a reasonable degree of professional certainty, it is my

---

[1] See section VIII.B. Federal Occupational Safety and Health Act (OSHA) Administration

[2] See section VIII.E. APTA, Standards and Practices Washington, DC, 2004. American Public Transit Association

Copyright © 2017 by Dr. Carl Berkowitz

professional opinion that NJ Transit failed to meet their duty of care to provide a safe environment for their personnel, passengers and was accountable for the injuries to Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale. At the time of the accident NJ Transit was responsible for:

- Operating and maintaining an unsafe and hazardous work environment. This condition is contrary to national standards, industry standards and guidelines applied to all commuter rail operations in the United States and abroad;
- Failing to prepare operating personnel, train crews, and passengers of this extraordinary perilous condition at Elizabeth Station. This unsafe and risky condition was fully known to the Railroad for a long time. It is the duty and responsibility of the Railroad to protect all employees, and passengers from themselves and all hazardous conditions;
- Failing to provide adequate and consistent training to prepare personnel to identify hazardous conditions and how to deal with potentially dangerous operating conditions on the Railroad. The train staff were not adequately trained to manage the hazardous situation from this annual event which required specific training in crowd control as well as self-defense. By failing to provide this training, NJ Transit's violated APTA RT-S-OP-013-03, Authorized September 28, 2003, Operating Practices, 13. Standard for Training of Rail Operations and Station Operations Personnel which outlines the basic elements required for a comprehensive rail and station operations employee training and retraining program;
- Failing to have in-place a state-of-the-art safety inspection program that would have immediately recognized and remedy any dangerous or perilous condition of the workplace where Tramontano, Gilmarten, and Pascale were injured. Furthermore, NJ Transit was not proactive in inspecting areas utilized by train crews and passengers daily (or more frequently) in order to ensure that there are no unsafe or hazardous conditions that might affect the safety of the train crew and passengers;
- Failing to assess NJ Transit operation in order to identify where there is potential for injuries and to establish a safety protection team of qualified persons to determine the best means of reducing exposure from hazardous conditions as per this specific situation;
- Failing to recognize the importance of oversight in safety management of the place where the accident occurred. The current lacks of a uniform workplace standard within accepted industry guidelines;
- Failing to exercise care in seeing that the train cars are in safe condition by controlling the causes of unruly passengers. NJ Transit knew of the dangerous condition, permitting the situation to continue to persist for an unreasonable long period of time and failed to act in a timely manner to correct it;
- Failing to follow industry rules and regulations for workplace safety. The accident could have been easily averted had NJ Transit followed the rules and regulations requiring them to be aware that safety and security function of NJTPD is the most

Copyright © 2017 by Dr. Carl Berkowitz

important element in performing their duties and must be careful to prevent injuries to the train crew and passengers;

- Failing to implement a comprehensive safety program that is concerned with the industry's principles applied to the safe operation of a railroad. Potential hazards in the system (people, procedures, training and operating environment) must be controlled or eliminated to achieve the railroads mandated system safety objectives;
- Failing to guarantee that procedures are documented and actively controlled to ensure that everyone involved remains current and relevant to requirements. Required tasks must be unmistakably defined for all stages, and a properly trained and staffed system safety organization must be maintained. The responsibilities, authorities and functions of all personnel with regard to safety must be clearly and unambiguously defined, and those functions must be consistently monitored to ensure their performance. Strict accountability for all safety-related activities must be established;
- Failing to guarantee that the railroad is free from the risk of injury or loss is a responsibility of management. Management must ensure that safety is emphasized in all activities and that policies are developed, communicated and enacted, and the organization fully supports these activities. NJ Transit has to be prepared for unexpected incidents; and train crew, and passenger safety have to always be a high priority;
- Failing to address numerous conditions of concern in the operation of the NJ Transit service (set of circumstances that can hinder achieving the highest level of safety if not remedied can result in an unsafe condition for train crews, and passengers), including: safety practices, training and public awareness initiatives. These concerns have contributed to injuries and are related to the Railroads inability to achieve and sustain the highest levels of safety;
- Failing in their duty of care for the safety of train crews, and passengers and their duty to avoid the consequences of any negligence on the part of its operation. Unfortunately, Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale were essentially placed in a position to be responsible for their own safety.

## III. Safety and Security Incidents - Generally

It is not unreasonable for a train crew to expect that they would be protected from the dangers of workplace violence. Many workplace mishaps on the train are caused by unexpected events that place railroad employees in harm's way. Typically, as in this case, poor control of the worker's environment creates more probability that an injury will occur by allowing disorderly behavior that is precipitated by uncontrolled and unruly passengers. Unduly strict behavioral controls, train crews are not offered early warning cues to attract their attention toward the dangers that await them from unruly passengers. However, in this case, the predictable was about to happen.

Copyright © 2017 by Dr. Carl Berkowitz

Unruly and disruptive passenger events are a real challenge and continuing concern for Railroads. It is critical for Railroads to prevent, identify, diffuse and manage disorderly passenger behavior.

The most important factor for preventing the unruly and disruptive passenger hazard is applying the best practices of passenger control.[3] The injuries in this case could have been easily prevented had NJ Transit properly prepared for the potential danger of unruly and disruptive passengers, by deploying adequate staff trained for these type of situations and by better coordinating with the local and state police.

Controlling unruly and disruptive passengers on transportation vehicles has long been recognized as a major safety problem that needs to be controlled in accordance with current industry standards and practices. The key measure that would have prevented these injuries was quite simply was to have in-place passenger control systems for unruly and disruptive passengers.

Workplace violence on the Railroad can best be described as the threat of violence against workers; and can occur anytime, ranging from passenger threats and verbal abuse, out-of-control passengers that can lead to physical assaults. Workplace violence and personal security is a continuing concern for train crews. This concern was expressed numerous times by train 7273 train crew and their colleagues on other trains operating that day.

Train crews are unfortunately in the unenviable position to have to deal with the unruly and disruptive passenger problem, as they are not able to escape the situation. The train crew is tasked with ensuring the safety of the train operations, but are not trained to maintaining good order and discipline on board. It has been frequently reported that unruly and disruptive passengers interfere with the performance of the duties of the train crew and lessen their ability to perform their assigned duties.

An out-of-control passenger can become a danger to themselves and others on board the train. In the event of an abnormal or emergency, the passenger would likely be less able to comprehend, cooperate, respond, follow instructions or evacuate the train.

Tolerating inappropriate passenger behavior at the station, platform, and on board the train can undermine the Railroad's goal to offer secure, and superior service to all passengers as well as the goal of a safe work environment for crew members.

The Railroad should not permit a passenger to board where there are reasonable grounds to believe that his/her faculties are impaired to an extent that will present a hazard to the train, to persons on board (crew or passengers) or to the passenger him/herself.

[3] Crowd management at Stations, A good practice guide, UK Rail Safety & Standards, October 2004

Copyright © 2017 by Dr. Carl Berkowitz

Of concern to the train crew is any unacceptable behavior (disruptive) that results in the routine operations to be interrupted, delayed, or create an unsafe environment. This type of behavior by passengers can be divided into the following inappropriate behavior categories:

- Verbal or non-verbal (with or without an intent to inflict harm) and can take the form of sarcasm, profanity, threats, loud and belligerent verbalizations, refusal to follow reasonable requests or the use of physical force or violence;
- Use of physical force to injure, or abuse another person or railroad property; and
- Use of a weapon or other instrument to threaten or inflict bodily harm.

Unruly and violent passengers create a massive safety risk to the train and its passengers. They can also prove to be very expensive to the Railroad. In some cases, the train has been forced to stop at an unscheduled stop to eject the disruptive passenger.

Disruptive passenger behavior can have many causes ranging from the stress of travel and the side effects of alcohol. However, it must be noted that many of the incidents of unruly and disruptive behavior that are reported have one thing in common, drinking excessive alcohol. In this case the passengers were coming from the Colombia Day Parade. At the end of the festivities, the passengers are tired, stressed out and often in the party mood, and wanting to party on the way home. They may continue to drink once on-board and as with any situation where there are drunken people, minor incidents such as a perceived slight can lead to abusive and even violent behavior.

On-board workplace violence can be categorized by four types of behaviors which are presented in Table 1.

**Table 1. Four Types of Behavior**

| Category | Description |
|---|---|
| Disruptive behavior | Shouting, swearing, obscene language (profanity or swearing out loud, directed at another person or an inanimate object), obscene gestures, harassing, humiliating, punching parts of the railcar, bullying, losing emotional control (excessive crying, yelling, or angry outbursts) |
| Threatening Behavior | Making threats or promoting fear of assault, making obscene phone calls, stalking someone by continually following them around, carrying a weapon onto the train, displaying symbols associated with hostile or violent groups, waving an object in a rude and threatening manner, glaring or staring at someone for an extended -- uncomfortable length of time, cornering someone, blocking someone's way and not letting them pass, pointing a finger in someone's face -- especially with an angry intent, using threatening body language which could include angry or inappropriate hand gestures, and facial expressions. |
| Verbal Threat | Direct threats, indirect threats, ambiguous (or vague, unclear) threats. |

Copyright © 2017 by Dr. Carl Berkowitz

| | |
|---|---|
| Dangerous Behavior | Throwing objects, physical actions such as pushing, shoving, grabbing, hitting, kicking, spitting, vandalism, and destruction of property. |

To provide a safe workplace there must be zero tolerance for any disruptive, threatening or dangerous behavior; and any demonstration of these behaviors should result in immediate action by the Railroad. This is best accomplished by having an in-place workplace safety and security program enforced by NJTPD which would include:

- A comprehensive plan for maintaining safety and security in the workplace and onboard trains;
- Assign responsibility and authority for this program to individuals or teams with appropriate training and skills;
- Affirm management commitment to an environment that places as much importance on worker safety as on servicing passengers;
- Confirm management commitment to worker involvement is essential elements of an effective workplace safety management system;
- Demonstrate to the train crew that there is an organization that is concerned for their emotional and physical safety;
- Establish a program to analysis the workplace to have a program that prevents train crew and passenger hazards;
- Provide each employee with workplace safety and security procedures training;
- Allocate appropriate authority and resources to all responsible parties;
- Maintain a system of accountability for involved managers, supervisors and train crews;
- Support and implement appropriate recommendations from safety committees;
- Work constructively with other parties, such as the NJ Transit and local police;
- Contribute to development of procedures that address safety and security concerns;
- Secure the workplace with video surveillance;
- Report violent incidents promptly and accurately;
- Investigate all violent incidents and threats and institute immediate corrective action, and
- Anticipate, and plan for and enforce security at special events.
- Deploy additional train crew, provide crew with self-defense training and equipment.

## IV. Background

In most workplaces where risk factors can be identified, the risk of assault can be prevented or minimized if the Railroad took appropriate precautions. One of the best protections employers can offer their workers is to establish a zero-tolerance policy toward workplace violence. This policy should cover the train crew and anyone else who may meet company personnel.

By assessing the worksite, the Railroad could identify methods for reducing the likelihood of incidents occurring. OSHA believes that a well written and implemented workplace violence prevention program, combined with administrative controls and training can reduce the incidence of workplace violence in the workplace.

Copyright © 2017 by Dr. Carl Berkowitz

Workers have a right to a safe workplace. The law requires employers to provide their employees with working conditions that are free of known dangers.

To create a secure workplace for the train crew, there are many concerns that should be considered. Table 2 summarizes some of the issues to ensure a safe workplace.

**Table 2. Safe Work Place**

| Attribute | Description |
|---|---|
| Clear policy and procedures | A zero-tolerance policy combined with procedures to ensure that all unruly passenger incidents are reported and documented to enable understanding of the incidents and provide sufficient information for prosecuting the offending perpetrator. |
| Train all personnel | Railroad should ensure that staff is aware of their responsibilities and the Railroad's procedures. |
| Improve communication | Facilitate the sharing of information among personnel, to help identify and diffuse situations earlier. |
| Railroad | Work with train crew to promote awareness of unacceptable behavior and the legal consequences. The Railroad need to acknowledge the negative effects of drinking alcohol on the train and work with the train crew on a solution. |
| Warning cards | Use of notification warning cards to be presented by the train crew to unruly passengers warning of the consequences of their disruptive actions. |

Surveillance cameras have been extremely effective in as a deterrent to unruly behavior. If passengers are made aware that the train car is fitted with cameras that will record the whole trip, they will be less likely to become disruptive. The internal cameras not only deter unacceptable behavior, if an incident did happen, the recorded images (registering the time, date and location) would be admissible as evidence in court. This would aid and speed up prosecution of the offender.

The concept of deterrence is quite simple it is the omission of an act because of the fear of sanctions or punishment. While not the entire premise, deterrence is certainly an important foundation for reducing unruly behavior on trains. Law enforcement exists both to apprehend wrongdoers and to convince would-be wrongdoers that there is a risk of punishment if they commit an unacceptable act. Laws provide a host of different sanctions for the commission of an offense (fines, probation, and imprisonment) serve notice that statutes contain a credible threat that, it is hoped, will inhibit those who have not yet offended from committing an unacceptable act at all. Implementing specific criminal justice policies such as police presence, enhanced enforcement in and surveillance of problem or potential problem can help diffuse potential unsafe conditions. It is reasonable to argue that a belief or expectation that sanction threats can deter unacceptable behavior is at the very heart of protecting passengers and train crew.

Copyright © 2017 by Dr. Carl Berkowitz

It is reasonable to believe that increasing the number of police officers on the train or station platforms will deter some amount of unruly behavior by increasing the risk of incarceration.

The evidence to date with respect to deterrence does speak clearly about the role of logical choice in the mind of the offender. It says that while offenders and would-be offenders may not be perfectly rational, they certainly are rational in the sense that they respond to incentives and disincentives. For example, research at the individual-level shows that people are affected by their perceptions about the risk of getting caught for misconduct and that these perceptions are sensitive to the outcomes of behavior. Perceptions of the risks of crime are pushed downward when people commit crimes and get away with them and are pushed upward when they get arrested. Policy studies about the policing of hot spots and police crackdowns do generally show that there is at least an initial general deterrent effect in response to the enhanced presence of the police and police actions and offenders rationally readjust their perceptions of the risk of sanctions and reduce their offending.

Table 3 presents a scale of the different levels of disturbance that can be anticipated on a passenger train when unruly behavior is permitted.

**Table 3. Levels of Disturbance**

| Disturbance Level | Description |
|---|---|
| 1 | Unsolicited verbal interaction |
| 2 | Encroaching into the adjoining passengers space |
| 3 | Baby crying and using the cell phone |
| 4 | Direct verbal abuse |
| 5 | Unruly behavior |
| 6 | Verbal threats |
| 7 | Physical violence |
| 8 | Violent threats to life |

## V. Professional qualifications: transportation safety and security

As fully discussed in my CV, a copy of which is attached to this report, I have extensive experience working in the transportation industry, including the government, private and academic sectors. I have comprehensive multi-modal experience in transportation planning, design, engineering, safety, security, construction, maintenance, operations and management. In addition to my work experience, I have conducted research, consulted, and given presentations on transportation safety and security, including specifically passenger and worker safety and security. I have worked as a transportation engineer for over fifty-five years, including four years as the highest ranking civil-service transportation engineer in the New York City Department of Transportation, I have multiple degrees, including a Ph.D. in Transportation Planning and Engineering from the Brooklyn Polytechnic Institute now of New York University, have held numerous teaching positions, have published academic and news articles, appeared on

Copyright © 2017 by Dr. Carl Berkowitz

national radio and television, and I am a member of various industry and professional associations.

While a graduate student at Brooklyn Polytechnic Institute, I worked with Dr. John Fruin on studying the behavioral characteristics of pedestrians and passengers. The primary focus of our research was to better understand how to create a safe and secure transportation infrastructure environment for both pedestrians and public transportation passengers. This research included the levels of service concept for pedestrians and passengers, congestion and crowding management, and methods to identify and remediate unsafe conditions.

This research interest in pedestrian and passenger safety and security continued throughout my professional career.

**A. While working in the New York State Governors Office of Planning Coordination my transportation safety and security initiatives included:**

1. Serving on regional transportation committees as the Governor's representative to improve the safety and security of rail passengers and the traveling public;
2. Reviewing the operation of the former Penn-Central Railroad to determine improvements needed to upgrade the systems passenger's safety and security; and
3. Helping in the development of the New York State Metropolitan Commuter Transportation Authority that eventually became the New York State Metropolitan Transportation Authority (MTA).

**B. While working with the New York City Department of Transportation my safety and security initiatives included:**

1. Creating defensible space (crime prevention through design) for pedestrians and passengers;
2. Creating vehicle free zones and defensible spaces for pedestrians;
3. Developing security systems for the NYC Garment Center for people and goods;
4. Participating in national initiatives with the Transportation Research Board for intermodal transportation safety and security;
5. Administering the NYC Ferry (Staten Island Ferry) and Aviation facilities' police force; (After NYC's Ferry and Aviation policing function was consolidated with the NYC Police Department, served as safety and security coordinator with the assigned police commander);
6. Reviewing new transportation infrastructure designs for safety and security (rail transit and bus);
7. Working with the NYC Transit Authority on studying the installation of improved communication systems and CCTV for passenger and worker safety and security; and
8. Developing a coordination system between the NYC Staten Island Ferry, and the MTA's Staten Island Rapid Transit, the Staten Island Bus system, the NYC Transit and Manhattan Bus operations to improve communication systems and to improve the safety and security of passenger and worker;

Copyright © 2017 by Dr. Carl Berkowitz

**C. While working for the National Aviation and Transportation Center at Dowling College undertook transportation research in the following areas:**

1. Intermodal transportation safety and security for the movement of people and goods;
2. Logistics and supply chain management safety and security;
3. Hazard control, management, and training;
4. Intermodal transportation security and the NAFTA trade agreement;
5. Making the workplace safe for employers, workers and visitors;
6. Emergency evacuation planning simulation and desktop scenario testing;
7. Transportation infrastructure facility safety;
8. Application of transportation security technologies, including: security patrols, surveillance systems and police;
9. Developing simulation techniques and scenario testing for intermodal transportation safety and security;
10. Serving on national and international professional committees with a focus on transportation infrastructure safety and security; and
11. Executive Director, Intermodal Transportation Research Institute for the safe and secure movement of people and goods.

**D. While working for Florida Atlantic University**

1. Appointed Distinguished Professor and Director, Center for Intermodal Transportation Safety and Security;
2. Appointed Deputy Executive Director, Florida University Consortium for Intermodal Transportation Safety and Security;
3. Conducting research (funded by Congress) for the US Department for Homeland Security and the US Department of Transportation on the safe and secure intermodal movement of people and goods in the marine and public transportation environments;
4. Member of the University's Safety and Security Committee; and
5. Assisting in the developing the University proposal for an Institute for Safety and Security.

**E. Professional Activities in transportation safety and security**

1. International Institute for Safety and Security, UAE-Dubai, Acting Dean
2. American Public Transit Association, Rail Safety and Security Committee, Bus and Rail Safety Committees
3. American Planning Association, American Institute of Certified Planners, Defensible Space
4. National Academy of Science, Transportation Research Board, Safe and Secure Movement of People and Goods
5. National Fire Protection Association, Safe and Secure Movement of Rail Passengers
6. Intelligent Transportation Society, Safe and Secure Movement of People and Good
7. Intermodal Association of North America, Safe and Secure Movement of Goods
8. National Association of Railroad Safety Consultants and Investigators, Railroad Safety and Security
9. American Railway Engineering and Maintenance of Way Association, Member Technical Committees 11 and 12 (focuses on infrastructure safety and security)
10. American Society of Civil Engineers, Fellow and Member Transportation Education and Security Committees

Copyright © 2017 by Dr. Carl Berkowitz

11. American Society of Safety Engineers, Member Transportation Practice Specialty
12. American Society of Testing Materials, Safe Walking Committee
13. International Consultant on Intermodal Transportation Safety and Security Issues

**F. University related teaching activities: transportation safety and security**

1. Logistics and Supply Chain Management Safety and Security
2. Intermodal Transportation Safety and Security
3. Transportation Terminal Safety and Security
4. Crowd Management and Crowd Control Techniques

**G. Below is a summary of the key research activities that I have undertaken that are related to the safe and secure movement of people and goods:**

1. Intermodal Goods Movement Safety and Security (Truck, Rail, Marine)
2. Workplace Violence Prevention Strategies and OSHA
3. Passenger and Freight Railroad Infrastructure Safety and Security
4. Training for Workplace Safety and Security
5. Planning for and Managing Crowd Control and Crowding (Level of Service, Scheduling)
6. Workplace Safety Culture and Human Behavior
7. Using Intelligent Transportation Systems and Security Technology
8. Work-zone Protection
9. Auto Free Zone, Defensible Space and Pedestrian Safety and Security
10. Passenger Terminal and Station Safety
11. Training in Safety and Security
12. Best Practices and Industry Stard of Care in Safety and Security
13. Railroad Right-of-Way Safety and Security
14. Bus Stop Safety and Security
15. Student Safety Door to Door
16. Terminal Planning, Design, and Operation
17. Congestion and Incident Management

**H. Technical book chapter on transportation safety and security**

Co Author, Train Accident Reconstruction and FELA, Chapter 18, **Pedestrian, Passenger, Worker Safety and Security in the Railroad Environment**, Publication Date 2017-8.

