**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

TRAMONTANO, *et al.*,

                    **Plaintiffs,**

            **v.**

NEW JERSEY TRANSIT RAIL
OPERATIONS, INC.,

                    **Defendant.**

Civil Action No.: 14-5706 (ES) (MAH)

OPINION

**SALAS, DISTRICT JUDGE**

Plaintiffs Danielle Tramontano and Daniel Gilmartin (together, "Plaintiffs") filed suit against Defendant, New Jersey Transit Rail Operations, Inc. ("Defendant" or "NJTRO") for alleged violations of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* (D.E. No. 1 ("Complaint" or "Compl.")).[1]  Before the Court are Defendant's (i) motion to exclude the opinions of Plaintiffs' liability experts Michael Coan and Carl Berkowitz, Ph.D. under Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (D.E. No. 130-2 ("Mov. Br.") at 39–44); and (ii) motion for summary judgment (D.E. No. 130; Mov. Br. at 28–38 & 45–52) on Plaintiffs' FELA claims.  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the reasons set forth below, Defendant's motion to exclude is **GRANTED-in-part** and **DENIED-in-part**; and Defendant's motion for summary judgment is **DENIED.**

---

[1]     This action was also initiated by Plaintiff Anthony Pascale.  (*See* Compl.).  Defendant submits that Pascale's claim against Defendant has since been resolved.  (D.E. No. 130-2 at 1–27 ("Def. SUMF") ¶ 2); D.E. No. 131 ("Pl. Resp. SUMF") ¶ 2).

## I.      BACKGROUND[2]

### A.      Factual Background

Unless otherwise noted, the following facts are not in dispute.  On July 21, 2013, Plaintiffs Tramontano and Gilmartin were working on New Jersey Transit Train Number 7273 ("Plaintiffs' train") as conductor and ticket collector, respectively.  (Def. SUMF ¶ 3 & Pl. Resp. SUMF ¶ 3).  That same day, the City of Elizabeth was hosting its annual Colombian Day Parade near the Elizabeth New Jersey Transit train station ("Elizabeth station").  (Def. SUMF ¶ 4 & Pl. Resp. SUMF ¶ 4).  Plaintiffs' train, which was traveling from New York to Long Branch, New Jersey, was required to make stops at Elizabeth, Woodbridge, and Perth Amboy.  (Def. SUMF ¶ 3 & Pl. Resp. SUMF ¶ 3).

At approximately 8:30 p.m., a train passed the Elizabeth station before Plaintiffs' train was scheduled to arrive.  (Def. SUMF ¶ 5 & Pl. Resp. SUMF ¶ 5).  After observing overcrowding on the Elizabeth station platform, Christopher Zappile,[3] an engineer on the first train, contacted NJTRO through the Amtrak dispatcher to request that NJTRO "get somebody there" because the amount of people was "getting out of hand."  (Def. SUMF ¶ 5 & Pl. Resp. SUMF ¶ 5).  Mr. Zappile testified as to his concerns as follows:

> Q: So what is it, when you went by Elizabeth Station before [Plaintiffs'] crew, that you observed?
>
> A: A lot of people on the platform, on the yellow line. And that was it.
>
> Q: What did you do about that?
>
> A: I called Amtrak CETC-9 and let him know that there were a lot

---

[2]      The Court gathers the following facts primarily from Defendant's statement of undisputed material facts and Plaintiffs' responses thereto.  (Def. SUMF; Pl. Resp. SUMF).

[3]      Plaintiff refers to this engineer as "Zappeli" (D.E. No. 132 ("Opp. Br.") at 5) while Defendant refers to him as "Zappile" (Reply at 7).  The Court refers to this engineer as Mr. Zappile, based on his deposition.  (D.E. No. 130-6, Ex. C ("Zappile Dep.") to D.E. No. 130-1 ("Stockdale Cert.")).

> of people and that the amount of people were getting out of hand
> and they needed to get somebody there.  My concern was somebody
> getting hurt, somebody getting hit.

(Zappile Dep. at 18:7–17).  The conductor on the first train, Scott Aitkens, also testified that the situation on the Elizabeth station platform was "alarming" because of the large number of individuals present on the platform.  (D.E. No. 132-10, Ex. 5 ("Aitkens Dep.") to Opp. Br. at 15:6–19).  He further testified that the state of the platform was "chaotic" because many of the individuals were visibly intoxicated and were yelling and shoving one another.  (*Id.* at 15:6–19, 31:11–16 & 35:24–36:2).  The parties dispute whether NJTRO responded to Mr. Zappile's request for assistance.  (Def. SUMF ¶ 7 & Pl. Resp. SUMF ¶ 7).  According to Defendant, who points to a New Jersey Transit Police Department ("NJTPD") computer aided dispatch ("CAD") blotter report, an Officer Giovannone was notified of the crowded conditions at the Elizabeth station and responded after the call was made by Mr. Zappile.  (Def. SUMF ¶ 7 (citing D.E. No. 130-8, Ex. E to Stockdale Cert.)).  According to Plaintiffs, no officer was dispatched to the Elizabeth station in response to Mr. Zappile's report.  (Opp. Br. at 39).  Plaintiffs point out that in his deposition, Officer Giovannone testified that he was never called to report to the Elizabeth station.  (D.E. No. 132-11, Ex. 6 ("Giovannone Dep.") to Opp. Br. at 62:9–20).

At about 8:43 p.m., Plaintiffs' train arrived at the Elizabeth station and took on passengers, after which it proceeded to Linden, Rahway, Woodbridge, and eventually Perth Amboy.  (Def. SUMF ¶¶ 8–9 & Pl. Resp. SUMF ¶¶ 8–9).  According to Plaintiffs, the passengers who boarded Plaintiffs' train in Elizabeth were out of control, drunk, and disorderly.  (Pl. Resp. SUMF ¶ 8).  After Plaintiffs' train departed from the Woodbridge station, a fight broke out between passengers in the first car.  (Def. SUMF ¶ 10 & Pl. Resp. SUMF ¶ 10).  At 9:09 p.m., NJTRO dispatch received a call from Plaintiffs' train requesting police assistance.  (Def. SUMF ¶ 11 & Pl. Resp. SUMF ¶

11).  The Perth Amboy Police Department was notified of the dispute and was dispatched to respond.  (Def. SUMF ¶ 12 & Pl. Resp. SUMF ¶ 12).  According to Defendant, Officer Giovannone was rerouted from Elizabeth to Perth Amboy to respond to Plaintiffs' request for assistance.  (Def. SUMF ¶ 13).  The passengers on the train assaulted and injured Plaintiffs during the altercation.  (Def. SUMF ¶¶ 15 & 18 & Pl. Resp. SUMF ¶¶ 15 & 18).  By approximately 9:30 p.m., Perth Amboy police officers apprehended seven suspects in connection with the assaults that took place on Plaintiffs' train.  (Def. SUMF ¶¶ 19–20 & Pl. Resp. SUMF ¶¶ 19–20).

NJTRO did not make arrangements to control potential overcrowding at the Elizabeth station on July 21, 2013.  (Def. SUMF ¶ 22 & Pl. Resp. SUMF ¶ 22).  According to Defendant, prior to July 2013, there were never any problems with maintaining control of the Colombian Day Parade crowds.  (Def. SUMF ¶ 37).  Also, according to Defendant, the NJTPD never received a request to station additional police personnel at the Elizabeth station to prepare for the Colombian Day Parade.  (*Id.* ¶ 29).  Moreover, Deputy Chief of Police for New Jersey Transit, Laura Hester, testified that such additional security was not in place because NJTRO never received any complaints about the Colombian Day Parade prior to July 21, 2013.  (Def. SUMF ¶¶ 30–31; D.E. No. 130-12, Ex. I ("Hester Dep.") to Stockdale Cert. at 36:14–19 & 38:8–23).  In contrast, Plaintiff Gilmartin testified that he consistently experienced problems with unruly, drunk, and disorderly crowds coming from the Colombian Day Parade for at least the past five years.  (D.E. No. 130-10, Ex. G ("Gilmartin Dep.") to Stockdale Cert. at 113:10–21).

### B.      Procedural History

On September 12, 2014, Plaintiffs filed the instant action against Defendant for alleged violations of FELA.  (Compl. ¶¶ 31–42).  Specifically, Plaintiffs claim that the physical assaults they sustained while performing their employment duties on July 21, 2013, were caused by

Defendant's negligence in violation of FELA.  (*Id.*).  After the parties completed discovery, Defendant filed the instant motion for summary judgment.  (D.E. No. 130).  Defendant also filed a motion to exclude the opinions of two of Plaintiffs' liability experts, (i) Michael Coan and (ii) Carl Berkowitz, Ph.D., under Rule 702 and *Daubert*, 509 U.S. 579.  (Mov. Br. at 39–44).[4]  The motions are fully briefed.  (Opp. Br.; D.E. No. 133 ("Reply"); D.E. No. 138 ("Surreply")).

## II.   LEGAL STANDARDS

### A.   *Daubert* Motion

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'"  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  However, this gatekeeping function is a "flexible" one, *Daubert*, 509 U.S. at 594, and "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility."  *Kannankeril*, 128 F.3d at 806.  "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: [i] qualifications, [ii] reliability, and [iii] fit."  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

*First*, "[t]he qualification prong of *Daubert* refers to the requirement that the witness possess specialized expertise."  *MD Retail Corp. v. Guard Ins. Grp.*, No. 14-6589, 2017 WL 1164499, at *5 (D.N.J. Mar. 28, 2017).  The Third Circuit has "interpreted Rule 702's qualification requirement liberally."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (first citing *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) and then citing *In re*

---

[4]     Defendant included a motion to exclude within its motion for summary judgment without a separate notice of motion.  (*See* Mov. Br. at 39–44).  Nonetheless, in the interest of efficiency, the Court construes the motion to exclude as a separate motion and considers it in the instant Opinion.

*Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).   A "broad range of knowledge, skills, and training qualify an expert as such." *Paoli*, 35 F.3d at 741.

*Second*, with respect to "reliability", the Third Circuit has found that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda*, 520 F.3d at 244 (citing *Kannankeril*, 128 F.3d at 806).   The district court enjoys "considerable discretion" to "determine the criteria for judging reliability under the particular circumstances." *Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002).   Generally, an expert's conclusion must rest upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Daubert*, 509 U.S. at 590).

Regarding the second prong, the Supreme Court in *Daubert* "noted factors relating to the reliability of an expert's scientific methodology, including whether the theory or technique 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether the known or potential error rate is acceptable, and whether it is generally accepted within a relevant scientific community." *Betterbox Communications Ltd.*, 300 F.3d at 329 (citing *Daubert*, 509 U.S. at 593–94).   However, in non-scientific cases, such as here, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).   In such cases, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.*   "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.   Accordingly,

a Court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *In re TMI Litigation*, 193 F.3d 613, 665–66 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (quoting *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).  Notably, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

*Third*, to satisfy the "fit" requirement, Rule 702 requires that an "expert's scientific, technical, or other specialized knowledge . . . help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  To be helpful, expert testimony must be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quotation marks and citation omitted).  Conversely, "expert evidence which does not relate to an issue in the case is not helpful." *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quotation marks and citation omitted).

Lastly, the court also "must ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).  "Although [Rule 704] permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Id.* (internal quotations omitted).

### B.    Summary Judgment

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the non-movant—a reasonable jury could

return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor.  *Id.*  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

At summary judgment, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *Id.* at 249.  The movant bears the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324.  To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

Because Defendant's motion to exclude Mr. Coan's and Dr. Berkowitz's testimony implicates the evidence that the Court can consider on summary judgment, the Court will first address Defendant's motion to exclude pursuant to *Daubert*.[5]

### A.   *Daubert* Motion

As a threshold issue, the Court will first address whether Defendant's motion to exclude the testimony of Mr. Coan and Dr. Berkowitz necessitates an evidentiary hearing.  The Third Circuit has "reiterated the importance of [holding] an *in limine* hearing in ruling upon *Daubert* challenges" even where, as here, there is no request by either of the parties for such a hearing.

---

[5]     The Court takes the facts related to Defendant's *Daubert* motion from Defendant's statement of undisputed material facts and Plaintiffs' responses thereto, as well as Mr. Coan's and Dr. Berkowitz's expert reports and depositions.  (Def. SUMF ¶¶ 41–96; Pl. Resp. SUMF ¶¶ 41–96; D.E. No. 130-16, Ex. M ("Coan Report") to Stockdale Cert.; D.E. No. 130-17, Ex. N ("Coan Dep.") to Stockdale Cert.; D.E. No. 130-18, Ex. O ("Berkowitz Report") to Stockdale Cert.; D.E. No. 130-19, Ex. P ("Berkowitz Dep.") to Stockdale Cert.).