**I. Recent presentations on transportation safety and security**

1. **Rail Passenger Terminal Safety Audit,** Website Proceedings, International Seminar and Exposition, Rail Safety, 2014, Orlando, FL, April 2014, Joint Author.
2. **Pedestrian Safety in a Terminal Environment,** Website Proceedings, Institute of Transportation Engineers, Northeastern District, Long Branch, NJ, May 2014, Joint Author.
3. **Passenger Safety: Subway and Bus,** Proceedings, Subway Series 2014: Get on Track, New York State Trial Lawyers Institute, New York, NY, May 2014.
4. **Passenger Railroad Facility Safety Audit as Revenue Protection,** Joint Rail Conference, San Jose, CA, March 2015, Joint Author.
5. **Passenger Terminal Safety,** The TASA Group Website, www.tasanet.com, Knowledge Center, Web Seminar, April 2012, Joint Presenter.

Copyright © 2017 by Dr. Carl Berkowitz

6. **Bus Passenger Safety,** The TASA Group Website, www.tasanet.com, Knowledge Center, Web Seminar, June 2012.
7. **Rail Terminal Safety,** Annual Meeting of the National Association of Railroad Safety Consultants and Investigators, Chicago, IL, September 2012.
8. **Student Safety Door to Door, Part I,** The TASA Group Website, www.tasanet.com, Knowledge Center, Web Seminar, January 2013.
9. **Student Safety Door to Door, Part II,** The TASA Group Website, www.tasanet.com, Knowledge Center, Web Seminar, February 2013.
10. **Passenger Safety: Train and Bus,** The TASA Group Website, www.tasanet.com, Knowledge Center, Web Seminar, November 2014.
11. **Bus and Rail Safety,** The Expert Institute, Webinar Seminar, New York, NY, May 2015.
12. **High-Level Station Platforms and Passenger Safety,** American Railway Engineers and Maintenance of Way Association (AREMA), Railway Interchange 2015, Minneapolis, MN, October 2015, Joint Author.

## VI. General Findings and Opinions

The findings and opinions in this report are based on information provided by the law firm of Coffey Kaye Myers & Olley, Attorney for the Plaintiff; and technical references listed here and in the Appendices.

### A. Tramontano, Gilmarten, and Pascale Physical Assault

An assault by individuals in a mob can cause personal injury to the victims. Individually, the lack of security represented a dangerous condition that resulted in personal injuries to multiple crew members in the employ on NJ Transit; and an unruly mob, engaging in boisterous, unruly, offensive and violent conduct all but guaranteed the disastrous outcome.

### B. Accident Location

The location of the incident was completely and within the responsibility of the employer and carrier, NJ Transit trains stations, rail network, and railcars of train number 7273. This is the very system that the NJT PD has the responsibility to protect.

The defendant, NJ Transit had an affirmative and non-delegable obligation under the Federal Employers' Liability Act to continually provide for a safe and secure place of work. NJ Transit failed to ensure that the plaintiff's, had a safe place of work. The defendants failed to warn the plaintiffs of the failures and thus directly causing the accident to the plaintiff in this case.

### C. Specific Opinions

The injuries sustained by Tramontano, Gilmarten, and Pascale were directly caused by the acts and the acts, omissions and violations of the Federal Employers' Liability Act, the Occupational Safety and Health Act of 1970[4], APTA Standards and Practices[5] and various statutes, standards and regulations by NJ Transit and its Police Department. The defendant failed to properly provide for the security and safety of its passengers and crews on July 21, 2013. Based on the

[4] See section VIII.B. Federal Occupational Safety and Health Act (OSHA) Administration

[5] See section VIII.E. APTA, Standards and Practices Washington, DC, 2004. American Public Transit Association

Copyright © 2017 by Dr. Carl Berkowitz

information presented throughout this report and within a reasonable degree of transportation engineering certainty, it is my professional opinion that the NJ Transit at the time of the accident are responsible for:

- Negligence by requiring the crew of train 7273 to allow onboard boisterous, unruly, intoxicated, and likely dangerous passengers;
- Failing to provide adequate and consistent security and safety enforcement at the platform in Elizabeth Station;
- Failing to provide adequate and consistent security and safety enforcement onboard train 7273;
- Failing to provide the crew of 7273 with tools and equipment that could be used for self-defense;
- Failing to respond in a timely and effective fashion to calls for help on the platform at Elizabeth Station and onboard 7273;
- Failing to properly plan for the security and safety needs of the Colombian Day festivities and the operational needs at Elizabeth Station; and
- Failed in their duty of care for the safety of its employees. It is mandated by federal statute under the Federal Employers' Liability Act that NJ Transit provide its employees a safe place to work;
- Failed in their duty of care for the safety of its passengers.

NJ Transit has an affirmative obligation to ensure the safety of its employees and passengers.

The failure of NJ Transit to properly manage and operate the train crew's workplace in accordance with industry standards is a breach of their responsibilities by their not providing an appropriate standard of care. NJ Transit violated the Occupational Safety and Health Act of 1970 which mandates that all employers have a general duty to provide their employees with a workplace free from recognized hazards likely to cause death or serious physical harm. The Railroad failed to prepare for the events of Columbian Day, prepare the train crew for the hazards present so that every staff member would be able to recognize and appreciate the dangers presented. In this case, the Railroad had greater knowledge of the dangers that existed than the train crew, and had numerous opportunities before this incident to take some action to negate this danger. As discussed this annual event was known to NJ Transit as a hazard with potential to result in serious physical harm.

To ensure safe operations NJ Transit has in-place established committees with the sole mission to address safety and security issues. This action was taken in recognition of the fact that they extraordinary responsibilities to their train crews, train passengers and the general public to provide a protected place to work and a secure environment to operate its trains.

NJ Transit has failed to make their workplace as safe as possible for their train crews, and passengers; they had a responsibility to review train operations for obvious dangers and take reasonable measures to eliminate the dangers for passengers and train crew. They also had a duty to warn of the dangers by training their management, police and conductor on how to best deal with unruly and disruptive passengers and thereby neutralizing the hazard.

Copyright © 2017 by Dr. Carl Berkowitz

For years, NJ Transit has turned a blind eye to the dangers in allowing unruly and disruptive passengers' and there has been a willful disregard for train crew and passenger safety by their intentional inactions. It has been well known by everyone in this transportation community and by the Railroad itself that unruly and disruptive passengers on-board the train was a dangerous proposition. A reasonable remedy would have been to recognize this hazard and to undertake simple measures to ameliorate their dangerous effects by deploying police on-board the trains.

NJ Transit had a continuing and non-delegable duty to monitor their system on a regular basis to anticipate and identify areas of serious safety and security concern and to take all the means within their control to render the train safe for train crew and passengers. In the case it would also have been prudent to also enlist the help of the local City of Elizabeth police to help jointly to control and remove the unsafe conditions. Elizabeth police was not contacted per the records reviewed.

NJ Transit operation as a common carrier has a heightened legal responsibility for the safety of their train crews, and passengers. This zone of safety for which the Railroad is held accountable includes the station and on-board the train. In this space, the Railroad must exercise extreme caution and diligently guard against dangerous conditions that might impact train crews, and passengers. The safety of vulnerable employees and passengers is solely in their hands, and they alone bear the responsibility of keeping everyone safe.

As a Railroad Company, they must carefully operate, and inspect their trains for hazards. Rail personnel must be appropriately trained, and the operations must be professional and cautious. Furthermore, the railroad must take reasonable precautions to protect their employees, and passengers from all foreseeable hazards.

Workplace safety should never be sacrificed for revenue or schedule. Of equal importance is to have an in-place system that encourages train crews and other operating personnel to report instances where they encounter dangerous on-board situations. This should be encouraged without the personnel having the fear for repercussions or being singled out by management.

Clearly, the injuries sustained were directly due to the Railroad's continuance of hazardous conditions that presented a significant danger to their train crews. Based on the information presented in this report and with a reasonable degree of professional certainty, it is my professional opinion that NJ Transit failed to meet their duty of care to provide a safe environment for their personnel, passengers and was accountable for the injuries to Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale. At the time of the accident NJ Transit was responsible for:

- Operating and maintaining an unsafe and hazardous work environment. This condition is contrary to national standards, industry standards and guidelines applied to all commuter rail operations in the United States and abroad;

Copyright © 2017 by Dr. Carl Berkowitz

- Failing to prepare operating personnel, train crews, and passengers of this extraordinary perilous condition at Elizabeth Station. This unsafe and risky condition was fully known to the Railroad for a long time. It is the duty and responsibility of the Railroad to protect all employees, and passengers from themselves and all hazardous conditions;
- Failing to provide adequate and consistent training to prepare personnel to identify hazardous conditions and how to deal with potentially dangerous operating conditions on the Railroad. The train staff were not adequately trained to manage the hazardous situation from this annual event which required specific training in crowd control as well as self-defense. By failing to provide this training, NJ Transit's violated APTA RT-S-OP-013-03, Authorized September 28, 2003, Operating Practices, 13. Standard for Training of Rail Operations and Station Operations Personnel which outlines the basic elements required for a comprehensive rail and station operations employee training and retraining program;
- Failing to have in-place a state-of-the-art safety inspection program that would have immediately recognized and remedy any dangerous or perilous condition of the workplace where Tramontano, Gilmarten, and Pascale were injured. Furthermore, NJ Transit was not proactive in inspecting areas utilized by train crews and passengers daily (or more frequently) in order to ensure that there are no unsafe or hazardous conditions that might affect the safety of the train crew and passengers;
- Failing to assess NJ Transit operation in order to identify where there is potential for injuries and to establish a safety protection team of qualified persons to determine the best means of reducing exposure from hazardous conditions as per this specific situation;
- Failing to recognize the importance of oversight in safety management of the place where the accident occurred. The current lacks of a uniform workplace standard within accepted industry guidelines;
- Failing to exercise care in seeing that the train cars are in safe condition by controlling the causes of unruly passengers. NJ Transit knew of the dangerous condition, permitting the situation to continue to persist for an unreasonable long period of time and failed to act in a timely manner to correct it;
- Failing to follow industry rules and regulations for workplace safety. The accident could have been easily averted had NJ Transit followed the rules and regulations requiring them to be aware that safety and security function of NJTPD is the most important element in performing their duties and must be careful to prevent injuries to the train crew and passengers;
- Failing to implement a comprehensive safety program that is concerned with the industry's principles applied to the safe operation of a railroad. Potential hazards in the system (people, procedures, training and operating environment) must be controlled or eliminated to achieve the railroads mandated system safety objectives;
- Failing to guarantee that procedures are documented and actively controlled to ensure that everyone involved remains current and relevant to requirements. Required tasks must be unmistakably defined for all stages, and a properly trained

Copyright © 2017 by Dr. Carl Berkowitz

and staffed system safety organization must be maintained. The responsibilities, authorities and functions of all personnel with regard to safety must be clearly and unambiguously defined, and those functions must be consistently monitored to ensure their performance. Strict accountability for all safety-related activities must be established;

- Failing to guarantee that the railroad is free from the risk of injury or loss is a responsibility of management. Management must ensure that safety is emphasized in all activities and that policies are developed, communicated and enacted, and the organization fully supports these activities. NJ Transit has to be prepared for unexpected incidents; and train crew, and passenger safety have to always be a high priority;
- Failing to address numerous conditions of concern in the operation of the NJ Transit service (set of circumstances that can hinder achieving the highest level of safety if not remedied can result in an unsafe condition for train crews, and passengers), including: safety practices, training and public awareness initiatives. These concerns have contributed to injuries and are related to the Railroads inability to achieve and sustain the highest levels of safety;
- Failing in their duty of care for the safety of train crews, and passengers and their duty to avoid the consequences of any negligence on the part of its operation. Unfortunately, Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale were essentially placed in a position to be responsible for their own safety.

NJ Transit operates a complex system and by their actions influences the safety of people in many ways. They hire and train personnel, establish procedures, oversee compliance with their rules and regulations, and establish organizational cultures that influence staff attitudes and performance. Each activity area has the potential to create error events and the railroad has the ultimate responsibility to guarantee that their actions minimize the role of potential antecedents, so that the goal is for the Railroad operating safely at all times.

Because the conductors have very little control over the operation of NJ Transit, they must rely on the reasonable judgment and skills of management. If there are dangerous situations, management has a duty to take every necessary step to prevent injuries.

NJ Transit was in possession of sufficient facts and should have realized not controlling unruly and disruptive passengers was an unreasonable act and by so doing disregarded a known risk that would likely put someone in peril. This, combined with the conscious indifference on the part of NJ Transit management and failure to establish safety and security protocols, created a high probability that harm would come to the train crew.

Although the railroad should have anticipated that by not banning alcohol there was a high probability of harming its train crews. The railroad's management did nothing to stop this practice, and took no basic policing procedures and precautions to protect their train crew and passengers from unruly and disruptive riders.

Copyright © 2017 by Dr. Carl Berkowitz

## VII. Accident Information Reviewed

A summary (See section VI for detailed list) of documents reviewed for this report pertaining to the incident is listed below:

1. Plaintiffs' Complaint, filed September 12, 2014
2. NJT Reports of the Incident, of Personal Injuries, of Voluntary Statements, and Investigations
3. NJT PD CAD Blotter
4. Depositions of Plaintiffs, Witnesses, and NJT Employees
5. Legal pleadings
6. Miscellaneous documents

### A. Elements of the Injury

Table 5 summarizes the elements that led-up to Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale physical assault.

**Table 4. Elements of *Tramontano, Gilmarten, and Pascale* Physical Assault**

| Step | Description | Time |
|---|---|---|
| One | NJ Transit Police Department did not take seriously the Colombia Festival Day Activities of July 21, 2013 in the City of Elizabeth and failed to plan for increased security at the station and onboard trains serving the City, and failed to utilize portable surveillance cameras and skytop vision and did not assign any police officers to the various rail platforms or the train. | Days to hours before incident |
| Two | NJ Transit Police Department failed to recognize the impending danger even when an assault and arrest incident had already taken place at the Elizabeth Stations hours earlier, when the festivities were just commencing. | |
| Three | The police officer Giovannone was located at the time at Linden Station, minutes from Elizabeth Station, and despite his proximity and the initial reports to the police of the dangerous crowd on the platform there; did not arrive before train number 7273 takes on a crowd of boisterous and unruly passengers and departs en-route to its next stations. It is unclear why police officer Giovannone was not immediately dispatched to Elizabeth Station or any of the train stations on the way to Woodbridge as he could have arrived in time to resolve the dangerous situation. Instead he was later dispatched to Perth Amboy station. Also unclear is why at the time of a major festival, a single police officer was assigned to two train lines which includes approximately 40 stations. | Nearly one hour before incident |
| Four | The train crew is duty bound to continue operating train number 7273 along its scheduled route; without law enforcement, the crew was left at the mercy of the crowd and are physically assaulted when they attempt to maintain order on the train and come to the aid of passengers near the Perth Amboy Station. | Unavoidable loss of control Just prior to incident |
| Five | Perth Amboy police are the first responders; and they were too late to | |

Copyright © 2017 by Dr. Carl Berkowitz

| Step | Description | Time |
|---|---|---|
| | prevent the physical assault to Tramontano, Gilmarten, and Pascale. | |
| Six | NJ Transit Police Department does not catch-up with the crew of train number 7273 until nearly one hour after the initial report of a dangerous crowd at Elizabeth Station. | |

## B. Injury Causation

NJ Transit is a common carrier under FELA has a duty to make their premises and/or the premises where their employees will work safe. NJ Transit had a non-delegable and continuous duty to provide all of their employees with a reasonably safe and secure place to work. In the case of Tramontano, Gilmarten, and Pascale, it breached its duty to provide secure working conditions which caused injuries to Tramontano, Gilmarten, and Pascale. NJ Transit, management and its Police Department failed to properly plan and manage the safety and security needs of the Colombian Day festivities, failed to properly maintain security and safety on the station platform at the Elizabeth Station, failed to properly maintain safety and security onboard for its train passengers and train crews, failed to respond in a timely manner to calls for assistance in order to restore order, safety and security and failed to provide the train crew members any self-defense training or self-defense equipment to protect themselves in an environment where they had inadequate police and crew members assigned to these areas. In addition the train crew had not means to be able to directly communicate with the police, such as with a panic button

## C. The Exposure to Hazards

The defendants' failure to eliminate this dangerous condition placed employees and passengers in danger of injury due to the lack of providing for safety and security. The first line of defense to prevent injury was to eliminate this unsafe condition at the workplace or to significantly reduce this hazard, which is the responsibility of the NJT Police Department and which required their presence. This did not happen in this case; and the facts clearly indicated that NJ Transit did not provide the necessary safety and security for its passengers and train crews. All the previously mentioned failures directly caused the accident to Tramontano, Gilmarten, and Pascale.

It was the defendant, NJ Transit's continuous non-delegable duty to provide a safe place to work for its employees and a safe place for its customers.

## D. Workplace Safety

Workplace safety is an important concern for all working individuals. Occupational workplace injuries represent damage to the human body resulting from unintentional or intentional exposure to an unsafe condition caused by a specific event as in this case.

Prevention of this occupational injury was simple; merely prescribe to minimum safety and security protocols. It is clear that NJ Transit has safety standards but they were not followed through or enforced on this day. If the appropriate standards were consistently enforced this alone would have prevented the injuries to the NJ Transit employees.

Copyright © 2017 by Dr. Carl Berkowitz

The first line of defense is always the presence of a safety and security management system, a strong safety culture among employees, proper training and applicable knowledge base. Compliance, obeying safety and security rules and regulations, following correct procedures, using appropriate methods is important to preventing injures.

The defendant NJ Transit failed to protect its employees and passengers from the risk of physical assault by failing to respond to a known emergency.

**E. Training**

People apply what they have learned to varied situations. This is an essential element of a safety program. It is not unreasonable to assume that trained workers are better prepared than untrained employees to deal with work-related unsafe conditions.

Training prepares employees to be able to understand the relationship between failure to maintain the Railroads' property and eliminate the potential for injury. By increasing employee knowledge, by developing safety policies, procedures and programs the Railroads can prevent injuries to its employees and passengers.

Training must include the correct use of equipment, technical and tactical police enforcement measures to deal with various types of safety and security situations, including those effect employees and passengers. NJ Transit violated its absolute duty under the Federal Employers Liability Act by failing to ensure that their employees received the necessary freedom from fear of injury and the potential outcome of a personal injury to fellow employees and passengers.

No one should be asked to sacrifice their safety because of a dangerous condition that can result in someone being injured. Continuous safety training is a key element in the prevention of work-related injuries and injuries to passengers. When employees are continuously educated on safety and security procedures, they would have known how to prevent an incident by assessing the present danger and selecting the proper mechanism to be able to respond to the dangerous situation. In environments where there is inadequate police the train employees need to be trained in self-defense training and provided with self-defense equipment to be able to protect themselves. In addition the train employees need the means to be able to directly communicate with the police when required in a dangerous situation. In this case, it would have been the proper planning for security and safety for the Colombian Day festivities.

Train crews are often the first to notice a potentially disruptive passenger. Their procedures and training should endeavor to ensure that minor complaints do not escalate into major incidents. On those occasions when tact, reassurance and interpersonal skills fail to resolve an incident, it is vital that the staff have guidance to identify and handle these behaviors. All front line personnel should have guidelines from the Railroad to follow the appropriate procedures to protect themselves, their colleagues and passengers.

In order to cope effectively when confronted with disruptive situations, it is suggested that the train crew have a clearly-defined procedure in the Railroad's policy that apply to them.

Copyright © 2017 by Dr. Carl Berkowitz

The effectiveness and successful implementation of a Railroad policy regarding unruly passengers will require train crew training. This training program should comply with the requirements of a competent authority and provide knowledge on how to detect, defuse and prevent critical situations.

Training programs should be designed and adapted for the train crew and the level of knowledge required. Some staff might only require awareness training; others may require greater training as per requirements of a competent authority.

### F. Warning

Unruly or disruptive passengers should be made aware of the consequences of their actions and the type of measures that will be taken to stop the disruptive behavior. Those conditions can be conveyed verbally or in writing and should include as a minimum restricting the unruly passenger's alcohol consumption; prohibiting the unruly passenger from behaving in a manner that might cause concern to other passengers and crew; and the passenger's mandatory compliance with all directions given to him or her by any member of the train crew.

### G. Anatomy of this Injury

Exposure to an unsafe condition simply means that there is a state of vulnerability and that person is vulnerable to being impacted by the potential for physical assault. If security personnel received better training and reinforcement of proper procedures, they would have appropriately responded in advance to this event and incident. The nature of the physical assault and subsequent injuries can only be attributed to the negligence of the defendant NJ Transit.