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 152 (3d Cir. 2000) ("[T]he district court has an

'independent responsibility for the proper management of complex litigation[.]'").  Nevertheless,

the Third Circuit has also held that a trial court need not conduct an evidentiary hearing on a

*Daubert* challenge if the record is sufficient to allow the Court to decide on the issues in dispute.

*See, e.g.*, *id.* at 151–55.

Here, Mr. Coan's and Dr. Berkowitz's reports were both provided to this Court, as were

their depositions regarding those reports.  (*See, e.g.*, Coan Report; Coan Dep.; Berkowitz Report;

Berkowitz Dep.).  The parties have also fully briefed the issues relating to Mr. Coan's and Dr.

Berkowitz's reports.  As such, the Court finds that the record before it is sufficient to allow for a

decision on the admissibility of Mr. Coan's and Dr. Berkowitz's testimony under *Daubert* without

an evidentiary hearing.  *See, e.g., Antonio v. Progressive Ins. Co.*, 795 F. App'x 128, 131 (3d Cir.

2020) (finding that the district court acted within its sound discretion in ruling on the admissibility

of expert testimony without holding a *Daubert* hearing where the court had before it the expert

report and the parties' submissions on its admissibility); *Furlan v. Schindler Elevator Corp.*, 516

F. App'x 201, 205–06 (3d Cir. 2013) (same).

### i.     Opinions of Michael Coan

The Court will now address Defendant's motion to exclude Mr. Coan's opinions pursuant

to *Daubert.*  Defendant moves to exclude the report and testimony of Plaintiffs' liability expert

Michael Coan.  In his report, Mr. Coan describes various ways in which NJTRO failed to act in

accordance with accepted police standards on July 21, 2013.  (Coan Report).  Defendant argues

that Mr. Coan's report and testimony are inadmissible because they (i) are not based upon

sufficient facts or data and (ii) utilize an unreliable and unscientific methodology.  (Mov. Br. at

39–44; Reply at 12).  Specifically, Defendant contends that Mr. Coan has failed to rely on any

statistics in forming his opinions, has failed to cite to any published standards in policing or railroad security applicable to the facts of this case, has failed to rely on sufficient facts in reaching his conclusions, and improperly drew legal conclusions. (Mov. Br. at 43–44). Plaintiffs oppose and argue that the report and testimony of Mr. Coan are reliable as they are based on his personal knowledge and experience. (Opp. Br. at 27–31). For the reasons set forth below, Defendant's request to exclude Mr. Coan's report and testimony is **GRANTED-in-part** and **DENIED-in-part**.

Before turning to the remainder of Defendant's arguments, the Court will briefly assess Mr. Coan's qualifications, which Defendant appears to contest. (Reply at 12). According to his expert report, Michael Coan is a law enforcement professional with thirty-five years of experience. (Coan Report at 2). He has held senior executive positions at the New York City Police Department and has worked as head of the police department at the New York State Metropolitan Transportation Authority ("MTA"). (*Id.*). During his time with the MTA, Mr. Coan implemented crime prevention strategies and security oversight for large scale events such as New Year's Eve at Times Square, as well as in transportation hubs such as Grand Central Terminal and New York Penn Station. (*Id.*). Mr. Coan asserts that his law enforcement career gives him extensive personal knowledge of police practices specific to the rail and public transportation industries. (*Id.* at 3). Further, during his deposition Mr. Coan stated that he was qualified in assessing rail operations from the "safety and security end." (Coan Dep. at 77:9–18). Based on the foregoing, the Court finds that Mr. Coan's experience and training indicate that he has specialized knowledge of police practices specific to the rail and public transportation industries. Defendant appears to suggest that Mr. Coan is not qualified because he has never testified as a security expert. (Def. SUMF ¶¶ 43–44). However, the fact that this is Mr. Coan's "first time testifying as an expert does not undermine [his] qualifications" which here, are based on years of working with public

transportation security.  *See United States v. Lee*, 339 F. App'x 153, 159 (3d Cir. 2009). Accordingly, the Court finds that Mr. Coan is sufficiently qualified under Rule 702.  *See, e.g., Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir. 1998) (foreman's years of experience with railroad track equipment, maintenance, and safety qualified him to testify as an expert on Amtrak's duty to maintain railroad track); *Lain v. BNSF Ry. Co.*, No. 13-2201, 2014 WL 6388419, at *2 n.1 (D. Kan. Nov. 14, 2014).

The Court will now turn to the remainder of Defendant's arguments regarding its motion to exclude Mr. Coan's opinions.  After examining the actions and procedures of NJTRO in the present case, Mr. Coan provided the following opinions in his report: that NJTRO acted contrary to accepted police standards and procedures by failing to (i) train its employees on how to protect themselves and respond with self-defense when threatened by a passenger; (ii) provide its employees with self-defense devices such as pepper spray or electric-shock weapons; (iii) adhere to the New Jersey Transit Rail Safety Policy as set forth in the New Jersey Transit Manual; (iv) plan for or provide adequate security at the Elizabeth station based on the size and scope of the Colombian Day Parade;[6] (v) respond to the initial call for assistance by Mr. Zappile at the Elizabeth station;[7] and (vi) inform its employees of potentially large crowds on the day of the Colombian

---

[6]     Mr. Coan identifies 10 principal ways that NJTRO failed to act in accordance with accepted police standards and procedures in his report.  (Def SUMF ¶ 42 (citing Coan Report at 5–6)).  For ease of reference, the Court combines the following four opinions here, including that (i) NJTRO created a dangerous situation when it failed to provide police services to meet the demands of the Colombian Day Parade; (ii) acted contrary to accepted police standards when it failed to ensure that the Elizabeth station would have any police presence on July 21, 2013; (iii) acted contrary to accepted police standards when it failed to plan or provide adequate security for an event the size of the Colombian Day Parade; and (iv) acted contrary to accepted police standards when it failed to assess the impact of the Colombian Day Parade on police resources and coordinate with local law enforcement to adequately police the event.  (*Id.*).

[7]     For ease of reference, the Court combines the following of Mr. Coan's opinions set forth in his report (Coan Report at 5–6) here, including that NJTRO acted contrary to accepted police standards and procedures when it (i) failed to respond to the initial call at Elizabeth station of a large and unruly crowd; and (ii) failed to provide adequate security or response to Plaintiffs' train or any station between Elizabeth and Perth Amboy.  (*Id.*).

Day Parade.[8]  (Def SUMF ¶ 42 (citing Coan Report at 5–6); *see also* Opp. Br. at 11–12).  Mr. Coan also provided testimony with regards to the conclusions he reached in his report during his deposition.  (*See* Coan Dep.).  For the reasons set forth below, the Court finds that Mr. Coan's report and testimony regarding the first three of the above-mentioned categories are inadmissible. The Court finds the remainder of Mr. Coan's challenged testimony admissible.

   *Inadmissible Testimony*.  The Court finds that Mr. Coan's testimony regarding the following topics is inadmissible: NJTRO's failure to (i) train its employees on how to protect themselves and respond with self-defense when threatened by a passenger; (ii) provide its employees with self-defense devices such as pepper spray or electric-shock weapons; and (iii) adhere to the New Jersey Transit Rail Safety Policy as set forth in the New Jersey Transit Manual.

   *First*, the Court finds that Mr. Coan's report and testimony regarding NJTRO's failure to (i) train its employees on how to protect themselves and respond with self-defense when threatened by a passenger; and (ii) provide its employees with self-defense devices such as pepper spray or electric-shock weapons are not reliable.  Plaintiffs argue that the report and testimony of Mr. Coan are reliable based on his personal knowledge and experience.  (Opp. Br. at 25–31).  Defendant contends that Mr. Coan's opinions regarding self-defense should be excluded because no transit authorities arm their employees or give their employees self-defense training.  (Reply at 11).  As such, Defendant contends that Mr. Coan cannot demonstrate that NJTRO deviated from any relevant standard of care.  (*Id.*).  The Court agrees with Defendant.  During Mr. Coan's deposition he testified that based on his experience with the MTA, employees are not typically trained in physical self-defense or equipped with self-defense devices.  (Coan Dep. at 78:13–20 & 80:4–7).

---

[8]     In his report, Mr. Coan assesses NJTRO's failure to inform its employees of potentially large crowds on the day of the Colombian Day Parade together with NJTRO's failure to warn its employees on how to protect themselves. (Coan Report at 6).  The court finds it more appropriate to assess Mr. Coan's opinion on NJTRO's failure to train its employees on how to protect themselves together with his opinion on self-defense.

And Mr. Coan was not aware of any rule that requires transit authorities to train their employees in self-defense or equip them with self-defense devices.  (*Id.* at 78:21–25 & 80:8–12).  Mr. Coan stated that he reached these conclusions because if NJTRO was not going to provide security, its employees would be left to their own vices.  (*Id.* at 79:5–12).  The Court cannot say that Mr. Coan adequately explained how his experience led to these conclusions or how his experience was reliably applied to the facts.  *See* Fed. R. Evid. Advisory Committee Notes to 2000 Amendments.  Rather, Mr. Coan's testimony on these topics appears to be based on his "'subjective belief or unsupported speculation'" and is thus unreliable.  *See Calhoun*, 350 F.3d at 321.

*Second*, the Court finds that Mr. Coan's testimony regarding NJTRO's failure to adhere to the New Jersey Transit Rail Safety Policy does not satisfy the fit requirement.  New Jersey Transit's Rail Safety Policy, which appears to have been submitted in connection with Dr. Berkowitz's report, provides that NJ Transit will strive to "identify and eliminate foreseeable hazards that can result in accidents and injuries."  (Berkowitz Report at 87).  This policy is too vague to assist a jury.  While it provides a generalized policy for NJTRO to follow in its day-to-day operations, it does not provide any relevant, specific guidance that would assist a factfinder in determining whether NJTRO was negligent under the specific circumstances of this case in failing to provide Plaintiffs' train with adequate security on the day of the Colombian Day Parade or respond to Mr. Zappile's request for assistance.  And during his deposition, Mr. Coan could not provide any explanation to support the basis of this opinion or cite to any experience he has with the New Jersey Transit Rail Safety Policy.  (Coan Dep. at 77:24–78:8).  As such, to the extent Mr. Coan's testimony relies on this portion of the New Jersey Transit Rail Safety Policy, it is not "sufficiently tied to the facts of th[is] case [such] that it will aid the jury in resolving a factual dispute."  *Schiff*, 602 F.3d at 173 (internal quotations omitted).  Accordingly, it must be excluded.

*See Jason v. Nat'l R.R. Passenger Corp.*, No. 17-7873, 2022 WL 16362456, at \*3 (D.N.J. Oct. 28, 2022) (finding expert's reliance on standard that provided a generalized framework and no specific guidance that would assist a factfinder was inadmissible); *Rodriguez v. Brit. Airways PLC*, No. 17-3691, 2017 WL 6372733, at \*3–4 (E.D.N.Y. Dec. 12, 2017).

  ***Admissible Testimony.*** The Court finds that Mr. Coan's testimony regarding the following topics is admissible based on his relevant personal experience and review of the record: NJTRO's failure to (i) plan or provide adequate security at the Elizabeth station based on the size and scope of the Colombian Day Parade; (ii) respond to the initial call for assistance by Mr. Zappile at the Elizabeth station; and (iii) inform its employees of potentially large crowds on July 21, 2013.

  *First*, after drawing on his professional experience in railway security and reviewing the deposition testimony of Mr. Zappile (Coan Dep. at 17:19–18:2), including that "the amount of people" on the Elizabeth station platform was "getting out of hand" (Zappile Dep. at 18:7–17), Mr. Coan testified that NJTRO should have "assess[ed] the situation and contact[ed] rail traffic control" because overcrowding is a major concern in transportation. (Coan Dep. at 22:20–23:22). *Second*, Mr. Coan stated that because the Colombian Day Parade attracted large crowds, NJTRO should have planned to have adequate security in advance of the event. Mr. Coan testified that based on his experience, a transit operations or planning unit typically makes security plans for such large events based on prior year's events. (*Id.* at 33:23–34:11). He also stated that based on his experience, NJTRO could review ridership data from prior years and coordinate with police departments to ensure there is adequate personnel in place around large scale events. (*Id.* at 28:24–29:16). Likewise, he testified that NJTRO has an intelligence unit that conducts threat assessments around large events to adequately staff risky areas and prevent acts of terrorism. (*Id.* at 28:24–29:16 & 37:22–39:15). Further, Mr. Coan testified that based on his experience as the chief of the

14

MTA police, security teams would work with different departments to ensure that there were security resources in place around large events.  (*Id.* at 35:11–20).  Accordingly, Mr. Coan concluded that NJTRO failed to act in accordance with typical police practices in the present case because there was no indication that NJTRO had made such assessments in advance of the 2013 Colombian Day Parade or assigned any security resources to protect Plaintiffs' train.  (Coan Report at 6–7).  *Third*, when testifying about NJTRO's failure to inform its employees of potentially large crowds on the day of the Colombian Day Parade, Mr. Coan drew on his experience and testified that typically, after assessing ridership around a large event, transit authorities "would pre-plan for the event[]" and notify the train to have additional crew available.  (Coan Dep. at 75:8–17).