### H. Analysis

The root causes of this assault proceeded the actual assault time by many hours or even the preceding day, which is when NJ Transit should have begun preparations for safety and security of its passengers and crew in connection with the Colombian National Day Parade in Elizabeth, NJ. This incident occurred on Sunday July 21, 2013, as the parade was winding down and partygoers were leaving by train from Elizabeth train station. To understand this connection, it is useful to review the following timeline and associated table.

- Earlier in the day, approximately at Noon hour there was another incident involving train 7266 and disorderly conduct at Elizabeth Station, which required response by unit 2A70 of NJ Transit PD and resulted in one arrest;
- Later, Train 7273 originated New York City was en route serving many stations outbound on its way to the final terminal in Long Branch, with a scheduled stop in Elizabeth;
- About 8:32 PM, as 7273 was departing the Newark Airport Station, there was a warning issued by engineer Zapille, operating a train that was by-passing Elizabeth, and that reported a large, loud, unruly, and dangerous crowd at Elizabeth Station;

Copyright © 2017 by Dr. Carl Berkowitz

- 7273 arrives at Elizabeth and takes on the heavy crowds as well as a band of ruffians looking to create trouble - - There are no notations or any paperwork of police officer Giovannone's movements.

**Table 5. Chronology of Key Events Constructed From NJT PD CAD and Depositions, 7/21/2013**

| Schedule 11/16/16 | Actual 7/21/13 | Event |
|---|---|---|
| | 11:47 | Train 7266 delayed 20 minutes for an arrest of a passenger at Elizabeth Station for disorderly conduct and assault; Unit 2A70 responded, Sgt. Perez; (Lt Mooney depo at p.19) [E13034574]; parade goers already arriving at the city of Elizabeth |
| 20:30 | | 7273 Schedule departure from Newark Airport Station |
| | 20:30 estimated | Train engineer Zapille, operating a non-stop train, calls the dispatch center and reports dangerous overcrowding on the platform at Elizabeth Station and that the crowd appears boisterous, unruly, and possibly violent |
| | 20:32 | Dispatch center, aka. 40 Office, relays warning to NJT PD, which in turn dispatch police officer Giovannone en route responding to Elizabeth Station crowd; no other officers are dispatched at this time [E13034634] |
| 20:39 | | 7273 schedule departure from Elizabeth Station |
| 20:40 | | 7273 schedule departure from Linden Station |
| | 20:43 | 7273 actually arrives at Elizabeth Station (per Tramontano's testimony) |
| 20:44 | | 7273 schedule departure from Rahway Station |
| | 20:XX | 7273 actual departure from Elizabeth w/ crowd of Ruffians |
| 20:52 | | 7273 schedule departure from Woodbridge Station |
| 20:58 | | 7273 schedule departure from Pert Amboy Station |
| | 21:10 | Engineer Pascale calls "a 29" as 7273 departs Woodbridge Station [E13034539]<br>Train is clearing platform, fight has broken out onboard and assault began by ruffians |
| | 21:12 | Unit 2B70 responding, presumed to be police officer Giovannone, from the vicinity of Linden Station; trip to Pert Amboy reported to be 15-20 minutes (p. 62 of testimony); Perth Amboy PD is notified but no other NJT PD officers respond at this time [E13034539] |
| | 21:24 | Approx. time of assault to Ms. Tramontano in the vicinity of the Pert Amboy Station (Tramontano Incident Report) |
| | 21:26 | Sgt. Mooney and others are responding [E13034539] |
| | 21:30 CAD21:53 | Approx. time police officer Giovannone arrives on scene (Investigation Report) [E13034539] |

Copyright © 2017 by Dr. Carl Berkowitz

There was a standard of care that is owed to employees and passengers to protect them against any type of injury that might not normally be expected to arise from the use of the NJ Transit facilities. This standard of care cannot be met by not managing unruly passengers on any of the property and services of NJ Transit.

NJ Transit had actual notice of this unsafe condition and their lack of their action with respect to not removing the security and safety hazard caused personal injury to their train crew.

The NJ Transit Police Department had all the necessary resources and procedures in place to manage the situation. They were provided with the training and ability (necessary equipment) to anticipate and neutralize any security and safety hazard. In addition, they failed to continually monitor conditions by providing regular surveillance of potentially dangerous areas.

Tramontano, Gilmarten, and Pascale acted responsibly and beyond their duty to protect their passengers from harm, yet because of the dangerous conditions caused by the unruly passengers they were injured. Tramontano, Gilmarten, and Pascale were left on their own and facing a large unruly mob of passengers without proper training and the proper defense tools, resulting in their serious injury. NJ Transit's failure violated its duty under the Federal Employers' Liability Act by failing to provide a safe place to work as mandated by federal statute.

Clearly, the injuries sustained by Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale were directly caused by defendant's failure to properly protect its employees and passengers. Based on the information presented throughout this report and with a reasonable degree of transportation engineering certainty, it is my professional opinion that the Railroad's personnel and management failed to meet their duty of care to provide a safe environment for employees and passengers and was the cause of the injuries to Tramontano, Gilmarten, and Pascale.

## VIII. Documents Reviewed and Summary of Testimony Related to the Accident

### A. Documents Reviewed

1. Plaintiff's Complaint (11 pages)
2. Defendant's Answer to Plaintiff's Complaint (22 pages)
3. NJ Transit Department Investigation Report (3 pages)
4. NJ Transit Voluntary Statement of James Muzikowski (1 page)
5. NJ Transit Voluntary Statement of Jessica Molina – passenger/victim (1 page)
6. NJ Transit Voluntary Statement of Daniel Gilmartin (1 page)
7. NJ Transit's Report of Personal Injury regarding Danielle Tramantano (3 pages)
8. NJ Transit's Report of Personal Injury regarding Danielle Tramantano (hand written) (2 pages)
9. NJ Transit form of Danielle Tramantano (2 pages)
10. NJ Transit form of Daniel Gilmartin (1 page)
11. NJ Transit form of Anthony Pascale (1 page)

Copyright © 2017 by Dr. Carl Berkowitz

12. NJ Transit form of James Muzikowski (1 page)
13. NJ Transit form of Patrick Hayes (1 page)
14. NJ Transit Investigation report – Tramantano (3 pages)
15. NJ Transit's Report of Personal Injury regarding Daniel Gilmartin (3 pages)
16. Statement form of Daniel Gilmartin (3 pages)
17. NJ Transit Investigation Report – Gilmartin (2 pages)
18. NJ Transit's Report of Personal Injury regarding Anthony Pascale (3 pages)
19. Statement form of Anthony Pascale (2 pages)
20. NJ Transit Police Department CAD Blotter (115 pages)
21. Deposition of Patrick Hayes, October 26, 2016 (45 pages)
22. Deposition of Christopher Zappile, October 26, 2016 (36 pages)
23. Deposition of Nicole Pratt, October 26, 2016 (49 pages)
24. Deposition of Emmanuel Motomal, October 26, 2016 (48 pages)
25. Deposition of Mike Reilly, October 28, 2016 (35 pages)
26. Deposition of Alan Antel, October 27, 2016 (41 pages)
27. Deposition of Scott Aitkens, October 26, 2016 (38 pages)
28. Deposition of Daniel Gilmartin, October 25, 2016 (129 pages)
29. Deposition of Fred Mattison, October 27, 2016 (70 pages)
30. Deposition of Police Officer, Christopher Giovannoe, October 27, 2016 (86 pages)
31. Deposition of Lt. Kevin Mooney, October 27, 2016 (102 pages)
32. Deposition of Danielle Tramantano, October 25, 2016 (111 pages)

**B. Plaintiff's Complaint**

1. The aforementioned train was traveling from New York City to Long Branch and was carrying many people who had attended the Colombian Festival Day activities
2. Prior to arriving at NJT'S Elizabeth Station, another NJT employee alerted NJT that there was a large, loud, unruly, and dangerous crowd at the Elizabeth Station.
3. NJT had both actual and constructive notice that a train carrying passengers from the Colombian Festival Day activities was likely to contain passengers under the influence of alcohol and/or other substances, and would be engaging in boisterous, unruly, offensive and violent conduct, because of problems that had regularly occurred while transporting the passengers from prior festivals, concerts, sporting events, etc.
4. NJT was informed that many in this crowd were under the influence of alcohol or other substances and were engaging in boisterous, unruly, and sometimes violent conduct.
5. Even though NJT had a police department, on the aforementioned date there was no visible police presence at the Elizabeth Station.
6. On the aforementioned date, after NJT had been warned of the problems at Elizabeth Station, plaintiff's train arrived at the Elizabeth Station and approximately 80 of the people on the platform boarded the train where they boisterous, unruly and out of control.
7. There was no police and/or other security present on Plaintiffs' train.
8. While the train was in route from Elizabeth Station to the Woodbridge Station, the behavior of the crowd became worse.
9. The passengers on board became more unruly, more boisterous, and the intensity of their behavior became more threatening.

Copyright © 2017 by Dr. Carl Berkowitz

10. At or near the Woodbridge Station, the plaintiffs contacted NJT to advise them of the continuing and increasingly dangerous situation and to request police and/or security protection.
11. Despite their request for assistance, no police or security arrived on the train at Woodbridge, and the train was required to proceed to the next station.
12. Shortly after departing the Woodbridge Station, the passengers became even more unruly and violent with each other.
13. As this was occurring, a female passenger and her two young children were in the middle of this dangerous situation and Ms. Tramantano and Mr. Gilmartin attempted to extract the passenger and her children and place them in a safe area of the train.
14. While doing so, Ms. Tramantano and Mr. Gilmartin were physically assaulted by members of the unruly crowd.
15. Thereafter, Mr. Pascale attempted to assist his co-workers and he too was physically assaulted.
16. Despite additional communications with NJT requesting emergency police and/or security or personnel, none arrived until several minutes after the train arrived at the Perth Amboy Station.
17. Danielle Tramantano
    a. Plaintiff sustained injuries to her left wrist, left shoulder, neck, left arm and lower back.
    b. Plaintiff suffered upper trunk brachial plexopathy with left double crush carpal tunnel syndrome with denervation, tear of the distal supraspinatus and tear of the anterior superior labrum.
    c. Plaintiff's injuries resulted in two surgeries
18. Daniel Gilmartin
    a. Plaintiff sustained injuries to his head, face, right ear, jaw, neck, cervical spine and back.
    b. Plaintiff suffered an exacerbation of his trigeminal neuralgia, hearing loss in his right ear, facial nerve pain, TMJ, anxiety disorder, insomnia and posttraumatic stress disorder.
19. Anthony Pascale
    a. Plaintiff suffered cervical sprain and strain, neck pain and headaches.

## C. NJ Transit Department Investigation Report

1. P.O. Giovannone while on radio motor patrol was requested to respond to Perth Amboy Station from Rt. 27 North for a fight in progress on NJ Coastline Train #7273.
2. Gilmartin, Pascale and Tramontano advised me at the time that they had been assaulted by two of the actors that had already been taken into custody by Perth Amboy PD. All victims were asked if they needed any medical attention at this time, they declined and stated they wanted to wait for their supervisor to be present before receiving medical attention.
3. Pascale and Tramontano stated they were going to continue with their shift and file their reports after they completed their route.
4. I (P.O. Giovannone) transported both Gilmartin and Muzikowski to Perth Amboy PD.
5. Conductor Danielle Tramontano and Engineer Anthony Pascale met us at Perth Amboy Police station and advised Sgt. Mooney and I once again that they were assaulted.

Copyright © 2017 by Dr. Carl Berkowitz

6. They stated they were both swung at and punched numerous times in the shoulder areas and in the facial areas with closed fists.

**D. NJ Transit Voluntary Statement of James Muzikowski**

1. Working TR46 on Train 7273 to Long Branch.
2. I was working rear 3 cars to meet rear brake.
3. As we arrived, train still moving, in Perth Amboy, I heard conductor over intercom tell rear brake "do not open doors, do not open doors."
4. Anticipating a problem I moved to first car to protect train and fellow crew member.
5. As I arrived in the first car coming down from the top level of multilvels – I witnessed Danny, A.C. and the engineer being punched and assaulted as they tried to back up to safety.
6. Passengers were also punching and verbally attacking each other.
7. Men were punching women.
8. A woman punched the engineer and other woman.
9. I stood between our train crew and the attacking passengers.
10. While we waited for the police, there was yelling, taunting, pushing and shoving.
11. Eventually crew retreated to cab taking young children and mother with us.

**E. NJ Transit Voluntary Statement of Daniel Gilmartin**

1. I was working Train 7273 – Train picked up passengers at Elizabeth Train Station.
2. Fight broke out in the first car between at least two passengers.
3. I was attempting to get to safety when I was attacked by a male passenger and punched in the face several times.
4. Police were summoned.
5. Passenger punched me several times on the right side of my face and bottom jaw.

**F. NJ Transit form of Danielle Tramantano**

1. Passengers boarded Elizabeth Station in car 7007, drunk, loud and disorderly, sat down as train moved west.
2. Group of kids began fighting on the train.
3. Daniel Gilmartin and Jim Muzikowski, rushed up to first car to make passengers that weren't involved into safer area, upon doing so passengers hit struck crew members.
4. I moved 2 kids and women that were sitting downstairs in that car into cab with engineer to protect them, when going back out shorter woman punched me in the shoulder.
5. After that younger male was opening emergency handle on fireman side and fell onto track 2.
6. He kept pushing Daniel and I, he would not get off live track.
7. Tony Pasacale, engineer, protected crew on train.
8. He came out of the cab to get Daniel and Jim out of the way; he got punched in the face.
9. Transit knew this Colombian parade was going on – no police – no protection! Unsafe work environment.

**G. NJ Transit form of Daniel Gilmartin**

Copyright © 2017 by Dr. Carl Berkowitz

1. Was working Train 7273 – was working the bottom of car 7007 when pulling into Elizabeth Station.
2. We pulled up 100's of passengers from the parade at Elizabeth.
3. As I was working rear brake out and I was stuck in the middle of 20 plus people punching each other, male and female.
4. As I was trying to my way to safety I was attacked by a male.
5. He punched me in the face multiple times.
6. Tony Pascale and Danielle Tramontano came to help.
7. Tony was punched in the face by the same male and female.
8. Danielle was punched in the shoulder.
9. We called for a 29 because there were no New Jersey Transit Police on the train even though they knew of the parade.

**H. NJ Transit form of Anthony Pascale**

1. A fight broke out on 7273 after leaving Woodbridge.
2. We called for a 29 at next station which is Perth Amboy while waiting for police, Conductor Danielle Tramontano put a woman and two young girls in the cab with me to protect them.
3. I was standing facing the fight with the door closed I noticed my crew member get punched in the face so I went to protect him.
4. Dan Gilmartin in the process, I was punched multiple times once in the face, my neck is stiff and lip is a little swollen.
5. I felt the safety of my crew and passengers was of the most importance.

**I. NJ Transit form of James Muzikowski**

1. Was in rear of Train 7273 to Long Branch working cars 4 and 5 in the consist.
2. I heard the conductor over the PA tell the rear brake "do not open the doors, do not open the doors."
3. Anticipating the train and crew may need assistance I went to the first car.
4. I came down from the upper level of the multilevel and witnessed passengers assaulting and punching A.C. Danny and the engineer in the face as they, the NJT crew, were trying to assist a victim passenger and a woman with small children get to safety in the cab car.
5. I stood between the fighting party and the crew.
6. Passengers pushed shoved and verbally encouraged violence despite our presence until the police arrived.
7. A woman punched both the conductor and the engineer in the face.
8. Men punched women in the face and woman punched both men and women.
9. My shirt is stained with passenger's blood.

**J. NJ Transit form of Patrick Hayes**

1. Working rear end of #7273 was told not to open doors approaching Perth Amboy.
2. Remained in hind end until resolved.

**K. NJ Transit Report of Employee Injury**

Copyright © 2017 by Dr. Carl Berkowitz

1. Danielle Tramontano:
   a. Based on the circumstances of this incident, the committee determined the employee did not contribute to the severity of her injuries.
   b. The committee recommends no action to be taken at this time.
2. Daniel Gilmartin:
   a. Based on the circumstances of this incident, the committee determined the employee did not contribute to the severity of her injuries.
   b. The committee recommends no action to be taken at this time.

## L. NJ Transit Department CAD Blotter

1. Domestic/violence reported – Elizabeth Station – eastbound platform. – 7/21/13 11:47.29
2. Crowd Control – Elizabeth Station – heavy crowd conditions – 7/21/13 20:32.09
3. Assault/Protected Employee – Perth Amboy Station – 2/22/13 5:00.12
   a. 7/21/13 – 21:09:40 NJCL requesting officer
   b. 7/21/13 – 21:09:54 Perth Amboy Notified and will assist and send unit
   c. 7/21/13 – 21:15:19 NJCL requesting officer for a fight on board train at the station
   d. 7/21/13 – 21:26:18 Coastline dispatcher reports that a conductor may have been assaulted
   e. 7/21/13 – 21:26:23 Sgt. Mooney responding
   f. 7/21/13 – 21:38:49 Officer Giovannone reports that two conductors and engineer were assaulted trying to break up fight.