The Court finds that Mr. Coan's opinions on these topics are reliable.  Mr. Coan reviewed numerous materials when formulating his report, including Plaintiffs' Complaint, Defendant's answer, NJTPD and New Jersey Transit's investigation reports, reports regarding Plaintiffs' injuries, NJTPD's CAD blotter, and various deposition transcripts.  (Coan Report at 3–4).  Mr. Coan also drew upon his specialized knowledge and decades of experience with police practices specific to the rail and public transportation industries.  (*Id.* at 3).  After reviewing the relevant evidence and applying his specialized knowledge and experience, Mr. Coan concluded that NJTRO acted contrary to accepted police standards and procedures.  Accordingly, his opinions on the above-mentioned topics are sufficiently reliable to form the basis of an admissible expert opinion.  *See, e.g.*, *Stokes v. Janosko*, No. 16-0064, 2018 WL 3361456, at *4 (W.D. Pa. July 10, 2018) (finding expert's opinion reliable where he reviewed relevant materials and relied on decades of experience as a law enforcement officer to assess the facts of the case); *Carlson v. BNSF Ry. Co.*, No. 19-1232, 2022 WL 37468, at *10 (D. Minn. Jan. 4, 2022) (finding expert's opinion reliable in FELA case where expert "reviewed the relevant evidence, applied his

specialized knowledge and experience, and reached conclusions about whether [defendant] adequately inspected and maintained railroad track conditions so as to provide safe train operation[.]"); *Hananburgh v. Metro-N. Commuter R.R.*, No. 13- 2799, 2015 WL 1267145, at *6 (S.D.N.Y. Mar. 18, 2015) (same).

Further, to the extent that Defendant contests fit, the Court finds that Mr. Coan's opinions on these topics satisfy the fit requirement. Here, the parties contest whether NJTRO satisfied its duty of care under FELA to provide its employees with a reasonably safe work environment under the circumstances, among other things. After evaluating the testimony of Mr. Zappile, who stated that the amount of people at the Elizabeth station was "getting out of hand" and expressed concerns over someone getting hurt or hit (Coan Dep. at 17:19–18:2), Mr. Coan concluded that NJTRO should have "assess[ed] the situation and contact[ed] rail traffic control." (*Id.* at 22:20–23:22). Further, after relying on his personal experience, testimony that the crowds in Elizabeth were large, and evidence of the security staffing arrangements on the day in question (*Id.* at 17:19–18:2, 27:4– 13 & 61:10–14), Mr. Coan concluded that NJTRO should have planned to have adequate security in advance of the Colombian Day Parade. Accordingly, Mr. Coan's opinions fit the issues in this case and will assist the jury in understanding whether NJTRO satisfied its duty to provide its employees with a reasonably safe work environment. *See Schiff*, 602 F.3d at 173.

Defendant's arguments to the contrary are unavailing. To start, as to Mr. Coan's opinion that NJTRO failed to plan or provide adequate security at the Elizabeth station considering the size and scope of the Colombian Day Parade, Defendant argues that Mr. Coan's report is unreliable because he did not rely on any crime statistics from prior Colombian Day Parades. (Mov. Br. at 43). However, the fact that Mr. Coan does not cite to crime statistics does not render his opinion unreliable for *Daubert* purposes. The availability of corroborative data, or lack thereof, "is a matter

of weight and not admissibility; otherwise stated, it is a proper subject for cross-examination of [an expert], but not a bar to the admissibility of his testimony." *United States v. Vaghari*, 735 F. Supp. 2d 197, 204 (E.D. Pa. 2010).

In addition, Defendant argues that Mr. Coan's conclusion that NJTRO should have provided more security at the Elizabeth station is not supported by sufficient facts because Mr. Coan did not know the size of the parade or how many officers were dispatched to the parade. (Mov. Br. at 50–51). However, in reaching his conclusion, Mr. Coan relied on testimony that the crowds in Elizabeth were large as well as the lack of security staffing arrangements made by NJTRO on the day in question. (Coan Dep. at 17:19–18:2, 27:4–13 & 61:10–14).[9] Defendant also argues that Mr. Coan fails to establish that increased security could have prevented the alleged assaults. (Mov. Br. at 51). While Mr. Coan acknowledged that there was no guaranty that pre-planning may have prevented the assaults, he also testified that based on his experience, police presence serves as a deterrent to violence. (Coan Dep. at 64:3–10 & 86:12–21). Accordingly, Mr. Coan's opinions on these matters are supported by sufficient facts and his personal experience to be admissible—Defendant is free to challenge them on these bases during cross-examination.[10]

---

[9]     In reply, Defendant points out that Mr. Coan knew that the Colombian Day Parade attracted over 200,000 people as a result of a Google search, which it asserts is inadmissible hearsay. (Reply at 5–6). However, Mr. Coan also relied on the testimony of Mr. Zappile who indicated that the platform at Elizabeth was crowded in connection with the parade. (Coan Dep. at 17:19–18:2). Likewise, Mr. Coan reviewed the deposition testimony of Plaintiff Tramontano (*Id.* at 108:14–17), who testified that the Elizabeth station was the most crowded she had ever seen it and that NJTRO was diverting buses because of the parade. (D.E. No. 130-9, Ex. F ("Tramontano Dep.") to Stockdale Cert. at 34:15–18 & 61:8–19). Because Mr. Coan's conclusion that there were crowds at the Colombian Day Parade is supported by other evidence of record, the Court will not address the admissibility of Mr. Coan's testimony as to the Google search at this time.

[10]     In its statement of material facts, Defendant cites to a portion of Mr. Coan's deposition where he testified that primary responsibility for Plaintiffs' injuries lies with the actual assailants and agreed that if the assailants did not board Plaintiffs' train at Elizabeth, then increased security at the Elizabeth station would not have had an effect in preventing Plaintiffs' injuries. (Def. SUMF ¶¶ 49–50). However, as Plaintiffs point out, Mr. Coan reviewed the deposition testimony of Plaintiff Tramontano (Coan Dep. at 108:14–17), who stated that a fight broke out after passengers boarded at the Elizabeth station, suggesting that the assailants did board at Elizabeth. (Tramontano Dep. at 57:25–58:20). Regardless, to the extent that Defendant contests Mr. Coan's assessment that increased security at the Elizabeth station could have prevented Plaintiffs' injuries, this is a proper topic for cross-examination.

Next, as to Mr. Coan's opinion that NJTRO failed to respond to the initial call for assistance by Mr. Zappile at the Elizabeth station, Defendant contends that Mr. Coan's conclusions rest on a factually incorrect premise that NJTRO had prior notice of unruly passengers at the Elizabeth Station linked to the Colombian Day Parade.  (Mov. Br. at 29 & 38).  Defendant contends that there is no evidence in the record indicating that passengers boarding Plaintiffs' train were unruly or that there was any nexus between the crowded conditions on the Elizabeth station platform and a potential for violence.  (Reply at 12–13).  However, in reaching his conclusions, Mr. Coan relied on the testimony of Mr. Zappile, who stated that he sent a dispatch regarding the conditions at the Elizabeth station because the amount of people was "getting out of hand" and he was concerned over someone getting hurt or hit.  (Coan Dep. at 17:19–18:2 & 21:15–25).  Though Mr. Zappile never explicitly classified the crowd as "unruly," Mr. Coan, relying on his experience, interpreted Mr. Zappile's testimony as describing such a crowd.  And there is other support in the record that Mr. Coan reviewed for his interpretation.  For example, Mr. Coan appears to have reviewed the depositions of Plaintiffs in this case (*Id.* at 9:21–25 & 108:14–17), including Plaintiff Tramontano, who stated that the passengers at Elizabeth were "drunk, loud [and] disorderly," (Tramontano Dep. at 57:25–58:5) and Plaintiff Gilmartin, who stated that there was "disorder" when Plaintiffs' train picked up passengers at the Elizabeth station and  stated that he consistently experienced problems with unruly, drunk, and disorderly crowds coming from the Colombian Day Parade for at least the past five years.  (Gilmartin Dep. at 49:16–22 & 113:10-21).  To cast doubt on Mr. Coan's testimony, Defendant cites to the portion of his deposition where Mr. Coan acknowledged that one of Mr. Zappile's concerns was with overcrowding and stated that there is no way to predict when a crowd will erupt into violence.  (Def. SUMF ¶ 53; Coan Dep. at 21:15–22:4).  However, to the extent that Defendant disputes Mr. Coan's interpretation, the Court finds that that is a proper topic

for cross-examination, but not a bar to the admissibility of his testimony.  Further, even if, as Defendant argues, Mr. Zappile was concerned only with overcrowding and not violence, Mr. Coan still concluded that NJTRO should have at least "assess[ed] the situation and contact[ed] rail traffic control" because overcrowding is a concern in public transportation.  (Coan Dep. at 22:20–23:22).  In sum, the Court cannot say that Mr. Coan's conclusions rested on a factually incorrect premise.  *See Andrews v. BNSF Ry. Co.*, No. 16-0424, 2018 WL 4701871, at *9 (S.D. Iowa Feb. 7, 2018).[11]

Defendant further argues that Mr. Coan's opinion is unreliable because he does not cite to any published standards in policing or railroad transportation.  (Mov. Br. at 29 & 43; *see also* Def. SUMF ¶¶ 60 & 63).  However, Mr. Coan relies on his personal experience in providing security specific to the railroad and public transportation industries when reaching his conclusions that NJTRO should have provided adequate security in advance of the Colombian Day Parade and explains "how that experience le[d] to the conclusion reached."  *See* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.  This is sufficient for his testimony to be admissible.  *See Hausknecht v. John Hancock Life Ins. Co. of New York*, No. 17-3911, 2022 WL 1664362, at *8 (E.D. Pa. May 25, 2022); *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004).

Finally, Defendant seeks to preclude Mr. Coan's opinions to the extent that his report deals with legal conclusions, such as whether Defendant violated FELA.  (Mov. Br. at 43–44).  As an initial matter, Defendant argues that Mr. Coan's report improperly deals with an ultimate issue and invades the purview of the fact finder.  (*Id.* at 44).  However, "Rule 704 expressly states that '[a]n opinion is not objectionable just because it embraces an ultimate issue.'  The correct question in

---

[11]    Though Mr. Coan testified that NJTRO would have acted in accordance with police practices and procedures if it dispatched an officer to Elizabeth (Coan Dep. at 23:23–24:2), there is conflicting evidence in the record regarding whether such an officer was dispatched.  (Def. SUMF ¶ 7 & Pl. Resp. SUMF ¶ 7).  Accordingly, the Court does not find that Mr. Coan's testimony regarding NJTRO's failure respond to Mr. Zappile's dispatch at the Elizabeth station is unreliable on this basis.

this context is whether, and to what extent, [the expert's] opinion attempts to introduce improper legal testimony." *United States ex rel. Penelow v. Janssen Prod., LP*, No. 12-7758, 2022 WL 94535, at *5 (D.N.J. Jan. 10, 2022). Here, the Court finds that Mr. Coan has not attempted to introduce improper legal testimony. Rather, based on his personal knowledge and experience, Mr. Coan concludes that NJTRO acted contrary to accepted police standards and procedures on the day of the Colombian Day Parade. (Coan Report at 8). This he is allowed to do. Accordingly, Mr. Coan's opinions on the following can form the basis of an admissible expert opinion: NJTRO's failure to (i) plan or provide adequate security at the Elizabeth station based on the size and scope of the Colombian Day Parade; (ii) respond to the initial call for assistance by Mr. Zappile at the Elizabeth station; and (iii) inform its employees of potentially large crowds on July 21, 2013.

*Deposition Misconduct.* Defendant also requests to bar Mr. Coan's opinions as a sanction for Plaintiffs' counsel's alleged misconduct during Mr. Coan's deposition. (*See* Mov. Br. at 45–48). For the reasons set forth below, the Court declines to do so.