## M. Testimony Reviewed

| Question | Answer |
|---|---|
| **Examination of Patrick Hayes (Assistant Conductor, NJT) 10/26/16** | |
| So what is your date of hire with New Jersey Transit? | 6/22 of '12, I believe is the date. |
| All passenger service? Why don't you give me a rundown of the general duties you are responsible for in passenger service? | I take the train with the crew into Sunnyside and when we come out, we're a passenger train for round trip down the Northeast Corridor line or the North Jersey coastline. |
| So you have to walk up and down the aisles and meet the passengers, collect the revenue, issue tickets, all that sort of thing; is that correct? | Correct. |
| Now, back in 2012, when you got hired, what kind of training do you have? | We went through the ACTP class, which taught us the rear brake job, ticket collecting, opening doors, I probably had to resolve door issues, know where certain parts of equipment might be. |
| Does the radio have any direct contact on either the New Jersey Transit Police Station or any local police station? | I don't believe so, no. |
| If you wanted to ask for a police officer, would you have to call the engineer first? | I think that's the protocol, but if it was a serious situation, I think I can get a call a 29 to that local |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| | dispatch and ask for it myself. |
| And it is your statement and you were the rear brake? | The rear brake is the individual on the train, upon approaching each station or a stop at each station, his duties are to open the doors to load and unload passengers. |
| And could you read your statement into the record, please? | Statement: "Working hind end of train number 7273. Was told not to open doors approaching Perth Amboy. Remained on hind end until resolved." |
| Now, at some point, you said you were ordered to keep the doors closed at Perth Amboy? | I believe it was Danielle. I don't know how the communication came, either radio or over the PA. |
| And what does that mean, when you are not supposed to open the doors? I mean, you just… | That signifies to me that there was an issue up front, that she didn't want the doors open for maybe the perpetrator not to run off the train. |
| So if there is an issue up front, you have to close the doors and that means the passengers can't get off at the station? | …when we were approaching Perth Amboy, I was told to keep the doors closed and not open them at Perth Amboy Station. |
| Yes, right there at Perth Amboy, he wasn't supposed to open the doors. | I think we were stuck therefore about 40 minutes, so at the latter part of it, before our train was annulled, I might have noticed that the police were coming down finally. |
| Perth Amboy Police. Did you see where they went? | I saw them go to the front of the train. |
| At any time before the train left I New York, was there any kind of bulletin, a written or verbal bulletin given by New Jersey Transit or any of its employees about a potential problem at the Elizabeth train station with unruly passengers? Do you recall? | I don't recall any statements. |
| Do you recall New Jersey Transit assigning an uninformed police officer at the New York train station to board your train? | No. |
| Do you recall whether anyone from NJT assigned additional personnel to ride on the train with you that day? | No. |
| Do you remember hearing any crew member from another train calling in a problem at Elizabeth Station before you got there? | Not so much a problem, overcrowding, that there was an overflow of potential passengers close to the edge. |
| Did you hear anything that they were | No. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| unruly or problems with the crowd? | |
| That would be from another crew? | Correct. |
| Would that have been from another engineer? | Yes. |
| **Examination of Christopher Zapille (Engineer, NJT) 10/26/16** | |
| So you didn't become an engineer with them? | No. I only stayed there until June 13th, 2007, when I was hired by New Jersey Transit. |
| So you didn't stop at Elizabeth Station? | No, I did not stop. |
| So what is it, when you went by Elizabeth Station before Pascale's crew that you observed? | A lot of people on the platform, on the yellow line. And that was it. |
| What did you do about that? | I called Amtrak CETC-9 (Central Electronic Traffic Control) and let him know that there were a lot of people there and that the amount of people was getting out of hand and they needed to get somebody there. My concern was somebody getting hurt, somebody getting hit. |
| Why did you call the Amtrak dispatcher? | That is his territory. He is in control of that territory. |
| So it is not controlled by a New Jersey Transit dispatcher? | No, sir. |
| You went by Elizabeth train station approximately 11 or 12 minutes before they were to arrive. Is that correct? | I think so. |
| So the engineer, Pascale, would have been on the same channel you would be? | He would have been on the same channel. |
| I am going to mark this as Zappile-C. Could you read this into the record? | "We called CETC-9 we were at Elizabeth a whole 11 minutes ahead of 7263 to warn them things were getting out of control on the platform. As you see, they did nothing with the advance warning. Absolutely pathetic." |
| Now, when you made that call to CETC-9, your expectation was that there would be additional people or security people at Elizabeth Station? | I would imagine they would call somebody. |
| As an engineer, have you made calls like that in the past, before this time? | Yes, absolutely. If you see something going on a platform, something that is not right, you call it in. |
| From 2007 to 2013, have you made these kinds of calls? | I've called the dispatcher several times and we are even encouraged now by the company to call, if you see something, say something. If you see anything that's not right, call it in. |
| **Examination of Nicole Pratt (Assistant Supervisor, NJT) 10/26/16** | |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| When did you go to work for the railroad? | 2003. |
| And if he was just trying to report problems on a specific platform at Elizabeth, New Jersey, how would he get that information to New Jersey Transit? | It is not New Jersey Transit that he should be reporting to. He needs to report it to Amtrak dispatch. |
| ...if a New Jersey Transit engineer or trainman is trying to report a situation that they want New Jersey Transit to know about and they are Amtrak territory, how do they contact somebody from New Jersey Transit is what I am saying? | The engineer should be contacting Amtrak dispatch when he is on Amtrak territory. If he feels that there is something else that needs to be contacted, he should be communicating with his conductor. |
| ...who does the conductor try to contact at New Jersey Transit? | He would report to his supervisor. |
| So who has the company issued cell phones on the crews? | The conductors. |
| So that's two calls, one to the New Jersey Transit dispatchers and one to the Amtrak dispatchers? | Depending on which way he is operating, I specified east. If he is operating west, then he will be speaking to the New Jersey Transit dispatcher. |
| **Examination of Emmanuel Motomal (Utility Dispatcher, NJT) 10/26/16** | |
| How do they interact with you as a utility dispatcher? | Generally, it is through a supervisor of train operations. |
| Let me see if I have another copy of that. Now, it says. In regards to this train, 7273, at 10:49 p.m., it says NC. What does that mean? | NC is North Jersey coastline. |
| "Was held at SA24." What does that mean? | The 7668, which is an eastbound, was held at SA Interlocking for 24 minutes, because 7273 was holding at Perth Amboy for police activity. |
| "Elizabeth 7226 was held ten minutes for police to arrive and remove two unruly passengers. Train arrived NYPS." What is that, New York Penn Station? | Yes. |
| Are they calling New Jersey Transit Police or Perth Amboy Police? | That was the New Jersey Transit Police dispatcher calling the Perth Amboy Police Department. |
| **Examination of Michael Reilly (Conductor, NJT) 10/28/16** | |
| What was your date of hire with NJT? | I hired out with Conrail before NJT in 1978. |
| Now, the notes also indicate that you referred to their being a lack of safety culture at New Jersey Transit, do you | Yes, I do. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| recall using that terminology? | |
| And in April of 2014, is it also accurate that you indicated that there are a lot of bad areas where cameras are needed for purposes of security because of the number of conductors assaulted? That's at least a representation in the minutes? | I don't recall saying that, but if it's in the minutes, obviously I said that. |
| If an assault was occurring, what was a conductor permitted to do to protect themselves? | Wasn't really spelled out. I guess you would do whatever, what you think is right. But as far as I know, it's not really spelled out what you're allowed to do and what you're not allowed to do. |
| So they didn't provide you with useful information on how to protect themselves from unruly passengers? | No. |
| But they didn't do anything in terms of helping you and your coworkers in the day-to-day operation of a train, and when you deal with potentially dangerous passengers? | No. |
| Do you know when you are handling an event situation, again, a concert, a festival, sporting events, are there more conductors and train personnel assigned to the trains during these situations? | Normally, yes. |
| And under certain circumstances, in emergencies, aren't they allowed to use those cell phones to contact Transit for transit business? | Yes. |
| And while a train crew is in Amtrak territory, if there's an issue, don't have a responsibility to go through the Amtrak dispatcher for that territory? | That's who you would call, yes. |
| **Examination of Alan Antel (General Superintendent, NJT) 10/27/16** | |
| What's your date of hire with New Jersey Transit? | April 19, 1989. |
| What's the difference between assistant superintendent and a general superintendent? | General superintendent, the assistant superintendent report to me. I have overall responsibility of all the management staff in the location, as well as the operation, and report to the deputy general manager at that point. |
| When you say the operation itself, are you talking about the scheduling of trains or what do you mean? | General Superintendent, for now. I'm in New York.<br>That's where I have been for the past several years. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| | I'm in charge of the train operations. I'm in charge of the station and the facility. I'm also in charge of the ticket office, or anything related to New Jersey Transit in Penn Station New York comes under my jurisdiction and my staff's jurisdiction. |
| Now, prior to that week, does your office have anything to do with the planning of any kind of scheduling of police officers or additional train crews to handle larger crowds with the Columbian Day Parade? | Not that I recall. |
| What is your train crew supposed to do if they are attacked physically by a passenger? | We have something in our TRO12 regulations so that if you're in dispute with a passenger, it tells you to keep an arm's length distance and not to go up, not to provoke the situation and keep that arm's length distance to prevent from being assaulted. |
| I asked you what is your train crew supposed to do when they are assaulted? | When they are assaulted, they are supposed to notify the police. |
| Ms. Tramontano's train had an engineer and four crew people to handle six bilevels. Why isn't there a crew person on every level so they can monitor the condition and make sure the other crew people are safe? | Four people for a six-car train is a decent size crew to work that train. |
| So in other words, there's nothing there to save the crew person from getting beat up, then. You have no security on the train, right? | Well, there is not police on every train. There is a procedure that we follow and we need to call for police assistance, what the crew is supposed to do. |
| Do your passenger cars have interior cameras for monitoring? | Not that I'm aware of. |
| **Examination of Scott Aitkens (General Superintendent, NJT) 10/27/16** | |
| And what is your date of hire at New Jersey Transit? | Yes. August 8th, 2001, I was hired. |
| And what was that training? | That training was, I think it was about a month, studying of physical characteristics, taking a written test, pass, they send you out into the field. |
| Now, during your training, from that time period even up to the present, has New Jersey ever provided any kind of training for self-defense to defend yourself on trains, either than police or any of their security personnel? | No. |
| Did you see any uniformed police on the | I don't recall. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| platform? | |
| What did you observe at that time at the Elizabeth Station? | And what I remember in the last train I remember the train coming into the station, I recall stopping there. I recall a lot of people standing on the platform, to the point where people were shoulder to shoulder. The platform was at its maximum capacity. And a period that more people were also trying to get onto the platform because of the festival was ending or was about to end. People were coming from below, coming up onto the platform and the platform was at capacity is what I remember. |
| Did you observe any behavior of those people? | The only way I can say they were drinking is because you can smell some of the alcohol. Some people had the appearance of possibly being intoxicated, by the way they walked, the way they shuffled, the way they slurred there words. I also witnessed some kind of a verbal dispute among a group of people. I couldn't tell you their faces or names or anything about it. It is just that there were so many people, it was chaotic would be the best way to describe it. |
| Now, at the point, in Elizabeth, did you directly observe any uniformed police officers of Transit or any police department on that platform, directing the people or controlling the people? | No, I did not. |
| And what did you do, did you relay this information to anybody on your crew, your engineer? | I either told my engineer to call the dispatcher, which I believe was CETC-9 and/or I called myself on the radio, because that incident stood out in my mind. |
| Now, he wrote a note on Facebook that said: "We called CETC-9 we were at Elizabeth a whole 11 minutes ahead of 7263 to warn them things were getting out of control on the platform. As you see, they did nothing with the advance warning. Absolutely pathetic." Is that your recollection of the time period? | Oh, yes, absolutely. We for that matter, because we were a crew, we work together, communicated with the dispatcher that there was an alarming amount of people on the platform. |
| …and you remember your train arriving at Elizabeth Station before 7273? | Yes. |
| At least 11 minutes before? | That would sound accurate. |
| Do you specifically recall your train | And I said I don't recall that, because I remember |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| stopping on that third time at the platform? | having the experience of the doors opening, smelling alcohol, have a pressed feeling on the platform is what I remember. I remember some shoving and some pushing. |
| And when you said unsafe situation, you were concerned with overcrowding and people encroaching on the train and possibly falling off of the platform or being hit by the train; is that correct? | Sure, that would be one of them. |
| And at this time, when you came through Elizabeth Station, you didn't observe any physical violence on the platform, did you? | Some shoving, words exchanged with other people, but as far as any kind of violence, no. |
| What does CCETC-9 stand for? | It is Amtrak's acronym for that section of the territory of railroad for the northeast corridor that controls that portion of track through Elizabeth. |
| And that's an Amtrak controlled dispatch and not a New Jersey Transit controlled dispatch, correct? | That is correct. |
| So New Jersey Transit, you don't have direct access to a NJT dispatcher at that point because it has to go through Amtrak, right? | Yes. It is their territory, so I would have to speak to them through proper channels first. |
| And there is a lot of yelling and screaming between people, because people were trying to get to two different locations, correct? | Yes. |
| And there is nobody on the platform separating them, controlling the crowd that you could observe, correct? | Only my crew members. |
| So you are facing an unruly crowd at that point correct? | It had the potential of being an unruly crowd at that point. |
| That is why the engineer or you called into CETC-9, to get the situation at Elizabeth Station under control, correct? | Either under control and/or to let them know, the previous train, you may want to come in nice and easy. |
| **Examination of Daniel Gilmartin (Assistant Conductor and Plaintiff, NJT) 10/26/16** | |
| And from 2008 up until the assault on the train in July of 2013, were you an assistant conductor throughout that whole time? | Correct. |
| What type of training did they provide you as an assistant conductor? | There's three months of regular training, collect the revenue, the timetable, pretty much on-time performance. Your real knowledge pretty much starts when you're actually on the train. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| And what were your job duties as assistant conductor? | Collect the revenue. |
| I'd like to turn to the train incident of July 21st, 2013. On that date you were an assistant conductor, is that correct? | Correct. |
| And on the day of the incident, you were on Train No, 7273; is that correct? | Correct. |
| How big was the train, how many cars? | It's the multilevels, and I believe we had six cars open in total. As far as the number of cars on the Consist. |
| And how many New Jersey Transit employees were on that train that day? | There was the engineer. I believe five altogether. |
| Do you know who Christine Milling is? | She was a passenger. She had her two daughters. And when the fight erupted, and there were 20 to 30 of them, a bunch of them were jumping on, not personally attacking her and her kids, but they were trying to jump over her and her kids to get to the people behind them, she was the woman that the conductor, Danielle, put them in the cab car to protect them. |
| So if you could just take me through what you remember about what happened that day? | I remember I was working a three up to meet the conductor, Danielle. So she and I were splitting the second car. By the time we pulled into Elizabeth, I was right there in the first car, and when we pulled in, there were a few hundred of them on the platform, and it was all extremely disorienting for us and the passengers, because nobody knew where our train was going. So everyone was screaming Trenton line or Long Branch.<br><br>So we picked up an extreme amount of people at that stop. I couldn't tell you the number, but it was a huge, huge amount. I remember working on the platform, and there was a lot of shoving and pushing and just in general screaming and disorder, because nobody knew where they were going. |
| Is there anything that sticks out in your mind about the crowd of people? | They were disoriented and you just tell extremely intoxicated. |
| And what happened when the train left Woodbridge? | I was working the bottom level of the multilevels, and I was collecting revenue, and I don't know how it started, but one passenger screamed something to another, and that's when instantly about 20 to 30 of them jumped up and started punching each |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
| --- | --- |
| | other, they were punching each other in the face, spitting and yelling.<br>And I was literally caught in the middle of that as I was still working the bottom of that level, and that's when Christine Milling came into play, and Danielle grabbed her and her kids and put her in the cab.<br>I was still at the bottom of that car, and I remember I was trying to get to safety was far as the cab so I could get away from the actual assaulting and them trying to kill each other.<br>So when I was trying to get to the cab car, when I got to the top of the stairs of the multilevels, that's when that one guy personally assaulted me. He started punching me a few ties in the face and the head on the right side. |
| So when the fight broke out, you're on the bottom level of the car, how many cars back from the engine would you be? | We were right there, because at this point, this was all in the first car. |
| Is there anything else you observed around you? | When Tony came out to help me, there was a girl, I don't know if it was his girlfriend or who she was, and she was punching Tony, the engineer, in the back of the head, and then I witnessed her also punch Danielle, the conductor, in the shoulder. |
| First, how did she assault Mr. Pascale? | She was punching him in the back of the head. |
| And, to your knowledge, did anyone else on your train notify New Jersey Transit about the fight? | Danielle did, and I believe Tony did as well, the engineer and the conductor. |
| And at this point did she tell you that she heard this over the radio? | I can't remember exactly what stop we were at, but it was before Elizabeth, maybe about 10 to 15 minutes prior. |
| Did she tell you any specifics about what she heard over the radio? | Just how bad they were on the platform as far as being drunk and disorderly. So we knew it was going to be pretty bad. |
| And when you say "unsafe and unprotected," what precisely are you referring to? | Well, it was the 10th annual parade, and there were zero cops as far as New Jersey Transit anywhere. There were zero undercover police on the train. There wasn't one cop that even walked through. So it was a hundred percent unprotected. |
| Prior to July 21st, 2013, had you ever personally complained to New Jersey Transit about any unsafe conditions, whether it be police presence or | Always to everybody. You would say it to trainmasters and everybody you worked with. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| otherwise? | |
| And in the statement that you gave to Fred Mattson on July 21st, 2013? | "I was working Train 2273. Was working the bottom of car 7007. When pulling into Elizabeth we picked up 100's of passengers from the parade at Elizabeth. As I was working a riot broke out and I was stuck in the middle of 30 people punching each other male and female. As I was trying to make my way to safety I was attacked by a male. He punched me in the face multiple times. Tony Pascale and Danielle Tramontano then came to help. Tony was punched in the face by the same male, then a female. Danielle was punched in the shoulder. We called for a 29 because there were no New Jersey Transit police on the train even though they knew of the parade." |
| You called a 29. What does that mean? | That means you're calling the cops for assistance. |
| And it says that when the riot broke out, you were stuck in the middle of 30 people punching each other? | Right. |
| Did New Jersey Transit provide you with any additional personnel on this train to be at least one conductor in every car? | No. |
| On this day, did they provide you with any kind of security protection, whether New Jersey Transit Police or alert any public police, to patrol Elizabeth Station or any other stations between Elizabeth and Perth Amboy? | No. Zero. |
| Did you see any police presence, even if they were there for three seconds, uniform police on your train? | No. |
| You said a prior crew had called in a problem concerning about this large, unruly crowd in Elizabeth station. Correct? | Correct. |
| By the time you got there, did you see any police personnel on the platform? | No. |
| **Examination of Fred Mattison (Senior Road Foreman, NJT) 10/27/16** | |
| Where is that railroad education? | Conway, York and Conrail's locomotive Engineering School. I attended investigation training at Texas A&M. |
| What's your date of hire with Conrail? | 8/16/99. |
| And what does a senior road foreman of | You're in charge –you're designated supervisor of |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| engines do? | locomotive engineers, supervise road crews, investigate accidents and monitor rush hour. It's an entry-level supervisory position. |
| What training did you have in an accident investigation before July 21st, 2013? | Transit sent me to an accident investigation manager class here in Newark done by an outside contractor. |
| Did you conduct an investigation as to whether there were police officers – whether local police department officials or New Jersey Transit that were assigned to the Elizabeth Station for July 21, 2013, the day of the Colombian Day Parade? | No, I didn't. |
| Who in transportation speaks to the Police Department to get coverage on trains or platforms? | The train dispatchers at the ROC. |
| ...is there anybody in some sort of strategic planning position that says we want thus number of crews, this number of people on the trains, this number of police on and off the trains or platforms? What office would that be at New Jersey Transit? | We have a planning department, and they would coordinate with line supervision. |
| When there are large sporting events, concerts, Colombian Day parades, St. Patrick's Day parade, you recall whether train crews have complained about increase of disputes between passengers, trouble with passengers who are intoxicated, that's overcrowding, things of that nature? | Well, I wouldn't equate the Colombian Day parade in Elizabeth to St. Patrick's Day parade in New York. Its apples and oranges. It's not really a fair comparison, So, as far as I know the Colombian Day parade is an event. It's not considered a major event. It's certainly something that we don't go crazy planning on. If the police want to put extra people there, that's fine. But it's not something we make special planning outside the realm of operations to handle. |
| How did you become aware of the incident of the crew members of 7273 being assaulted on July 21, 2013? | From what I recall, I got a page that there was a train that was cancelled at Perth Amboy. And then I called the train dispatchers at ROC, the STO, and said what's going on. They said, you need to get there. There's some sort of fight and injuries. I don't remember the exact conversation. So I got in my car and drove to Perth Amboy. |
| And then what happened there? | The crew was pretty upset about what happened. There were a lot of cops there. |
| And so what did you do while you reached the police station? | I made sure the crew members were okay. Asked what happened. Thanked them for doing their job. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| | Apologized that they had to deal with nonsense. Then I got statements from them as to what happened so I could have an idea of what occurred. And then had them fill out injury reports after the fact. |
| Ms. Tramontano's statement, on the second page, she said "Transit knows this Colombia Day parade was going on, no police, no protection, unsafe work environment." When you reviewed that, did you question her further about this? | It was her statement. |
| Did you ever find out that New Jersey Transit had rerouted their buses around Elizabeth Station because of issues during the day? | I did not. |
| Did you interview any of the passengers from Train 7273? | No, I didn't. |
| So if your engineer wants to contact your company, they have to go through the Amtrak dispatcher. | At Elizabeth on the northeast corridor, yes. |
| How about Woodbridge? | No, That's the coastline dispatcher. |
| So that's the New Jersey Transit dispatcher? | Yes. |
| ...if an engineer wanted to contact New Jersey Transit Police Department in Amtrak territory, the primary way is through the radio on the train to contact the Amtrak dispatcher, who would then contact the Transit dispatcher, who would then contact New Jersey Transit police; is that your understanding? | If an engineer wants to get police assistance on his train, he calls the train dispatcher for his territory. You know, whatever the criteria is the train dispatchers do after that, I don't get involved. |
| If your employees, train crews, are trying to help other passengers and they are being struck by other passengers who were high, drunk, unruly are they allowed to defend themselves? | Employees have to protect themselves. |
| So your crew members are actually mandated, required by your own New Jersey Transit rules, to do as much as they can to protect the passengers on the train, correct? | Okay. Our rules are to protect passengers and company property. We don't specify what means they need to do it with. |
| And if there's no police. New Jersey Transit police or other police, on the | We don't specify. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| train, then protecting passengers and company property falls on the train crews, correct? | |
| Did you learn any facts in this investigation concerning the train crew of 7273, where they violated any rules or operational rules or procedures? | Well, if they violated rules or procedures, they would have been charged but they were not. |
| Are passengers allowed to be intoxicated on your train? | They are allowed to be. |
| And how are your train crews supposed to control intoxicated passengers? | Calling the police if they get unruly and need to be removed. |
| **Examination of Officer Christopher Giovannoe (Police Officer, NJT) 10/27/16** | |
| Why is that you filled out the police report? | I was the responding officer and the arresting officer for the charges against the actors. |
| And you got hired by NJT what year? | 2009. |
| Tell us about your training with Transit. | I went to the academy; I believe it was for 24 weeks, 25 weeks. |
| What did you do next? | I began my field training at New Jersey Transit. It's about a 15-week program that you are put with several different officers within the Transit police department And they train you, show you how to do reports and show you how to work here. They show you the arrest process procedures and the different ways that different commands work and how to patrol and territory and that's the basic gist of it. |
| Do you know who in your department makes a determination what police officers are assigned to what type of patrol duty, the location of the patrol duty? | No, that's the job of, I guess, the sergeant. |
| What job were you working on when you responded to the problems they had on Train 7273? | I was either working on the EC line or the Coastline. I'm not sure. I don't remember which one I was on. |
| How were you working that day? | You drive around, patrol the stations and wherever you get dispatched to, a call to, you respond to there from where you are. |
| Did you hear any radio communications at any time during your shift asking the Anti-crime team to patrol any trains going through Elizabeth station on July 21, 2013? | Not that I recall. |
| Do you remember going through to | No. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| Elizabeth Station on July 21, 2013 yourself? | |
| Were you given any kind of written instructions from anybody in the police department to check the Elizabeth Station on your patrol during July 21, 2013 before the occurrence with the 7273 crew? | I don't recall. |
| So would there be another uniformed police officer if you were in the Northeast Corridor Line; would there be another officer on the Coastline? | Yes. |
| So do you have any responsibility on any given day of turning in a particular route that you want to take on a day of assignment? | No. |
| Do you recall any police dispatchers talking to you about any problems at Elizabeth Station before you reported to Perth Amboy later that night? | No. |
| Were you ever called by anybody from New Jersey Transit to report to the Elizabeth Train Station because of overcrowding purposes or problems and people getting pushy and presence of intoxicated people on the platform? | No. |
| Do you remember a lot of calls about the Columbian Day parade? | I don't recall. |
| Were people still fighting by the time you got there? | No. |
| By the time you got there, did you see any passengers resisting arrest of the Perth Amboy Police? | No. Everybody was placed under arrest by the time I got there. |
| **Examination of Lieutenant Kevin Mooney (Police Officer, NJT) 10/27/16** | |
| And what, if anything did you find? | I had a memo book entry that I was a supervisor that day. That I am the afternoon sergeant and working B tour. |
| ...or did you or Sergeant Wells, meet with the police officers going out on patrol that day before they went out of Newark Penn Station? | Assignments are given, and certain BOLOs, be-on-the-lookouts for certain individuals are given out. Safety over tactics, maybe the next day. We discuss pretty much police tactics and your assignments. |
| Were you ever advised by an earlier shift in the police department or by any of the | No. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| police dispatchers or Transit dispatchers at the ROC at approximately 11:40 a.m. in Elizabeth Train station, Train 7226 was held up 10 minutes for police to arrive and remove two unruly passengers and gave it an event number 13034574? You were never told about that? | |
| Do you know whether there were any special arrangements made for any crowd issues with the Colombian Day parade? | Ni. |
| You have a minimum of eight police officers for what? | For District 2 working B tour, there's a minimum of eight officers: Four in the station, four on the road. |
| That's a minimum of eight for you to operate? | Yes. |
| Did you receive any instructions from anybody at New Jersey Transit Police Department requesting that you get more additional police personnel on July 21, 2013 to assist in crowd control conditions regarding the Colombian Day parade? | No. |
| What police officers would actually participate in traffic control in the street around Elizabeth train station? | It would be in the Union County sheriffs and Elizabeth PD and whoever else they bring into this festival. At the time I did not know that, I know that now. |
| And it's the Amtrak dispatcher's responsibility to contact NJT? | If he does,. He contacts our central communications center. |
| When we know the events were scheduled, do you schedule people to go there for extra patrol or monitoring during those times? | If we know there's a certain incident where there will be crowds before the incident happens, we would make contingency plans, depending on the size of the crowd and how many officers we would send. |
| Is there any protocol or procedure in the police department where there's a safety briefing with the supervisors in that shift? | Yes |
| Is that something that's mandatory? | That's why I come in a half hour early, to be briefed. |
| Did either of those two sergeants, Hennessey or Perez, inform you that there was a New Jersey Transit Police Department event which they numbered | No. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| 13034574 regarding the removal of unruly passengers by Transit police at Elizabeth Station marks at 11:40 a.m. that day? | |
| Besides you, there were two other sergeants, correct? | It was just me and Sergeant Wells. |
| What does that mean? | Directed patrol, there's a list of directed patrols that they put out whenever problem issues at certain stations, to make sure you check the station at least once during your tour. Twice. It depends on what that directed patrol specifies. |
| On this day was there anything listed about checking Elizabeth train station during the day of the Colombian Day parade? | Not that I recall. |
| What does that mean? | 8:52 p.m. at night was the first crowd control and those officers on the bottom were the ones that responded. |
| Is this the same thing as this event at Perth Amboy, or this was at Elizabeth first? | This was Elizabeth. |
| Amtrak reports that there's heavy crowd conditions ay the above station, referring to Elizabeth, right? | 8:52 p.m., none minutes prior this assault in Perth Amboy. |
| Officer Giovanonne notified and responded. Did he go to Elizabeth? | I recall he was en route to that location from wherever location he was, I believe was Linden, and he was diverted to an assault in progress at Perth Amboy. |
| Do you know if any camera systems were put in the Elizabeth train station after the incident on July 21, 2013? | I heard there was. |
| Who makes the decision when New Jersey Transit Police puts their sky watch equipment into an area of a large crowd like this? | The planning of an event would be done by the planner. |
| So New Jersey Transit's police department does have the capacity to have a live camera at a large parade such as this that could be monitored by NiceVision, correct? | Yes. |
| There is a notation that the train we're talking about –the incident occurred when your officers responded ultimately to Perth Amboy was 56 minutes late. | Any document noted should in the blotter on the CAD. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| And is there anything about that particular incident or any of the other incidents that you reviewed here today that would give you cause for concern that you would either heighten police presence or respond in any additional way, other than your usual course of business at Elizabeth Station? | No. |
| **Examination of Danielle Tramontano (Conductor and Plaintiff, NJT) 10/25/16** | |
| And then, in 2007, did you start working with New Jersey Transit? | Yes. |
| And what injuries do you currently have you believe are related to the train assault of July of 2013? | I have left shoulder brachioplexopathy, left carpal tunnel, and I was overusing my right hand, and I had carpal tunnel release surgery also in my right hand, and ulnar nerve in my right hand, between my fourth and fifth metatarsal. |
| How do the duties of an assistant conductor different from a ticket collector? | The assistant conductor is the one that will open and close the doors. He's the last person to observe the platform to make sure it's clear before giving the signal on the buzzer to proceed. But we all collect tickets. We all share the job. |
| From when you first, I guess observed the passengers at Elizabeth station. Let's start there. | When we left the airport, we did overhear something – Tony had said there was something on the radio, the train of us had called in, there was some issues going on at Elizabeth.<br>So we were working to meet. We had both finished when we were getting into Elizabeth station. We both stepped out from the southern door of the cab car, its multilevels, and people were pushing and shoving on the platform, and they were saying, what train are you?<br>It was a mob there on the platform. Honestly, in mu six and half year at the time of the incident, I've never seen a platform that busy, in general.<br>So I go up to Tony, and I'm like, I don't know, I don't have a good feeling about tonight. I'm just letting you know what's going on. I told Tony, there's a lot of screaming going on. I know you heard it in the cab. |
| | We go back, they're arguing. Hey, guys, really, relax. There's nothing –let's just get to where we want to go. We all want to go home tonight. Now Rahway comes and goes. We check the |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| | platform and let people off. We stayed an extra minute looking for the police. Nobody is there. We proceed on. Now we're going on to the Coast Line, which is Woodbridge. A more yelling and screaming is going on. There's nothing to show us to there was like hands to be thrown. There was nothing of that aspect showing at that point. We discharge at Woodbridge, look around, nobody there.<br>So now my rear brake is clear to go. We're literally out of the station. Probably all the cars have just cleared the station platform. I turn around, and it was just went from like one extreme to just a whole other extreme. People were throwing on each other fists were flying, punches, open-hand slaps, and a lot more screaming.<br>I go to Tony, and I'm like. We need cops. We need a 29. This is out of control I've never seen it like this. I won't even begin to know what to do.<br>We were into Perth Amboy. We were waiting for police to arrive. The mother and two kids are just getting pounced on by people.<br>I ran out of the cab, and I went to try to get them to safety, because the two kids, the mom is hovering over kids, like protecting them and just covering them as they're getting passengers thrown on them. These kids are just pushing, shoving, punching and tumbling on this mother and her two kids.<br>When I was coming up, that's when I got closed fisted right into my shoulder. I looked, I saw it was a girl, pusher her out of my way, and I had the mom and her kids like right in front of me, and I'm just pushing them through the cab. And I did put them in Tony's cab, just to get them to safety.<br>I get them in, turn around, and here's Danny just getting whacked in the face because he was trying to get out of it.<br>And Tony just turned around, and he was like, nobody hurts my crew.<br>As Tony was grabbing him. Tony was getting punched in the back of the neck, in the nose. He definitely got punched in the nose. His nose was |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| | bleeding.<br>And I'm like, Tony, we hot to go. I'm trying to grab. I got hit in my shoulder again. Danny was trying to make his way through.<br>Now, we finally get in the cab, and we're like. Where are these cops? I'm like, where are these cops. And we're going on the radio, what's going on.<br>I see the red light for the center door, and someone just got thrown out on the track.<br>I Tony, we got our foul time. I opened the cab door, and I jumped out on the track. I grabbed the hand iron with my right hand, and I jumped off the cab, and I'm telling this guy, you got to get off the track. I don't know if a train is coming. I don't know if we own the track.<br>And he doesn't understand. What do you mean. I don't want to.<br>And he's like coming at me , and I'm like closed my hands with my fists were closed and I'm shouting like, you got to get off the tracks. I don't want to witness anybody getting killed tonight, and I don't want to get killed. I'm trying to help you and save you off a live track, but you don't want to move.<br>I mean, it was 40 minutes, 42, 43 minutes of chaos. Finally, I pushed him right in front our train. And the Perth Amboy cop I guess heard is screaming because Danny had jumped down to make sure the gut wasn't coming at me, just to make sure I was okay.<br>And then the Perth Amboy cop came and that's when it really just like settled down. |
| And at the point did you think of calling Transit, notifying anyone of an issue? | We thought they had already been notified, because it was called in to the dispatcher with the train ahead of us. |
| And how did you learn that the train ahead of you called in to the dispatcher? | Via radio. |
| And what specifically did you hear? | You better get some help at Elizabeth, the platforms are overcrowded, craziness, along those lines. |
| So when you hear that radio transmission, there wasn't any specific mention of any fighting that broke out at that point; is | Correct. There was nothing. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| that correct? | |
| And was there anyone that specifically called for New Jersey Transit police officers to respond to a train in that transmission. | Just to get the police to the station, to send some police for the overcrowding. |
| You said when you got to Linden station, you didn't see any police. Did you expect to see police at Linden Station? | We expected it along the way, sure. |
| But did you hear any other radio transmission that said, Hey, we need help at Linden station. Also, or, hey, we need help on a specific train? | No. We just expected that if they knew there were issues, maybe they would have someone show up to see if we needed their presence on the train. |
| And you said at one point. "We need a 29." | That's the official code for police. |
| And at what point did you decide that you needed a 29? | When we saw people throwing punches and shoving and a lot of screaming going on. |
| And did you hear him (Tony) calling dispatch at that point? | Tony did, yes, on the cab radio. |
| And what did he say? | We need a 29. There's a fight that broke out on our train. He gave the train number, this is 7273, Coast line. Normal radio transmission. Tony is very professional on the radio. |
| Could you explain that for me? | The light came on, the red light which means the door light someone had pulled the emergency door handle and threw someone onto Track 2. We were on Track 1. |
| And which door would this have been? | The center door in the cab. It's the cab, and then the very next door in the car. So the center door, the left side. |
| And was the train already stopped at this point? | We were stopped. |
| And you were stopped at the station waiting for Transit police; is that right? | For police, yes. |
| And what did you three discuss on the ride over to the police station? | We discussed why we had to bring the train to Long Branch. That was a big discussion on my end. When we were released we weren't asked if we were okay. It's move the train. Its on-time performance first, employees last. That's what I felt. |
| Immediately following the assault on the train, did you report any injuries to anyone? | Tony and I had told the dispatcher we were assaulted. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| Did you report any specific injuries that you sustained to anybody? | Just Fred Mattison, who was there. I told him I got punched in my shoulder and that it hurt. |
| And when did you first speak to Fred Mattison? | Probably 45 minutes after the assault. |
| Please read it into the record for me. | "Please explain in your own words, exactly what happened in connection with the above mentioned incident:"<br>"Passengers boarded Elizabeth Station in Car 7007, drunk, load and disorderly, sat sown as train moved west. Group of kids began fighting in train. Daniel Gilmartin and Jim Muzikowski up to the first car to make sure passengers were not involved… Upon doing so passengers struck crew members. I moved 2 kids and woman that was sitting downstairs in the car into cab with engineer to protect them. When going back out shorter punched me in the shoulder. After that younger male with khaki shorts and black tank top was opening emergency handle on fireman side and fell onto Track 2. He kept pushing Daniel and I" saying" he would not get off: the "live track. Tony Pascale, engineer protected crew on train. He came out" of "the cab to get Daniel and Jim out of the way. He got punched in the face by" a "girl with a purple tank top on."<br>Then there's a line drawn underneath, and I wrote:" Transit knew this Columbian Parade was going on – no police – no protection. Unsafe work environment." |
| So this something else, what was the point of the last sentence there? | Because the company knew about this and yet there was no protection for us. There was no one to keep us safe, when the company's number one priority is safety. |
| …at the time that you wrote this statement, did you know that Transit knew about the Colombian Day parade? | The buses were diverted. They were making announcements on the PA at Elizabeth Station. |
| And what do you mean by that? | That it was just nobody was there to just show a presence or nobody was at the platform to show their presence. Even on the platform, when you show a police presence, you have more order. It's just that people don't like to act foolish on front of police officers. |
| Prior to your train crew I believe calling | Not that day. We were told later on, I don't |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| for a 29, were you aware of any other reports to Transit of fights on trains that day? | remember who told us, that the train also had a 29 at Metuchen, which is on the corridor, in regards to the parade. |
| When you begin your shift at Transit or at some other time, is there any sort safety meeting, safety briefing, or are there any safety bulletins that you read prior to coming onto a shift? | There are bulletin orders. They tell you tracks out of service, speed restrictions, things of that nature. Safety bulletins, we have a job briefing with our engineer. If you're a conductor, you have a job briefing with your engineer first. |
| After you heard the other engineer, Mr. Zapille, and the other crew calling for assistance at Elizabeth station, approximately how many minutes did it take for your train to get to Elizabeth station after that? | 10 to 12 minutes. |
| When you got there, were there any New Jersey Transit police present/ | No. No one could be seen. |
| So during the 40 minutes of time, did any New Jersey Transit police or any public township police officer arrive at Linden station at the platform on your train? | No. |
| Did they provide you with extra personnel on your train to provide more security or backup on your train when you got to Elizabeth and then to Linden, Rahway, Woodbridge, and ultimately Port Authority? | No, no extra help. |
| Are there any signs of any of your New Jersey Transit trains warning passengers or advising them there's an undercover or uniform police presence on the trains? | No. |
| Are there any cameras on the trains, in the interior of the cars, to show the crowds whoever is monitoring them? | No. |
| Now, when you're in a situation when there's large crowds of people refusing to give you fares, spitting on you, rubbing up against you, pushing on you, what has Transit done to train you how to handle these situations? | They don't give you any guidance of what to do. The answer that I've gotten from management is try your best to walk away. |
| Prior to the day of this incident, had you yourself ever been pushed or shoved on trains? | Yes. |
| And have you complained about it to | Yes. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| management? | |
| And what have they done about it? | Nothing. |
| And who told you that? | I've heard it from different management. They said Transit's number one goal is on-time performance, because when you're late, you better have a good reason why you're late, because, if not, you're going to be filling out a lot of paperwork. They don't want to hear, I got pushed, I got shoved and I got spit on. That's not a reason to delay, in their eyes. I've been told in the past, they want on-time performance. |