On August 11, 2020, Defendant took the deposition of Mr. Coan via video conference. (Def. SUMF ¶ 97 & Pl. Resp. SUMF ¶ 97). During a break that took place during the deposition, Plaintiffs' counsel, Lawrence Katz, Esq.[12] conferred with Mr. Coan. (Def. SUMF ¶ 99 & Pl. Resp. SUMF ¶ 99). Because Mr. Katz did not turn off the video conference link, Defendant overheard the conversation. (Def. SUMF ¶ 99 & Pl. Resp. SUMF ¶ 99). According to Defendant, Mr. Katz "proceeded to coach Mr. Coan on how to deal with Defense counsel's questions, including how to skirt around hypothetical questions and what questions would be brought up by Mr. Katz" on cross-examination. (Def. SUMF ¶ 99). Plaintiffs dispute this account. Plaintiffs assert that Mr. Katz did not "coach" Mr. Coan and did not advise Mr. Coan as to how to answer specific

---

[12] The Court notes that Mr. Katz has since withdrawn his appearance on behalf of Plaintiffs. (D.E. No. 141).

questions—rather, according to Plaintiffs, the two were merely discussing their respective surprise at the questions that had been asked by counsel for Defendant during the deposition.  (Pl. Resp. SUMF ¶ 99).  Further, Plaintiffs state that Mr. Katz did not inform Mr. Coan of the actual questions he would elicit on cross-examination or how they should be answered, but only stated that he may address defense counsel's use of the word "possibility" in certain hypothetical questions.  (*Id.*).  Following the exchange, Defendant contacted the Honorable Michael Hammer, U.S.M.J. for guidance on how to proceed.  (Def. SUMF ¶ 101).  In response to questioning by Judge Hammer, Mr. Katz testified as follows:

> Your Honor, first of all, let me apologize.  I honestly didn't think I was doing anything improper, otherwise, I would have turned the mic off.  We were talking about some of the questions that were occurring, the fact that I made numerous objections to these questions, Mr. Stockdale was just asking about remote possibilities and the fact that, you known, the possibility is not an issue in the case based on the evidence, he's talking about things that weren't in evidence.
>
> We were talking about basically well, how to address that issue because no matter how often I objected, these ridiculous questions were still asked and, sure enough, I did remind him about something I was going to bring up during cross-examination, nothing different than I had spoken to him about beforehand where I would give him subjects we were discussing.  I do apologize if that was inappropriate.

(Coan Dep. at 56:16–57:10).  In response, Judge Hammer stated the following:

> If it turns out that the witness's responses were tainted in some way because of conversation that counsel inappropriately had with the witness while the witness was still under oath and giving a deposition, that's one thing.  If, on the other hand, it was that the discussion was so obvious or inconsequential, then it may be the case that while it is certainly not an appropriate discussion to be had, it's nonetheless innocuous and not prejudicial.

(*Id.* at 58:2–11).  Judge Hammer stated that the best way to proceed would be for the parties to complete the deposition, after which the Court could make a more informed assessment as to

whether there was an issue. (*Id.* at 58:12–17). Defendant requests that the Court disregard Mr. Coan's opinions because Plaintiffs' counsel's conduct was highly prejudicial. (Mov. Br. at 47–48; Reply at 14). Defendant further asserts that no amount of sanctions and fees could cure this prejudice because the witness was coached on how to deal with the questions posed during his deposition. (Mov. Br. at 47). Plaintiffs oppose and argue that Defendant has suffered no prejudice based on Mr. Katz's conduct because the record makes clear that the conversation between Plaintiffs' counsel and Mr. Coan did not impact Mr. Coan's testimony. (Opp. Br. at 36–38). For the reasons set forth below, the Court agrees with Plaintiffs.

Pursuant to Rule 30(c), examination at a deposition is to proceed as it does at trial. Fed. R. Civ. P. 30(c)(1). In fact, "[d]uring a civil trial, a witness and his . . . lawyer are not permitted to confer at their pleasure during the witness's testimony . . . The same is true at a deposition." *Hall v. Clifton Precision*, 150 F.R.D. 525, 528 (E.D. Pa. 1993). Moreover, counsel and the deponent are prohibited from engaging in private, off-the-record conferences during any breaks in a deposition, except for the purpose of deciding whether to assert a privilege, because they interfere with the deposing attorney's pursuit of the truth. *Id.* at 528–29. Here it is undisputed that counsel for Plaintiffs—Mr. Katz—and Plaintiffs' expert—Mr. Coan—engaged in an off-the record conference during a deposition break. (Def. SUMF ¶ 99 & Pl. Resp. SUMF ¶ 99). And there is no indication that this conference was conducted for the purpose of deciding whether to assert a privilege. As such, the Court finds that Plaintiffs' counsel's conduct violated Rule 30(c).

The Court must determine whether sanctions under Federal Rule of Civil Procedure 30(d)(2) are warranted. Rule 30(d)(2), provides that "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorneys' fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P.

30(d)(2).  "The decision to impose sanctions for discovery violations and any determination as to what sanctions are appropriate are matters generally entrusted to the discretion of the district court."  *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007).  A court "may decide that the circumstances warrant imposition of only part of the adversary's expenses or perhaps only a reprimand.'"  *Doering v. Union Cty. Bd. of Chosen Freeholders*, 857 F.2d 191, 195 (3d Cir. 1988) (quoting *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 158 (3d Cir. 1986)).

To impose sanctions on Plaintiffs and their counsel's conduct, this Court must find that Mr. Katz's conduct impeded, delayed, or frustrated the fair examination of Mr. Coan.  Fed. R. Civ. P. 30(d)(2).  Here, though Mr. Katz's conduct was inappropriate, the Court cannot say that it frustrated the fair examination of Mr. Coan.  To start, when speaking with Judge Hammer, Mr. Katz testified that he would not explore the areas he had planned to go into on cross-examination to cure any potential prejudice that resulted from his off-the-record discussion with Mr. Coan.  (Coan Dep at 58:18-25).  Further, Mr. Coan testified during his deposition that he did not change any of his testimony or opinions as a result of his conversation with Mr. Katz during the break.  (*Id.* at 96:16–20).  And Defendant does not argue that Mr. Coan's testimony after the break was suddenly inconsistent with his prior testimony.  While Defendant argues that there is no way of knowing whether Mr. Coan altered his testimony in reliance on Mr. Katz's statements (Reply at 14), the Court will take Mr. Coan's testimony, given under oath, at its word, particularly in the absence of other evidence indicating that Mr. Coan was suddenly inconsistent with his prior testimony.[13]  Accordingly, the Court finds that the off-the record-conference between Mr. Katz and Mr. Coan did not frustrate the purpose of the deposition.  *See, e.g., Gay v. City of Rockford*,

---

[13]     Defendant argues that Mr. Katz presumably continued to coach Mr. Coan even after Mr. Katz disconnected from Zoom based on Mr. Katz's testimony that he would have taken himself off of zoom if he knew his conference with Mr. Coan was inappropriate.  (Mov. Br. at 47 (citing Coan Dep. at 57:9–12)).  The Court declines to make such an inference in the absence of evidence which indicates that Mr. Katz continued to confer with Mr. Coan.

No. 20-50385, 2021 WL 5865716, at *4–5 (N.D. Ill. Dec. 10, 2021) (declining to award sanctions pursuant to Rule 30(d)(2) where private conference did not appear to change the deponent's testimony or interfere with Plaintiff's counsel's ability to obtain substantive testimony).  Further, the alleged discovery misconduct solely concerns Plaintiffs' counsel, Mr. Katz—not Plaintiffs. Here, Defendant requests that the Court bar Mr. Coan's testimony based on Mr. Katz's conduct. Such a sanction, however, punishes Plaintiffs for Plaintiffs' counsel's actions and would thus be inappropriate.  *Republic of the Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 74 (3d Cir. 1994) ("If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney.").[14]  Accordingly, the Court declines to disregard Mr. Coan's opinions based on Mr. Katz's conduct during Mr. Coan's deposition.  The Court reminds counsel of their obligation to comply with Rule 30(c) in the future.

### ii.        Opinions of Carl Berkowitz, Ph.D.

Defendant also moves to exclude the opinion of Plaintiffs' liability expert Carl Berkowitz, Ph.D.  Defendant argues that Dr. Berkowitz's report and testimony are inadmissible because they (i) are not based upon sufficient facts or data and (ii) utilize an unreliable methodology.  (Mov. Br. at 39–44; Reply at 12).  Specifically, Defendant contends that Dr. Berkowitz has failed to rely on any statistics in forming his opinions, failed to cite to any published standards in policing or railroad security applicable to the facts of this case, failed to rely on sufficient facts in reaching his conclusions, and improperly drew legal conclusions.  (Mov. Br. at 43–44).  Plaintiffs oppose and

---

[14]        The cases cited by Defendant do not compel a contrary conclusion.  (Mov. Br. at 45–46).  Defendant first cites to *Phinney v. Paulshock*, 181 F.R.D. 185 (D.N.H. 1998), *aff'd sub nom. Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1 (1st Cir. 1999), to support its request for sanctions.  In contrast to the present case, which involved one improper conference during a deposition break, counsel for Defendant in *Phinney*, made a number of speaking objections, engaged in a number of impermissible coaching objections, and coached the witness during the deposition. *See Phinney,*181 F.R.D. at 196.  Likewise, unlike here in *McDonough v. Keniston*, 188 F.R.D. 22 (D.N.H. 1998), the Court imposed sanctions because plaintiff's counsel engaged in witness coaching, speaking objections, and improper instructions.  *McDonough*, 188 F.R.D. at 24.  As such, *Phinney* and *McDonough* are inapposite.

argue that the report and testimony of Dr. Berkowitz are reliable based on his personal experience. (Opp. Br. at 25–26 & 31–35).  For the reasons set forth below, Defendant's request to exclude Dr. Berkowitz's report and testimony is **GRANTED-in-part** and **DENIED-in-part**.

Before turning to the remainder of Defendant's arguments, the Court will briefly assess Dr. Berkowitz's qualifications, which Defendant appears to contest.  (Reply at 12).  According to his expert report, Dr. Berkowitz has extensive experience in the transportation industry, including the government, private, and academic sectors, and holds a Ph.D. in Transportation Planning and Engineering.  (Berkowitz Report at 12).  Dr. Berkowitz has worked as a transportation engineer for over fifty-five years, with involvement in passenger safety and security, including during his time at the New York State Governor's Office of Planning and Coordination and the New York City Department of Transportation.  (*Id.* at 12–13).  He has also worked as System Commissioner Executive Director of the Staten Island Ferry and has been involved with conducting research for the U.S. Department of Transportation and U.S. Department of Homeland Security.  (Berkowitz Report at 13–14; Berkowitz Dep. at 9:11–10:7 & 14:15–18).  Based on the foregoing, the Court finds that Dr. Berkowitz's experience indicate that he has specialized knowledge of security in transportation.  Defendant appears to suggest that Dr. Berkowitz is not qualified because he has never worked as a police officer or operated a train system.  (Def. SUMF ¶¶ 72A[15]–73).  As pointed out above, however, Dr. Berkowitz stated that he has extensive involvement in passenger safety and security and has worked with the U.S. Department for Homeland Security, the U.S. Department of Transportation, and the Staten Island Ferry.  Accordingly, the Court finds that Dr. Berkowitz is sufficiently qualified.  *See, e.g., Lauria*, 145 F.3d at 599.

---

[15]     In its statement of material facts, Defendant designates two paragraph numbers by number 72.  (Def. SUMF at 19).  The Court will refer to paragraph 72, which contains the statement that Dr. Berkowitz has never been a police officer as paragraph 72A.

The Court will now turn to the remainder of Defendant's arguments regarding its motion to exclude Dr. Berkowitz's opinions.  After examining the actions and procedures of NJTRO in the present case, Dr. Berkowitz provided the following opinions: that NJTRO failed to adequately (i) provide the crew of Plaintiffs' train with tools and equipment for self-defense; (ii) abide by Occupational Safety and Health Act ("OSHA") standards, the American Public Transportation Association ("APTA") Manual for the Development of System Safety, and other standards for New Jersey Transit; (iii) comply with FELA and satisfy its duty of care for the safety of its employees and the safety of its passengers;[16] (iv) plan or provide adequate security at the Elizabeth station or on Plaintiffs' train in preparation for the Colombian Day Parade;[17] and (v) respond to Mr. Zappile's initial call for assistance at the Elizabeth station.[18]  (Def. SUMF ¶ 70; Berkowitz Report at 5 & 16–17; Opp. Br. at 11–12 (citing Berkowitz Report at 16–17)).  Dr. Berkowitz also testified as to these opinions during his deposition.  (*See* Berkowitz Dep.).  For the reasons set forth below, the Court finds that Dr. Berkowitz's testimony regarding the above-mentioned three categories is inadmissible.  The remainder of Dr. Berkowitz's challenged testimony will be allowed.

***Inadmissible Testimony.***  The Court finds that Dr. Berkowitz's report and testimony regarding the following is inadmissible: NJTRO's failure to (i) provide the crew of Plaintiffs' train

---

[16]     Dr. Berkowitz identifies eight principal ways that NJTRO failed to act in accordance with accepted police standards and procedures in his report.  (Def. SUMF ¶ 70 & Berkowitz Report at 5 & 17).  For ease of reference, the Court combines the following two opinions here, including that NJTRO failed (i) in its duty of care for the safety of its employees as mandated under FELA; and (ii) in its duty of care for the safety of its passengers.  (*Id.*).