## IX. Discussion and Evaluation

### A. Preventing Injuries

At the time of the injuries to Ms. Tramontano, Mr. Gilmarten, and Mr, Pascale, the Railroad was not been brought-up to currently accepted transportation industry standards and practices. Preventive measures to eliminate the hazard were quite simple; have a program in-place to operator dangerous conditions before they become a problem.

Table 6 outlines the key concerns for injury prevention.

**Table 6. Preventing Injuries**

| Item | Action | Description |
|---|---|---|
| 1 | Determine Root Causes | It involves the search for those factors that cause injuries (to seek from among the available data the nature of the causes that leads to these undesired consequences). |
| 2 | Identify Causation | Determine factors present where accidents occur. |
| 3 | Undertake Accident Investigation | • Collect hard facts in order to consider which elements, if removed, would prevent an accident.<br>• Ensure a thorough analysis and take the necessary steps to create a clearer picture of previous accidents (accident prevention measures could be derived from these investigations). |
| 4 | Conduct Safety Inspection Practices | • Ensure frequent inspections during active use conditions.<br>• Ensure that inspections are not interrupted until completed.<br>• Ensure that the inspector is sufficiently trained in knowing what to look for. |
| 5 | Review Operation | Had the system been operated effectively accident factors might have been identified and corrected before they take on significance. |
| 6 | Develop Written Procedures | • Ensure that adequate procedures are in place as inadequate procedures are a common cause of accidents.<br>• Remember that similar situations produce recurrent accident patterns. |

Copyright © 2017 by Dr. Carl Berkowitz

| Item | Action | Description |
|---|---|---|
| | | • Remain sensitive to safety operations and maintain capabilities to respond to changes in the systems' safety. |
| 7 | Track Accidents | Be concerned with recurring accidents and making an effort to articulate accidents and assess the likelihood that a new strategy is necessary to decrease the risk of trip-slip and fall accidents. |
| 8 | Review Safety Program | • Ensure that the safety process is well understood and does not require coordinated action.<br>• Safety issues should be corrected the first time because there are not a lot of opportunities to improvise when things go wrong. |

## B. Federal Occupational Safety and Health Act (OSHA) Administration

The Occupational Safety and Health Act require employers to comply with safety and health standards and regulations.

The Occupational Safety and Health Act of 1970[6] mandates that, in addition to compliance with hazard-specific standards, all employers have a general duty to provide their employees with a workplace free from recognized hazards likely to cause death or serious physical harm. OSHA relies on Section 5a-1 the "General Duty Clause"[7] for enforcement authority. Failure to implement these guidelines is not in itself a violation of the General Duty Clause; however, employers can be cited for violating this Clause if there is a recognized hazard of the workplace in their premises, and they do nothing to prevent or abate it. These standards address employee safety and security risks.[8] In addition to the General Duty Clause, employers are also responsible for appropriate training of employees and proper supervision of the workplace.

In most workplaces where risk factors can be identified, the risks of personal injury can be prevented or minimized when management takes appropriate precautions. One of the best protections' employers can offer their employees, and visitors would be to establish a zero-tolerance policy in the presence of hazards and risks of personal injuries. This policy should cover the employees, visitors and anyone else who may come in contact with the Railroad's facilities.

By assessing the worksite, the management could identify methods for reducing the likelihood of incidents occurring. OSHA believes that a well-written and implemented workplace accident prevention program, combined with administrative controls and training can reduce the incidence of workplace hazards.

Employees have a right to a safe workplace. The law requires employers to provide their employees with working conditions that are free of known dangers.

---

[6] Public Law 91-596, December 29, 1970; and as amended by P.L. 101-552, Section 3101, November 5, 1990
[7] "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."
[8] See: https://www.osha.gov/Publications/ OSHA3148/osha3148.html (Captured 9/6/2014)

Copyright © 2017 by Dr. Carl Berkowitz

In order to create a secure workplace there are a number of concerns that should be taken into account. Table 7 summarizes some of the issues to ensure a safe workplace.

**Table 7. Accident Free Work Place**

| Attribute | Description |
|---|---|
| Clear policy and procedures | A zero-tolerance policy combined with procedures to ensure that all employee incidents are reported and documented to enable understanding of the incidents and provide sufficient information for prosecuting the offending staff member. |
| Train all personnel | Management should ensure that staff is aware of their responsibilities and procedures. Staff should also be provided with adequate self-defense training and self-defense equipment for situations that are dangerous and the police is not available. |
| Improve communication | Facilitate the sharing of information among personnel, to help identify and diffuse situations earlier. |
| Promote awareness | Promote awareness of unacceptable behavior and the legal consequences. |

## C. Factors Affecting Assessment of Hazards and Other Risks

When formulating a safety-related policy and standard operating procedures, hazards and consequences should be considered.

There is no such thing as absolute safety. In transportation, it is impossible to eliminate all risks. However, risks can be managed to a level as low as reasonably practicable. Risk mitigation can be measured and balanced against time, cost, and the difficulty of taking action to reduce or eliminate the risk. Effective risk management seeks to maximize the benefits of accepting a risk (e.g. a reduction in time and/or cost) while minimizing the risk itself.

A clearer understanding of these concepts would have helped identify serious workplace concerns and would have highlighted what changes can effectively reduce or eliminate such barriers and improve employee safety. Table 8 is one approach to reviewing and determining the potential level of risk to personnel, including Ms. Tramontano, Mr. Gilmarten, and Mr. Pascale.

**Table 8. Work Place Injury Assessment**

| Frequency Rating | Severity Rating | | | |
|---|---|---|---|---|
| | Minor | Moderate | Serious | Fatal |
| Frequent | Moderate-High | High | Highest | Highest |
| Occasional | Moderate | Moderate-High | High | Highest |
| Infrequent | Low | Moderate | Moderate-High | High |
| Rare | Lowest | Low | Moderate | Moderate-High |

Copyright © 2017 by Dr. Carl Berkowitz

## D. Diligence

The Defendant, **NJ TRANSIT**, as a passenger carrier and the employer of the plaintiff was obligated to provide the plaintiff with a continuing and non-delegable duty to provide him with a safe place to work in order to prevent accidents such as what occurred on the present case. The defendant, NJ Transit also had its own duty of care to provide Tramontano, Gilmarten, and Pascale as well as other passengers and other crew members a safe means of ingress and egress to the platform where the trains are located as well as the top of the railroad station itself at the top of the stairway. Plaintiff was placed in danger of physical injury when both defendants ignored their mandated legal obligations to properly inspect, maintain, repair or eliminate the dangerous condition as well as failed to warn the plaintiff of the dangerous condition in and of itself.