[17]     For ease of reference, the Court combines the following three opinions here, including that NJTRO failed to (i) provide adequate and consistent security and safety enforcement at the Elizabeth station platform; (ii) provide adequate and consistent security and safety enforcement onboard Plaintiffs' train and (iii) properly plan for the security and safety needs of the Colombian Day Parade.  (Berkowitz Report at 5 & 17).

[18]     For ease of reference, the Court combines the following two opinions here, including that NJTRO failed to (i) prevent unruly and dangerous passengers from boarding Plaintiffs' train; (ii) respond in a timely manner to calls for help at the Elizabeth station and onboard Plaintiffs' train.  (Berkowitz Report at 5 & 17).

with tools and equipment for self-defense; (ii) abide by OSHA standards, the APTA Manual, and standards for New Jersey Transit; and (iii) comply with FELA and satisfy its duty of care for the safety of its employees and the safety of its passengers.

*First*, the Court finds that Dr. Berkowitz's report and testimony regarding NJTRO's failure to provide the crew of Plaintiffs' train with tools and equipment for self-defense is not reliable. Plaintiffs argue that the report and testimony of Dr. Berkowitz on this topic is reliable based on his personal knowledge and experience with the Staten Island Ferry which armed its police officers and trained its crew in various forms of self-defense. (Opp. Br. at 25–26 & 33). Defendant contends that Dr. Berkowitz's testimony on this topic should be excluded because no transit authorities arm their employees or give their employees self-defense training. (Reply at 11). As such, Defendant contends that Dr. Berkowitz cannot demonstrate that NJTRO deviated from any relevant standard of care. (*Id.*). The Court agrees with Defendant. During Dr. Berkowitz's deposition he did testify that during his time with the Staten Island Ferry, police personnel on the ferry were trained in self-defense. (Berkowitz Dep. at 109:1–21). Dr. Berkowitz also testified that his ferry crew and deckhands—prior members of the military and navy—were trained in self-defense. (*Id.*). Outside of the Staten Island Ferry police personnel and ferry crew that were prior members of the military and navy, however, Dr. Berkowitz testified that he was not aware if any transit authority trains its employees in self-defense or provides those employees with self-defense equipment such as pepper-spray. (*Id.* at 109:24–110:15). And Dr. Berkowitz was also not aware of any rule or regulation that requires transit authorities to train their employees in self-defense or equip them with self-defense devices. (*Id.* at 110:4–20). Accordingly, while Dr. Berkowitz may have drawn on his experience to explain why police personnel or crew members working on the Staten Island Ferry were trained in self-defense, the Court cannot say that Dr. Berkowitz

adequately explained how his experience led to his conclusion that as a transit authority, NJTRO should have trained its employees in self-defense or supplied them with self-defense equipment. *See* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.  Rather, Dr. Berkowitz's testimony appears to be based on his "subjective belief or unsupported speculation" and is thus unreliable and inadmissible. *Calhoun*, 350 F.3d at 321.

As further support for his position that Defendant should have provided its employees with self-defense training, Dr. Berkowitz cites to the APTA Manual, which outlines basic elements required for employee training, specifically APTA RT-S-OP-013-03.  (Def SUMF ¶ 96A[19]; Berkowitz Report at 6 & 19).  Further, Dr. Berkowitz cites to a Memorandum from OSHA which emphasizes that employees should be trained so that work will be performed in a safe and healthful manner.  (Def SUMF ¶ 82; Berkowitz Report at 78).  These materials, however, do not provide sufficient support for Dr. Berkowitz's opinion that NJTRO should have trained its employees in self-defense.  Regarding the APTA, Dr. Berkowitz stated in his deposition that APTA RT-S-OP-013-03 provides only a general outline of standards regarding employee training and does not specifically provide that employees need to be trained with self-defense tactics.  (Berkowitz Dep. at 120:2–18).  Likewise, the OSHA Memorandum provides only a general outline regarding employee training and does not specifically provide that employees should be trained with self-defense.  (Berkowitz Report at 78).  As such, the Court cannot say that Dr. Berkowitz adequately explained how these sources led to his conclusion that NJTRO should have trained its employees in self-defense or provided them with self-defense equipment and his opinion on these topics is thus excluded.  *See* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.

*Second*, the Court finds that Dr. Berkowitz's opinions in his report regarding NJTRO's

---

[19]   In its statement of material facts, Defendant designates two paragraph numbers by number 96.  (Def. SUMF at 24).  The Court will refer to paragraph 96, which contains facts as to Dr. Berkowitz's report as paragraph 96A.

failure to abide by OSHA standards, the APTA Manual, and standards for New Jersey Transit are inadmissible because they do not satisfy the fit requirement. To start, in his report, Dr. Berkowitz states that Defendant violated the Occupational Safety and Health Act of 1970. (Def SUMF ¶ 82; Berkowitz Report at 5). Dr. Berkowitz references OSHA's general duty clause which provides in part that employers shall furnish to their employees a place of employment free from recognized hazards. (Berkowitz Report at 82). Likewise, Dr. Berkowitz appends a list of OSHA Employer responsibilities which generally provide that employers are responsible for keeping the workplace free from serious hazards. (*Id.* at 80–81). These standards, however, are too vague to assist a jury. The OSHA provisions to which Dr. Berkowitz cites provide only a general outline of policies which employers should follow and does not provide any relevant, specific guidance that would assist a factfinder in determining whether NJTRO was negligent in failing to provide adequate security in connection with the Colombian Day Parade or in responding to Mr. Zappile's dispatch. As such, Dr. Berkowitz's testimony regarding OSHA standards is not "sufficiently tied to the facts of th[is] case [such] that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173. Accordingly, it will be excluded. *See Jason*, 2022 WL 16362456, at *3 (finding that Dr. Berkowitz's reliance on the OSHA general duty clause would not assist a factfinder because it contained only a generalized requirement); *Rodriguez*, 2017 WL 6372733, at *4 (finding that Dr. Berkowitz's reliance on the OSHA general duty clause would not assist a fact finder because it was "inapplicable or, at best, hortatory and vague . . . . It is a conclusion looking for grounds, rather than grounds leading to a conclusion").

Next, the Court reaches a similar conclusion regarding Dr. Berkowitz's opinion that NJTRO failed to abide by the APTA standards. Dr. Berkowitz opines that NJTRO failed to adhere to the APTA standards. (Def SUMF ¶ 96A; Berkowitz Report at 5). These standards, however,

are too vague to assist a jury.  As already discussed, the APTA provision to which Dr. Berkowitz cites provides only a general outline of standards regarding employee training and does not provide any relevant, specific guidance that would assist a factfinder in determining whether NJTRO was negligent in failing to adequately train its employees or provide adequate staffing in connection with the Colombian Day Parade.  (Berkowitz Dep. at 120:2–18).  And the APTA Manual, which Dr. Berkowitz appends to his expert report, outlines only a generalized framework for implementing a safety program for commuter railroads.  (Berkowitz Report at 57 & 70–77).  As such, Dr. Berkowitz's testimony regarding the APTA is not "sufficiently tied to the facts of th[is] case [such] that it will aid the jury."  *Schiff*, 602 F.3d at 173.  Accordingly, it will be excluded. *See Jason*, 2022 WL 16362456, at *3.

Further, for the same reasons stated above with respect to Mr. Coan's opinions, the Court finds that Dr. Berkowitz's reference to standards for New Jersey Transit do not satisfy the fit requirement.  In his report, Dr. Berkowitz provides that NJTRO failed to abide by standards and regulations for New Jersey Transit.  (Def SUMF ¶ 82; Berkowitz Report at 5).  He appends to his report NJTRO's employee safety rules and on-track safety procedures manual, including the Rail Safety Policy.  (Berkowitz Report at 84–90).  New Jersey Transit's Rail Safety Policy provides that NJ Transit will strive to "identify and eliminate foreseeable hazards that can result in accidents and injuries."  (*Id.* at 87).  The manual further emphasizes that the "safe course must be taken," instructs supervisors to provide safety instruction to their employees, and provides that unusual conditions should be reported as quickly as possible to the proper authority.  (*Id.* at 86 & 88–89; Berkowitz Dep. at 64:3–65:16).  While these policies provide a generalized framework for NJ Transit to follow in preventing injuries, they do not provide any specific guidance that would assist a factfinder in determining whether NJTRO was negligent in failing to provide Plaintiffs' train

with adequate security on the day of the Colombian Day Parade or responding to Mr. Zappile's request for assistance. As such, Dr. Berkowitz's testimony regarding these portions of the New Jersey Transit manual and Rail Safety Policy is not "sufficiently tied to the facts of th[is] case [such] that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173. As such, it will be excluded. *See also Jason*, 2022 WL 16362456, at \*3.

*Third*, the Court finds that Dr. Berkowitz's report and testimony regarding NJTRO's failure to comply with FELA and satisfy its duty of care for the safety of its employees and the safety of its passengers is inadmissible because it is an improper legal conclusion. Defendant seeks to preclude Dr. Berkowitz's testimony to the extent that he opines on legal conclusions, such as whether Defendant violated FELA.[20] (Mov. Br. at 43–44). Here, Dr. Berkowitz renders numerous legal opinions in his report. Dr. Berkowitz states that Defendant has failed in its duty of care for the safety of its employees in violation of FELA and has failed in its duty of care for the safety of its passengers. (Berkowitz Report at 5). Further, Dr. Berkowitz opines that NJTRO has a continuing and non-delegable duty to monitor its transit system and provide its employees with a reasonably safe place to work and has a heightened responsibility as a common carrier for the safety of its crews and passengers. (*Id.* at 5 & 18). Because these portions of Dr. Berkowitz's report and testimony, and others like them, risk usurping the Court's primary role in articulating the law to the jury, the Court will exclude them. *See, e.g., Janssen Prod., LP*, 2022 WL 94535, at \*5; *see also Jason*, 2022 WL 16362456, at \*5. Further, in his report, Dr. Berkowitz opines that NJTRO is responsible for negligence by requiring Plaintiffs' train to allow unruly and dangerous passengers onboard. (Berkowitz Report at 5). While Dr. Berkowitz can, based on his personal

---

[20]     Defendant also argues that Dr. Berkowitz's report improperly deals with the ultimate issue. (Mov. Br. at 44). However, Rule 704 "expressly states that [a]n opinion is not objectionable just because it embraces an ultimate issue. The correct question in this context is whether, and to what extent, [the expert's] opinion attempts to introduce improper legal testimony." *Janssen Prod., LP*, 2022 WL 94535, at \*5 (internal quotations omitted).

experience, testify as to how NJTRO should have responded to Mr. Zappile's call for assistance at the Elizabeth station, he cannot testify as to whether Defendant was negligent, as this amounts to an improper legal conclusion. *See Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 394 (S.D.N.Y. 2017) (stating in FELA case that while expert "cannot testify that Metro–North was 'negligent.' [the expert] may permissibly opine on what steps a reasonable employer could have taken to mitigate [] risk factors and whether Metro–North took those steps.")

*Admissible Testimony.*   The Court finds that Dr. Berkowitz's testimony regarding the following topics is admissible: NJTRO's failure to (i) plan or provide adequate security at the Elizabeth station or on Plaintiffs' train in preparation for the Colombian Day Parade; and (ii) respond to Mr. Zappile's initial call for assistance at the Elizabeth station.

*First*, after reviewing Mr. Zappile's deposition testimony, which suggested that things were "getting out of hand" on the Elizabeth station platform, Dr. Berkowitz testified that NJTRO should have dispatched an officer to the station or at least held Plaintiffs' train until an officer could arrive. (Berkowitz Dep. at 24:3–15, 28:8–20, 47:10–22 & 98:14–99:13).  Dr. Berkowitz reached this conclusion based on his professional experience, stating that Mr. Zappile's testimony expressing a concern that someone might get hurt or hit was serious and warranted a timely response, even though crowding on train platforms may happen from time-to-time.  (*Id.* at 23:17–24:15, 47:10–22 & 79:8–11).  He also reached this conclusion based on his personal experience that transit systems will hold trains when they receive a report of crowded conditions for safety purposes.  (*Id.* at 62:9–63:15).  *Second*, when testifying about NJTRO's failure to provide adequate security, Dr. Berkowitz stated that based on his experience, New Jersey Transit is routinely informed about large-scale events likely to draw crowds for safety purposes, and thus should have been able to ensure that there was appropriate security for the Colombian Day Parade.  (*Id.* at 85:11–86:21).