## E. APTA, Standards and Practices Washington, DC, 2004. American Public Transit Association

These standards and recommended practices represent an industry consensus for rail transit systems to achieve a high level of safety for passengers, employees, and the general public. (**NJ TRANSIT** professional staffs were active in the development of these standards and practices.) If these standards and practices were properly adhered to by **NJ TRANSIT**, injuries would never have occurred.

### APTA RT-S-OP-013-03, Authorized September 28, 2003, Operating Practices, 13. Standard for Training of Rail Operations and Station Operations Personnel

This Standard outlines the basic elements required for a comprehensive rail and station operations employee training and retraining program. This Standard is intended to provide the training requirements for rail and station operations employees. The rail transit system should also have a system to track performance to measure the effectiveness of training.

The purpose of a comprehensive training program is to ensure the consistent and complete training of all appropriate rail and station operations employees covered by this Standard. Such a program requires employees to have a base knowledge that is consistent with their particular job. The program also ensures that the rail transit system provides initial certification and refresher training.

## X. References

1. American Public Transit Association, "1981 Guidelines for Design of Rapid Transit Facilities," Washington, DC, pp. 16 and 141.
2. American Public Transit Association, "Standards Development Program," 2013
3. Atkins and Department of Transport, "Significant Steps: Technical Analysis, UK, October, 2004.
4. Bentzen, B. L., J. M. Barlow, and L. S. Tabor, "Detectable Warnings: Synthesis of U.S. and International Practice," U.S. Access Board, Washington, DC, May12, 2000.
5. Canadian Centre for Occupational Health and Safety, June 10, 1999, www.ccohs.ca.
6. Center for Personal Protection and Safety, Spokane, WA, http://flashpoint.cpps.com/, captured December 2014

Copyright © 2017 by Dr. Carl Berkowitz

7. Kerr, Kim M., "Workplace Violence," Butterworth-Heinemann (Elsevere) Burlington, MA, 2010.
8. Nakanishi, Y., "Transit Security Update," TCRP Synthesis 80, National Academy of Science, Transportation Research Board, Washington, DC, 2009.
9. "Public Transportation Safety," US Department of Transportation, NHTSA, http://www.nhtsa.dot.gov/people/injury/buses/GTSS/talkpublic.html.
10. Sullivan, B.F., "Discovery 9/11 Litigation Letter to John Pistole at DHS" from https://archive.org/stream/pdfy-8NksAu3qXD3aBoqH/SullivanLetter_djvu.txt, Captured November, 2014.

Copyright © 2017 by Dr. Carl Berkowitz

**Appendix A. Passenger and Workplace Security**

Passenger and workplace security is often explained as the state of freedom from the risk of intentional bodily harm or death while as passenger or as worker, provided by rules, measures and practices that are promulgated and followed.

Railroads and transit agencies face a variety of unique security challenges to ensure the safety of their passengers and workers, and protecting their assets, while at the same time overseeing a smooth day to day operation. In addition to managing the day-to-day operation of their facilities, they must adhere to strict regulations, safety and security procedures, while maintaining uninterrupted service and enabling passengers to move quickly and safely through their facilities and to protect workers from injury.

The two broad subject areas in security are crime prevention and counterterrorism. The broad objectives of counterterrorism, and also applicable to anticrime efforts, are to discourage, deter, and ultimately detect to prevent.[9] A survey of 45 U. S. transit agencies identified the most important security measures and practices widely used and they are listed in Table A.1.

**Table A.1 Most Important and Effective Security Measures and Practices**[10]

| Measures | Practices |
|---|---|
| • Access control<br>• Patrols and surveillances<br>• Passenger security inspections<br>• Threat detection<br>• Tunnel security<br>• Cyber security | ***Counterterrorism***<br>• Identity management<br>• Intelligence information<br>• Passenger security inspections<br>• Public education and outreach<br>• Regional coordination<br>• Training of enforcement employees<br>• Trace detection technology |
| | ***Anticrime***<br>• Passenger codes of conduct<br>• Crime statistics map<br>• Plainclothes officers<br>• School outreach<br>• Bus driver training |
| | ***Combination counterterrorism/anticrime*** |

[9] Brian F. Sullivan, "Discovery 9/11 Litigation Letter to John Pistole at DHS"
[10] Nakanishi, Y., "Transit Security Update"

Copyright © 2017 by Dr. Carl Berkowitz

| Measures | Practices |
|---|---|
| | • Crime prevention through environmental design (CPTED)<br>• Imagery mapping and surveillance<br>• Police and security personnel<br>• Visible prevention and response teams<br>• Video technology |

A brief review of principal security practices would include the following:

**Crime Prevention Through Environmental Design (CPTED)-**Measures covered by these principles are often referred to in the crime literature. APTA provides excellent CPTED guidelines[11] on this subject for station areas. Although considered very effective, if strictly applied, these measures provide for a sterile station environment lacking seating, greenery and other passenger amenities.

**CCTV and video analytics-**CCTV and video analytics offer the opportunity to improve security, help in investigating incidents and are used to coordinate between the rail operator and the first responders. The information collected can also be used to assist in preventing incidents, anticipating system crowding, trespassing, and identify suspicious situations.

**Network communication systems-**Communication is crucial to an effective security management system. Reliable communications help to enhance the coordination of staff and improve the response to incidents.

**Information management-**Collecting relevant information in a manageable format is a key to a successful security control. Only information that is rapidly processed and analyzed when needed is useful; and can improve the decision-making process, especially during emergency response. Managed information can monitor systems and help staff in standard situations too. They can focus staff attention on relevant events and coordinate incident response; and combined with passenger information, can help keep the impact of incidents on passengers to an absolute minimum.

**Training-**Training has been confirmed as one of the most productive security safeguards, just as in safety. The development of appropriate training programs has proven to be very effective in maximizing safety and security measures.

**Workplace Violence**

Workplace violence is a special case in the security arena and the violent crime area in particular. This type of crime occurs between workers or persons related by work activities, i.e. his or her employment. There is virtually no FRA or FTA regulations of this subject matter

[11] APTA SS-SIS-RP-007-10, 2010.

Copyright © 2017 by Dr. Carl Berkowitz

and therefore OSHA and law enforcement are the agencies overseeing this problem. Violence inflicted on employees may come from many sources— external parties such as robbers or muggers and internal parties such as coworkers and patients. OSHA suggests that workplace violence policies indicate a zero-tolerance for all forms of violence from all sources. See expanded definition of workplace violence earlier in this chapter.

## Regulatory Environment in Workplace Violence

## Occupational Safety and Health Act of 1970 General Duty Clause

In addition to compliance with hazard-specific standards, the OSH Act requires that employers provide a place of work "free from recognized hazards that are causing or are likely to cause death or serious physical harm... to employees." OSHA will rely on Section 5(a)(1) of the *Occupational Safety and Health Act of 1970 (OSH Act)*,[12] the "General Duty Clause," for enforcement authority. Employers can be cited for violating the General Duty Clause if there is a recognized hazard of workplace violence in their establishments and they do nothing to prevent or abate it.

When Congress passed the *OSH Act*, it recognized that workers' compensation systems provided state-specific remedies for job-related injuries and illnesses. Determining what constitutes a compensable claim and the rate of compensation was left to the states, their legislatures and their courts. Congress acknowledged this point in Section 4(b)(4) of the *OSH Act*, when it stated categorically: "Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law."[13] OSHA issues non-mandatory guidelines that should not be viewed as enlarging or diminishing the scope of work-related injuries. The guidelines are intended for use in any state and without regard to whether any injuries or fatalities are later determined to be compensable.

## OSHA Guidelines for Workplace Violence Prevention

In January 1989, OSHA published voluntary, generic safety and health program management guidelines for all employers to use as a foundation for their safety and health programs, which can include workplace violence prevention programs[14]. OSHA's violence prevention guidelines build on these generic guidelines by identifying common risk factors and describing some feasible solutions. Although not exhaustive, the workplace violence guidelines include policy recommendations and practical corrective methods to help prevent and mitigate the effects of workplace violence. The goal is to eliminate or reduce worker exposure to conditions that lead to death or injury from violence by implementing effective security devices and administrative work practices, among other control measures.

---

[12] Public Law 91-596, December 29, 1970; and as amended by P.L. 101-552, Section 3101, November 5, 1990.
[13] 29 U.S.C. 653(b)(4).
[14] OSHA's Safety and Health Program Management Guidelines (54 *Federal Register* (16):3904-3916, January 26, 1989).

Copyright © 2017 by Dr. Carl Berkowitz

The best protection employers can offer is to establish a zero-tolerance policy toward workplace violence against or by their employees. The employer should establish a workplace violence prevention program or incorporate the information into an existing accident prevention program, employee handbook, or manual of standard operating procedures. It is critical to ensure that all employees know the policy and understand that all claims of workplace violence will be investigated and remedied promptly. In addition, employers can offer additional protections such as the following:

- Provide safety education for employees so they know what conduct is not acceptable, what to do if they witness or are subjected to workplace violence, and how to protect themselves;
- Secure the workplace. Where appropriate to the business, install video surveillance, extra lighting, and alarm systems and minimize access by outsiders through identification badges, electronic keys, and guards;
- Provide drop safes to limit the amount of cash on hand. Keep a minimal amount of cash in registers during evenings and late night hours;
- Equip field staff with cellular phones and hand-held alarms or noise devices, and require them to prepare a daily work plan and keep a contact person informed of their location throughout the day. Keep employer-provided vehicles properly maintained;
- Instruct employees not to enter any location where they feel unsafe. Introduce a "buddy system" or provide an escort service or police assistance in potentially dangerous situations or at night; and
- Develop policies and procedures covering various types of service providers. Address the expected rules of conduct for employees, and their right to assess and refuse to provide services in a perceived hazardous situation.

**Elements of an effective violence prevention program**

The five main components of any effective safety and health program also apply to the prevention of workplace violence:

1. Management commitment and employee involvement;
2. Worksite analysis;
3. Hazard prevention and control;
4. Safety and health training; and
5. Recordkeeping and program evaluation.

**Railroads and Rail Transit Preventive Measures of Workplace Violence**

Railroads and rail transit agencies must provide a safe workplace from intentional harm - i.e. crime committed by fellow workers or outsiders. To provide a safe workplace, there must be zero tolerance for unauthorized individuals (trespassers). This is accomplished by having an in-place workplace safety program which follows rail industry recommended best practices and, at a minimum, would include:

- A comprehensive plan for maintaining safety in the workplace;
- Assign responsibility and authority for this program to individuals or teams with appropriate training and skills;

Copyright © 2017 by Dr. Carl Berkowitz

- Affirm management commitment to an environment that places as much importance on worker safety as on servicing passengers;
- Confirm management commitment to worker involvement is essential elements of an effective safety management system;
- Demonstrate to the yard personnel that there is an organization that is concerned for their emotional and physical safety;
- Establish a program to analysis the workplace in order to have a program that prevents yard personnel hazards;
- Provide every single employee with workplace safety training;
- Allocate appropriate authority and resources to all responsible parties;
- Maintain a system of accountability for involved managers, supervisors and yard crews;
- Support and implement appropriate recommendations from safety committees;
- Work constructively with other parties, such as the Railroad's police;
- Contribute to development of procedures that address safety and security concerns;
- Secure the workplace with video surveillance;
- Report violent incidents promptly and accurately; and
- Investigate all violent incidents and threats and implement immediate corrective action.

In most workplaces where risk factors can be identified, the risk of assault can be prevented or minimized if the Railroad took appropriate precautions. One of the best protections employers can offer their workers is to establish a zero-tolerance policy toward workplace violence. This policy should cover anyone else who may come in contact with company personnel.

By assessing the work site, the Railroad could identify methods for reducing the likelihood of incidents occurring. The guidance from the Department of Occupational Safety and Health Administration (OSHA)[15] indicates that a well-written and implemented violence prevention program, combined with administrative controls and training can reduce the incidence of violence in the workplace.

Workers have a right to a safe workplace. The law requires employers to provide their employees with working conditions that are free of known dangers.
In order to create a secure workplace, there are a number of concerns that should be considered. Table A.2 summarizes some of the issues to ensure a safe workplace.

**Table A.2 Safe Work Place**

| Attribute | Description |
|---|---|
| Clear policy and procedures | A zero-tolerance policy combined with procedures to ensure that all trespassing incidents are reported and documented to enable understanding of the incidents and provide sufficient information for prosecuting the offending individual. |
| Train all personnel | Railroad should ensure that staff is aware of their responsibilities and the Railroad's procedures. |
| Improve communication | Facilitate the sharing of information among personnel, to help identify and |

[15] https://www.osha.gov/Publications/ OSHA3148/osha3148.html

Copyright © 2017 by Dr. Carl Berkowitz

| Attribute | Description |
| --- | --- |
| | diffuse situations earlier. |
| Railroad | Work with shop and yard personnel to promote awareness of trespassers and the legal consequences. The Railroad need to acknowledge the negative effects of trespassing on the yard and implement a solution. |

Surveillance cameras have been extremely effective as a deterrent to trespassing. If unauthorized individuals are made aware that the yard is fitted with cameras that will record their presence, they will be less likely to enter the facility. The cameras not only deter unacceptable behavior, if an incident did happen, the recorded images (registering the time, date and location) would be admissible as evidence in court. This would aid and speed up prosecution of the offender.

The concept of deterrence is quite simple it is the omission of an act because of the fear of sanctions or punishment. While not the entire premise, deterrence is certainly an important foundation for reducing unruly behavior on trains. Law enforcement exists both to apprehend wrongdoers and to convince would-be wrongdoers that there is a risk of punishment if they commit an unacceptable act. Laws provide a host of different sanctions for the commission of an offense (fines, probation, and imprisonment) serve notice that statutes contain a credible threat that, it is hoped, will inhibit those who have not yet offended from committing an unacceptable act at all. It is important to have a criminal-justice policy such as police presence, enhanced enforcement and surveillance of problems or potential problems. It is reasonable to argue that a belief or expectation that sanction threats can deter unacceptable behavior is at the very heart of protecting yard personnel.

It is reasonable to believe that increasing the number of police officers in the rail facility workplace, i.e. shop or yard, will deter trespassing by increasing the risk of incarceration. The evidence to date with respect to deterrence does speak clearly about the role of logical choice in the mind of the offender. It says that while offenders and would-be offenders may not be perfectly logical, they certainly are rational in the sense that they respond to incentives and disincentives. For example, research at the individual-level shows that people are affected by their perceptions about the risk of getting caught for misconduct and that these perceptions are sensitive to the outcomes of behavior. Perceptions of the risks of crime are pushed downward when people commit crimes and get away with them and are pushed upward when they get arrested. Police and crime deterrence studies about the policing of hot spots and police crackdowns do generally show that there is at least an initial deterrent effect in response to the enhanced presence of the police and police actions and offenders rationally readjust their perceptions of the risk of sanctions and reduce their offending.

Table A.3 presents a scale of the different levels of security breaches that can be anticipated in a facility without effective access control.

Copyright © 2017 by Dr. Carl Berkowitz

**Table A.3 Levels of Security Breach**

| Disturbance Level | Description |
|---|---|
| 1 | Littering |
| 2 | Loitering |
| 3 | Unsolicited verbal interaction |
| 4 | Direct verbal abuse |
| 5 | Unruly behavior |
| 6 | Verbal threats |
| 7 | Physical violence |
| 8 | Violent threats to life |

Any workplace that is open to the public 24/7 exposes employees to certain risks. An increase in criminal behavior occurs more often during a certain time of the day than at other times (Late and early working hours).

Recognition is the key when it comes to workplace violence prevention, and in most cases one can see workplace violence coming:

"The path toward violence is an evolutionary one with signposts along the way.[16]"

The most effective way to reduce crime is by properly designing the environment. Through proper design, the goal is to limit access to the work site to only approved users of the space. In this case the yard personnel did not provide ongoing surveillance of the work site and did not develop territorial reinforcement of the worksite for legitimate employees.

Territorial reinforcement refers to a designed work space so that only legitimate users are admitted, totally eliminating the presence of strangers. Through environmental design using controlled access, ongoing surveillance and police presence are the best deterrents to prevent crime; and will alert authorized employees to the presence of strangers so that effective measures can be taken to reduce any potential risk.

Controlling access allows legitimate employees and visitors access to the work site so that normal business activity may continue without undue interruption. Properly designed facilities can ensure this function.

Training is a key component of an effective workplace violence policy. Employees should be trained on how to recognize the signs and symptoms of workplace violence and that all potentials for threats must be taken seriously. A key component of a workplace violence policy for any company should be a zero-tolerance policy toward violence against employees by outsiders.

Ensuring a multidisciplinary approach to workplace violence is another key component. Representatives from several functional areas of an organization, such as safety, human

[16] *Center for Personal Protection and Safety, Spokane, WA, 2014*

Copyright © 2017 by Dr. Carl Berkowitz

resources, security, legal and operation, should be included on a threat management/assessment team. The team should assess the potential threats of violence and should determine what action to take to prevent the threat from being carried out. A comprehensive workplace violence procedure should also include emergency procedure for employees to follow in the event of an incident.

Since criminals do not want to be caught, and anything that increases the risk of physically being seen will prove helpful in risk reduction. Adequate lighting increases the probability of being visible and will lead trespassers to search for other darker targets. The outside of all yard areas and all interior spaces should be adequately lit during the high-crime hours after sunset.

Preventing violence is difficult, but far from impossible. The initial line of defense is policing. When one is thinking of violence prevention, the first consideration is involving the Railroad's police force and increasing the number of police present on-site during high-risk hours. Policing is not the complete answer to preventing crime, but its presence is the most important part of the deterrent puzzle.

Heightened security is accomplished through the use of hardware and devices to control access and to increase the observation by the workforce. Locking gates is one obvious form of security and there are electronic systems to control access. The ability of employees to observe unauthorized personnel can be increased through the use of cameras, mirrors and various forms of electronic alarm systems.

Closed-circuit television (CCTV) allows the yard's security to see what is happening in different areas in real-time. It also helps security and police to monitor from remote locations. CCTV is a great deterrent against criminals; however, if no one is watching at the moment an incident is happens no responder will be alerted. CCTV then becomes a tool for retrieving video after the incident.

NJ Transit had at their disposal portable cameras and skycams but failed to deploy any of this equipment for the purpose of monitoring of this large event with a history of incidents in the past. NJ Transit has 5,000 cameras in their system, but not a single camera is deployed at Elizabeth station; while at the same time they have deployed 500 cameras at Hoboken station. NJ Transit's failure to properly prepare for this event directly contributed to the incident.

**Railroad and Rail Transit Frontline Employees**

Many railroads and rail transit agencies recognize and train frontline employees on best practices for dealing with unruly passengers and or avoiding becoming potential crime victims. One such program is being implemented jointly by the UTU and AMTRAK.

The UTU, as a subcontractor to Amtrak, is in the final stages of developing a training manual – "Emerging Incidents Procedures" – for some 8,000 front-line Amtrak employees, such as conductors, assistant conductors, engineers, lead service attendant and on-board service employees. The manual will be used as part of Amtrak's 2012 Block Training cycle to assist

Copyright © 2017 by Dr. Carl Berkowitz

frontline employees aboard trains, in stations and on platforms in developing skills related to situational awareness, observation, communication and response,[17]

The training is based on the assessment of AMTRAK frontline employee experiences which revealed that the most prevalent problem was employees dealing with unruly passengers, which occurs not only at Amtrak, but at all ground service public transportation facilities in the U. S. The training course was deployed in 2012 and introduced scenario exercises and an array of techniques in understanding and dealing with dangerous and threatening frontline situations.

[17] UTU Training and Education Coordinator, Bruce D. Feltmeyer

Copyright © 2017 by Dr. Carl Berkowitz

## Appendix B. Injury Potential Model

A good model to apply when conducting risk assessment is the Injury Potential Model. The purpose of this model is to recognize that a number of issues contribute to the potential for accidents ...it is not sufficient to consider only one item in isolation. It is by understanding the interrelationship and the relevance of the three components that a satisfactory assessment of the fall potential can be made. The model looks at those factors that are controllable.



Copyright © 2017 by Dr. Carl Berkowitz

## Appendix C. Occupational Safety and Health Act

The Occupational Safety and Health Act of 1970[18] mandates that, in addition to compliance with hazard-specific standards, all employers have a general duty to provide their employees with a workplace free from recognized hazards likely to cause death or serious physical harm. OSHA relies on Section 5a-1 the "General Duty Clause"[19] for enforcement authority. Failure to implement these guidelines is not in itself a violation of the General Duty Clause; however, employers can be cited for violating this Clause if there is a recognized hazard of the workplace in their premises, and they do nothing to prevent or abate it. These standards address employee safety and security risks.[20] In addition to the General Duty Clause, employers are also responsible for appropriate training of employees and proper supervision of the workplace.