32

For example, Dr. Berkowitz testified that he used to conduct research for Homeland Security, which would report special events that attract any gathering of crowds to the general police population, including New Jersey Transit, because of the threat of a potential terrorist attack. (*Id.*). And Dr. Berkowitz testified that based on his experience, New Jersey Transit could have consulted statewide databases which track large-scale events, to make sure it was adequately equipped for an event such as the Colombian Day Parade because events that attract any gathering of crowds are reported into the system. (*Id.* at 85:11–86:21, 87:2–24 & 95:19–96:18). As further support, Dr. Berkowitz explained that when he oversaw the Staten Island Ferry, he would review ridership data to assess whether certain events required more staffing than others. (*Id.* at 102:9–103:17). Dr. Berkowitz stated that there was no indication that NJTRO reviewed reports from Homeland Security, statewide databases, or historic ridership data in advance of the Colombian Day Parade or assigned any security resources to protect Plaintiffs' train. (*Id.* at 100:10–25 & 102:9–103:23).

The Court finds that Dr. Berkowitz's opinions on these topics are reliable. Dr. Berkowitz reviewed numerous materials when formulating his report, including Plaintiffs' Complaint, Defendant's answer, New Jersey Transit's investigation reports and voluntary statements, reports regarding Plaintiffs' injuries, NJPTD's CAD blotter, and various deposition transcripts. (Berkowitz Report at 26–27). Dr. Berkowitz also drew upon his specialized knowledge and decades of experience in transportation planning and security. Accordingly, his opinions on the above-mentioned topics are sufficiently reliable. *See, e.g., Stokes*, 2018 WL 3361456, at *4.

Further, to the extent that Defendant contests fit, the Court finds that Dr. Berkowitz's opinions on these topics satisfy the fit requirement. Here, among other things, the parties contest whether NJTRO satisfied its duty of care under FELA to provide its employees with a reasonably safe work environment under the circumstances. After evaluating the testimony of Mr. Zappile,

which suggested that things were getting out of hand on the Elizabeth station platform, Dr. Berkowitz testified that NJTRO should have dispatched an officer to the station or at least held Plaintiffs' train until an officer could arrive. (Berkowitz Dep. at 24:3–15, 28:8–20, 47:10–22 & 98:14–99:13). Further, after relying on record evidence that the Colombian Day Parade attracted large crowds (*Id.* at 22:2–23:9) as well as his personal experience, Dr. Berkowitz concluded that NJTRO should have planned to have adequate security in advance of the Colombian Day Parade. (*Id.* at 85:11–86:21). Accordingly, Dr. Berkowitz's opinions fit the issues in this case and will assist the jury in determining whether NJTRO satisfied its duty. *Schiff*, 602 F.3d at 173.

Defendant's arguments do not lead to a contrary conclusion. As to Dr. Berkowitz's opinion that NJTRO failed to plan or provide adequate security at the Elizabeth station or on Plaintiffs' train in preparation for the Colombian Day Parade, Defendant argues that Dr. Berkowitz's report is unreliable because he did not cite to any crime statistics from prior Colombian Day Parades when reaching this conclusion. (Mov. Br. at 43). However, the fact that Dr. Berkowitz does not cite to crime statistics does not render his opinion unreliable for *Daubert* purposes. The availability of corroborative data, or lack thereof, "is a matter of weight and not admissibility; otherwise stated, it is a proper subject for cross-examination of [an expert], but not a bar to the admissibility of his testimony." *Vaghari*, 735 F. Supp. 2d at 204.

In addition, Defendant argues that Dr. Berkowitz's conclusion is not supported by sufficient facts because Dr. Berkowitz did not know the size of the parade or how many officers were dispatched to the parade. (Mov. Br. at 50–51). Further, Dr. Berkowitz testified that he did not know whether NJTRO was specifically notified of the parade in advance from Homeland Security or statewide databases and did not himself review ridership data from prior years in reaching his conclusion that NJTRO should have provided more security in advance of the

Colombian Day Parade.  (Berkowitz Dep. at 87:25–88:5 & 105:23–106:1).  Further, multiple witnesses in this case testified that NJTRO never received any complaints about the Colombian Day Parade prior to July 21, 2013.  (*See e.g.,* Hester Dep. at 36:14–19; D.E. No. 130-13, Ex. J ("Bruce Dep.") to Stockdale Cert. at 23:13–17).  However, in reaching these conclusions, Dr. Berkowitz relied on record evidence that the Colombian Day Parade attracted large crowds as well as the lack of security staffing arrangements made by NJTRO on the day in question.  (Berkowitz Dep. at 100:10–25 & 103:18–23).  For example, Dr. Berkowitz relied on the testimony of Mr. Zappile that the crowd at the Elizabeth station was large.  (*Id.* at 22:2–23:9).  Dr. Berkowitz also appears to have relied on the deposition testimony of Plaintiff Tramontano (Berkowitz Report at 27; Berkowitz Dep. at 75:23–76:3), who testified that the Elizabeth station was the most crowded she had ever seen it and noted that NJTRO was diverting buses because of the parade. (Tramontano Dep. at 34:15–18 & 61:8–19).  Dr. Berkowitz also drew on his personal experience that any gathering of crowds is typically reported to NJTRO.  (Berkowitz Dep. at 85:11–86:21, 87:2–24 & 95:19–96:18).  Defendant also argues that Dr. Berkowitz fails to establish that increased security could have prevented the alleged assaults.  (Mov. Br. at 51).  Yet, Dr. Berkowitz testified that based on his personal experience, police presence serves as a deterrent to violence.  (Berkowitz Dep. at 94:19–95:4).  Accordingly, Dr. Berkowitz's opinions on these matters are supported by sufficient facts and his personal experience to be admissible—Defendant is free to challenge them on these bases during cross-examination.

As to Dr. Berkowitz's conclusion that NJTRO should have responded to Mr. Zappile's initial request for assistance, Defendant again argues that Dr. Berkowitz's conclusion rests on the same factually incorrect premise as Mr. Coan's testimony: that NJTRO had prior notice of unruly passengers at the Elizabeth Station linked to the Colombian Day Parade.  (Mov. Br. at 29 & 38).

Defendant contends that there is no evidence in the record to indicate that NJTRO had prior notice that passengers at the Elizabeth station were unruly or that there was any nexus between the crowded conditions at the Elizabeth station and a potential for violence.  (Reply at 12–13).  However, in reaching this conclusion, Dr. Berkowitz explicitly relied on the testimony of Mr. Zappile who stated that he sent a dispatch regarding the conditions at Elizabeth because the amount of people at the Elizabeth station was "getting out of hand" and he was concerned that someone might get "hurt" or "hit."  (Berkowitz Dep. at 24:3–15 & 75:23–76:3).  Dr. Berkowitz interpreted Mr. Zappile's testimony as showing that the crowd at the Elizabeth station was unruly. (*Id.* at 27:19–22).  Further, Dr. Berkowitz appears to have reviewed Plaintiff Gilmartin's testimony (Berkowitz Report at 27; Berkowitz Dep. at 75:23–76:3) who stated that an extreme amount of people boarded Plaintiffs' train which resulted in disorder and stated that he consistently experienced problems with unruly, drunk, and disorderly crowds coming from the Colombian Day Parade for at least the past five years.  (Gilmartin Dep. at 49:16–22 & 113:10-21).  And Dr. Berkowitz also reviewed the deposition of Plaintiff Tramontano (Berkowitz Dep. at 75:23–76:3), who stated that the passengers boarding Plaintiffs' train were "drunk, loud [and] disorderly." (Tramontano Dep. at 57:25–58:5).  Accordingly, the Court cannot say that there were no facts to support Dr. Berkowitz's conclusion that NJTRO should have responded to the initial call for assistance by Mr. Zappile at the Elizabeth station.  *Andrews*, 2018 WL 4701871, at *9.  To the extent that Defendant disagrees with Dr. Berkowitz's interpretation, the Court finds that Defendant may address those concerns on cross-examination.

Finally, Defendant argues that Dr. Berkowitz's opinion is unreliable because he does not cite to any published standards in policing or railroad transportation.  (Mov. Br. at 29 & 43; *see also* Def. SUMF ¶¶ 89 & 92).  However, Dr. Berkowitz relies on his personal experience when

36

reaching his conclusions that NJTRO should have responded to Mr. Zappile's request for assistance and provided more security in advance of the Colombian Day Parade and explains "how that experience le[d] to the conclusion reached." *See* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. This is sufficient for his testimony to be admissible. *Hausknecht*, 2022 WL 1664362, at *8. Accordingly, Dr. Berkowitz's opinions regarding NJTRO's failure to (i) plan or provide adequate security at the Elizabeth station or on Plaintiffs' train in preparation for the Colombian Day Parade; and (ii) respond to Mr. Zappile's initial call for assistance at the Elizabeth station are admissible and he may testify about them.[21]

### B.   Motion for Summary Judgment

***Local Rule Dispute***. Before turning to Defendant's motion for summary judgment, the Court will first address Plaintiffs' argument that Defendant's motion for summary judgment should be dismissed with prejudice because it does not comply with Local Civil Rule 7.2. (Opp. Br. at 1). The Court denies Plaintiffs' request to dismiss Defendant's motion for summary judgment on this basis. *First*, Plaintiffs contend that Defendant filed its motion untimely because Judge Hammer, ordered Defendant to resubmit its motion by March 11, 2021. (Opp. Br. at 1). However, on March 11, 2021, Judge Hammer ordered that the parties file any motion for summary judgment no later than April 2, 2021. (D.E. No. 129). Defendant filed the instant motion for

---

[21]     In connection with their opposition brief, Plaintiffs submitted an affidavit from Dr. Berkowitz which addresses (i) the methodology he used to reach the conclusions in his report and (ii) the scientific evidence that shows a large crowd of individuals can increase the foreseeability of violent behavior. (D.E. No. 132-21). In reply, Defendant contends that this affidavit amounts to an out-of-time supplemental report that should not be considered. (Reply at 12). Plaintiffs contend that Dr. Berkowitz is qualified to render his opinions even without the studies referenced in his affidavit, based on his observations and experiences. (Opp. Br. at 32–33). Because the Court finds that Dr. Berkowitz's testimony regarding NJTRO's failure to (i) plan or provide adequate security at the Elizabeth station or on Plaintiffs' train in preparation for the Colombian Day Parade; and (ii) respond to Mr. Zappile's initial call for assistance at the Elizabeth station, is reliable based on his personal knowledge and experience, the Court need not consider his affidavit. Further Dr. Berkowitz's affidavit does not address the parts of Dr. Berkowitz's report and testimony that this Court excludes. As such, the Court will not address Dr. Berkowitz's affidavit.

summary judgment on March 29, 2021, well within this time frame.  (D.E. No. 130).  As such, Defendant's motion was timely submitted.

*Second*, Plaintiffs argue that Defendant has failed to abide by Local Civil Rule 7.2(b) because its brief in support of its motion for summary judgment contained neither a table of contents nor a table of authorities.  (Opp. Br. at 2).  *See also* L. Civ. R. 7.2(b).  Litigants are required to comply with Local Civil Rule 7.2(b).  "But the Court also has discretion to overlook such a shortcoming in the interests of judicial efficiency and fairness," and finds it appropriate to do so here.  *Agostino v. Costco Wholesale Corp.*, No. 19-8976, 2019 WL 6080242, at *6 (D.N.J. June 24, 2019), *report and recommendation adopted*, No. 19-8976, 2019 WL 6050746 (D.N.J. Nov. 7, 2019).  Defendant's motion for summary judgment did not contain a table of contents or table of authorities when first submitted, but Defendant corrected these deficiencies by way of its submission on May 13, 2021.  (D.E. No. 134).  Thus, the Court will not dismiss Defendant's motion for summary judgment on this ground.  *See Agostino*, 2019 WL 6080242, at *6.

*Third*, Plaintiffs argue that Defendant has failed to abide by Local Civil Rule 7.2(b) because Defendant's brief in support of its motion for summary judgment exceeds 40 pages.  (Opp. Br. at 2).  *See also* L. Civ. R. 7.2(b).  Defendant contends that there is good cause to consider the brief in its entirety—even though it exceeds 40 pages—because of the extensive scope of the issues it raises.  (Reply at 15).  Courts may disregard or strike overlength briefs.  *Fisher v. Pratt*, No. 19-0273, 2020 WL 773262, at *3, n.7, (D.N.J. Feb. 18, 2020).  Courts, however, are hesitant "in imposing such a sanction, reserving it for only the most egregious violations of the Local Civil Rules."  *Capaldi v. BJ's Wholesale Club, Inc.*, No. 18-10615, 2020 WL 2569965, at *2 (D.N.J. May 21, 2020).  Here, Defendant submitted a brief that was 52 pages—12 pages over the permitted page limit.  However, 27 pages of Defendant's brief constituted its statement of undisputed

material facts.  (*See* Mov. Br. at 1–27).  Pursuant to Local Civil Rule 56.1(a) "[e]ach statement of material facts shall be a separate document (not part of a brief)."  L. Civ. R. 56.1(a).  Defendant failed to submit its statement of material facts as a separate document and instead included it within its brief.  Without its statement of material facts, Defendant's brief is well within the page limit requirement of Local Civil Rule 7.2(b).  While Defendant's submission was not proper, the Court finds that Defendant's overlength brief does not amount to an egregious violation of the Local Civil Rules.  Accordingly, the Court will not dismiss Defendant's motion because its supporting brief amounts to 52 pages, or because the brief improperly contains Defendant's statement of material facts.  *See Cluver v. Borough of Sayreville*, No. 10-3173, 2013 WL 394030, at *6 n.4 (D.N.J. Jan. 30, 2013), *aff'd*, 557 F. App'x 180 (3d Cir. 2014); *Andujar v. Gen. Nutrition Corp.*, No. 14-7696, 2017 WL 2323405, at *1 n. 2 (D.N.J. May 26, 2017).  The Court will now turn to Defendant's motion for summary judgment on Plaintiffs' FELA claims.