In most workplaces where risk factors can be identified, the risks of personal injury can be prevented or minimized if management took appropriate precautions. One of the best protections' employers can offer their workers, and visitors would be to establish a zero-tolerance policy in the presence of hazards and risks of personal injuries. This policy should cover the workers, commercial drivers, visitors and anyone else who may come in contact with a company's facilities.

By assessing the worksite, the management could identify methods for reducing the likelihood of incidents occurring. OSHA believes that a well-written and implemented workplace accident prevention program, combined with administrative controls and training can reduce the incidence of workplace hazards.

Workers have a right to a safe workplace. The law requires employers to provide their employees with working conditions that are free of known dangers.

In order to create a secure workplace there are a number of concerns that should be taken into account. Table I summarizes some of the issues to ensure a safe workplace.

**Table I. Injury Free Work Place**

| Attribute | Description |
|---|---|
| Clear policy and procedures | A zero-tolerance policy combined with procedures to ensure that all worker incidents are reported and documented to enable understanding of the incidents and provide sufficient information for prosecuting the offending staff member. |
| Train all personnel | Management should ensure that staff is aware of their responsibilities and procedures. |
| Improve communication | Facilitate the sharing of information among personnel, to help identify and diffuse situations earlier. |
| Yard company | Work crews to promote awareness of unacceptable behavior and the legal consequences. |

---

[18] Public Law 91-596, December 29, 1970; and as amended by P.L. 101-552, Section 3101, November 5, 1990

[19] "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

[20] See: https://www.osha.gov/Publications/ OSHA3148/osha3148.html (Captured 9/6/2014)

Copyright © 2017 by Dr. Carl Berkowitz

**Appendix D. APTA Manual for the Development of System Safety Program Plans, May 15, 2006. (Applicable to any mode of transportation)**

1.0 The Importance of a System Safety Program Plan to Commuter Railroad Operations

The primary purpose for the existence of a commuter railroad is to move people safely. According to statistics provided by the National Transportation Safety Board, commuter railroads have the lowest number of passenger fatalities compared to other transportation modes, regardless whether air, water, or surface transportation. Commuter railroads throughout the United States move hundreds of thousands of riders each day - safely, securely, and efficiently. To do so railroads must have a program that provides consistent, comprehensive safety guidance in a form that ensures continuity during changes in staff, infrastructure, and operating practices and conditions. Such a program must be adequately planned, organized, documented, and staffed. To be effective the program must be flexible to fit the organizational context of each individual commuter railroad, while adhering to established safety principals gained from over 100 years of operations. This process is known as system safety. System safety is the management and engineering discipline that addresses these needs and the System Safety Program Plan (SSPP) is the first element of a formal process for applying its principles.

A well-written SSPP will provide the basis for identifying any and all hazards that might interfere with customer and employee safety, as well as the public at large. It will provide for safety reviews of capital improvements, changes in equipment, and changes in operating practices and will include or refer to concrete methods for eliminating, minimizing, and otherwise mitigating these hazards. An SSPP also defines the lines of responsibility and authority for addressing potential hazards in an organization, and establishes safety and security tasks for departmental units that have a lead or a support role in implementation of those responsibilities.

The field of system safety originally evolved to meet the needs of defense and space applications, but for two decades it has been successfully applied to transportation. In the widely read "System Safety Program Requirements," MIL-STD-882B, Department of Defense, 30 March 1984, subsequently revised through version D, four elements of an effective system safety program were recognized:

- A planned approach to system safety program tasks
- Qualified personnel to accomplish the tasks
- Authority to implement the tasks through all levels of management
- Appropriate financial and personnel resources to accomplish the tasks

Through the use of a formal, planned approach to safety, commuter railroads adhering to system safety concepts have identified and resolved hazards earlier, responded to emergencies in a more orderly manner, anticipated the impact of capital programs and changes in operations, and maintained safe operation despite changes in key personnel.

Copyright © 2017 by Dr. Carl Berkowitz

This APTA manual seeks to assist commuter railroads in applying these concepts in the context of each railroad's unique operating characteristics and hierarchy of priorities, taking into account such factors as:

- Differences among established properties, new- starts, and those in the midst of substantial growth;
- Organizational structures that vary from large agencies with well-defined operational and administrative divisions of labor to smaller ones with over-lapping staff responsibilities;
- Self-operated or contractor-operated properties;
- Owned, leased, and shared rights of way.

All commuter rail operators, regardless of size, operating configuration, or age, should apply system safety principles in a manner appropriate to its operation. This edition of the manual reflects APTA's desire to recognize this variety of operational contexts, and the diversity of SSPPs required.

The APTA Commuter Rail Safety Management Program incorporates three distinct functions designed to support commuter railroads with attaining the highest degree of safety and security practicable, given constrains on time, resources, and operational effectiveness. In addition to this manual on developing a system safety program plan, the Commuter Rail Safety Management Program provides practical guidance on how to implement a System Safety Program Plan, including effective practices and an evaluation of the effectiveness of their system safety programs by using an external audit process. The APTA Safety Management Program is a triennial safety assessment that answers the following questions:

1. Does the railroad system have a System Safety Program Plan that conforms with the APTA Manual for the Development of System Safety Program Plans for Commuter Railroads?
2. Has the respective railroad's SSPP been fully implemented?
3. Does the respective railroad have an internal safety and security compliance assessment program to identify, monitor, and resolve program deficiencies?

The net result to participating commuter railroads is an improved awareness of the adequacy of their safety and security program, providing methods to continually refine and improve their program delivery. The capture of effective practices provides the industry with an ongoing, benchmarking tool to meet the demands of changing technology and ridership expectations. The Safety Management Program addresses safety management policies, plans, and practices and assesses the extent to which the system safety program conforms to sound transit practice. It offers a unique, independent perspective as to whether the railroad's management process is tracking all the items necessary to maximize safety and security in its operation. The program is thus designed to demonstrate the ability of the railroad to maintain adequate self-regulation. The program does not assess physical conditions of the railroad or its actual safety performance.

Copyright © 2017 by Dr. Carl Berkowitz

The American Public Transportation Association (APTA) has produced this Manual for the Development of System Safety Program Plans for Commuter Railroads to assist its members in developing a System Safety Program Plan designed for the specific needs of a commuter railroad over the entire range of operating circumstances and system life cycles. This manual will further serve as the baseline for the APTA Commuter Rail Safety Management Program.

- To establish a system safety philosophy within the commuter rail industry
- To guide commuter railroads in preparing and/or revising their SSPPs
- To assist commuter railroads in preparing for internal and external system safety reviews, assessments, and audits *
- To provide the means by which a commuter railroad can demonstrate diligence toward the safety and security of its operations.
- To provide commitment to continuous improvement over the entire commuter rail life cycle.

*Note: Qualification for a safety audit or security assessment requires the development and approval of a System Safety Program Plan.

To achieve the System Safety Program goals as described in Section 1 of this manual, specific sections of this manual have been dedicated to functions that will support the overall goal. They are:

- Section 3: Safety Management Administrative Requirements
- Section 4: Safety Program Implementation
- Section 5: Safety Engineering Techniques and Analysis
- Section 6: Safety Assurance

Elements 1 - 7 constitute the planning phase of preparing a System Safety Program Plan in which the philosophy and strategic safety plan of the organization is developed from the mission, vision, and values of the organization. Starting with a policy statement and authority, the SSPP is developed to define goals, objectives, organizational context, administrative controls, inter-departmental coordination, and contract requirements.

2.2.2 Safety Program Implementation

Elements 8 -17 constitute the implementation phase of the System Safety Program Plan and cover all the essential tasks that must be in place to effectively manage commuter railroad safety and security efforts. Most of these tasks are associated with APTA standards or FRA regulations.

2.2.3 Safety Engineering Techniques and Analysis

Elements 18 - 21 constitute the measurement and checking phase of the System Safety Program Plan and provide evaluation and analysis functions against the plan's performance goals and objectives. The Hazard Management process is a key feature of this phase. Loss Prevention and

Copyright © 2017 by Dr. Carl Berkowitz

Loss Control, Accident Investigation, and Safety Data Acquisition! Analysis is other programs that help to identify and control hazards and to manage risk to the organization.

2.2.4 Safety Assurance

Elements 22 and 23 constitute the evaluation and corrective action phase of the System Safety Program Plan. Both internal and external reviews, assessments, and audits are used to determine if the plan and controls are functioning as intended. Opportunities for improvement are identified and reported back to the Safety Management Administrative phase to enable adjustments to existing programs, or the creation of new programs to be planned and developed that will enrich and improve the System Safety Program Plan over time.

5.0 Safety Engineering Techniques and Analysis

The practice of system safety integrates management systems with safety engineering practices to optimize safety performance at the highest level practicable within the constraints of time, cost, and operational effectiveness. To achieve this performance, system risk must be identified, measured and controlled effectively using a variety of analytical methods and techniques. This section of the manual establishes the means by which risk to the organization can be determined, minimized, and controlled using evaluative tools to check the progress of implementing goals and objectives.

5.1 Element 18: Hazard Management Process

The hazard identification/resolution process is perhaps the heart of the System Safety Program. While there has been much written about the level of formality needed for this section of the program, it remains an individual matter for each transit system to fit the proper process to its respective organization. The important element that must be included in a fully developed System Safety Program is the mechanism, accessible to all levels of the organization, by which hazards are identified, analyzed for potential impact on the operating system, and resolved in a manner acceptable to general management. The entire Hazard Management process is nothing more than a formalized procedure for risk acceptance by the commuter railroad management staff. It allows for a systematic hazard identification process and a coordinated hazard effects minimization process. The Hazard Management process usually resides with the safety unit of the commuter railroad organization, which is responsible for all supporting documentation and coordination.

There are a number of Hazard Management models that may be used to guide the development of a Commuter Rail Hazard Management Program. The most widely used and referenced model is Military Standard 882. Many of the common hazard analysis techniques in use today, such as Preliminary Hazard Analysis, System Hazard Analysis, Subsystem Hazard analysis, Operations Hazard Analysis, as well as many others are based upon Military Standard 882.

Conducting investigations of accidents and incidents is related to the Hazard Management process in that feedback and follow-up from these investigations should be automatically evaluated for hazard resolution. Once an incident occurs, it is incumbent upon commuter railroad safety management to identify potential actions to prevent a recurrence of the

Copyright © 2017 by Dr. Carl Berkowitz

respective problem. Some basic elements necessary for a properly executed investigation of all accidents, incidents, and "near misses" include the following:

5.2.1 Criteria and Procedures
A formal policy must exist and be fully understood by all organizational groups as to exactly which accidents/incidents will be investigated. This policy should include a pre-determination on such things as thresholds for automatic activation of an investigation, guidelines on whether incidents should be investigated immediately or after the fact, and who is in charge of each specific level of investigation.

Preparation of appropriate procedures, formats, and approaches for performing investigations must be documented and properly implemented. Verification of full understanding and compliance with such procedures by all organizational elements is also required.

5.2.2 Internal and External Notification
Pre-determination of the appropriate notification of accidents and participation in accident investigations should be understood and available to all involved commuter railroad personnel. Exact criteria for establishing notification thresholds are required both internally and externally to the organization.

External notification requirements and the preparation of necessary reports to all regulatory agencies and governing boards should be identified and personnel assigned to carry out these requirements.

5.2.3 Cause Analysis
While actual procedures for accident/incident investigation may vary greatly from one commuter railroad to another, especially in: such areas as the department in charge and responsible for addressing corrective acti9ns, the ultimate goal remains the same elimination of accidents. This will not occur unless a thorough incident investigation has developed all of the facts in evidence and a cause analysis is performed in accordance with the Hazard Management Process. Findings, conclusions, and recommendations resulting from investigations should be specified as to type, format, distribution, and retention.

5.2.4 Reporting and Follow-up Documentation
All necessary information pertaining to a specific occurrence should be in standard format and stored in a specified location. Applications for use of incident documentation include ongoing training, especially where human error and procedural error are involved; litigation, where documentation of efforts to prevent such incident can be extremely valuable especially to establish that commuter railroad management is reasonable and prudent; and budget development, where certain re-designs and equipment purchases can be easily justified. Assurance should be provided that all recommendations and identified needs for corrective actions are assigned, tracked, reported, and verified. This is an extremely important step to providing a key element in recurrence prevention.

Copyright © 2017 by Dr. Carl Berkowitz

One of the most important services the safety unit provides for the commuter rail organization is the collection, maintenance, and distribution of safety data relative to system operation. This data includes information gathered from within the respective railroad on various operating events relative to safety. Analysis of this system specific data can be used to determine trends and patterns in system operation. Used as part of the Hazard Management process, data collection and analysis can be used to identify hazards before they cause accidents by such techniques as trend analysis. It thus becomes a vital component of efforts to improve system performance, not only in respect to safety and security but also in the overall delivery of service to the riding public. The responsibilities for providing, receiving, processing, and analyzing data should be listed here and can be general or specific, based on the needs of the commuter rail system.

Exactly what types of analysis techniques are used as part of the data analysis process must be determined by the individual needs of each commuter railroad. This decision is based on variable aspects of the railroad environment such as whether any major system changes or procurements are underway. Frequently, ongoing procurement contracts require a certain amount of safety data and analysis to be provided by suppliers. It must be determined in advance how this data will be used and who will be responsible for its evaluation.

Communication with other commuter railroads is also a productive source of input into both the data acquisition and hazard management processes. This type of coordination can be used to discover potential problems before they occur at a given railroad by monitoring events at other railroads, especially those with similar components. Development of "lessons learned" from historical data is a key component of the Safety Data Acquisition element. Participation in industry committees, work shops and conferences, and other efforts in this regard further enhance the value of data acquisition/analysis.

Loss prevention plans and control procedures are important aspects of any safety or security effort to keep the potential of catastrophic property loss low and to appropriately manage incident costs. Fire loss of facilities and vehicles has historical precedent and should always be a concern for commuter rail properties. Another concern for commuter rail properties is maintaining control of costs associated with all types of accident loss, whether it be from third-party claims, employee injury related medical costs, or litigation. The SSPP should provide for management plans and procedures to identify and analyze the potential for loss and methods for control. This section of the manual should be used to incorporate the results of formal hazard analysis performed and the resultant management control plans that became ongoing programs. A Business Continuity of Operations Plan would be one example of this. Two common management practices in Loss Prevention and Control for commuter railroads are shown below:

5.4.1 Fire Safety Analysis

Recent regulations and APTA standards provide a high degree of importance on maintaining vigilance and preparedness for fire events. Specific guidance is provided for conducting a fire safety analysis of vehicles in commuter rail

Copyright © 2017 by Dr. Carl Berkowitz

service. Additional fire safety analysis for passenger stations is found in NFPA 130.

5.4.2 Casualty Management Review

Many, but not all losses sustained by a commuter rail property arise from safety and security events. Effective practices have been developed to deal with major loss events by developing inter-departmental coordination and reporting on potential loss events that occur throughout the organization. Safety and security personnel have an important role in providing information and analysis to support loss control initiatives.

6.0 Safety Assurance

System safety programs must be able to ensure that the margin of safety designed and built into the commuter rail system is maintained consistently over time and is not diminished by necessary changes that are inevitable in a transportation system. To provide this level of safety assurance, a method for managing change must be adopted and a system to measure the effectiveness of program implementation must be incorporated.

Because changes to the transportation system are constant and come from all aspects of commuter rail operations, different techniques for identifying and managing change in the organization must be adopted to ensure that the integrity of safety and security procedures, equipment, and personnel are not compromised. Changes found to be beneficial to one part of the organization may create the opportunity for a catastrophic incident in another part of the organization, if there is no effective means of identifying, analyzing, and controlling changes that occur across the system.

Configuration Management is the top level methodology for assessing the impact of change to safety critical areas of operations. Configuration management is a process that ensures, as much as possible, that all property, equipment, systems design elements, and etc. is documented as to configuration, both accurately and completely. Any changes to an individual sub system or a fleet/inventory wide change must be recorded on as-built drawings and addressed in training courses, maintenance manuals, and procedures in a timely and effective manner. The Configuration Management process must include, as a minimum procedures for the authority to make configuration changes, the process for incorporating these changes into all appropriate documentation, and the process for ensuring that all necessary units, including System Safety, are formally made aware of such changes. Configuration Management works in conjunction with other stand-alone programs to ensure the highest level of safety practicable is maintained throughout the system's life cycle.

The SSPP should make reference to applicable standards where they exist and govern the operation of safety critical functions of the railroad. The areas where deviations to standards or waivers to regulatory requirements were adopted need also to be identified. In areas where no standards exist for safety critical processes or equipment, design criteria and controls used should be referenced and originals retained.

Copyright © 2017 by Dr. Carl Berkowitz

Commuter rail systems are in a perpetual state of acquisition, as new equipment, system expansions and modifications, and system rehabilitations require constant design and procurement efforts. Ongoing acquisitions and procurement in fact can be more critical than initial design for many reasons. Coordination and compatibility with the existing system, construction efforts under operating conditions, and testing and break-in phases must all be managed as part of the ongoing system safety effort.

6.1.1.3 Quality Assurance/Quality Control Interface

Another effective technique that can be employed in the management of change is to use existing Quality Programs to provide levels of assurance over safety critical parts and procedures. Commuter rail operators that have obtained ISO 9000 and/or ISO 14000 certification have the ability to control changes but do not have the capability to provide hazard analysis and approve new changes in safety critical areas.

Safety Certification is used to oversee the addition and introduction of completely new systems and the integration to the existing system if the project is not a new start. The US DOT Federal Transit Administration and APTA have jointly published a manual on how to conduct a safety certification program.

Methods for identification and maintenance of control documents should include a provision for handling those documents deemed to be safety critical. Many methods and systems of document control exist and it is at the discretion of the commuter rail organization to adopt one that fits their organizational needs.

System safety is the formal process of managing a system to ensure that all identified safety elements in a given environment are in place and are performing as designed. In a commuter rail environment, it is difficult to identify any elements which are not safety related, even if only indirectly. The **Internal Safety Management Assessment** process thus becomes extremely important in determining if all organizational elements, equipment, procedures, and functions are performing as intended, from a system safety perspective. It requires constant attention and activity

The Internal Safety Audit determines compliance with an agency's safety policies, rules, regulations, guidelines, codes, procedures, assigned system safety activities, and requirements as prescribed within the System Safety Program Plan. Items found not in conformance are reported and corrective action plans filed to improve the deficiencies.

And defining threats and vulnerabilities, self-assessments can provide a needed critique function to identify areas for improvement.

Copyright © 2017 by Dr. Carl Berkowitz

## Appendix E. Memorandum from OSHA on Training from David Michaels, Assistant Secretary, April 28, 2010

The purposes of this memorandum are to reiterate OSHA's policy that employee training required by OSHA standards must be presented in a manner that employees can understand, and to provide enforcement guidance to the area and regional offices relative to the Agency's training standards. This position applies to all of the agency's agriculture, construction, general industry, and maritime training requirements.

### Employer's Training Obligation

Many OSHA standards require that employees receive training so that work will be performed in a safe and healthful manner. Some of these standards require "training" or "instruction," others require "adequate" or "effective" training or instruction, and still others require training "in a manner" or "in language" that is understandable to employees. It is the Agency's position that, regardless of the precise regulatory language, the terms "train" and "instruct," as well as other synonyms, mean to present information in a manner that employees receiving it are capable of understanding. This follows from both the purpose of the standards -- providing employees with information that will allow work to be performed in a safe and healthful manner that complies with OSHA requirements -- and the basic definition that implies the information is presented in a manner the recipient is capable of understanding.

OSHA has a long and consistent history of interpreting its standards and other requirements to require employers to present information in a manner that their employees can understand. See, e.g., CPL 2-238(D)(1998) ("[i]f the employees receive job instructions in a language other than English, then training and information to be conveyed under the [hazard communication standard] will also need to be conducted in a foreign language"); letter from Russell B. Swanson to Chip MacDonald (1999) ("instruction that employers must provide under §1926.21 must be tailored to the employees' language and education...."). Courts and the Commission have agreed with OSHA that an employer may not take advantage of "an adequately communicated work rule" when it did not communicate that rules to a non-English speaking employee in a language that employee could understand. See, e.g., Modern Continental Construction Company, Inc. v. OSHRC, 305 F.3d 43, 52 (1st Cir. 2002); Star Brite Construction Co., 19 (BNA) OSHC 1687, 1695 n.12 (N. 95-0343, 2001).