*FELA Claims.*  FELA was enacted against the backdrop of "exceptionally hazardous" working conditions for railroad employees that resulted in the "'death or maiming of thousands of workers every year.'"  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting *CONRAIL v. Gottshall*, 512 U.S. 532, 542, (1994)).  The statute aims to "'shif[t] part of the human overhead of doing business from employees to their employers,'" *id.* (quoting *Gottshall*, 512 U.S. at 542), and to "provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer or their fellow employees."  *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561 (1987).  FELA has been described as a "broad remedial statute" that is to be liberally construed to accomplish Congress's objectives in passing it.  *Id.* at 562 (citing *Urie v. Thompson*, 337 U.S. 163, 180 (1949)).  The relevant statutory language of FELA provides:

> Every common carrier by railroad while engaging in [interstate] commerce . . . shall be liable in damages to any person suffering

39

> injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . .

45 U.S.C. § 51.  In the Third Circuit, an employee bringing a cause of action under FELA must establish that (i) the defendant is a common carrier by railroad engaged in interstate commerce, (ii) the plaintiff was employed by the defendant and was assigned to perform duties that furthered that interstate commerce, (iii) the plaintiff's injuries were sustained while employed by the common carrier, and (iv) the plaintiff's injuries resulted from the defendant's negligence.[22] *Felton v. Southeastern Pennsylvania Transp. Auth.*, 952 F.2d 59, 62 (3d Cir. 1991).

FELA is "founded on common-law concepts of negligence and injury."  *Gottshall,* 512 U.S. at 543 (quoting *Urie,* 337 U.S. at 182).  Although the standard for causation is lessened under FELA, to establish a *prima facie* claim a "Plaintiff must prove the elements of a common law negligence action: duty, breach, foreseeability, and causation."  *Infermo v. New Jersey Transit Rail Operations, Inc.*, No. 10-2498, 2012 WL 209359, at *7 (D.N.J. Jan. 24, 2012); *Bruce v. Norfolk S. Ry. Co.*, No. 19-476, 2022 WL 510552, at *3 (W.D. Pa. Jan. 3, 2022), *report and recommendation adopted*, No. 19-0476, 2022 WL 1774046 (W.D. Pa. Feb. 22, 2022).  The employer's duty of care under FELA is to provide its employees with a reasonably safe work environment under the circumstances.  *Atchison Ry. Co.*, 480 U.S. at 558.  "[A] railroad breaches its duty when it knew, or by the exercise of due care, should have known that its operations were inadequate to protect its employees."  *Bruce*, 2022 WL 510552, at *3 (citing *Urie*, 337 U.S. at 182).  Reasonable foreseeability of harm is an essential ingredient of FELA negligence.  *CSX Transp., Inc.*, 564 U.S. at 703.  To establish foreseeability, the employee must show that the

---

[22]     Here the parties' dispute turns on the fourth element—whether Plaintiffs' injuries resulted from the Defendant's negligence.

employer possessed actual or constructive notice of the unsafe condition that caused the injury. *Wisowaty v. Port Auth. Trans-Hudson Corp.*, No. 11-2722, 2013 WL 103385, at *3 (D.N.J. Jan. 8, 2013). FELA does not require the employer railroad's negligence to have been the sole cause of the employee's injury. *Steele v. Consol. Rail Corp.*, No. 96-0079, 2005 WL 8179746, at *6 (W.D. Pa. Dec. 27, 2005). Rather, a railroad will be held liable if its "negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." *Gottshall*, 512 U.S. at 543. This is so even when "the extent of the [injury] or the manner in which it occurred'" was not "'foreseeable.'" *CSX Transp., Inc.*, 564 U.S. at 704.

A FELA plaintiff need only present a minimum amount of evidence in order to defeat a summary judgment motion. *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 268 (3d Cir. 1991) (citing *Pehowic v. Erie Lackawanna R.R.*, 430 F.2d 697 (3d Cir. 1970)). "A trial court is justified in withdrawing . . . issue[s] from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee." *Pehowic*, 430 F.2d at 699–700. Nevertheless, a plaintiff's case cannot survive summary judgment based on speculation or a record completely devoid of probative facts. *Newton v. Norfolk S. Corp.*, No. 05-1465, 2008 WL 55997, at *8 (W.D. Pa. Jan. 3, 2008).

Defendant moves for summary judgment on Plaintiffs' FELA claims. First, Defendant argues that it is entitled to summary judgment because Plaintiffs have failed to show that their injuries were foreseeable. More specifically, Defendant argues that the record unequivocally demonstrates that it did not have notice, either actual or constructive, that the Colombian Day Parade near the Elizabeth train station posed a hazard to the safety of the crew of Plaintiffs' train. (Mov. Br. at 28 & 37–38). Second, Defendant contends that because it did not have actual or constructive notice, it acted reasonably and did not breach its duty of care. In particular, Defendant

41

appears to suggest that it acted reasonably after it was notified of Mr. Zappile's report by dispatching an officer to the Elizabeth station.  (Mov. Br. at 38; Def. SUMF ¶¶ 7 & 55).  Third, Defendant argues that because it did not have actual or constructive notice, Plaintiffs' injuries were not caused by Defendant, but rather by the assailants who erupted into violence without warning on Plaintiffs' train.  (Mov. Br. at 38 & 50).  Accordingly, the Court will address foreseeability, breach, and causation in turn.

i.   **Foreseeability**

Reasonable foreseeability of harm is an essential ingredient of FELA negligence.  *CSX Transp., Inc.*, 564 U.S. at 703.  And foreseeability of harm is generally left to the factfinder's broad discretion under FELA.  *Burns v. Penn Cent. Co.*, 519 F.2d 512, 514 (2d Cir. 1975).  Here, the parties' principal dispute turns on whether Plaintiffs' injuries were foreseeable.  (Mov. Br. at 37; Opp. Br. at 2).  Defendant argues that it should be granted summary judgment because Plaintiffs have failed to show notice, either actual or constructive, that the Colombian Day Parade near the Elizabeth train station posed a hazard to the safety of the crew of Plaintiffs' train.  (Mov. Br. at 28 & 37–38).  Plaintiffs oppose and argue that Defendant had notice—both actual and constructive— that the Colombian Day Parade posed a hazard to the safety of the crew of Plaintiffs' train.  (Opp. Br. at 22).  For the reasons set forth below, the Court finds that Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had actual or constructive notice.

***Actual Notice.***  Defendant argues that the record unequivocally demonstrates that it did not have actual notice that the Colombian Day Parade near the Elizabeth train station posed a hazard to the safety of the crew of Plaintiffs' train.  (Mov. Br. at 28 & 37–38).

"'A defendant has actual notice [of a dangerous condition] if [the defendant] either created the condition or received reports of it such that [the defendant] is actually aware of the existence

42

of the particular condition.'"  *Wagner v. CSX Transp., Inc.*, No. 20- 1314, 2023 WL 34803, at *4

(W.D.N.Y. Jan. 4, 2023) (quoting *DeFilippo v. Nat'l R.R. Passenger Corp.*, 2019 WL 3531761, at

*7 (S.D.N.Y. Aug. 2, 2019)).

Here, Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether

Defendant had actual notice.  Plaintiffs argue that NJTRO had actual notice that the crowd at the

Elizabeth station posed a hazard to Plaintiffs' crew because Mr. Zappile had warned NJTRO that

the situation on the Elizabeth station platform was "getting out of hand" at least eleven minutes

before Plaintiffs' train arrived at the platform.  (Opp. Br. at 21–22).  As support, Plaintiffs point to

the deposition testimony of Mr. Zappile who testified about his dispatch as follows:

> Q. So what is it, when you went by Elizabeth Station before
> [Plaintiffs'] crew, that you observed?
>
> A: A lot of people on the platform, on the yellow line. And that was
> it.
>
> Q: What did you do about that?
>
> A: I called Amtrak CETC-9[23] and let him know that there were a lot
> of people and that the amount of people were getting out of hand
> and they needed to get somebody there. My concern was somebody
> getting hurt, somebody getting hit.

(Zappile Dep. at 18:7–17).  And the NJTPD CAD Blotter, indicates that New Jersey Transit

received the report that there were heavy crowd conditions at Elizabeth.  (D.E. No. 130-8, Ex. E

to Stockdale Cert).  Based on this testimony, Plaintiffs contend that Defendant had notice for

eleven minutes before Plaintiffs' train arrived at the Elizabeth station and for nearly forty minutes

---

[23]     In its statement of material facts, Defendant cites to the deposition testimony of Laura Hester, Deputy Chief of Police for New Jersey Transit who testified that if a train crew needed police assistance, they would have to call NJ Transit dispatch, not the Amtrak dispatch.  (Hester Dep. at 40:18–20).  Nevertheless, Defendant appears to concede that Mr. Zappile "communicated to NJTRO through the Amtrak dispatcher." (Def. SUMF ¶ 5).  Likewise, Defendant cites to the NJTPD CAD Blotter, which indicates that there was a report of heavy crowd conditions at Elizabeth communicated to NJTPD.  (D.E. No. 130-8, Ex. E to Stockdale Cert).

from the time Plaintiffs' train left the Elizabeth station to when Plaintiffs were attacked, that the crowd posed a danger to the crew of Plaintiffs' train.  (Opp. Br. at 21–24).  In fact, after Plaintiffs were assaulted, Mr. Zappile wrote the following on social media: "We called [Amtrak dispatch] when we were at Elizabeth a whole 11 minutes ahead of [plaintiffs' train] to warn them things were getting out of control on the platform.  As you see, they did nothing with the advance warning, absolutely pathetic."  (Zappile Dep. at 29:2–10).  Plaintiffs also point to the deposition testimony of the conductor on the first train, Scott Aitkens, who also testified that the situation on the Elizabeth station platform was "alarming" because of the large number of individuals present on the platform.  (Aitkens Dep. at 15:6–19).  He further testified that the state of the platform was "chaotic" because many of the individuals were visibly intoxicated and were yelling and shoving one another.  (*Id.* at 15:6–19, 31:11–16 & 35:24–36:2).  As such, Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had actual notice.

Defendant's arguments to the contrary are unavailing.  Defendant claims that Mr. Zappile's report only indicated that the platform was getting crowded, not dangerous, and Mr. Zappile was only concerned about somebody getting hit *by a train*, not a passenger, because the platform was crowded and people were "on the yellow line."  (Mov. Br. at 38; Reply at 6).  As such, Defendant contends that while it might have had notice that the Elizabeth station was crowded, it did not have actual notice that the crowd would pose a threat to Plaintiffs.  (Reply at 10).  As support, Defendant cites the deposition testimony of Mr. Coan who testified that there is no way to predict when a crowd will erupt into violence.  (*Id.* (citing Coan Dep. at 22:2–4)).  And Defendant points out that although both of Plaintiffs' experts—Mr. Coan and Dr. Berkowitz—testified that the crowd at the Elizabeth station was unruly and that this information was communicated to NJTRO, Mr. Zappile never classified the crowd as unruly and as such, NJTRO was not on notice of an unruly crowd.

44

(Mov. Br. at 29).  However, whether Mr. Zappile's testimony indicated that he was only concerned about overcrowding, rather than the potential for violence, when he passed by the Elizabeth station is a factual issue better resolved by a jury.  The Court cannot say that this is one of those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of the employee.  *Pehowic*, 430 F.2d at 700.

     ***Constructive Notice.***  Defendant argues that the record unequivocally demonstrates that it did not have constructive notice that the Colombian Day Parade near the Elizabeth train station posed a hazard to the safety of the crew of Plaintiffs' train.  (Mov. Br. at 28 & 37–38).