In practical terms, this means that an employer must instruct its employees using both a language and vocabulary that the employees can understand. For example, if an employee does not speak or comprehend English, instruction must be provided in a language the employee can understand. Similarly, if the employee's vocabulary is limited, the training must account for that limitation. By the same token, if employees are not literate, telling them to read training materials will not satisfy the employer's training obligation. As a general matter, employers are expected to realize that if they customarily need to communicate work instructions or other workplace information to employees at a certain vocabulary level or in language other than English, they will also need to provide safety and health training to employees in the same manner. Of course, employers may also provide instruction in learning the English language to non-English speaking employees. Over time this may lessen the to provide OSH Act training in

Copyright © 2017 by Dr. Carl Berkowitz

other languages. Additionally, OSHA's training provisions contain a variety of specific requirements related to employee comprehension. For example, §1910.147(c)(7)(i) (Lockout/Tagout) requires the employer to verify that the employees have "acquired" the knowledge and skills which they have been trained; §1910.134(k)(5)(ii) (Respiratory Protection) requires retraining when "inadequacies in the employee's knowledge or use of the respirator indicate that the employee has not retained the requisite understanding or skill;" §1910.1030(g)(2)(vii)(N) (Blood borne Pathogens) requires "[a]n opportunity for interactive questions and answers with the person conducting the training session;" and many other standards have analogous requirements. Employers need to examine the standards applicable to their workplaces to be familiar with these specific requirements.

Copyright © 2017 by Dr. Carl Berkowitz

**Appendix F. OSHA Employer Responsibilities**
**https://www.osha.gov/as/opa/worker/employer-responsibility.html**

**Under the OSHA law, employers have a responsibility to provide a safe workplace. This is a short summary of key employer responsibilities:**

- Provide a workplace free from serious recognized hazards and comply with standards, rules and regulations issued under the OSH Act.
- Examine workplace conditions to make sure they conform to applicable OSHA standards.
- Make sure employees have and use safe tools and equipment and properly maintain this equipment.
- Use color codes, posters, labels or signs to warn employees of potential hazards.
- Establish or update operating procedures and communicate them so that employees follow safety and health requirements.
- Employers must provide safety training in a language and vocabulary workers can understand.
- Employers with hazardous chemicals in the workplace must develop and implement a written hazard communication program and train employees on the hazards they are exposed to and proper precautions (and a copy of safety data sheets must be readily available). See the OSHA page on Hazard Communication.
- Provide medical examinations and training when required by OSHA standards.
- Post, at a prominent location within the workplace, the OSHA poster (or the state-plan equivalent) informing employees of their rights and responsibilities.
- Report to the nearest OSHA office within 8 hours any fatal accident or one that results in the hospitalization of three or more employees. Call our toll-free number: 1-800-321-OSHA (6742); TTY 1-877-889-5627
- Keep records of work-related injuries and illnesses. (Note: Employers with 10 or fewer employees and employers in certain low-hazard industries are exempt from this requirement.
- Provide employees, former employees and their representative's access to the Log of Work-Related Injuries and Illnesses (OSHA Form 300). On February 1, and for three months, covered employers must post the summary of the OSHA log of injuries and illnesses (OSHA Form 300A).
- Provide access to employee medical records and exposure records to employees or their authorized representatives.
- Provide to the OSHA compliance officer the names of authorized employee representatives who may be asked to accompany the compliance officer during an inspection.
- Not discriminate against employees who exercise their rights under the Act. See our "Whistleblower Protection" webpage.
- Post OSHA citations at or near the work area involved. Each citation must remain posted until the violation has been corrected, or for three working days, whichever is longer. Post abatement verification documents or tags.
- Correct cited violations by the deadline set in the OSHA citation and submit required abatement verification documentation.

Copyright © 2017 by Dr. Carl Berkowitz

- OSHA encourages all employers to adopt an Injury and Illness Prevention Program. Injury and Illness Prevention Programs, known by a variety of names, are universal interventions that can substantially reduce the number and severity of workplace injuries and alleviate the associated financial burdens on U.S. workplaces. Many states have requirements or voluntary guidelines for workplace Injury and Illness Prevention Programs. Also, numerous employers in the United States already manage safety using Injury and Illness Prevention Programs, and we believe that all employers can and should do the same. Most successful Injury and Illness Prevention Programs are based on a common set of key elements. These include: management leadership, worker participation, hazard identification, hazard prevention and control, education and training, and program evaluation and improvement. OSHA's Injury and Illness Prevention Programs topics page contains more information including examples of programs and systems that have reduced workplace injuries and illnesses.

Copyright © 2017 by Dr. Carl Berkowitz

## Appendix G. The General Duty Clause of the United States Occupational Safety and Health Act

29 U.S.C. § 654, 5(a)1: **Each employer** shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

29 U.S.C. § 654, 5(a)2: **Each employer** shall comply with occupational safety and health standards promulgated under this act.

29 U.S.C. § 654, 5(b): **Each employee** shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this Act which are applicable to his own actions and conduct.

### The General Duty Clause

The following is the General Duty Clause from the OSH Act of 1970:

a) Each employer --

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees

(2) shall comply with occupational safety and health standards promulgated under this Act.

(b) Each employee shall comply with occupational safety and health standards and all rules, regulations and orders issued pursuant to this Act which are applicable to his own actions and conduct.

### Employer Responsibilities

It is incumbent upon the employer to actively examine the workplace and workplace practices to determine possible hazards and/or practices that can cause harm to their employees or others. That is, the responsibility is upon the employer to initiate the search for and correction of all hazards that are found in the workplace in order to provide for the safety of all personnel. The regulations (Title 29 of the Code of Federal Regulations) are to be followed by the employer to ensure the safety of their employees and all individuals who enter that workplace.

Under the Occupational Safety and Health Act of 1970, the OSH Act, employers are responsible for providing a safe and healthful workplace. The OSHA General Duty Clause is Section 5(a) of the Occupational Safety and Health Act. It states

This language can also be found in 29 CFR 1903.1.

The general duty provisions are used by OSHA Compliance Officers in OSHA inspections only where there are no specific standards applicable to the particular hazard involved. Any recognized hazard created in part by a condition not covered by an OSHA standard may be cited under the General Duty Clause. A hazard is recognized if it is a condition that is (a) of a common knowledge or general recognition in the particular industry in which it occurred, and (b) detectable (1) by means of the senses (sight, smell, touch, and hearing), or (2) is such wide,

Copyright © 2017 by Dr. Carl Berkowitz

general recognition as a hazard in the industry that even if it is not detectable by means of the senses, there are generally known and accepted tests for its existence which should are generally known to the employer. In addition, voluntary standards, such as practices promoted by industry groups, consensus standards, such as those of ANSI, also meet the preceding criteria for identifying a hazard. Citations based on the General Duty Clause are limited to alleged serious violations (including willful and/or repeated violations which would otherwise qualify as serious violations, except for their willful or repeated nature

Copyright © 2017 by Dr. Carl Berkowitz

## Appendix H. NJ Transit Rail Employee Safety Rules and On-Track Safety Manual

NJ TRANSIT
The Way To Go.

# RAIL EMPLOYEE SAFETY RULES and ON-TRACK SAFETY PROCEDURES MANUAL

2007

TRO-5

Copyright © 2017 by Dr. Carl Berkowitz

## INTRODUCTION

The rules herein are effective **January 6, 2007** and govern all NJ TRANSIT Rail employees, and supersede all previous Safety Rules.

NJ TRANSIT is constantly endeavoring to maintain safe working conditions and to protect its employees from injuries and accidents.

Each industry has hazards peculiar to itself. The following safety rules have been developed as a result of railroad experience and are designed to prevent injuries and accidents.

By your sincere cooperation and safety consciousness in following these rules, we can enjoy the benefits of a successful safety program.

We are vitally interested in your safety. We seek your cooperation in complying with these safety rules and also bringing to the attention of your supervisor any unsafe actions or conditions which should be corrected.

Copyright © 2017 by Dr. Carl Berkowitz

## NOTICE

Safety is of first importance.

In case of doubt, the safe course must be taken.

To retain employment, obedience to these rules is mandatory.

Employees to whom these safety rules apply must study, know and understand their application. When in doubt as to their meaning, they must contact the proper supervisor for an explanation.

Employees must take every precaution to prevent personal injury and accidents. Violations of these rules must be promptly reported to the proper supervisor.

Employees are expected to use sound judgment when conditions or situations arise which are not covered by these rules.

Supervisors shall make frequent observations of employees while they are performing their duties and take such action as is necessary to ensure compliance with these rules.

Supervisors are responsible for the safety instruction and performance of the employees under their jurisdiction. New employees must be given special guidance so that they may acquire proper safety habits.

Regardless of whether on-duty or off-duty, employees are governed by applicable safety rules.

Copyright © 2017 by Dr. Carl Berkowitz

## NJ TRANSIT Rail Safety Policy

NJ TRANSIT Rail is committed to providing a safe and healthy environment for our co-workers, our customers, and the communities we serve.

We will strive to identify and eliminate foreseeable hazards that can result in accidents and injuries.

We recognize that safety rules, training, and procedures are provided and must be followed to ensure safety. Also, we will strive to use our best judgment and make responsible decisions and take actions to prevent accidents and injuries.

We recognize that accident and injury prevention will benefit all of us and our business. Therefore, safety is a vital part of every job.

We will work towards the goal of preventing all accidents and injuries.

We believe that this goal is obtainable.

NJ TRANSIT Rail will accomplish this goal by each of us becoming personally involved in safety and by sharing these responsibilities.

Copyright © 2017 by Dr. Carl Berkowitz

4. It is essential to safety that employees performing service must give their undivided attention to duty. The following are prohibited.

(a) While on duty or on Company property: Gambling, fighting or participating in any illegal, immoral or unauthorized activity.

(b) When required to perform service: Sleeping or assuming the attitude of sleep. Having or using a television, radio, or similar device, other than those provided for railroad operations. Card playing or reading other than Company instructions.

(c) Railroad supplied or authorized electronic and electrical devices are to be used for company business only. The use of personal cell phones to make personal phone calls is prohibited while required to perform service. Personal cell phones should be tuned off while on duty and may only be used in case of an emergency, or as provided by Safety Rule 101.

(d) Railroad supplied or authorized electronic and electrical devices must not be used in proximity to a track by an on ground employee where there is a danger of being struck by moving train or equipment unless protection is provided by another ground employee.

(e) Having firearms or other deadly weapons, including knives with a blade in excess of three inches, in their possession while on duty or on company property

(f) Solicitation and/or acceptance of gratuities from patrons.

5. Accidents, defects, vandalism or any unusual or suspicious conditions which may affect the movement of trains must be reported by the quickest available means of communication to the proper authority.

Copyright © 2017 by Dr. Carl Berkowitz

10. (cont'd)

Job briefings should be conducted face-to-face. When not practical or impossible to do so, radio or telephone communication may be used.

The following office job briefing items must be discussed prior to any meeting at a rail facility:
(a) Location of emergency exits.
(b) Emergency evacuation procedures.
(c) Location of fire extinguishers.
(d) Location of fire alarm.
(e) Location of telephone.
(f) How to obtain emergency assistance (telephone number).
(g) Street address location for emergency responders.
(h) Knowledge of first aid or CPR.

For meetings normally scheduled on a daily basis, an office job briefing is required only at the first meeting of the month. When individuals attending subsequent meetings are unfamiliar with the location or are not NJ TRANSIT personnel, the office briefing must be conducted.

## GENERAL RULES

50. Employees must know the safety rule of the day. They are required to know the meaning, intent, and application of the rule.

51. Supervisors must make sure that employees know, and fully understand, the safety rule of the day.

52. Employees must be aware of their surroundings and are responsible for their own safety and the safety of their co-workers, customers and general public.

53. Employees must notify, and are under a continuing obligation to notify, the Medical Services Department of any existing physical condition not already on record with the department, which could impair their ability to perform their duties. This notification must be made immediately upon the employee receiving knowledge of the condition and is not limited to those conditions discovered during required medical examinations.

11

Copyright © 2017 by Dr. Carl Berkowitz

154. Employees must wear clothing sufficient to protect against wind chill. The chart below shows those conditions that require additional protection.

WIND CHILL INDEX

| WIND VELOCITY | TEMPERATURE IN FAHRENHEIT | | | | | | |
|---|---|---|---|---|---|---|---|
| 0 | 30 | 20 | 10 | 0 | -10 | -20 | -30 |
| 10 | 16 | 2 | -9 | -22 | -31 | -45 | -58 |
| 15 | 11 | -6 | -18 | -33 | -45 | -60 | -70 |
| 20 | 3 | -9 | -24 | -40 | -52 | -68 | -81 |
| 25 | 0 | -15 | -29 | -45 | -58 | -75 | -89 |
| 30 | -2 | -18 | -33 | -49 | -63 | -78 | -94 |
| 35 | -4 | -20 | -35 | -52 | -67 | -83 | -98 |
| 40 | -4 | -22 | -36 | -54 | -69 | -87 | -101 |

EXTREME DANGER

Exposed flesh can freeze within one minute when the Index is in the shaded area.

WALKING

200. Employees must be alert and watch where they are walking and not run. When walking they must:

(a) Use established paths or routes when going to or from an office, station or other work location.
(b) Avoid tripping or slipping hazards.
(c) Remove tripping or slipping hazards when possible. If unable to remove a tripping or slipping hazard they must report the hazard to their immediate supervisor.
(d) Take short steps when necessary to walk on slippery surfaces.
(e) Walk around excavations, holes or open pits, and not jump across them.
(f) Avoid walking through steam or smoke which obscures vision. When necessary to walk through steam or smoke, use short steps.
(g) Not carry long objects when walking through steam or smoke.
(h) When carrying long objects, be careful when turning or going around corners to prevent injuries to others.

23

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| Did you report any specific injuries that you sustained to anybody? | Just Fred Mattison, who was there. I told him I got punched in my shoulder and that it hurt. |
| And when did you first speak to Fred Mattison? | Probably 45 minutes after the assault. |
| Please read it into the record for me. | "Please explain in your own words, exactly what happened in connection with the above mentioned incident:"<br>"Passengers boarded Elizabeth Station in Car 7007, drunk, load and disorderly, sat sown as train moved west. Group of kids began fighting in train. Daniel Gilmartin and Jim Muzikowski up to the first car to make sure passengers were not involved… Upon doing so passengers struck crew members. I moved 2 kids and woman that was sitting downstairs in the car into cab with engineer to protect them. When going back out shorter punched me in the shoulder. After that younger male with khaki shorts and black tank top was opening emergency handle on fireman side and fell onto Track 2. He kept pushing Daniel and I" saying" he would not get off: the "live track. Tony Pascale, engineer protected crew on train. He came out" of "the cab to get Daniel and Jim out of the way. He got punched in the face by" a "girl with a purple tank top on."<br>Then there's a line drawn underneath, and I wrote:" Transit knew this Columbian Parade was going on – no police – no protection. Unsafe work environment." |
| So this something else, what was the point of the last sentence there? | Because the company knew about this and yet there was no protection for us. There was no one to keep us safe, when the company's number one priority is safety. |
| …at the time that you wrote this statement, did you know that Transit knew about the Colombian Day parade? | The buses were diverted. They were making announcements on the PA at Elizabeth Station. |
| And what do you mean by that? | That it was just nobody was there to just show a presence or nobody was at the platform to show their presence. Even on the platform, when you show a police presence, you have more order. It's just that people don't like to act foolish on front of police officers. |
| Prior to your train crew I believe calling | Not that day. We were told later on, I don't |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| for a 29, were you aware of any other reports to Transit of fights on trains that day? | remember who told us, that the train also had a 29 at Metuchen, which is on the corridor, in regards to the parade. |
| When you begin your shift at Transit or at some other time, is there any sort safety meeting, safety briefing, or are there any safety bulletins that you read prior to coming onto a shift? | There are bulletin orders. They tell you tracks out of service, speed restrictions, things of that nature. Safety bulletins, we have a job briefing with our engineer. If you're a conductor, you have a job briefing with your engineer first. |
| After you heard the other engineer, Mr. Zapille, and the other crew calling for assistance at Elizabeth station, approximately how many minutes did it take for your train to get to Elizabeth station after that? | 10 to 12 minutes. |
| When you got there, were there any New Jersey Transit police present/ | No. No one could be seen. |
| So during the 40 minutes of time, did any New Jersey Transit police or any public township police officer arrive at Linden station at the platform on your train? | No. |
| Did they provide you with extra personnel on your train to provide more security or backup on your train when you got to Elizabeth and then to Linden, Rahway, Woodbridge, and ultimately Port Authority? | No, no extra help. |
| Are there any signs of any of your New Jersey Transit trains warning passengers or advising them there's an undercover or uniform police presence on the trains? | No. |
| Are there any cameras on the trains, in the interior of the cars, to show the crowds whoever is monitoring them? | No. |
| Now, when you're in a situation when there's large crowds of people refusing to give you fares, spitting on you, rubbing up against you, pushing on you, what has Transit done to train you how to handle these situations? | They don't give you any guidance of what to do. The answer that I've gotten from management is try your best to walk away. |
| Prior to the day of this incident, had you yourself ever been pushed or shoved on trains? | Yes. |
| And have you complained about it to | Yes. |

Copyright © 2017 by Dr. Carl Berkowitz

| Question | Answer |
|---|---|
| management? | |
| And what have they done about it? | Nothing. |
| And who told you that? | I've heard it from different management. They said Transit's number one goal is on-time performance, because when you're late, you better have a good reason why you're late, because, if not, you're going to be filling out a lot of paperwork. They don't want to hear, I got pushed, I got shoved and I got spit on. That's not a reason to delay, in their eyes. I've been told in the past, they want on-time performance. |

## IX. Discussion and Evaluation

### A. Preventing Injuries

At the time of the injuries to Ms. Tramontano, Mr. Gilmarten, and Mr, Pascale, the Railroad was not been brought-up to currently accepted transportation industry standards and practices. Preventive measures to eliminate the hazard were quite simple; have a program in-place to operator dangerous conditions before they become a problem.

Table 6 outlines the key concerns for injury prevention.

**Table 6. Preventing Injuries**

| Item | Action | Description |
|---|---|---|
| 1 | Determine Root Causes | It involves the search for those factors that cause injuries (to seek from among the available data the nature of the causes that leads to these undesired consequences). |
| 2 | Identify Causation | Determine factors present where accidents occur. |
| 3 | Undertake Accident Investigation | • Collect hard facts in order to consider which elements, if removed, would prevent an accident.<br>• Ensure a thorough analysis and take the necessary steps to create a clearer picture of previous accidents (accident prevention measures could be derived from these investigations). |
| 4 | Conduct Safety Inspection Practices | • Ensure frequent inspections during active use conditions.<br>• Ensure that inspections are not interrupted until completed.<br>• Ensure that the inspector is sufficiently trained in knowing what to look for. |
| 5 | Review Operation | Had the system been operated effectively accident factors might have been identified and corrected before they take on significance. |
| 6 | Develop Written Procedures | • Ensure that adequate procedures are in place as inadequate procedures are a common cause of accidents.<br>• Remember that similar situations produce recurrent accident patterns. |

Copyright © 2017 by Dr. Carl Berkowitz

| Item | Action | Description |
|---|---|---|
| | | • Remain sensitive to safety operations and maintain capabilities to respond to changes in the systems' safety. |
| 7 | Track Accidents | Be concerned with recurring accidents and making an effort to articulate accidents and assess the likelihood that a new strategy is necessary to decrease the risk of trip-slip and fall accidents. |
| 8 | Review Safety Program | • Ensure that the safety process is well understood and does not require coordinated action.<br>• Safety issues should be corrected the first time because there are not a lot of opportunities to improvise when things go wrong. |

## B. Federal Occupational Safety and Health Act (OSHA) Administration

The Occupational Safety and Health Act require employers to comply with safety and health standards and regulations.

The Occupational Safety and Health Act of 1970[6] mandates that, in addition to compliance with hazard-specific standards, all employers have a general duty to provide their employees with a workplace free from recognized hazards likely to cause death or serious physical harm. OSHA relies on Section 5a-1 the "General Duty Clause"[7] for enforcement authority. Failure to implement these guidelines is not in itself a violation of the General Duty Clause; however, employers can be cited for violating this Clause if there is a recognized hazard of the workplace in their premises, and they do nothing to prevent or abate it. These standards address employee safety and security risks.[8] In addition to the General Duty Clause, employers are also responsible for appropriate training of employees and proper supervision of the workplace.

In most workplaces where risk factors can be identified, the risks of personal injury can be prevented or minimized when management takes appropriate precautions. One of the best protections' employers can offer their employees, and visitors would be to establish a zero-tolerance policy in the presence of hazards and risks of personal injuries. This policy should cover the employees, visitors and anyone else who may come in contact with the Railroad's facilities.

By assessing the worksite, the management could identify methods for reducing the likelihood of incidents occurring. OSHA believes that a well-written and implemented workplace accident prevention program, combined with administrative controls and training can reduce the incidence of workplace hazards.

Employees have a right to a safe workplace. The law requires employers to provide their employees with working conditions that are free of known dangers.

---

[6] Public Law 91-596, December 29, 1970; and as amended by P.L. 101-552, Section 3101, November 5, 1990
[7] "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."
[8] See: https://www.osha.gov/Publications/ OSHA3148/osha3148.html (Captured 9/6/2014)