     "To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit [the defendant] to discover and remedy it."  *Wagner*, 2023 WL 34803, at *4 (quoting *Robinson v. Wal-Mart Stores, Inc.,* 242 F.3d 367 (2d Cir. 2000)).  The "mere [e]xistence of an alleged dangerous condition is not constructive notice of it."  *Wisowaty v. Port Auth. Trans-Hudson Corp.*, No. 11-2722, 2012 WL 5555337, at *3 (D.N.J. Nov. 9, 2012) (quoting *Jensen v. Hilton Newark Airport*, No. 09-1290, 2011 WL 1792374, at *5 (D.N.J. May 10, 2011)).  "Rather, there must be some basis for concluding that the defendant 'should have known' about the defect."  *Wagner*, 2023 WL 34803, at *4.

     Here, Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had constructive notice that the Colombian Day Parade near the Elizabeth train station posed a hazard to Plaintiffs' safety.  Defendant contends that the record is entirely devoid of any evidence showing that it had constructive notice.  (Mov. Br. at 37).  To start, Defendant argues that Plaintiffs have not uncovered a single episode of violence linked to the Colombian Day Parade in the past.  (*Id.*).  Further, Defendant points to the testimony of multiple witnesses who stated that the Colombian Day Parade had never been an issue prior to July 21, 2013.  (*Id.*).  For example,

Lieutenant Mooney, a New Jersey Transit Police Officer, testified that he was never previously notified of overcrowding during the Colombian Day Parade.  (D.E. No. 130-7, Ex. D ("Mooney Dep.") to Stockdale Cert. at 24:4–14).  And Laura Hester, Deputy Chief of Police testified that the Colombian Day Parade was never a problem and if it would have been, the local police department would have notified them of that fact.  (Hester Dep. 36:14–19 & 38:8–23).  Defendant also cites to the deposition testimony of Ed Bruce, who testified that he did not recall any problems maintaining control of the Colombian Day Parade prior to July 2013, as well as Alan Antel, assistant superintendent, who stated that no one reported issues to him regarding the Colombian Day Parade.  (Bruce Dep. at 23:13–17; D.E. No. 130-15, Ex. L. to Stockdale Cert. at 17:23–18:4).  Likewise, Defendant cites the deposition of Fred Mattison, Senior Road Foreman of Engines for New Jersey Transit, who testified that he did not even know of the Colombian Day Parade before the incident in question.  (D.E. No. 130-14, Ex. K to Stockdale Cert. at 31:12–16).

In opposition, Plaintiffs argue that Defendant had constructive notice because the Colombian Day Parade drew huge crowds and passengers coming from the event had been drunk and disorderly for at least the last five years.  (Opp. Br. at 22).  Plaintiffs cite to the deposition of Plaintiff Tramontano who testified that NJTRO was aware of the Colombian Day Parade because it rerouted buses that usually operate near the Elizabeth station because of the parade.  (Tramontano Dep. at 61:14–19).  She further stated that passengers coming from such large events are typically unruly.  (*Id.* at 97:1–8).  Further, Plaintiff Gilmartin testified that for the past five years, New Jersey Transit has had the same problems with the Colombian Day Parade.  He stated:

> Q: Every year when they had this Colombian Day Parade, they had
> the same problems, unruly, drunk, and disorderly crowds?
> . . .
> A: Yes.
>
> Q: And how many years did that go on?

A: All the years I was there.

Q: And which was how many years?

A: Before I went out, it was five years.

(Gilmartin Dep. at 113:13–21). Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had constructive notice that the Colombian Day Parade near the Elizabeth train station posed a hazard to the safety of the crew of Plaintiffs' train.

Defendant's arguments to the contrary are unavailing. Defendant argues that even if parade goers had been rowdy in the past no one ever "notified New Jersey Transit of that condition." (Reply at 2). However, based on Plaintiff Tramontano's testimony that NJTRO was aware of the Colombian Day Parade because it rerouted its buses from Elizabeth and her testimony that passengers coming from large events are typically unruly, as well as Plaintiff Gilmartin's testimony that NJTRO experienced the same problems with unruly, drunk, and disorderly crowds at the Colombian Day Parade for the past five years,[24] the Court cannot say that this is one of those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of the employee. *Pehowic*, 430 F.2d at 700. This evidence is enough under FELA to raise a jury question as to whether the Defendant was on constructive notice, particularly since foreseeability of harm is generally left to the factfinder's broad discretion under FELA. *Hines*, 926 F.2d at 268 (finding that a FELA plaintiff need only

---

[24]     Defendant contends that Plaintiffs' deposition testimony is self-serving. (Reply at 2). However, "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. This remains true even if the affidavit is 'selfserving.'" *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320 (3d Cir. 2014). Here, Plaintiff Gilmartin's and Plaintiff Tramontano's testimony was based on personal knowledge and was directed at a material issue in dispute, namely constructive notice. This is not a case where the Court, based on all the evidence, can say with confidence that a rational trier of fact could not credit Plaintiffs' testimony, particularly since the right of the jury to pass on factual issues in FELA cases is liberally construed. *Burns*, 519 F.2d at 514. As such, the Court finds Defendant's argument unavailing.

present a minimum amount of evidence in order to defeat a summary judgment motion); *Gallick*, 372 U.S. at 108 (finding plaintiff's injury from being bitten by an insect attracted to a stagnant pool of water was foreseeable to the defendant railroad company because it "knew that the accumulation of the pool of water would attract bugs and vermin to the area," even though it could not foresee that a particular type of insect posed a safety risk.); *Burns*, 519 F.2d at 514–15 (finding that plaintiff's case warranted adjudication by a jury on the issue of foreseeability after railroad employee was shot with a rifle while stopping to unload passengers in Harlem "[b]ased on the railroad's actual knowledge of stonings in the vicinity in recent months and its *constructive* (and indubitably actual) knowledge of the *generally dangerous conditions* prevailing in the neighborhood in which the fatality transpired." (emphasis added)).[25]

In further support of its argument that Plaintiffs' injuries were not foreseeable Defendant contends that there is no evidence that shows whether the third parties who assaulted Plaintiffs even attended the Colombian Day Parade or boarded Plaintiffs' train in Elizabeth.  (Reply at 2). The Court disagrees.  *Gallick* is instructive on this point.  In *Gallick*, the Supreme Court held that a plaintiff's injury from being bitten by an insect attracted to a stagnant pool of water was foreseeable to the defendant railroad company even though there was no evidence that the insect that stung the employee was hatched from the stagnant pool or was attracted there by it.  *Gallick*, 372 U.S. at 113, 118–19.  The plaintiff in *Gallick* was not required to demonstrate that the agent of harm issued from the dangerous condition on the railroad's property.  *See, e.g., Syverson v.*

---

[25]     Defendant's cited case-law does not compel a contrary conclusion.  Defendant cites to *Green v. River Terminal Ry. Co.*, 763 F.2d 805, 809 (6th Cir. 1985), where the Court found that an assault by a fellow employee was not foreseeable because there was no evidence indicating that the fellow employee posed a problem, and *Brooks v. Washington Terminal Co.*, 593 F.2d 1285, 1289 (D.C. Cir. 1979), where the Court found that an assault by a fellow employee was not foreseeable because there was no evidence indicating that the employee had a propensity for violence.  (Mov. Br. at 35–36).  In contrast, here, Plaintiff Gilmartin testified that NJTRO experienced the same problems with unruly, drunk, and disorderly crowds at the Colombian Day Parade for the past five years.  (Gilmartin Dep. at 113:13–21).  As such, these cases are inapposite.

*Consol. Rail Corp.*, 19 F.3d 824, 827 (2d Cir. 1994) (citing *Gallick*, 372 U.S. at 118–19). Defendant can fare no better by arguing that the assailants may not have come from the Colombian Day Parade.  *See id.* at 827 (finding that where railroad employee was attacked near an area that had been "a magnet for vagrants," Defendant's argument that the trespasser did not come from that area was unavailing.).  Accordingly, Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had actual or constructive notice that the Colombian Day Parade posed a hazard to the safety of the crew of Plaintiffs' train.

### ii.   Breach

As noted above, Defendant contends that because it did not have actual or constructive notice, it acted reasonably under the circumstances and did not breach its duty of care.  (Mov. Br. at 50–51).  Further, Defendant appears to suggest that it did not breach its duty of care and acted reasonably after it was notified of Mr. Zappile's report by dispatching an officer to the Elizabeth station.  (Mov. Br. at 38; Def. SUMF ¶¶ 7 & 55).

The employer's duty of care under FELA is to provide its employees with a reasonably safe work environment under the circumstances. *Atchison Ry. Co.*, 480 U.S. at 558.  "[A] railroad breaches its duty when it knew, or by the exercise of due care, should have known that its operations were inadequate to protect its employees." *Bruce*, 2022 WL 510552, at *3 (citing *Urie*, 337 U.S. at 182).  Defendant appears to suggest that it acted reasonably after it was notified of Mr. Zappile's report by dispatching an officer to the Elizabeth station.  (Mov. Br. at 38; Def SUMF ¶ 7).  In opposition, Plaintiffs argue that Defendant took no action to adequately protect its employees.  (Opp. Br. at 6).  The Court finds that Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant breached its duty of care.  Defendant cites the NJTPD CAD blotter, which states that Officer Giovannone responded to Mr. Zappile's call for assistance

and the deposition testimony of Lieutenant Mooney who stated that Officer Giovannone was sent to Elizabeth, to show that it acted reasonably under the circumstances.  (D.E. No. 130-8, Ex. E to Stockdale Cert.; Mooney Dep. at 69:14–18).  Plaintiffs, however, point out that in his deposition, Officer Giovannone testified that he was never called to report to the Elizabeth station. (Giovannone Dep. at 62:9–20).  Further, as discussed above, Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had actual notice or constructive notice that the Colombian Day Parade posed a hazard to Plaintiffs' safety.  And Plaintiffs introduced the testimony of their experts Mr. Coan and Dr. Berkowitz who stated that Defendant acted unreasonably despite this notice, by failing to ensure there would be adequate security in advance of the Colombian Day Parade.  (Coan Report at 5–6; Berkowitz Report at 5).  As such, there are genuine disputes of material fact as to whether Defendant satisfied its duty of care.

      **iii.    Causation**

As noted above, Defendant argues that because it did not have actual or constructive notice, Plaintiffs' injuries were not caused by Defendant, but rather by the assailants who erupted into violence without warning on Plaintiffs' train.  (Mov. Br. at 38 & 50).

With respect to causation, a railroad will be held liable if its "negligence played any part, even the slightest, in producing the injury . . . for which damages are sought."  *Gottshall*, 512 U.S. at 543.  To the extent that Defendant argues that there is no evidence to support causation (Mov. Br. at 38 & 50), the Court disagrees.  As an initial matter, as already discussed above, Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant had actual or constructive notice that the Colombian Day Parade posed a hazard to the safety of the crew of Plaintiffs' train.  And Plaintiffs point to the opinions of their experts, Mr. Coan and Dr. Berkowitz who both testified that NJTRO acted unreasonably despite this notice by failing to respond to Mr.

Zappile's request for assistance or provide adequate security in advance of the Colombian Day Parade. (Coan Report at 5–6; Berkowitz Report at 5). And both experts testified that based on their personal experience, police presence serves as a deterrent to violence. (Coan Dep. at 86:12–21; Berkowitz Dep. at 94:19–25). Further, as stated above, there is a dispute of fact as to whether NJTRO dispatched security in response to Mr. Zappile's call for assistance. (D.E. No. 130-8, Ex. E to Stockdale Cert. & Giovannone Dep. at 62:9–20). While Defendant points out that Plaintiffs' injuries were caused by those who assaulted them (Mov. Br. at 50), under FELA a railroad will be held liable if its "negligence played any part, even the slightest, in producing the injury." *Gottshall*, 512 U.S. at 543. The Court cannot say that this is one of those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of the employee. *Pehowic*, 430 F.2d at 700. Rather, the Court finds that Plaintiffs have set forth sufficient facts to create a genuine dispute as to whether Defendant's negligence played any part in producing Plaintiffs' injuries.

In sum, because Plaintiffs have set forth sufficient facts that create a genuine dispute as to whether (i) Defendant had actual or constructive notice that the Colombian Day Parade near the Elizabeth train station posed a hazard to the safety of the crew of Plaintiffs' train; (ii) Defendant acted reasonably and satisfied its duty of care, and (iii) played any part in producing Plaintiffs' injuries, Defendant's motion for summary judgment on Plaintiffs' FELA claims is **DENIED**.

## V.      CONCLUSION

For the reasons stated above, Defendant's motion to exclude is **GRANTED-in-part** and **DENIED-in-part**, and Defendant's motion for summary judgment is **DENIED.** An appropriate Order accompanies this Opinion.

Dated: May 4, 2023                                           *s/ Esther Salas*
                                                                          **Esther Salas, U.S.D.J.**